UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA
BATON ROUGE DIVISION

SHARON LEWIS                                    Civil Action No:
Plaintiff

V.

BOARD OF SUPERVISORS OF LOUISIANA
STATE UNIVERSITY,
ATHLETIC COMMITTEE OF THE BOARD OF
SUPERVISORS LOUISIANA STATE UNIVERSITY,
GARRETT " HANK" DANOS,
 ROBERT "BOBBY" YARBOROUGH,
STANLEY JACOBS,
JAMES WILLIAMS,
MARY LEACH WERNER,
F. KING ALEXANDER,
WILLIAM JENKINS,
TAYLOR PORTER BROOKS & PHILLIPS LLP,
SHELBY MCKENZIE,
VICKI CROCHET,
ROBERT "BOB" BARTON,
LESLIE EDWIN "LES" MILES,
JOE ALLEVA,
SCOTT WOODWARD,
VERGE AUSBERRY,
MIRIAM SEGAR
JOHN DOE (1-10) AND
JANE DOE (10-20)
Defendants

## **COMPLAINT AND JURY DEMAND**

Plaintiff, SHARON LEWIS, through her attorneys, files this Complaint against

Defendants, **BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY,**

**ATHLETIC COMMITTEE OF THE BOARD OF SUPERVISORS LOUISIANA STATE**

**UNIVERSITY, GARRETT " HANK" DANOS, ROBERT "BOBBY" YARBOROUGH,**

**STANLEY JACOBS, JAMES WILLIAMS, MARY LEACH WERNER, F. KING**

**ALEXANDER, WILLIAM JENKINS, TAYLOR PORTER BROOKS & PHILLIPS LLP, SHELBY MCKENZIE, VICKI CROCHET, BOB BARTON, LESLIE EDWIN "LES" MILES, JOE ALLEVA, SCOTT WOODWARD, VERGE AUSBERRY, MIRIAN SEGAR and JOHN DOE DEFENDANTS AND JANE DOE DEFENDANTS** for cause of action and claims and would respectfully show the following:

## PARTIES AND JURISDICTION

1. Plaintiff, SHARON LEWIS, is an African-American woman and citizen of the United States and a resident of Louisiana and is an employee of Louisiana State University who has played a vital role in LSU Football Recruiting since 2002 and all times relevant to this cause of action.

   Made Defendants Are:

2. Defendant, Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (the "Board," "Defendant Board" or "LSU"), is a public constitution corporation organized and existing under the laws of the State of Louisiana to operate, manage, and control the LSU public university system, including its campus in Baton Rouge, with its principal place of business located at 3810 West Lakeshore Drive, Baton Rouge, Louisiana 70808. LSU is a recipient of federal funds within the meaning of 20 U.S.C. §1681(Title IX).

3. Athletic Committee is a Committee of the Board of Supervisors of Louisiana State University and manages all matters of policy concerning intercollegiate athletics of the Louisiana State University System.

4. Defendant, Garrett " Hank" Danos, a resident of Louisiana of full age of majority who served as Chairman of the Board on May 15, 2013.

5. Defendant, Robert " Bobby" Yarborough, a resident of Louisiana of the full age of majority who served as Chairman Elect of the Board on May 15, 2013.

6.  Defendant, Stanley Jacobs, a resident of Louisiana and is of the full age of majority who served as the Chairman of the Board's – Athletic Committee on May 15, 2013.

7.  Defendant, James Williams, a resident of Louisiana and is of the full age of majority who was Chairman of the Board in April 2019 and currently serves as a Board Member and member of the Athletic Committee.

8.  Defendant, Mary Leach Werner, is a resident of Louisiana and of the full age of majority who is a was Chairman of the Board in April 2019 and a currently serves member of the Board in April.

9.  Defendant, F. King Alexander, is of the full age of majority and served as President of the LSU System from July 1, 2013 through December 31, 2019.

10. Defendant, William Jenkins, is of the full age of majority and served as Interim System President and Chancellor at LSU from 2012 to 2013.

11. Defendant, Taylor, Porter, Brooks & Phillips, L.L.P.  ("Taylor Porter," "LSU law firm,"  LSU Attorneys," "LSU  Outside Legal Counsel"),  is a Limited Liability Partnership duly authorized to do business in the State of Louisiana and with offices at 450 Laurel Street, 8th Floor, Baton Rouge, Louisiana is a Law Firm that represents the Board of Supervisors of Louisiana State University and the LSU Athletic Department.

12. Defendant, W. Shelby McKenzie, is a resident of Louisiana of the full age of majority and is a partner at Taylor Porter and served as LSU Lead Legal Counsel in May 2013.

13. Defendant, Vicki Crochet, is resident of Louisiana and of the full age of majority and is a partner at Taylor  Porter.

14. Defendant, Robert "Bob" Barton, is a resident of Louisiana of the full age of majority and the Managing Partner at Taylor Porter.

15. Defendant, Leslie Edwin "Les" Miles, is of the full age of majority and was employed at LSU as

Head Football Coach from 2005 to 2016.

16. Defendant, Joe Alleva, of the full age of majority and was Vice Chancellor and Director of Athletics at LSU from 2008 to through 2019.

17. Defendant, Scott Woodward, is a resident of Louisiana and of the full age of majority and currently serves as Athletic Director of LSU.

18. Defendant, Verge Ausberry, is a resident of Louisiana and of the full age of majority and currently serves Executive Deputy AD/Executive Director of External Relations at LSU.

19. Defendant, Miriam Segar, is a resident of Louisiana and of full age of majority and currently serves as Senior Associate Athletic Director at LSU.

20. John Does (1-10) and Jane Does (11-20)

## JURISCTION AND VENUE

21. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because this litigation involves claims arising under Title IX of the Education Amendments of 1972, 20 U.S.C § 1681, 18 U.S. § 1962 (c) and (d).

22. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events and omissions giving rise to this case and the damages sustained by Plaintiff occurred in East Baton Rouge Parish, Louisiana, which is part of the United States District Court for the Middle District of Louisiana.

## OPERATIVE FACTS

23. Plaintiff, SHARON LEWIS, has played a vital role in LSU Football Recruiting since 2002.Ms. Lewis is a 1991 graduate of LSU who was a student worker in the Athletic Department and an All-SEC heptathlete and high jumper for LSU's national championship women's track and field team.   Ms. Lewis earned a Master's Degree from Southern University in Baton Rouge,

4

Louisiana.

24. Ms. Lewis began her career in athletics with Career Sports International, where she coordinated recruiting efforts and implemented personal development plans for professional athlete clients. Ms. Lewis also spent four years as the sponsorship coordinator and assistant to the executive director for the Alamo Bowl in San Antonio.

25. Ms. Lewis was hired as the Assistant Athletic Director for Football Recruiting and Alumni Relations in 2002 under Nick Saban. Sharon Lewis has recruited the top football players in the nation to play football at the highest level in college football for nearly 20 years.

26. Ms. Lewis remained the Assistant Athletic Director for Football Recruiting and Alumni Relations for nearly 20 years.

27. Ms. Lewis was given a new title as Associate Athletics Director for Football Recruiting and Alumni Relations in August 2020.

28. Ms. Lewis' recruitment program has been consistently ranked in the top five (5) in the SEC and top five (5) nationally, except in 2013 and 2018.

29. Ms. Lewis oversees all of LSU's Football on-campus recruiting activities and manages the recruiting staff. Due to the success of the football recruiting program under Ms. Lewis' leadership, LSU won 2003 National Champions (Nick Saban); 2007 National Championship (Les Miles); 2007 SEC Champions (Les Miles); 2011 SEC Championship (Les Miles); 2011 National Championship Game (Les Miles); 2019 SEC Championship (Ed Orgeron) and 2020 National Championship (Ed Orgeron).

30. In addition to her recruiting duties, Ms. Lewis is responsible for maintaining positive relationships with LSU football alumni. An LSU alumna herself, she is also the President of the

National L Club Board of Directors, serving former letter winners from all of LSU's sports.

31. Ms. Lewis' duties include the hiring and firing of recruitment student workers. Ms. Lewis modified the expectations for the student workers to require that student workers wear suits, dress more professionally and develop administrative skills.

32. Her role with the football department is to direct all official and unofficial recruiting visits with duties including management of recruitment interns. Ms. Lewis also oversees all special events associated with recruiting, such as pregame and postgame events, dinners, banquets and social outings for official visits. Additionally, she manages student workers to help with the day-to-day recruiting tasks and planned activities.

## FACTUAL BASIS FOR CLAIMS
### (General Facts Underlying Claims of  A Continuing Pattern of : Retaliation, Hostile Work Environment, Failure To Promote, Gender Discrimination and Civil RICO)

33. Sometime in 2009 plaintiff became concerned that LSU Head Coach Les Miles (Miles) had an inappropriate fixation on female student workers and plaintiff reported her concerns to Verge Ausberry who asked plaintiff to give him details in which she did.

34. A month later Miles hired Shelly, who was  white,  blonde and female to lead LSU Football recruitment and stated to plaintiff  "now that's the face of recruitment."

35. Miles then told plaintiff to fire Shelly because he did not like the fact she wore sweat suits to work, but plaintiff refused to comply with his demand.

36. Sometime in 2009 Miles told plaintiff there were too many Black girls employed in Athletics and told plaintiff to fire them and plaintiff again refused to comply.

37. On November 21, 2010 Miles stated in a staff meeting with the coaches and athletic department staff that he had ugly girls here and stated, when he was at Oklahoma State, he took over

interviewing student female workers and hired them himself.

38. Plaintiff felt embarrassed and isolated and immediately reported what was said in the meeting to her superior, Verge Ausberry.

39. Verge Ausberry took no action against Miles for those and other statements.

40. Miles stated to plaintiff, the student female workers she hired look like a "bad bowling team" and that became a joke among the coaching staff and throughout the athletic department building, including the cleaning staff.

41. Sometime in 2010 Miles also started labeling the female student workers as "AM and PM" girls and stated to plaintiff that "there are two types of girls he likes to hire: AM girls are the worker bee types. They are for filing, typing and in office work. The PM girls are the pretty girl, one that people like to look at and they need to use for recruiting events."

42. Sometime in 2010, Miles directed plaintiff to hire "blondes with the big boobs."

43. Plaintiff reported these comments to Verge Ausberry and she was told "she was making too big of a deal about the comments that Coach Miles was making about the girls," "you need to just worry about doing your job" and "I hired prettier girls."

44. Frank Wilson, Running Back Coach, met with others present and directed them to tell plaintiff to hire prettier girls, more light skinned black girls" and that would stop Miles from bullying plaintiff.

45. Plaintiff complained to Bo Bahnsen, Sr. Associate Athletics Director, about Miles sexiest and racist comments, but was told maybe it was time for plaintiff to look for another job.

46. After LSU lost the 2012 National Championship game, Miles' fixation on student workers grew and he complained to plaintiff that the student female workers were too fat, too ugly, too black

and  demanded plaintiff hire "blonde girls" with "big boobs."

47. The student workers that plaintiff hired were evenly split between African-American and Caucasian but Miles only communicated with the Caucasian student workers.

48. Plaintiff reported Miles' conduct to her superiors and no action was taken.

49. Sometime in 2012,  Miles  told an Athletic official to inform plaintiff that he would take over the hiring of female student workers and the interviews would take place in his office at night and requested that plaintiff set up the interviews.

50. In a meeting with Sam Nadar and Haleh Samadnouri, plaintiff told them that Miles interviewing Student female workers at night in his office was inappropriate, but was subsequently instructed by Verge Ausberry to set up the night interviews between Miles and student female workers.

51. Miles interviewed the female students at night in his office and went to sorority houses to recruit female student workers.

52. Miles interviewed about 15 to 20 female LSU students.

53. Several of the young women interviewed by Miles reported to plaintiff that Miles asked them about their sex life.

54. One student interviewed by Miles stated that he asked her if she were a virgin.

55. Plaintiff  reported Miles' conduct to Verge Ausberry, Sam Nader, Miriam Segar and was told by Verge Ausberry "if you don't like it here, leave."

56. Plaintiff noticed that her superiors became hesitant to meet with her and Verge Ausberry told her several times that plaintiff needed to go find another job and told plaintiff that she "should have taken a job at Alabama."

**PLAINTIFF REPORTS TITLE IX VIOLATION**

57. The Office of Civil Rights ("OCR"), a division of the United States Department of Education ("DOE"), is responsible for the implementation, interpretation, and enforcement of Title IX.

58. The DOE was authorized by Congress, pursuant to 20 U.S.C.A. § 1682, to promulgate regulations to govern the implementation, interpretation and enforcement of Title IX.

59. On April 4, 2011, OCR in the DOE issued a Dear Colleague Letter on sexual harassment and sexual violence ("DCL").

60. The DCL is a "significant guidance document," intended to provide educational institutions with clarity as to the requirements they must follow in order to be in compliance with the DOE. Pursuant to 72 Fed. Reg. 3432, a "guidance document" is "an agency statement of general applicability and future effect, other than a regulatory action…that sets forth a policy on a statutory, regulatory, or technical issue or an interpretation of a statutory or regulatory issue." A "significant guidance document" is "a guidance document disseminated to regulated entities or the general public that may reasonably be anticipated to… (iv) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in Executive Order 12866, as further amended."

61. A failure to adhere to the requirements outlined in the DCL could result in the loss of federal funding for an educational institution.

62. The DCL also outlines OCR recommendations regarding complainant safety. The DCL states, "Title IX requires a school take steps to protect the complainant as necessary, including taking interim steps before the final outcome of the investigation. The school should take these steps promptly once it has notice of a sexual harassment or violence allegation." The DCL continues, "When taking steps to separate the complainant and alleged perpetrator, a school should minimize the burden on the complainant, and thus should not, as a matter of course, remove

complainants from classes or housing while allowing alleged perpetrators to remain."

63. The DCL specifically addresses retaliation, stating, "Schools should be aware that complaints of sexual harassment or violence may be followed by retaliation by the alleged perpetrator or his or her associates. For instance, friends of the alleged  perpetrator may subject the complainant to name-calling and taunting. As part of their Title IX obligations, schools must have policies and procedures in place to protect against retaliatory harassment."

## **PLAINTIFF PROTECTED ACTIVITY**

64. Sometime in 2013, a  female  student worker (Student 1) came to plaintiff traumatized and very upset about something that happened when she was alone with Miles.

65. Student 1 stated that Miles got on top of her in his office.

66. Student 1 requested plaintiff's assistance in confronting Miles and plaintiff accompanied Student 1 to Miles' office where Student 1 stated to Miles, "you know what you did to me" and Miles repeatedly apologized to Student 1.

67. Plaintiff  immediately reported Student 1's allegations to Miriam Segar.

68. Student 1 met with Miriam Segar, but LSU took no action.

69. There is no record of the Student 1 complaint about Miles  being investigated in a manner consistent with the then-University policy. *See Husch Blackwell Report attached as Exhibit 1.*

70. In February 2013, a second female student worker (Student 2) reported to plaintiff she had received contact via social media and text messages from Miles.

71. Plaintiff  immediately reported the Student 2 complaint about Miles to Miriam Segar and provided Segar with text messages from Miles to the Student 2.

72. LSU System Interim President and Chancellor William Jenkins requested Taylor Porter

investigate the complaint of female student workers against Miles.

73. There are no LSU Title IX policy provisions that allow for the outsourcing of its federally mandated duties to third parties.

74. Outsourcing the investigation to Taylor Porter was a violation of LSU Title IX Policy and Title IX regulations.

75. *LSU Title IX And Sexual Misconduct Policy* states that "Any investigation or complaints involving student athletes or Athletic Personnel shall be handled and/or investigated by the LSU Title IX Coordinator.

76. As part of the investigation plaintiff was instructed to meet at Taylor Porter offices in downtown Baton Rouge where she met with Vicki Crochet and when she asked what happens next, Vicki Crochet told her that it was legal because the student workers were of the "consenting age" and the reported conduct was "not illegal, maybe immoral."

77. On May 15, 2015 Taylor Porter issued a written report that concluded that Miles had not violated LSU Sexual Harassment Policy nor his contract.  *See Taylor Porter "Hand Delivered" Report attached as* **Exhibit 2**.

## CONTINUING PATTERN
## of  Title IX  Retaliation and Hostile Work Environment

78. Once Miles was cleared of any wrongdoing by LSU, Miles  began to immediately retaliate against plaintiff for reporting Student 1 and Student 2 complaints.

79. Plaintiff asked Miles why she was not included in the raises that the coaching and athletic department staff received. She was told her pay increase was dependent upon how the girls looked.

80. The athletic department restructured Plaintiff's position so Miles controlled her pay and determined her raise.

81. Plaintiff complained about the restructuring to Verge Ausberry and was told she should look for another job.

82. Plaintiff was eating lunch with a colleague and Miles walked in and stated to plaintiff, "who hired these ugly girls."

83. In a meeting with Miles in her office, he demanded that plaintiff fire a male student worker because he looked gay.

84. Plaintiff reported this incident to her superiors and no action was taken.

85. Sometime in 2013 plaintiff received a phone call from a student worker who was upset because Miles had told her to leave the building because she was ugly.

86. Miles retaliation against plaintiff became so bad that she would hide under her desk when she would hear him coming to avoid him.

87. The retaliation from Les Miles became so severe that plaintiff would sometime hide under her desk when Miles enter the building.

88. When plaintiff complained to Senior Athletic officials, she was told "just leave."

89. Because plaintiff complained to her supervisors about Miles' conduct, she was left out of recruiting meetings.

90. Because plaintiff complained to her supervisors about Miles' conduct, she was left off emails that pertained to recruiting from the administration.

91. Plaintiff asked to attend a NCCA meeting on compliance and was denied.

92. The senior leadership of the athletic department sent plaintiff admonishment letters for recruiting

12

violations that she did not commit, was not present for, nor was aware of.

93. Plaintiff was denied the same athletic gear as coaches and athletic department staff, even though she was told she would receive this when she was promoted in 2007.

94. In January 2019 plaintiff contacted Greg Stringfellow because she did not receive her athletic shoes post bowl game and he sent her a size 12 male shoe in which she reported to Verge Ausberry and he laughed.

95. Verge Ausberry retaliated against plaintiff for continuingly bringing Title IX violations to his attention.

96. Verge Ausberry would routinely scream and belittle plaintiff in front of her student workers and co-workers.

97. In a speaker phone discussion with staff, including plaintiff, Verge Ausberry called plaintiff a "stupid incompetent bitch."

98. Plaintiff went to Miriam Segar to ask for help and asked her to go to Joe Alleva to have him stop the harassment by Verge Ausberry but plaintiff was later informed by a co-worker that when Segar met with Joe Alleva and Verge Ausberry, they laughed and made of a joke about Ausberry calling her a "stupid incompetent bitch."

99. Plaintiff continually went to Miriam Segar for help and was told to stop being emotional and defensive.

100.     Whenever plaintiff would ask to meet with Joe Alleva, Verge Ausberry would show up in his place.

101.     Plaintiff applied for and was approved to attend a personal development conference only to have Joe Alleva withdraw the approval and told Verge Ausberry "why would I send her."

13

102.     Joe Alleva refused to send plaintiff to a NFL meeting as a representative of LSU and
when she asked to meet with him, he included Verge Ausberry and Miriam Segar where they
verbally berated her.

103.     In the meeting, Verge Ausberry told plaintiff you only have relationships with the white
players, which Ausberry knew was not true.

104.     In the meeting, Miriam Segar told plaintiff you only have your position because of Nick
Saban.

105.     Plaintiff's coworkers expressed their concern over Verge Ausberry's treatment of
plaintiff, but they took no actions.

106.     Sometime in 2014 plaintiff was hospitalized after a surgical procedure; Bo Bahnsen
called plaintiff at the hospital, screaming at her to write up a coach for something she did not
observe, was not present and was not aware of.

107.     Bo Bahnsen required Ms. Lewis to submit the report the next day although she was still
hospitalized and would still be hospitalized the next day.

108.     Sometime in March 2021 in a staff meeting, plaintiff asked to serve on a committee that
was drafting policies on managing Title IX complaints and was told it would not be appropriate
for her to be on that committee.

109.     Sometime in March 2021 in a staff meeting discussing Husch Blackwell Report it was
stated, in plaintiff's presence, that the Athletic Department needed to have a Title IX policy for
"Tattletales."

110.     As a result of being subjected to a continuing pattern of retaliation and hostile work
environment plaintiff suffered a mental breakdown and was hospitalized and LSU paid for

plaintiff's medical bills.

111.     Plaintiff continues to seek mental health support to cope with the continued retaliation and harassment she is subjected to for bringing Title IX violations to the attention of her supervisors.

## ADVERSE EMPLOYMENT ACTION

112.     As a result of her filing Title IX complaint against Miles and other Senior Athletic Officials, LSU has repeatedly refused to promote plaintiff from 2013 to present.

113.     In November of 2020 plaintiff went to Verge Ausberry to complain why she was repeatedly being denied a promotion and Verge Ausberry told plaintiff she was not being promoted  because " you use the word Title IX too much and people are afraid of you.

114.     In December 2020, plaintiff  again went to Verge Ausberry and asked why she was not being promoted and Ausberry replied "You will never be promoted because you file Title IX complaints. You even filed one against me."

115.     In the November 2020 and December 2020 meeting with Verge Ausberry plaintiff was told you can complain to Scott Woodward but "he is my boy."

116.     Since his employment as Athletic Director Scott Woodward has never met with plaintiff even though she is on the Senior Staff.

117.     Plaintiff has repeatedly made requests to meet with Scott Woodward and she has been refused.

118.     Scott  Woodward has refused to meet with plaintiff because of her continually bringing Title IX complaints in the Athletic Department.

119.     In 2020 Plaintiff was promoted to Associate Athletic Director of Football Recruiting

and Alumni Relations, but received no increase in pay even though her responsibilities were increased.

120.     From 2013 to present, plaintiff has received significantly lower compensation than her similarly situated male co-workers, despite the fact that she has played a significant role in LSU's Football success.

121.     Plaintiff's salary is $117,000; her immediate supervisor Verge Ausberry's salary is $500,000.

122.     Plaintiff has been discriminated against in pay for her continually bringing Title IX violations to Senior Athletic officials attention.

123.     From 2013 to present plaintiff was denied access to resources and support of administrative staff because she has repeatedly complained of Title IX violations in the Athletic Department.

124.     From 2013 to present plaintiff was subjected to repeated disciplinary actions because of her repeated complaints of Title IX violations in the Athletic Department.

125.     On October 1, 2018 LSU opened a PM-73 (Title IX) investigation against plaintiff for failure to report a Title IX complaint and was subsequently found to have violated LSU Title IX and Sexual Misconduct Policy.

126.     Despite the fact since 2009 plaintiff has repeatedly reported Title IX violations and LSU took no action, plaintiff is the only person in the entire University who has ever been disciplined in any form for failing to make a report under PM-73 (Title IX). *See Exhibit 1*

127.     Plaintiff appealed Jeffrey Scott's decision to Human Resources and was told that the decision would be reversed but plaintiff has never received any written confirmation and the PM-

73 (Title IX) violation wrongfully remains in her personnel file.

**CIVIL RICO**

128.    That the allegations of fact in paragraph 1 through 127, inclusive, are re-plead and reasserted herein as though set forth *in extenso*.

129.    Plaintiff herein asserts her right to a private cause of action under 18 U.S. Section 1962 (c ) and  (d).

130.    Garrett "Hank" Danos,  Robert "Bobby" Yarborough, Stanley Jacobs, James Williams, Mary Leach Werner, Joe Alleva, Scott Woodward, Miriam Segar, Verge Ausberry, Shelby McKenzie, Vicki Crochet, Bob Barton  (herein after referred to as the "Enterprise") entered into a conspiracy to shield the LSU Athletic Program from Title IX oversight, cover up Title IX investigations and sexual harassment complaints  against  LSU Athletic Officials and student football players,  by violating 18 U.S. Code Section 1961(1) bribery; Section 1341 mail fraud; section 1343 wire fraud; section 1503 obstruction of justice, in violation of 18 U.S. Section 1962 (c ) and  (d).

131.    LSU Board of Supervisors and Taylor Porter  (herein referred to as the "University") entered into a conspiracy to shield LSU's Athletic Program from Title IX oversight, cover up Title IX investigations and sexual harassment complaints against its LSU coaches and student football players by violating 18 U.S. Code Section 1961(1) bribery; Section 1341 mail fraud; section 1343 wire fraud; section 1503 obstruction of justice, in violation of 18 U.S. Section 1962 (c ) and (d ).

132.    Plaintiff became aware of the Enterprise and University racketeering with the publishing of the *Husch Blackwell Report* and shortly thereafter the publishing of the Taylor Porter written investigation of Les Miles in March 2021 by *USA Today*.

**PATTERN OF CONDUCT**

133.    At all times The Enterprise was acting with full knowledge and support of the University.

134.    The  Enterprise began May 2013 and continues to April 2021 with the full support and knowledge of the University.

135.    The Enterprise since May 15, 2013   to April 2021 has managed the day to day operations of the LSU Athletic Department including the hiring and firing of personnel and Title IX investigations.

136.    The Enterprise directed the LSU Athletic Department to ignore Title IX protocols for reporting of complaints of Sexual Harassment in the Athletic Department.

137.    Since May 2013 to April 2021 there have been numerous Title IX   and sexual harassment investigations of coaches, athletic officials and student football players and the Enterprise has directed that the reports of those investigations be hidden or destroyed in order to shield them from  public document requests and federal oversight. *See* Exhibit 1

138.    The Enterprise and University have engaged in a pattern of racketeering to maintain a competitive advantage for the LSU football team among its Power Five Rivals and to avoid NCAA sanctions.

139.    The Enterprise and University have engaged in a pattern of racketeering by hiding Title IX violations to avoid the loss of federal dollars in violation of federal law.

140.    The Enterprise and University used email, text messages, phone calls and U.S. Mail to further the objectives of its racketeering activities.

141.    In 2012 and 2013 two student workers complained to plaintiff that Les Miles had

sexually harassed them and she reported complaints to her superiors.

142.    Miriam Segar, Joe Alleva contacted Taylor Porter about the students complaints.

143.    Chancellor William Jenkins retained Taylor Porter to investigate the student complaints.

144.    Outsourcing the investigation to Taylor Porter was a violation of Title IX Policy.

145.    *LSU Title IX And Sexual Misconduct Policy* states that "Any investigation or complaints involving student athletes or Athletic Personnel shall be handled and/or investigated by the LSU Title IX Coordinator.

146.    Selecting Taylor Porter to investigate sexual harassment complaints of students was a violation of Title IX protocols.

147.    The selection of Taylor Porter created a conflict of interest as Shelby McKenzie was a partner at Taylor Porter while serving as General Counsel to LSU and the adversarial position of the complainant students and/or employees.

148.    Taylor Porter never sought nor was it given a waiver of conflict by LSU  per the *Louisiana Rules of Professional Conduct*.

149.    Taylor Porter Attorneys Bob Barton and Vicki Crochet coordinated the investigation of Les Miles with Miriam Segar. *See* Exhibit 2

150.    Taylor Porter and LSU investigation found that:

   a.  "Student 1" was employed in Football Operations

   b.  Student 1 reported that she had a phone call and other reactions with Les Miles that made her uncomfortable.

   c.  Les Miles had Student 1 baby sit for him which is a violation of LSU policy.

   d.  Student 1 reported that on one occasion when she was babysitting Les Miles children, he ended up staying with the children instead  and asked to join them when they went to a movie.

e.  Student 1 reported that she stayed at Les Miles' apartment when she had some problems with her apartment.

f.  Student 1 reported that a window was broken in Les Miles' apartment and Les Miles made her uncomfortable when he asked her to accompany him to check on the window repair.

g.  "Student 2" was hired to work in recruiting and a couple of days afterwards she began to receive Facebook messages Les Miles.

h.  In March 2013 Student 2 had a meeting with Les Miles in his office regarding her future plans and no one else was in the office.

i.  Les Miles told Student 2 that she could work for him on his personal business when she graduated.

j.  Les Miles told Student 2 to enter her phone number but to use an alias and he would do the same with her number.

k.  Les Miles initiated text messages with Student 2.

l.  Student 2 met Les Miles off campus; got in his vehicle; and the two of them rode around.

m.  Les Miles suggested they go to a hotel together and mentioned his condo as another meeting place.

n.  Les Miles drove Student 2 behind the Athletic Complex, parked the car, engaged in a sex act and kissed her twice.

o.  In 2012 Les Miles participated in interviewing female student employees

p.  Les Miles made it clear he wanted female students workers to be attractive and blond.

q.  Les Miles told senior athletic supervisors female students who were not attractive and blond were to be given fewer hours or terminate them.

151.    Student 1 stated to plaintiff and another athletic department staff member, that Miles got on top of her in his office on his couch.

152.    On April 19, 2013 Joe Alleva sent William Jenkins an email recommending that Les Miles be terminated for cause.

153.    Taylor Porter determined there was not cause to discipline or terminate Les Miles contract.

154.     On May 15, 2013 Garrett "Hank" Danos (Chairman of the Board of Supervisors) Robert "Bobby Yarborough (Board Chairman Elect), Stanley Jacobs (Chairman of the Board – Athletic Committee), Shelby McKenzie (LSU Legal Counsel and Partner at Taylor Porter), Joe Alleva (Vice-Chancellor and Director of Athletics), Miriam Segar (Senior Associate A.D./Senior Woman Administrator), Vicki Crochet ( Partner at Taylor Porter) and Bob Barton (Managing Partner Taylor Porter) met to discuss the Taylor Porter investigation of Les Miles i.e the "Enterprise". *See* **Exhibit 2**

155.     After multiple in person meetings, emails, text messages and phone calls the Enterprise agreed to not take any action against Miles and not to inform the full Board of Supervisors of their actions.

156.     The University knew and consented to the actions that the Enterprise had agreed upon to cover up the sexual harassment investigation of Miles.

157.     The Enterprise agreed  to hide the written report in Taylor Porter offices off campus at its downtown Baton Rouge Offices.

158.     Taylor Porter is not the designated Custodian of Public Records for LSU per *La. R.S. 44.1 et al.*

159.     Taylor Porter has never been designated the Custodian of Public Records for LSU per *La. R.S. 44.1 et al.*

160.     LSU's website directs all Public Documents Request are to be made directly to the LSU Chancellor by mail at 3810 W. Lakeshore Dr. Baton Rouge, LA 70808 or to click on an email link to a LSU offical.

161.     The Enterprise agreed that any written directives given to Miles about his conduct be

exchanged between Taylor Porter and Miles lawyers in order to shield the documents from public documents request and not report a Title IX investigation to Federal Officials. *See* Exhibit 1

162.    The Enterprise directed that Miles' name appear as 'XXX' in the Taylor Porter investigation in order to hide his identity.

163.    The Enterprise blacked out parts of the report that states Miles engaged in explicit sex acts with Student 2.

164.    The Enterprise, in July 2013, participated in settlement negotiations between Miles and a LSU student.

165.    The Enterprise conducted a fraudulent investigation of the sexual harrasment complaints against Les Miles.

166.    The University agreed to pay Taylor Porter eighty ($80,000.00) thousand dollars for the fraudulent investigation of Les Miles. *See Exhibit 3 Taylor Porter Billing Records.*

167.    Taylor Porter billing records show that there were multiple emails, phone calls and meetings between members of the Enterprise in order to further the fradulent investigation and conspiracy.

168.    Attorney Stanley Jacobs, in a March 9, 2021, *Sports Illustrated Article "Former LSU Board Member Goes Inside Decision to Keep Les Miles"* stated that the Enterprise met "multiple times" in face-to-face meetings  and had "countless phone calls" to discuss the matter and deliberate on Miles' future and that "Attorneys along with Jenkins demanded that he and other board members keep the ordeal secret."

169.    *USA Today,* sometime in 2021, sued LSU in order to get a copy of the Taylor Porter

investigation of Miles.

170.	The University official policy is to refuse to honor public documents request of Title IX investigations in furtherance of the racketeering conspiracy.

171.	*USA Today.* in October of 2020, sued LSU to access four (4) reports of Title IX investigations.

172.	The Enterprise continues to maintain control of the day to day operations of the LSU Athletic Department to present.

173.	In April 2019 James Williams, then Chairman of the Board of Supervisors, Board Member Mary Leach Werner and two other unnamed Board Members, operating on behalf of the Enterprise, met with Chancellor F. King Alexander in Juban's, a restaurant in Baton Rouge and directed him to fire Athletic Director Joe Alleva and hire Scott Woodward.

174.	At the April 2019 meeting James Williams wrote on a napkin the amount of Scott Woodward's salary and handed it to Alexander and told him this is what Woodward was to be paid.

175.	At the April 2019 meeting James Williams, Mary Leach Werner and the other Board Members told Alexander to promote Verge Ausberry and increase his salary from $250,000 to $500,000 annually.

176.	F. King Alexander followed the Enterprise instructions and terminated Joe Alleva and hired Scott Woodward at the salary that the Enterprise had instructed.

177.	F. King Alexander followed the Enterprise instructions and doubled Verge Ausberry salary from $250,000 to $500,000 to maintain his loyalty and support of the ongoing racketeering and conspiracy.

178.     The Enterprise  hired Scott Woodward as Athletic Director to further their conspiracy
of racketeering to cover up Title IX Investigations and sexual harassment complaints against
Athletic Officials and student Football players.

179.     The Enterprise doubled  Verge Ausberry's overnight to maintain his  loyalty and support
of the on the ongoing racketeering conspiracy.

**Sharon Lewis  Professional Reputation Damaged**

180.     Since 2009 to present Sharon Lewis is the only person in the Athletic Department that
has reported Title IX violations and sexual harassment complaints. *See* Exhibit 1

181.     Plaintiff reporting of Title IX violations was a direct threat to the millions of dollars
generated by the LSU Football program and a risk to federal funding for violating Title IX.

182.     The  Enterprise and University directed Scott Woodward not to meet with plaintiff and
since his employment he has not done so.

183.     The Enterprise  and University directed Scott Woodward not to promote plaintiff.

184.     The   Enterprise and University directed Scott Woodward not to give plaintiff a pay
raise.

185.     On October 1, 2018 LSU opened a PM-73 investigation against plaintiff for failure to
report a Title IX complaint.

186.     Plaintiff was notified by email and U.S. mail of the investigation.

187.     Miriam Segar and Verge Ausberry were the only two "material observers" interviewed.

188.     In furtherance of the conspiracy of racketeering Miriam Segar and Verge  Ausberry
gave false testimony against plaintiff.

189.     Verge Ausberry and Miriam Segar, in March 2021, were suspended by LSU for their

24

mishandling of sexual harassment complaints.

190.    Jeffrey Scott, Title IX Lead Investigator, found that plaintiff had violated LSU Title IX and Sexual Misconduct Policy.

191.    Jeffrey Scott was acting in concert with the Enterprise and University to damage plaintiff's professional reputation.

192.    Plaintiff appealed Jeffrey Scott's decision to Human Resources and was told that the decision would be reversed, but plaintiff has never received any written confirmation and the PM-73 (Title IX) violation remains in her personnel file.

193.    Plaintiff, on December 11, 2020, requested a copy of the full PM-73 (Title IX) investigation of Sharon Lewis by email  and LSU by email responded that it would produce the documents but has failed to do so.

194.    The fraudulent PM-73 (Title IX) investigation has been reported in state and national media.

195.    The University has never issued a statement to local and national media that the findings of Jeffrey Scott was overturned.

196.    The fraudulent PM-73 (Title IX) investigation was done to damage plaintiff's professional reputation and to force her out of the Athletic Department.

197.    Plaintiff has been one of the most successful on-campus recruiters in the country and the Enterprise and University in furtherance of their racketeering scheme has rendered her unemployable.

198.    No University will hire a Senior Athletic official with a PM-73 (Title (IX) violation in her personnel record and who's name associated with a national scandal caused by the conduct

of the Enterprise and University.

199.    Plaintiff has directly suffered loss of salary, loss of promotion and loss of employment opportunities as a result of the Enterprise and University efforts to further its racketeering activities.

## CAUSATION

Plaintiff plead that all of her discriminatory injures and damages were caused by the Defendant's intentional violations of various Federal Statutes which are pled herein above or alternatively by negligence and gross negligence of the executives, agents, and managers of the defendants and University.

## PLAINTIFF PLEA FOR DAMAGES AND REMEDIES

A.  Plaintiff seeks past and future lost wages and benefits;

B.  Plaintiff seeks damages for emotional pain and distress and mental anguish;

C.  Plaintiff seeks damages for humiliation and suffering of discrimination;

D.  Plaintiff seeks damages for loss of enjoyment of life and inconvenience;

E.  Plaintiff seeks damages for loss of earning potential;

F.  Plaintiff seeks damages to her physical health and mental health;

G.  Plaintiff seeks punitive  and treble damages under 20 U.S.C. §1681(Title IX) and 18 U.S. Section 1962 (c) and (d). and any and applicable state laws;

H.  Plaintiff seeks reasonable attorney fees and cost of suit pursuant to 20 U.S.C. §1681(Title IX) and  18 U.S. Section1962 (c) and  (d) and applicable state laws;

I.  Plaintiff seeks damages of injury to their reputation, character, economic opportunities and defamation;

J.  Plaintiff seeks injunctive relief to stop the violation of law and to require defendants to provide a workplace free of discrimination and to make the Plaintiff whole in her job, duties and opportunities for advancement.

## JURY DEMAND

Plaintiff demands trial by jury.

## PRAYER FOR RELIEF

Plaintiff Sharon Lewis, respectfully prays for judgment against Defendants, individually, jointly and severally, for an amount of no less than FIFTY MILLION ($50,000,000) DOLLARS, together with legal interest, reasonable attorneys' fees and costs against LSU and all named Defendants, pursuant to 20 U.S.C. §1681(Title IX) and  18 U.S. Section 1962 (c ) and  (d). and for all general and equitable relief as the Court may deem just and proper under the circumstances.

Respectfully submitted

Larry English, LSB No. 22772
English & Associates
423 W. 127 Street, 7th Floor
New York, New York 10027
917-531-3909
englishlaw2008@gmail.com

Tammye C. Brown  29108
Campbell Brown Law
1220 E. Northside Drive, Suite 170-176
Jackson, Mississippi 39211
601-703-8911
601-703-8999 (fax)
tbrown@campbellbrownlaw.com
LEAD ATTORNEY

Bridgett Brown, LSB No. 18815
Brown & Associates
418 DeSoto Street
Alexandria, Louisiana 71301
lawyer4u.bridgett@gmail.com

Attorneys For Plaintiff