Exhibit 2



ROBERT W. BARTON
*Managing Partner*

(225) 381-0215  TELEPHONE
(225) 215-8702  DIRECT FAX
(225) 346-8049  FACSIMILE
bob.barton@taylorporter.com

SINCE 1912
March 4, 2021

**VIA EMAIL ONLY:**

Peter Ginsberg
c/o pginsberg@mrllp.com

Scott Sternberg
c/o scott@snw.law

Re:   Jacoby v. Galligan, Docket No. C-703746, Division "N", 19th Judicial District Court
      Parish of East Baton Rouge, State of Louisiana

Dear Peter and Scott:

Attached please find the documents reviewed in camera by Judge Moore.  We have taken the handwritten redactions performed by the Court and made certain through computer redaction that the redacted portions are not readable.  I am copying Ms. Hultberg so that the Court has a copy of what I have produced to you.  She can confirm that it is identical to the redactions ordered by Judge Moore.

I will prepare a Judgment of Dismissal for our review and submission later this week or early next week.  In the meantime, if you either of you has any questions or concerns regarding this matter, please do not hesitate to contact me.

Thank you both for your professionalism in handling and resolving this matter.

Sincerely,

TAYLOR, PORTER, BROOKS & PHILLIPS, L.L.P.

Robert W. Barton

RWB/srb
Attachment
cc via email:   Judge Richard Moore (s.hultberg@19thjdc.org)
                Graham Williams (graham@snw.law)

TAYLOR, PORTER, BROOKS & PHILLIPS L.L.P.        **BATON ROUGE**        LAKE CHARLES

www.taylorporter.com        450 Laurel Street, Suite 800    Post Office Box 2471      225.387.3221  PHONE
                            Baton Rouge, Louisiana 70801    Baton Rouge, LA 70821     225.346.8049  FAX



**MEMORANDUM**

| | |
|---|---|
| **DATE:** | May 15, 2013 |
| **CLIENT/ MATTER NO:** | 0905/05005 |
| **TO:** | File |
| **FROM:** | Vicki M. Crochet |
| **RE:** | Student Complaint - Athletic Department |

The attached legal opinion and proposed policies and procedures were hand delivered and discussed in a meeting on May 15, 2013. Those reviewing the attachments were: Garret "Hank" Danos (Chair of the Board of Supervisors), Robert "Bobby" Yarborough (Board Chairman Elect), Stanley Jacobs (Chairman of the Board - Athletic Committee), Shelby McKenzie (LSU Lead Legal Counsel), Joe Alleva (Vice Chancellor and Director of Athletics), and Miriam Segar (Senior Associate A.D./Senior Woman Administrator). Also present at the meeting and participating in the discussion were Vicki Crochet and Bob Barton of Taylor Porter.

Following a comprehensive discussion of the attachments, all copies of the attachments were returned to Taylor Porter to maintain in its file. The handwritten notation on the opinion reflects a clarification discussed at the meeting.

After review and discussion of the investigation, those present agreed to and accepted the findings and recommendations of counsel, with the recognition that any further investigation or remedial action was likely to endanger the student's confidentiality which repeatedly has been requested by the student and her father since the initial report. Also, those present agreed that this was appropriate administrative action that could and should be taken without further review by the full Board.

VMC:mm

641062.1

May 15, 2013

<div style="border:1px solid black; display:inline-block;">**HAND DELIVERED**</div>

Re:     Student Complaint

Near the end of February 2013, a student employee in the Athletic Department reported recent interactions with XXX that made her uncomfortable enough to quit her part-time position. As a result of what this student (referred to in this letter as Student No. 2) reported to her supervisors, officials in the Athletic Department's administration were contacted and they subsequently interviewed the student.    After some initial fact-finding, Miriam Segar, Senior Associate AD/Senior Woman Administrator and Joe Alleva, Vice Chancellor and Director of Athletics, contacted our office about the student's report.    Shortly thereafter, the Chancellor asked Taylor Porter to investigate the situation with the assistance of Ms. Segar.

Subsequently, Bob Barton, Miriam Segar and Vicki Crochet coordinated the investigation of the student's report.    We interviewed Student No. 2.    We also interviewed a former student employee (referred to in this correspondence as Student No. 1) who had reported concerns about her interactions with XXX in the summer of 2012; and other employees and students in the Athletic Department who might have knowledge of the situation involving both students and XXX.

<u>**Investigation:**</u>

Student No. 2 ▮▮▮▮▮▮▮▮ was hired ▮▮▮▮▮▮▮▮▮▮ to work in recruiting after being interviewed by XXX and others. Her supervisor was Sharon Lewis. Student No. 2 reported that shortly after she started work, she began to receive Facebook messages from XXX. ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In March 2013, Student No. 2 had a discussion with XXX in his office regarding her future plans. No one else was present in the office. She indicated that she was interested in sports marketing and claims that XXX indicated that she may be able to work for him on his personal business when she graduated.    Student No. 2 contends that XXX told her to enter her number in his personal phone but to use an alias and that he would do the same with her number. After this meeting, XXX and Student No. 2 began texting each other and making plans to meet again. The texts were initiated by XXX at the outset and then by both subsequently.

Ultimately, Student No. 2 met XXX off campus; got into his vehicle; and the two of them rode around talking. Student No. 2 contends that XXX suggested that they go to a hotel together and mentioned his condo as another meeting place. He also complimented her on her appearance and said he was attracted to her. Student No. 2 says that XXX drove his vehicle behind the Athletic Complex, parked the car, ▮▮▮▮▮▮▮▮▮▮▮ and kissed her twice.

639111.1

May 15, 2013
Page 2

XXX agrees that he did Facebook message and text Student No. 2. He contends that this was an outgrowth of her interest in sports marketing and that nothing inappropriate was discussed. XXX strongly believes that it is part of his role to mentor students (not only student athletes). He says that the purpose of his meeting with Student No. 2 was to talk with her more about her career aspirations and to tell her about a sports agent he had seen on a recent trip. He indicates that he met Student No. 2 off campus and took her for a drive because he had expected her to meet with him earlier at his office and when she did not arrive at the Athletic Building he left work. The student then contacted him about meeting and rather than return to the Athletic Building he suggested that they meet and go for a ride. XXX denies suggesting meeting at a motel or the condo and strongly denies ███████████████ or kissing her. He contends that they discussed her career, his recent trip and says that she asked him about his interests and marriage.

When we met with Student No. 2, she was accompanied by her father ████████████████ ████████ █ ████████ █ ████████. Both Student No. 2 and her father have strongly emphasized the importance of her identify remaining confidential. We have continued to have contact with both Student No. 2 and her father.

During the course of our investigation we obtained the following additional information:

1.  Numerous Athletic Department employees indicate that following the National Championship game XXX became more "hands on" about many things in the Athletic Department, including the student employees. In 2012 he participated in recruiting and interviewing female student employees. According to the employees who supervise the student employees, XXX made it clear that he wanted these employees to have a certain "look" (attractive, blond, fit). He also made their supervisors feel that existing student employees who did not meet this criteria should be given fewer hours or terminated.

2.  Prior to Student No. 2's complaint, LSU had become aware of a concern expressed by another student employee (Student No. 1). Student No. 1 was also employed in Football Operations. Student No. 1 reported that she had a phone call and other interactions with XXX that made her uncomfortable. This arose in the context of Student No. 1 babysitting XXX's children (this was contrary to directions given to student employees; they are advised at hire that they could not be both a student employee and a babysitter for any coach). Student No. 1 was concerned because on an occasion when she was supposed to babysit the children and XXX ended up staying with the children instead, he asked her to join them when they went to a movie. LSU also became aware that Student No. 1 had stayed in XXX's condo when there had been some problem with her apartment (this was at the suggestion of XXX's wife). A window was broken during her stay and XXX made the student uncomfortable when he asked her to accompany him to check on the window's repair.

As a result of the concerns expressed by Student No. 1, Mr. Alleva met with XXX and told him that he was no longer to have any one-on-one meetings or interactions with student employees (XXX agrees he was told this) and that he should not text or call them (XXX denies this). Additionally, department-wide training which included every

May 15, 2013
Page 3

Athletic Department employee (and specifically XXX) was also conducted on various subjects, including sexual harassment.

3.  We have learned that XXX has texted at least one other former student employee using his personal cell phone (Mr. Alleva, Ms. Segar and XXX's administrative assistant do not have this phone number). The student was not uncomfortable but thought that it was unusual. Troubling is the fact that other department employees told her not to respond to the texts as a way of addressing the situation. They implied that others had similar experiences.

4.  In addition to Student No. 1, Student No. 2 and XXX, we have interviewed the full-time employee supervisors of the student employees as well as other female full-time students in the department. We have also interviewed a former student employee who was reported to have received texts from XXX. We have not interviewed every student employee working with Student No. 2. The reason for this is twofold: (1) we do not have any indication that any other student employee has had a similar experience; and (2) we are concerned about the ability to maintain Student No. 2's confidentiality if we did this.

In our conversations with Student No. 2's father and in a separate meeting he had with XXX's counsel (this meeting took place as a result of XXX lawyer's request and we made it clear to the father that the university was not asking her to meet with XXX's lawyer),

XXX has retained two attorneys to represent him in connection with this situation. His local counsel is Ed Hardin, a labor and employment lawyer practicing at the Kean Miller law firm. He has also retained Peter Ginsberg from New York, New York. We have met several times with Mr. Hardin and Mr. Ginsberg to discuss the claims made by Student No. 2 and to explore ways to address the concerns raised by Student No. 2, as well as LSU's concerns.

**Legal Standards:**

LSU has two policies prohibiting sexual harassment. PS-73 applies to employees and PS-95 applies to students. Because Student No. 2 falls into both categories (student and employee) the complaint has been investigated under the auspices of both policies with Taylor Porter assuming the role usually undertaken by the Human Resources Department. LSU's Associate Vice Chancellor, Human Resources has been notified of the complaint and we have confirmed that he is aware of no other similar complaint regarding XXX.

LSU policies define sexual harassment in accordance with applicable law. The policies prohibit both "hostile environment" harassment and "quid pro quo" harassment.

May 15, 2013
Page 4



May 15, 2013
Page 5



May 15, 2013
Page 6



It is important to note that at the time of her complaints and during this investigation, Student No. 1 could not articulate exactly what had occurred which she found troubling or inappropriate. After learning of Student No. 2's alleged experiences, Student No. 1 told Student No. 2 that she had been "cornered" and touched by XXX but she denied this when we interviewed her. Student No. 1's demeanor and inconsistent, vague statements are such that she does not appear to be a reliable source of information.

Student No. 2 and her father feel strongly that LSU had notice that XXX has engaged in problematic behavior in the past as a result of what they believe to be the experiences of Student No. 1. ███████████████████████████████████████████

It is important to note that following the reports from Student No. 1 steps were taken to address her concerns (unclear though they were). XXX was instructed to have no one-on-one contact with students and not to call, message or text student employees. He was also told that student employees could not babysit for him. Additionally, XXX was told that he could no longer be involved in hiring students.

Student No. 2 claims that she was subjected to an unwanted touching. ████████████████ ██████████████████████████

Both Student No. 1 and Student No. 2, as well as Student No. 2's father, have strongly emphasized their desire to have their concerns addressed, while at the same time maintaining their confidentiality. Student No. 2 is particularly concerned that her identity not be known

May 15, 2013
Page 7

We are unable to determine what occurred in the car between XXX and Student No. 2.

However, there can be little doubt that the conduct, if true, is inappropriate and unacceptable. Even accepting XXX's version of events, it appears that he has shown poor judgment in placing himself (and the student employee) in a situation in which the student employee might be uncomfortable and/or he can be subject to such complaint.

XXX, of course, has an Employment Agreement, dated July 1, 2006, which was most recently amended on January 1, 2013. Under the Employment Agreement, XXX can be disciplined in only very limited circumstances.

Of the for cause provisions in the Employment Agreement, only the general "catch all" provisions would arguably apply to this situation. In general, these provisions require XXX to comport himself at all times "in accordance with the high moral, ethical and academic standards" of the University and not participate in any "serious misconduct which brings XXX into public disrepute sufficient to impair XXX's ability to continue in his position without adverse impact on the University's football program or reputation."

Section 13.D provides that the University may suspend XXX without remuneration for up to 90 days for any one or more of the acts or omissions representing grounds for termination for cause.

Under Section 13.A.ii of the Employment Agreement, XXX is entitled to liquidated damages if he is terminated by the University without cause. Those liquidated damages are not owed if the termination is determined to be for cause.

We do not believe under existing law and the terms of the contract there is cause to discipline and/or terminate the contract. Further complicating the situation is the fact that Student No. 2 is adamant that her identity remain confidential and she would likely be an unwilling witness if contested issues arose related to LSU's relationship with XXX.

**Recommendations:**

We do recommend that remedial steps be taken to address some of the problematic behaviors which have occurred. This includes a written directive to XXX prohibiting him from having one-on-one direct contact with student employees; requiring him to use his LSU-issued cell phone for any communication with employees; prohibiting social media messaging, texting and phone calls to student employees, and instructing him that he is not to be involved in hiring student employees. We also recommend that XXX be required to attend counseling to help him understand how to establish appropriate boundaries with students and student employees. XXX should also authorize the counselor to confirm to LSU that he is participating in the counseling.

May 15, 2013
Page 8

Similarly, written guidelines should be established for student employees and their supervisors so that they are aware that these rules apply to their employment in the Athletic Department.

These recommendations are consistent with what Student No. 2 and her family have indicated they believe is appropriate. ████████████████████████████████████████

XXX's lawyers are very reluctant to have any written directive or other document generated regarding the resolution of this complaint. However, because past attempts to sensitize XXX to the consequences of his behavior have been unsuccessful, we recommend that there be such a written directive. At the same time, we are acutely sensitive to the confidentiality concerns of XXX, Students Nos. 1 and 2, and the University (as well as anyone else involved in the investigation). Though in the face of a public records request we believe LSU could successfully take the position that such a document is protected from production by the privacy rights of the individuals involved, there is no guarantee that such a document might not have to be produced either as a result of a public records request or other legal proceeding. In order to attempt to minimize the possibility of this, we suggest that the written directive to XXX (as described above) be sent by our law firm to the law firm representing XXX. Each law firm would maintain copies of the document in its files. The directive to XXX's lawyer will reference the Department wide and Football Operations specific policies and LSU's expectation that XXX comply with them. It will also reference the counseling commitment.

Sincerely,

Dear Head Coaches:

On October 30, 2012, the NCAA Division I Board of Directors adopted legislation that changes the landscape of addressing NCAA bylaw violations. Notably, NCAA Division I Bylaw 11.1.2.1 now provides that an institution's head coach is presumed to be responsible for the actions of all assistant coaches and administrators who report, directly or indirectly, to the head coach. A head coach shall promote an atmosphere of compliance within his or her program and shall monitor the activities of all assistant coaches and administrators involved with the program who report, directly or indirectly, to the head coach. Therefore, pursuant to Bylaw 11.1.2.1, a head coach is presumed responsible for major/Level I and Level II violations (e.g., academic fraud, recruiting inducements, etc.) occurring within his or her program unless the head coach can show that he or she promoted an atmosphere of compliance and monitored his or her staff appropriately and sufficiently.

In response to the new NCAA compliance issues concerning Bylaw 11, which becomes fully effective on August 1, 2013, please direct your immediate attention to the enclosed Head Coaches Statement which you are required to review and sign as part and parcel of your employment duties as a head coach for Louisiana State University. Execution of the statement is mandatory for all LSU head coaches. The terms and conditions set forth in the Head Coaches Statement are mandatory and non-negotiable. Once you have had a chance to review and sign the enclosed Head Coaches Statement   contact the President, Athletics Director, and Compliance Office to begin implementing the communication and monitoring policies set forth therein.

Please note that the ultimate determination of whether a head coach has exercised proper control over his her program rests with the NCAA Committee on Infractions, and a failure to promote an atmosphere of compliance and/or failure to monitor determination will consider the unique facts and circumstances of each case. As you are already aware, you are obligated to cooperate fully with representatives of the NCAA, the Department of Athletics, and University counsel in reference to any investigation.

Should you have any questions regarding the enclosed Head Coaches Statement or the terms and conditions set forth therein, please contact me immediately.

Sincerely,


Joe Alleva

**LOUISIANA STATE UNIVERSITY**
**HEAD COACHES STATEMENT**

**NCAA Bylaw 10.1 Unethical Conduct.**

Unethical conduct by a prospective or enrolled student-athlete or a current or former institutional staff member (e.g., coach, professor, tutor, teaching assistant, student manager, student trainer) may include, but is not limited to, the following:

(a) Refusal to furnish information relevant to an investigation of a possible violation of an NCAA regulation when requested to do so by the NCAA or the individual's institution;

(b) Knowing involvement in arranging for fraudulent academic credit or false transcripts for a prospective or an enrolled student-athlete;

(c) Knowing involvement in offering or providing a prospective or an enrolled student-athlete an improper inducement or extra benefit or improper financial aid;

(d) Knowingly furnishing or knowingly influencing others to furnish the NCAA or the individual's institution false or misleading information concerning an individual's involvement in or knowledge of matters relevant to a possible violation of an NCAA regulation;

(e) Receipt of benefits by an institutional staff member for facilitating or arranging a meeting between a student-athlete and an agent, financial advisor or a representative of an agent or advisor (e.g., "runner");

(f) Knowing involvement in providing a banned substance or impermissible supplement to student-athletes, or knowingly providing medications to student-athletes contrary to medical licensure, commonly accepted standards of care in sports medicine practice, or state and federal law. This provision shall not apply to banned substances for which the student-athlete has received a medical exception per Bylaw 31.2.3.5; however, the substance must be provided in accordance with medical licensure, commonly accepted standards of care and state or federal law;

(g) Failure to provide complete and accurate information to the NCAA, the NCAA Eligibility Center or an institution's admissions office regarding an individual's academic record (e.g., schools attended, completion of coursework, grades and test scores);

(h) Fraudulence or misconduct in connection with entrance or placement examinations;

(i) Engaging in any athletics competition under an assumed name or with intent to otherwise deceive; or

(j) Failure to provide complete and accurate information to the NCAA, the NCAA Eligibility Center or the institution's athletics department regarding an individual's amateur status."(Revised: 1/16/10)

**11.1.2.1 - Responsibility of Head Coach.**

An institution's head coach is presumed to be responsible for the actions of all assistant coaches and administrators who report, directly or indirectly, to the head coach. An institution's head coach shall promote an atmosphere of compliance within his or her program and shall monitor the activities of all assistant coaches and administrators involved with the program who report directly or indirectly to the coach.

**_Communications_**

The President and the Athletics Director will meet with all Head Coaches annually to discuss the Institution's expectations for NCAA rules compliance. The meeting will address the following:

- Institutional expectations for NCAA rules compliance;
- Institutional responsibilities for timely reporting of all violations or concerns of possible violations;
- Institutional expectations of regular compliance training and education;
- President's and Athletics Director's philosophy and expectations on rules compliance;
- Rules compliance resources for each sports program;

LOUISIANA STATE UNIVERSITY
HEAD COACHES STATEMENT

- Each sports program's shared responsibility with compliance staff;
- Continued dialogue with Athletics Director and Director of Compliance to discuss the institution's and sports programs' compliance environment and expectations.

The Compliance Office will meet with the Head Coach annually to discuss expectations for NCAA rules compliance. The meeting will address the following:

- Compliance Office's philosophy and expectations on rules compliance;
- Compliance Office's resources for the sports program;
- A discussion of the Compliance Office's and sports program's expectations for submitting rules interpretations and waiver requests and resolution of any disagreements over the submission of such requests;
- Sports program's shared responsibility with the Compliance Office;
- Expectations for reporting actual and suspected NCAA rules violations or concerns (*e.g.*, immediate action, reporting lines, and confidential and/or anonymous reporting);
- Establishment of a plan for continuing dialogue between the coaching staff and Compliance Office to discuss the institution's and sports program's compliance environment and expectations;
- Establishment of a plan for ongoing dialogue between the coaching staff and Compliance Office to discuss key issues facing the sports program (*e.g.*, agents, recruiting, initial eligibility, pre-enrollment amateurism, continuing eligibility, and boosters)

The President, Athletics Director, Director of Compliance, and Head Coach will meet annually to discuss the institution's and sports program's compliance environment and expectations.

*Monitoring*

The Head Coach will be proactive in identifying potential NCAA rules violations and will work collaboratively with the Compliance Office to ensure compliance with all NCAA rules and regulations.

In consultation with the Compliance Office, the Head Coach will create written procedures to fully ensure that his/her coaching staff, including all those with duties concerning the management of the sports program in any fashion (*i.e.*, assistant coaches, managers, directors of operations, volunteers, student assistants, trainers, etc.) have responsibility for monitoring compliance with NCAA rules.

In consultation with the Compliance Office, the Head Coach will:

- Assign a sports program liaison to the Compliance Office;
- Assign sports program members to monitor specific areas of compliance (*e.g.*, contacts, telephone calls, official and unofficial visits, initial eligibility, amateurism, complimentary tickets, and boosters);
- Regularly evaluate the coaching staff to ensure their specific area of responsibility is monitored and that those responsibilities are executed in a timely fashion;
- Ensure that the coaching staff has adequate and ongoing compliance training and that there is a plan in place for discussion of important information;
- Determine reporting lines for resolving actual and potential NCAA rules issues;
- Determine reporting lines to alert Compliance Office of issues involving prospective student-athletes and current student-athletes (*i.e.*, agents, recruiting, initial eligibility, pre-enrollment amateurism, continuing eligibility, and boosters);
- Regularly solicit feedback from the coaching staff concerning their areas of compliance and the sports program's overall compliance environment to ensure that the rule monitoring systems are functioning properly and efficiently;
- Ensure that the coaching staff immediately notifies the Compliance Office when concerns and/or red flags related to potential NCAA rules violations occur.

**LOUISIANA STATE UNIVERSITY**
**HEAD COACHES STATEMENT**

*I affirm that the NCAA guidelines mandate my responsibility regarding compliance with all NCAA rules and regulations. I assume responsibility regarding the above statements and policies. I further understand that an atmosphere of compliance remains the duty of the Head Coach and that neither the Compliance Office nor its staff is responsible for my awareness of or adherence to NCAA rules and regulations. I have reviewed the provisions of Bylaws 10 & 11 respectively and do attest to the fact that I have responsibility for monitoring my staff members and promoting an atmosphere that fosters compliance with NCAA rules and regulations. I further acknowledge that my complete cooperation with any investigation of a possible NCAA rules violation is a condition of my employment with Louisiana State University.*

| | |
|---|---|
| *Name (Please Print):* | |
| *Signature:* | *Date:* |
| *Director of Athletics Signature:* | *Date:* |
| *Compliance Office Signature:* | *Date:* |

All Athletic Department Full, Part-Time and Student Employees:

Attached are written policies and procedures that are applicable to all LSU Athletic Department full, part-time, and student employees. Please review the enclosed policies and procedures, and return a signed copy to Senior Athletics Director, Miriam Segar, on or before July 1, 2013. Execution of this document is mandatory for all full, part-time, and student employees of the LSU Athletic Department.

Should you have any questions or concerns regarding these policies and procedures, please do not hesitate to contact either me or Miriam Segar.

Sincerely,


Joe Alleva