UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA
BATON ROUGE DIVISION

SHARON LEWIS                                          Civil Action No: 21-198-BAJ-RLB

Plaintiff

V.

LOUISIANA STATE UNIVERSITY;
BOARD OF SUPERVISORS OF LOUISIANA
STATE UNIVERSITY;
GARRETT "HANK" DANOS, INDIVIDUALLY;
 ROBERT "BOBBY" YARBOROUGH, INDIVIDUALLY;
STANLEY JACOBS, INDIVIDUALLY;
JAMES WILLIAMS, INDIVIDUALLY;
MARY LEACH WERNER, INDIVIDUALLY;
FELTON KING "KING" ALEXANDER, INDIVIDUALLY;
WILLIAM JENKINS, INDIVIDUALLY;
TAYLOR PORTER BROOKS & PHILLIPS LLP,
WILLIAM SHELBY MCKENZIE, INDIVIDUALLY;
VICKI CROCHET, INDIVIDUALLY;
ROBERT "BOB" BARTON, INDIVIDUALLY;
LESLIE EDWIN "LES" MILES, INDIVIDUALLY;
JOSEPH "JOE" ALLEVA, INDIVIDUALLY;
SCOTT WOODWARD, INDIVIDUALLY;
VERGE AUSBERRY, INDIVIDUALLY;
MIRIAM SEGAR, INDIVIDUALLY;
JOHN DOE (1-10) INDIVIDUALLY AND
JANE DOE (10-20) INDIVIDUALLY

Defendants

## **FIRST AMENDED COMPLAINT FOR DAMAGES**

TO THE HONORABLE JUDGE OF SAID COURT:

## **PARTIES AND JURISDICTION**

1. Plaintiff SHARON LEWIS is an African American woman and citizen of the United States and a

   resident of Louisiana and is an employee of Louisiana State University who has played a vital role

   in LSU Football Recruiting since 2002 and all times relevant to this cause of action.

Made Defendants herein are:

2. Defendant, Louisiana State University ("LSU"), is a public university system organized and duly authorized to operate under the laws of the State of Louisiana;

3. Defendant, Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (the "Board," "Defendant Board" or "LSU"), is a public constitution corporation organized and existing under the laws of the State of Louisiana to operate, manage and control the LSU public university system, including its campus in Baton Rouge, with its principal place of business located at 3810 West Lakeshore Drive, Baton Rouge, Louisiana 70808. LSU is a recipient of federal funds within the meaning of 20 U.S.C. §1681 (Title IX);

4. Defendant, Garrett "Hank" Danos, a resident of Louisiana and of the full age of majority who at various material times served as Chairman of the Board and made Defendant herein in his individual capacity;

5. Defendant, Robert "Bobby" Yarborough, a resident of Louisiana and of the full age of majority who at various material times served as served as Chairman and Chairman Elect of the Board and made Defendant herein in his individual capacity;

6. Defendant, Stanley Jacobs, a resident of Louisiana and of the full age of majority who at various material times served as served as the Chairman of the Board's Athletic Committee and made Defendant herein in his individual capacity;

7. Defendant, James Williams, a resident of Louisiana and of the full age of majority who at various material times served as Chairman of the Board and member of the Athletic Committee and made Defendant herein in his individual capacity;

8. Defendant, Mary Leach Werner, is a resident of Louisiana and of the full age of majority who at various material times served as Chairman of the Board and Chairman of the Athletic Committee

and made Defendant herein in her individual capacity;

9. Defendant, Felton King "King" Alexander, is of the full age of majority and at various material times served as President of the LSU System and Chancellor of the Baton Rouge Campus and made Defendant herein in his individual capacity;

10. Defendant, William Jenkins, is of the full age of majority and at various material times served as Interim System President and Chancellor of Baton Rouge Campus and made Defendant herein in his individual capacity;

11. Defendant, Taylor, Porter, Brooks & Phillips, L.L.P.  ("Taylor Porter," "LSU's law firm," LSU's Attorneys," "LSU's Outside Legal Counsel"), is a law firm and Limited Liability Partnership with offices in Baton Rouge and Lake Charles and at various material times represented LSU;

12. Defendant, William Shelby McKenzie, is a resident of Louisiana and of the full age of majority and is a partner at Taylor Porter and at various material times served as LSU's Lead Legal Counsel and made Defendant herein in his individual capacity;

13. Defendant, Vicki Crochet, is a resident of Louisiana and of the full age of majority and is a partner at Taylor Porter and at various material times served as LSU Legal Counsel and made Defendant herein in her individual capacity;

14. Defendant, Robert "Bob" Barton, is a resident of Louisiana of the full age of majority and the Managing Partner at Taylor Porter and at various material times served as LSU Legal Counsel and made Defendant herein in his individual capacity;

15. Defendant, Leslie Edwin "Les" Miles, is of the full age of majority and at various material times served as LSU as Head Football Coach and made Defendant herein in his individual capacity;

16. Defendant, Joseph "Joe" Alleva is of the full age of majority and at various material times served as Vice Chancellor and Director of Athletics and made Defendant herein in his individual capacity;

3

17. Defendant, Scott Woodward, is a resident of Louisiana and of the full age of majority and at various material times served as Athletic Director of LSU and made Defendant herein in his individual capacity;

18. Defendant, Verge Ausberry, is a resident of Louisiana and of the full age of majority and at various material times served as Executive Deputy AD/Executive Director of External Relations and made Defendant herein in his individual capacity;

19.  Defendant, Miriam Segar, is a resident of Louisiana and of the full age of majority and at various material times served as Senior Associate Athletic Director at LSU and made Defendant herein in her individual capacity;

20. John Does (1-10) are other Defendants who may be identified through the course of litigation and Plaintiff reserves the right to amend the Complaint to add Defendants as they become known.

21. Jane Does (11-20) are other Defendants who may be identified through the course of litigation and Plaintiff reserves the right to amend the Complaint to add Defendants as they become known.

## <u>JURISDICTION AND VENUE</u>

22. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because this litigation involves claims arising under Title IX of the Education Amendments of 1972, 20 U.S.C § 1681, and this being an action which arises under 18 U.S.C. § 1961 -1968, 901(A) of Title IX of the Organized Control Act of 1970 as amended, otherwise known as RICO and 42 U.S.C. §§1981 and 1982.

23. Personal jurisdiction and venue are predicated upon 18 U.S.C. § 1965, and 28 U.S.C. § 1391, and other applicable venue statutes since the defendants are residents of, have an agent or agents, or transact affairs in this district and because a substantial part of the events and omissions giving rise to this case and the damages sustained by Plaintiff occurred in East Baton Rouge Parish,

Louisiana, which is part of the United States District Court for the Middle District of Louisiana.

## OPERATIVE FACTS

24. Plaintiff, SHARON LEWIS, has played a vital role in LSU's Football Recruiting since 2001. Ms. Lewis is a 1991 graduate of LSU who was a student worker in the Athletic Department and an All-SEC heptathlete and high jumper for LSU's national championship women's track and field team. Ms. Lewis was hired as the Coordinator for Recruiting Operations in 2001 under Nick Saban. Ms. Lewis was promoted to Assistant Athletics Director for Football Recruiting and Alumni Relations in 2007. Ms. Lewis has recruited the top football players in the nation to play football at the highest level in college football for nearly 20 years. Ms. Lewis remained the Assistant Athletic Director for Football Recruiting and Alumni Relations for nearly 13 years. Ms. Lewis was given a new title as Associate Athletics Director for Football Recruiting and Alumni Relations in August 2020. Her duties included management of full-time employees as well as 35-40 student workers. Ms. Lewis also oversees all special events associated with recruiting, such as pregame and postgame events, dinners, banquets and social outings for official visits. Additionally, she manages student workers to help with the day-to-day recruiting tasks and planned activities. Ms. Lewis' recruitment program has been consistently ranked in the top five (5) in the SEC and top five (5) nationally, except in 2013 and 2018. Ms. Lewis oversees all of LSU's Football on-campus recruiting activities and manages the recruiting staff. Due to the success of the football recruiting program under Ms. Lewis' leadership, LSU won 2003 National Championship (Nick Saban); 2007 National Championship (Les Miles); 2007 SEC Championship (Les Miles); 2011 SEC Championship (Les Miles); 2011 National Championship Game (Les Miles); 2019 SEC Championship (Ed Orgeron) and 2020 National Championship (Ed Orgeron). Ms. Lewis modified the expectations for the student workers to require student workers wear suits, dress more professionally and develop

administrative skills.

25. Plaintiff alleges she engaged in protected activity by reporting complaints of Title IX violations and sex discrimination and defendants retaliated against her in compensation, promotions and inadequate support.

26. Plaintiff alleges she has been subjected to discreet discriminatory acts and has experienced a racially hostile work environment throughout her employment since 2009 to present, including unlawful harassment for the relevant time periods referenced herein.

27. Plaintiff alleges she has been intentionally discriminated against and she is entitled to compensatory damages and punitive damages. Plaintiff, an African-American, asserts LSU and the Board of Supervisor have engaged in unlawful discrimination with malice or with reckless indifference to federally protected rights to which she is entitled.

28. Plaintiff alleges there has been a continuing pattern of discrimination against Plaintiff and African-American employees that continues to exist at the initiation of this action.

29. Plaintiff alleges the wrongful acts, pled herein, were either intentionally, directly or tacitly ratified, approved, encouraged and endorsed by LSU, the Board of Supervisors, Senior Administrators of LSU or alternatively, the intentional discriminatory acts of agents and employees were ignored by upper and middle management with negligence and gross negligence, which contributed to the cause, the harm, the damage and this is the basis of this complaint and subject action.

30. Plaintiff alleges she became aware, in March 2021, defendants had engaged in a pattern of racketeering to hide Title IX and sexual misconduct investigations of LSU's athletic

officials and football players and her business and property were injured as a result.

31. Miriam Segar ("Segar") was the Athletics Department designee to receive and investigate Title IX related complaints or reports of complaints at all relevant times herein.

32. Verge Ausberry ("Ausberry") was plaintiff's immediate supervisor at all relevant times herein.

**FACTUAL BASIS FOR CLAIMS**
**(General Facts Underlying Claims of a Continuing Pattern of:**
**Retaliation, Failure to Promote, Gender Discrimination,**
**Race Discrimination/Hostile Work Environment and Civil RICO)**

33. That the allegations of fact in paragraph 1 through 32 inclusive, are re-plead and reasserted herein as though set forth *in extenso*.

34. After the hiring of head coach Les Miles (Miles) in 2005, Miles, in his first meeting with plaintiff, made racist comments and stated he "prefers the blonde over the brunette." Shortly after, Miles hired Shelley Roberts who was a white, blonde, female to lead LSU's football recruitment and stated to plaintiff, "now that's the face of recruiting." Miles selected Shelly based solely on her appearance after spotting her in the Athletics building. Miles later ordered plaintiff to fire Shelly because he did not like that Shelley wore sweat suits to work, but plaintiff refused to comply with his demand.

35. Plaintiff became concerned Miles had an inappropriate fixation on female student workers and plaintiff reported her concerns to Ausberry, her immediate supervisor, who asked plaintiff to give him details but took no actions.

36. Miles complained to plaintiff about the appearance of the female students on the recruiting staff and told plaintiff there were "too many Black girls," "fat girls" and "ugly girls" employed in LSU's Athletics and ordered plaintiff to fire them. Plaintiff again refused to comply. Miles stated to plaintiff, the student female workers she hired looked like a "bad bowling team." That comment

became a joke among the coaching staff and throughout the football operations building and senior athletic administration staff, including the cleaning staff.

37. On November 21, 2010, Miles stated in a staff meeting with the coaches and athletics department staff he had ugly girls here and stated, when he was at Oklahoma State,[1] he took over interviewing student female workers and hired them himself. Plaintiff felt embarrassed and isolated and immediately reported what was said in the meeting to her superior Verge Ausberry, who took no action against Miles for those and other racist and sexist statements.

38. Sometime in 2010 Miles also started labeling the female student workers as "AM and PM" girls and stated to plaintiff that "there are two types of girls I like to hire: AM girls are the worker bee types. They are for filing, typing and in office work. The PM girls are the pretty girls, ones that people like to look at and we need to use for recruiting events" and Miles directed plaintiff to hire "blondes with the big boobs." Plaintiff reported these comments to Verge Ausberry ("Ausberry") and was told "you are making too big a deal about the comments that Coach Miles was making about the girls and you need to just worry about doing your job and I hired prettier girls." Frank Wilson, Running Back Coach, met with plaintiff with others present and directed them to tell plaintiff to "hire prettier girls, more light skinned black girls and that would stop Miles from bullying plaintiff." Plaintiff complained to Bo Bahnsen, Sr. Associate Athletics Director, about Miles' sexist and racist comments, but was told maybe it was time for plaintiff to look for another job.

---

[1] During Les Miles' tenure at Oklahoma State (2001-2004) the cowboys orange pride program provided female students as hostesses to recruits. The program was disbanded after allegations that hostesses had sex with football recruits. *See* https://www.theadvocate.com/baton_rouge/sports/lsu/article_40f2f159-25ae-5612-b40b-cb0168122733.html, *citing* Sports Illustrate 9/13/2013 article entitled Special Report on Oklahoma State Football: Part 4 – The Sex.

39. After LSU lost the 2011 National Championship game, Miles' fixation on student workers grew to an obsession and he complained to plaintiff that the student female workers were "too fat," "too ugly," "too black" and demanded plaintiff hire "blonde girls" with "big boobs." The student workers plaintiff hired were fairly evenly split racially between African-American and Caucasian but Miles only communicated with the Caucasian student workers. Plaintiff reported Miles' sexist and racist comments to her superiors and no action was taken.

40. Sometime in 2012, Miles told an Athletics official to inform plaintiff he would take over the hiring of female student workers and the interviews would take place in his office at night and requested plaintiff set up the interviews. In a meeting with Sam Nadar and Haleh Samadnouri, plaintiff expressed concerns of Miles' plan to interview student female workers at night in his office was inappropriate, but she was subsequently ordered by Ausberry to set up the night interviews between Miles and student female workers. Miles interviewed the female students at night in his office and went to sorority houses to recruit female student workers.

41. Miles interviewed about 15 to 20 female LSU students for student recruitment staff positions. Several of the girls interviewed by Miles reported to plaintiff Miles asked them about their sex life. One student interviewed by Miles stated he asked her if she were a virgin. Plaintiff reported Miles' conduct to Ausberry, Sam Nader ("Nader") and Segar and was told by Ausberry, "if you don't like it here, leave." Plaintiff noticed her superiors became hesitant to meet with her after reporting Miles' racist and sexist comments. Ausberry told her several times she needed to go find another job and "she should have taken a job at Alabama."

## CAUSES OF ACTION

### I.  TITLE IX
### A.  LSU FAILED TO MEET ITS TITLE IX OBLIGATIONS

42. That the allegations of fact in paragraph 1 through 41 inclusive, are re-plead and reasserted herein as though set forth *in extenso*.

43. For the purposes of Title IX claims asserted herein, the Title IX defendants are: Louisiana State University, a recipient of federal funds; the Board of Supervisors of Louisiana State University; William Jenkins; Felton King "King" Alexander; Joseph "Joe" Alleva; Scott Woodward; Leslie Edwin "Les" Miles; Verge Ausberry and Miriam Segar ("Title IX Defendants").

44. Title IX has been in effect since 1972 and has required institutions like LSU to designate a Title IX Coordinator since 1975. Title IX prohibits retaliation for reporting sexual misconduct and sex discrimination complaints.  Further, LSU's obligations under Title IX requires notice that Title IX prohibits retaliation against those who report, such as Plaintiff.

45. The Office of Civil Rights ("OCR"), a division of the United States Department of Education ("DOE"), is responsible for the implementation, interpretation and enforcement of Title IX. The DOE was authorized by Congress, pursuant to 20 U.S.C.A. § 1682, to promulgate regulations to govern the implementation, interpretation and enforcement of Title IX.

46. According to OCR's *2001 Guidance*, a responsible employee includes any employee: who has the authority to take action to redress sexual violence; who has been given the duty of reporting incidents of sexual violence or any other misconduct by students to the Title IX coordinator or other appropriate school designee; or whom a student could reasonably believe has this authority or duty.

47. On April 4, 2011, OCR in the DOE issued a Dear Colleague Letter ("DCL"), a "significant guidance document," on sexual harassment and sexual violence intended to provide educational institutions with clarity as to the requirements they must follow in order to be in compliance with the DOE. In this 2011 OCR guidance, LSU was again reminded that a failure to adhere to the requirements outlined in the DCL could result in the loss of federal funding for an educational institution. The DCL also outlines OCR recommendations regarding complainant safety. The DCL states, "Title IX requires a school take steps to protect the complainant as necessary, including taking interim steps before the final outcome of the investigation. The school should take these steps promptly once it has notice of a sexual harassment or violence allegation." The DCL specifically addressed retaliation and the risk of retaliation by the alleged perpetrator or his or her associates. As part of its Title IX obligations, LSU was required to have policies and procedures in place to protect against retaliatory harassment.

48. The 2014 OCR Questions and Answers on Title IX and Sexual Violence again offered guidance to institutions like LSU.

49. OCR further provided guidance about Title IX requirements to publish a policy against sex discrimination, designate a Title IX coordinator and adopt and publish grievance procedures.

50. The Title IX regulations outline three (3) key procedural requirements that LSU must: (1) disseminate a notice of nondiscrimination; (2) designate at least one (1) employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX and (3) adopt and publish grievance procedures providing for the prompt and equitable resolution of student and employee sex discrimination complaints.

51. LSU intentionally, deliberately, strategically and systematically refused to comply with Title IX and the DCL guidance and, instead, took steps to evade its Title IX obligations.  Despite Title IX

requirements since 1975 and the DOE's multiple guidance documents, during the relevant time

frame alleged herein, LSU did not have a full-time Title IX coordinator until 2016, Jennie Stewart.[2]

However, LSU designated Segar, the Senior Associate Athletics Director of Student Services, to

receive reports of sexual harassment and sexual assault for the Athletics Department.

52. At all times relevant herein, Miriam Segar was the designee in the Athletics Department to receive

sexual harassment and sexual assault reports.  At all times relevant herein, Plaintiff reported sexual

harassment and sexual assault complaints from female student workers in the Athletics Department

to Miriam Segar.

53. Pursuant to LSU's Football Operations Policies and Procedures Paragraph 8, "[i]f an employee

becomes aware that a student-athlete is arrested, engages in misconduct unbecoming of a student-

athlete, is involved with any recruiting violations or participates in a hazing activity, it is

imperative that Sr. Associate Athletics Director Student Services, Miriam Segar, is notified

immediately but no later than 24 hours after the event occurs."

54. On June 4, 2015, an LSU law professor sent a letter to then-President F. King Alexander and the

University Title IX personnel and expressed concern about the legality of PM-73 (LSU's Title IX

policy).  The letter specifically advised that the policy "fails to provide for the 'Prompt and

Equitable' Resolution of Complaints;" "does not contain timeframes, whatsoever, relative to formal

resolution procedures. Nor does it require LSU to provide any such timeframes."  The 2015 law

professor's letter ultimately advised that LSU's Title IX policy defects were unlawful, inexcusable

and must be remedied. LSU's leadership did nothing to address the unlawful defects in its policy.

---

[2] LSU's first attempt at a Title IX Coordinator was in 2014 with the interim designation of Jim Marchand, one of its General Counsel. Gaston Renoso, Assistant Vice President of Human Resource Management was also designated as the Title IX Coordinator and Deputy Coordinator of Human Resource Management.

*See* Husch Blackwell Report attached as Exhibit 1.

55. Per a June 8, 2016 email to the Athletics Department staff, Joe Alleva, the Athletics Director, instructed that "staff member should not attempt to conduct any investigation or make any determination regarding alleged, reported or suspected misconduct. Instead, you are required to report all potential issues so that they are properly addressed by trained university officials. Please report these issues to either Miriam Segar, Sr. Associate Athletics Director Student Services or Wendy Nall, Assistant Athletics Director HR. Both of these individuals have been trained in Title IX law and can help facilitate the proper reporting that is required by law and university policy."

56. The Tiger Athletic Foundation ("TAF") at LSU engaged the Dan Beebe Group "to conduct an Independent Assessment of human relations risks, including misconduct prevention policies and programs applicable" to both "Louisiana State University's Athletics Department and Louisiana State University." The March 2016 Dan Beebe Group report to Tom Skinner, LSU's General Counsel, again made Title IX policy recommendations.

57. Again, LSU's leadership did nothing to address its unlawful Title IX practices. *See* Exhibit 1.

58. In August 2016, President Alexander created a Task Force to review LSU's Title IX "policies, practices and procedures" and to submit a report to President Alexander by July 1, 2017. This Presidential Task Force made 17 Title IX policy recommendations in a February 2017 report.

59. Again, LSU's leadership did nothing with the Task Force report and recommendations. *See* Exhibit 1.

60. Although Title IX has been federally mandated since 1975, Louisiana State University hired its

first Title IX Coordinator, Jennie Stewart, in February 2016.[3] Stewart quickly realized the grave

Title IX defects and presented recommendations in September 2016 to King Alexander, President;

Tom Skinner, General Counsel and Daniel Layzell, Chief Financial Officer.    Stewart

recommended LSU invest resources to its woefully anemic Title IX program, including a lead

investigator's position. A year and a half later LSU hired a Title IX investigator, Jeffery Scott.

61. In 2017, LSU's Office of Internal Audit issued a report regarding practices to ensure compliance

with Title IX obligations. This Internal Audit Report was sent to President Alexander, General

Counsel Tom Skinner and Title IX Coordinator Jennie Stewart.

62. Again, LSU's leadership did nothing with the findings in that audit report. *See* Exhibit 1.

63. In 2018, LSU consulted the Baker Tilly firm to conduct an "Athletics Risk Assessment." This time

LSU did not maintain a report of those findings or do anything to address Title IX related concerns.

64. Again, LSU leadership continued to show deliberate indifference and deliberate disregard for and

therefore, deliberately failed to comply with its Title IX obligation.

65. In 2019, LSU's Board of Trustees retained Morgan Lewis & Bockius, LLP (Morgan Lewis) "to

conduct a privileged and confidential review of LSU's Title IX policies and Practices as they apply

to LSU's Athletics Department." Morgan Lewis sent a findings report to Tom Skinner, LSU's

General Counsel, on September 16, 2019. This time, LSU received a report complimentary of its

defective and unlawful Title IX "structure" and Morgan Lewis reported "LSU has a good structure

in place to receive and investigate/resolve PM-73 (Title IX Policy) complaints, as well as

substantial resources and support services for those involved in PM-73 (Title IX Policy)

---

[3] LSU's first attempt at a Title IX Coordinator was in 2014 with the interim designation of Jim Marchand, one of its General Counsels. Gaston Renoso, Assistant Vice President of Human Resource Management was also designated as a Title IX Coordinator and Deputy Coordinator of Human Resource Management.

complaints, investigations, and adjudication processes." Nevertheless, even though the Morgan Lewis report provided recommendations, LSU's leadership never shared the Morgan Lewis findings with the Title IX office or the Athletics Department.

66. LSU hired Morgan Lewis to provide them with a favorable review of their defunct Title IX program. Despite the misleading favorable review, LSU again deliberately disregarded Title IX recommendations.

67. LSU has repeatedly and intentionally tolerated, inadequately addressed and been deliberately indifferent to students, employees, faculty and plaintiff's complaints of sexual harassment and Title IX violations.

68. LSU's Title IX policy referenced herein as PM-73 has consistently been wholly inadequate to provide a prompt and equitable response; eliminate the risk of retaliation for those who report and prevent administrators from engaging in victim-blaming. LSU further violated its inadequate policy; failed to comply with Title IX and actively concealed the sexual misconduct of Miles and football players by engaging and conspiring with outside counsel to circumvent and evade compliance with their policy and applicable federal and state law to avoid disclosure.

69. LSU admits its policies for handling complaints were unclear and employees didn't receive proper training for roles they held." See Galligan Statement in 3/18/2021 AP article entitled "Governor supports LSU response to sexual misconduct report."

70. LSU's deliberate indifference to allegations of sexual harassment and sexual assault made Plaintiff and those who reported vulnerable to and ultimately the subject of retaliation.

71. Miriam Segar was the designated employee to receive such reports for the Athletics Department at LSU.

## B.  PLAINTIFF'S PROTECTED ACTIVITY

72. That the allegations of fact in paragraph 1 through 71 inclusive, are re-plead and reasserted herein as though set forth *in extenso*.

73. Starting in 2009, Plaintiff complained to her immediate supervisors Miles was sexually harassing female student workers and they failed to take any action to investigate or discipline Miles. Plaintiff complained to her immediate supervisors Miles was subjecting plaintiff and African-American students to racist insults and they failed to take any action to investigate or discipline Miles.

74. Sometime in 2013, a female student worker ("Student 1") came to plaintiff traumatized and very upset about something that happened when she was alone with Miles.  Student 1 stated Miles got on top of her in his office. Student 1 requested plaintiff's assistance in confronting Miles and plaintiff accompanied Student 1 to Miles' office where Student 1 stated to Miles, "you know what you did to me" and Miles repeatedly apologized to Student 1. Plaintiff immediately reported Student 1's allegations to Miriam Segar. Student 1 met with Miriam Segar, but she took no action. There is no record of Student 1's complaint about Miles being investigated in a manner consistent with the then-University policy. *See* Exhibit 1.

75. In February 2013, a second female student worker ("Student 2") reported to plaintiff she had received contact, via social media and text messages, from Miles. Plaintiff immediately reported Student 2's complaint about Miles to Segar and provided Segar with text messages from Miles to Student 2.

76. As part of the investigation, plaintiff was instructed to meet at Taylor Porter's offices in downtown Baton Rouge where she met with Vicki Crochet and when she asked, "what happens next?" Vicki Crochet told her it was legal because the student workers were of the "consenting age" and the

16

reported conduct was "not illegal, maybe immoral." On May 15, 2013, Taylor Porter issued a written report which concluded Miles had not violated LSU's Sexual Harassment Policy nor his contract. *See* Taylor Porter's Written Investigation attached hereto as Exhibit 2.

77. In around 2015, plaintiff filed a complaint (referenced herein as "Complaint 9") to Miriam Segar against Verge Ausberry for verbal harassment, emotional abuse, belittling and open humiliation of plaintiff.

78. Per a June 8, 2016, email to the Athletics Department staff, Joe Alleva, Athletics Director, instructed that "staff members should not attempt to conduct any investigation or make any determination regarding alleged, reported or suspected misconduct. Instead, you are required to report all potential issues so that they are properly addressed by trained university officials. Please report these issues to either Miriam Segar, Sr. Associate Athletics Director Student Services or Wendy Nall, Assistant Athletics Director HR. Both of these individuals have been trained in Title IX law and can help facilitate the proper reporting that is required by law and university policy."

79. Plaintiff received notice of the nude photograph of Samantha Brennan's (referenced herein as "Student 3") complaint in 2016. Plaintiff reported the complaint to Segar.

80. In or about the Fall of 2016, plaintiff received a report of misconduct of a football player from Calise Richardson (referenced herein as "Student 4") regarding a drink tossing incident at a local bar. The Richardson complaint was reported to plaintiff, Keva Soil-Cormier and Ya'el Lofton. As instructed by Athletics Department leadership, plaintiff reported Richardson's complaint to Segar. Plaintiff was specifically instructed not to conduct investigations of such complaints and did not conduct an investigation of Richardson's complaint.

81. In or around May 2016, female student worker (referenced herein as "Student 5") complained to plaintiff of Earl Chevalier, a member of the athletics department coaching staff, seeking to date or

otherwise pursue an inappropriate relationship with the student worker.  Plaintiff reported Student 5's complaint to Segar.

82. Another student (referenced herein as "Student 6") complained of Title IX related misconduct to plaintiff in January or February 2017.  Plaintiff reported the Student 6's complaint to Segar as repeatedly instructed.

83. In or around December 2017, plaintiff received the Gloria Scott (referenced herein as "Complaint 8") complaint and reported the complaint, along with text messages, to Segar and Ausberry.

84.  In 2018, plaintiff received another complaint of a female student worker threatening a male student (referenced herein as "Student 7") with Title IX type misconduct.  Plaintiff reported the Student 7's complaint to Segar.

85. In a complaint to Jeffery Scott, Title IX Officer, plaintiff also filed a Title IX complaint requesting Segar and Ausberry be investigated for failing to make mandatory Title IX reports, yet no action has ever been taken.

### C.  CONTINUING PATTERN

### Of Title IX Retaliation

86. That the allegations of fact in paragraph 1 through 85 inclusive, are re-plead and reasserted herein as though set forth *in extenso*.

87. Once Miles was cleared of any wrongdoing by LSU, Miles began to immediately retaliate against plaintiff for reporting the complaints of Student 1 and Student 2 by leaving plaintiff out of recruiting meetings and off emails that pertained to recruiting and when plaintiff requested she be allowed to attend an NCCA meeting on compliance, she was denied. Plaintiff complained about the retaliation to her superiors, but they took no action.

88. The Athletics Department restructured plaintiff's position so Miles controlled her pay raises and when plaintiff complained about the restructuring to Verge Ausberry, he told her she should look for another job. Miles granted pay raises to coaching and athletics department staff and when plaintiff asked Miles why she was not included in the raises, she was told her pay increase was dependent upon how the girls looked and sometime in 2013 plaintiff was eating lunch with a colleague and Miles walked in and asked plaintiff "who hired these ugly girls?"

89. Sometime in 2013, Miles threatened to punch plaintiff "in her motherfucking mouth." Miles' retaliation against plaintiff became so bad she would hide under her desk when she would hear him coming to avoid him and would sometimes hide under her desk when Miles entered the building. When plaintiff complained to Senior Athletics officials, she was told "just leave."

90. In 2013, the senior leadership of the athletics department sent plaintiff admonishment letters for recruiting violations she did not commit, was not present for, nor aware of. Bo Bahnsen wrote up plaintiff for a purported NCAA violation by Brick Haley, assistant football coach, while Haley was traveling in Texas but plaintiff was not present and was not aware of the purported prohibited act(s).  In 2013, Bo Bahnsen wrote up plaintiff when Johanna Trees, secretary for defensive coaches, supposedly broke an NCAA rule by walking a prospective student athlete down the tiger walk but plaintiff was not present and was not aware of the prohibited activity. Bo Bahnsen, Joe Avella and Verge Ausberry ordered plaintiff to sign fraudulent reprimand letters, but plaintiff refused.  February 2013, Bob Barton, LSU's attorney from Taylor Porter, met with plaintiff to intimidate and force plaintiff to sign a reprimand in an effort to force plaintiff to take responsibility for an NCAA violation allegedly committed by others, but plaintiff refused to sign.

91. Sometime in 2014 plaintiff was hospitalized after a surgical procedure; Bo Bahnsen called plaintiff at the hospital, screaming at her to write up a coach for something she did not observe, was not

present for and of which she was not aware. Bahnsen required Ms. Lewis to submit the report the next day although she was still hospitalized and would still be hospitalized the next day.

## Ausberry Retaliation

92. That the allegations of fact in paragraph 1 through 91 inclusive, are re-plead and reasserted herein as though set forth *in extenso*.

93. Starting in 2012 to present Ausberry has continually and systematically retaliated against plaintiff for continuingly bringing Title IX violations to his attention. Ausberry would routinely scream and belittle plaintiff in front of her student workers and co-workers. In a speaker phone discussion with staff, including plaintiff, Ausberry called plaintiff a "stupid incompetent bitch." Plaintiff went to Miriam Segar to ask for help and requested a meeting with Joe Alleva to have him stop the harassment by Ausberry, but he refused to meet with her. Plaintiff was later informed by a co-worker that when Segar met with Joe Alleva and Verge Ausberry, they laughed and made a joke about Ausberry calling her a "stupid incompetent bitch."

94. Plaintiff continually went to Miriam Segar to complain of Ausberry and others retaliation and was told to stop being emotional and defensive and when plaintiff requested Segar set up a meeting with Joe Alleva to discuss Ausberry's retaliation, Ausberry would show up at meetings rather than Alleva to intimidate plaintiff.  In 2017, Joe Alleva refused to send plaintiff to an NFL meeting as a representative of LSU and when she asked to meet with him, he included Ausberry and Segar but rather than address Ausberry's conduct, plaintiff was reprimanded and told by Ausberry "you only have relationships with the black players" and Miriam Segar told plaintiff "you only have your position because of Nick Saban" in order to intimidate plaintiff from bringing anymore complaints against Ausberry and others.

95. Plaintiff's coworkers expressed their concern over Ausberry's hostile treatment of plaintiff to senior leadership of the athletics department, but they took no actions. In interviews with Husch Blackwell "Football Operations employees confirmed witnessing Ausberry hollering and screaming at plaintiff over the course of the last several years" *See* Exhibit 1.

**Retaliation Under Scott Woodard Regime**

96. Since being hired as Athletics Director in 2019 Scott Woodward has refused to address the continuing retaliation against plaintiff. Plaintiff has sought to meet with Athletics Director Scott Woodward to complain of retaliation and harassment by Ausberry and others, but Woodward has refused to meet with plaintiff and at all relevant times was aware of and enabled the retaliation against plaintiff.

97. In 2019 Plaintiff was denied the same athletic gear as coaches and athletics department staff, although she was told she would receive this when she was promoted in 2007. Plaintiff contacted Greg Stringfellow because she did not receive her athletic shoes post bowl game and he sent her a size 12 male shoe which she reported to Ausberry and he laughed.

98. Sometime in March 2021, in a staff meeting, plaintiff asked to serve on a committee that was drafting policies on managing Title IX complaints and was told it would not be appropriate for her to be on that committee and, in March 2021, in a staff meeting discussing the Husch Blackwell Report it was stated, in plaintiff's presence, the Athletics Department needed to have a Title IX policy for "Tattletales."

99. In 2013, as a result of being subjected to a continuing pattern of retaliation and hostile work environment plaintiff suffered a mental breakdown and underwent treatment and LSU paid plaintiff's medical bills. Plaintiff continues to seek mental health support to cope with the continued retaliation and harassment she is subjected to for bringing Title IX violations to the

attention of her supervisors.

## D.  ADVERSE EMPLOYMENT ACTION

100.    That the allegations of fact in paragraph 1 through 99 inclusive, are re-plead and

reasserted herein as though set forth *in extenso*.

101.    As a result of her filing a Title IX complaint against Miles and other Senior Athletics

Officials, LSU has repeatedly refused to promote plaintiff from 2013 to present. In November of

2020 plaintiff went to Ausberry to complain about repeatedly being denied a promotion and

Ausberry told plaintiff she was not being promoted because "you use the word Title IX too much

and people are afraid of you." In December 2020, plaintiff again went to Verge Ausberry and asked

why she was not being promoted and Ausberry replied "You will never be promoted because you

file Title IX complaints. You even filed one against me." At both meetings Ausberry told plaintiff

you can complain to Scott Woodward but "he is my boy."

102.    From 2013 to present, plaintiff has received significantly lower compensation than her

similarly situated male co-workers, despite this fact she has played a significant role in LSU's

Football success. In 2020, Plaintiff was promoted to Associate Athletic Director of Football

Recruiting and Alumni Relations but received no increase in pay although her responsibilities were

increased. Plaintiff's salary is $117,000; her immediate supervisor Verge Ausberry's salary is

$500,000.

103.    From 2013 to present plaintiff was denied access to resources and support of

administrative staff and subjected to repeated disciplinary actions because of her repeated

complaints of Title IX violations in the Athletics Department.

104.    On October 1, 2018, LSU opened a PM-73 (Title IX) investigation against plaintiff for

failure to report a Title IX complaint. Plaintiff was subsequently found to have violated LSU's

Title IX and Sexual Misconduct Policy. Plaintiff appealed Jeffrey Scott's decision to Human Resources and was told the decision was found to be reversed but plaintiff has never received any written confirmation and the PM-73 (Title IX) violation wrongfully remains in her personnel file.

105.     Since 2009 plaintiff has repeatedly reported Title IX violations and LSU took no action. Plaintiff is the only person in the entire University who has ever been disciplined in any form for failing to make a report under PM-73 (Title IX). *See* Exhibit 1.

106.     Plaintiff alleges .... LSU and the Board of

## II.  CIVIL RICO

107.     That the allegations of fact in paragraph 1 through 106 inclusive, are re-plead and reasserted herein as though set forth *in extenso*.

108.     Plaintiff herein asserts her right to a private cause of action under 18 U.S. Section 1962 (c) and (d).

109.     Garrett "Hank" Danos, Robert "Bobby" Yarborough, Stanley Jacobs, James Williams, Mary Leach Werner, Joe Alleva, William Jenkins, F. Alexander King, Scott Woodward, Miriam Segar, Verge Ausberry, Shelby McKenzie, Vicki Crochet, Bob Barton, Board of Supervisors Louisiana State University is a RICO enterprise within the meaning of 18 U.S.C. § 1961 (4) that is engaged in and affects interstate commerce.

110.     Garrett "Hank" Danos, on information and belief at various material times served as Chairman of the Board of Supervisors and served on the Athletic Committee and in such capacity conducted or participated in the conduct of the enterprise's affairs.

111.     Robert "Bobby" Yarborough, on information and belief at various material times served as Chairman of the Board of Supervisors and served on the Athletic Committee and in such

capacity conducted or participated in the conduct of the enterprise's affairs.

112.    Stanley Jacobs, on information and belief at various material times served as Chairman of the Athletics Committee for the Board of Supervisors and in such capacity conducted or participated in the conduct of the enterprise's affairs.

113.    James Williams on information and belief at various material times served as Chairman of the Board of Supervisors and Chairman of the Athletic Committee and in such capacity conducted or participated in the conduct of the enterprise's affairs.

114.    Mary Leach Werner on information and belief at various material times served as Chairman of the Board of Supervisors and Chairman of the Athletic Committee and in such capacity conducted or participated in the conduct of the enterprise's affairs.

115.    William Jenkins on information and belief at various material times served as Chancellor of LSU Baton Rouge Campus and President of the LSU System and in such capacity conducted or participated in the conduct of the enterprise's affairs.

116.    F. King Alexander on information and belief at various material times served as Chancellor of LSU's Baton Rouge Campus and President of the LSU System and in such capacity conducted or participated in the conduct of the enterprise's affairs.

117.    Joe Alleva on information and belief at various material times served as the Vice-Chancellor and Director of Athletics and in such capacity conducted or participated in the conduct of the enterprise's affairs.

118.    Scott Woodward on information and belief at various material times served as the Director of Athletics and in such capacity conducted or participated in the conduct of the enterprise's affairs.

119.     Miriam Segar on information and belief at various material times served as the Associate Athletics Director and Senior Women's Administrator and in such capacity conducted or participated in the conduct of the enterprise's affairs.

120.     Verge Ausberry on information and belief at various material times served as Associate Athletics Director, the Executive Deputy Athletics Director and Executive Director of External Relations and in such capacity conducted or participated in the conduct of the enterprise's affairs.

121.     Shelby McKenzie on information and belief at various material times served as LSU's in-house legal counsel and on Taylor Porter's Executive Committee, and other senior partner administrative positions in the firm and in such capacity participated in the conduct of the enterprise's affairs.

122.     Vicki Crochet, on information and belief at various material times served on Taylor Porter's Executive Committee and other senior partner administrative positions in the firm and in such capacity participated in the conduct of the enterprise's affairs.

123.     Bob Barton, on information and belief at various material times served as Managing Partner of Taylor Porter, on its Executive Committee and other senior partner administrative positions in the firm and in such capacity participated in the conduct of the enterprise's affairs.

124.     The Board of Supervisors on information and belief at various material times was the governing authority of the LSU system and in such capacity participated in the conduct of the enterprise's affairs.

125.     This complaint alleges, *inter alia,* violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § § 1961-1968, and is brought by plaintiff in connection with a series of schemes, devised, conducted and/or participated in by the individual defendants (sometimes referred to as the "defendant persons" or "RICO Defendants"

or "enterprise"), each of whom participated in the enterprise. The individual defendant persons conducted or participated, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering, and conspired to do so, all to the detriment of the business and property of the plaintiff.

126.    During the relevant times set forth herein, the individual defendants conspired with one another to destroy plaintiff's property rights in her employment. The multifarious racketeering activities through which the broad objectives of the individual defendants were carried out through interstate travel and the use of other instrumentalities of interstate commerce consisted of a complex pattern of individual transactions and groups of transactions. It was part of the scheme to shield LSU's Athletics employees and football players from Title IX and sexual harassment complaints and investigations initiated by plaintiff, employees, students, faculty and others that the defendants would and did agree to conspire together with the others to devise and participate in a plan of deceit, deception and whereby they would and did abuse their positions of trust and fiduciary relationships with the plaintiff, students, employees, faculty and others; they would and did abuse the discretion granted to them and breached their obligations of loyalty and fidelity and their duty to act honestly and faithfully in the best interests of the plaintiff, employees, students, faculty and others, and they would and did use false and fraudulent pretenses, representations and promises calculated to deceive persons of ordinary prudence and due care and made material non-disclosures and concealments of facts and information, all so as to unlawfully, intentionally and with intent to defraud, that is, knowingly and with specific intent to deceive in order to cause financial gain for themselves and pursue greater profits.

127.    In carrying out the scheme to hide Title IX and sexual harassment complaints, investigations and control of Athletics, the individual defendants engaged, inter alia, in conduct in violation of the following laws:

26

a.   18 U.S.C. § 1341 (relating to mail fraud);

b.   18 U.S.C. § 1343 (relating to wire fraud);

c.   18 U.S.C. § 1510 (relating to obstruction of criminal investigation);

d.   18 U.S.C. § 1512 (relating to tampering with a witness, victim or an informant);

e.   18 U.S.C. § 1513 (relating to retaliating against a witness, victim or an informant);

f.   18 U.S.C. § 1951 (relating to interference with commerce, robbery or extortion);

g.   18 U.S.C. § 1952 (relating to interstate travel in aid of racketeering);

128.   The enterprise, since May 15, 2013 to April 2021, has managed the day to day operations of the LSU Athletics Department including the hiring and firing of personnel and there has been numerous Title IX and sexual harassment complaints and investigations of coaches, Athletics officials and student football players and the enterprise has directed that the reports of those investigations be hidden or destroyed in order to shield them from public document requests and federal oversight. *See* Exhibit 1.

129.   The predicate acts involved in the following scheme include, inter alia, violations of 18 U.S.C. § 1341, 18 U.S.C. § 1343, 18 U.S.C. § 1510 and 18 U.S.C. § 1512.

## A.  SCHEMES
### Scheme 1: Scheme to Hide Les Miles' Sexual Harassment Investigation From Government

130.   RICO Defendants used wire and mail, effecting interstate commerce, in furtherance of their conspiracy to hide Miles' Title IX violations from the federal government.[4] *See* Taylor Porter Billing Records attached hereto as Exhibit 3.

---

[1.]   Taylor Porter's Billing Records in Exhibit 3 lay out in exhaustive detail RICO defendants use of wire and mail effecting interstate commerce in furtherance of RICO defendants racketeering activity as to all schemes alleged herein.

[2.]   Miles' activity also required police investigation which RICO defendants' activity obstructed such related criminal investigation pursuant to the Cleary Act.

131.    In 2012 and 2013 two student workers complained to plaintiff Miles had sexually harassed them and Student 1 stated to plaintiff and another Athletics department staff member Miles got on top of her in his office on his couch. Plaintiff reported students' complaints to her superiors. Miriam Segar, Joe Alleva contacted Taylor Porter about the students' complaints.

132.    On information and belief sometime in March 2013 Chancellor William Jenkins was informed about the complaint and retained Taylor Porter, who informed the Board of Supervisors by email. Scott McKenzie was serving as General Counsel of LSU and Vicki Crochet was advising LSU on Title IX and sexual harassment issues and Taylor Porter never sought nor was it given a waiver of conflict by LSU.

133.    Outsourcing the investigation to Taylor Porter was a violation of LSU's *Title IX and Sexual Misconduct Policy* which states that "Any investigation or complaints involving student athletes or Athletics Personnel shall be handled and/or investigated by the LSU Title IX Coordinator."

134.    Taylor Porter Attorneys Bob Barton and Vicki Crochet coordinated the investigation of Les Miles with Miriam Segar. *See* Exhibit 2.

135.    Taylor Porter and LSU's investigation found that:

 a.  "Student 1" was employed in Football Operations

 b.  Student 1 reported that she had a phone call and other reactions with Les Miles that made her uncomfortable.

 c.  Miles had Student 1 baby sit for him, which is a violation of LSU policy.

 d.  Student 1 reported that on one occasion when she was babysitting Miles' children, he ended up staying with the children instead and asked to join them when they went to a movie.

 e.  Student 1 reported she stayed at Miles' apartment when she had some problems with her apartment.

f.   Student 1 reported that a window was broken in Les Miles' apartment and Miles made her uncomfortable when he asked her to accompany him to check on the window repair.

g.   "Student 2" was hired to work in recruiting and a couple of days after she began to receive Facebook messages from Miles.

h.   In March 2013 Student 2 had a meeting with Miles in his office regarding her future plans and no one else was in the office.

i.   Miles told Student 2 she could work for him on his personal business when she graduated.

j.   Miles told Student 2 to enter her phone number but to use an alias and he would do the same with her number.

k.   Miles initiated text messages with Student 2.

l.   Student 2 met Miles off campus; got in his vehicle; and the two of them rode around.

m.   Miles suggested they go to a hotel together and mentioned his condo as another meeting place.

n.   Miles drove Student 2 behind the Athletics Complex, parked the car, engaged in a sex act and kissed her twice.

o.   In 2012 Miles participated in interviewing female student employees

p.   Miles made it clear he wanted female student workers to be attractive and blonde.

q.   Miles told senior athletic supervisors female students who were not attractive and blonde were to be given fewer hours or terminated.

136.    On information in belief, sometime in 2013 Joe Alleva emailed both former Chancellor William Jenkins and F. King Alexander that Miles' "continued employment needs to be seriously considered" and on April 19, 2013, Joe Alleva sent Jenkins an email recommending Miles be terminated for cause, but at the conclusion of its investigation Taylor Porter determined there was not cause to discipline Miles or terminate Miles' contract.

137.    On information and belief sometime in April 2013 Taylor Porter prepared a report for the LSU Board of Supervisors related to the sexual harassment complaint against Miles. *See* Taylor Porter Billing Records attached as Exhibit 3.

138.    On May 15, 2013 Garrett "Hank" Danos (Chairman of the Board of Supervisors) Robert

"Bobby" Yarborough (Board Chairman Elect), Stanley Jacobs (Chairman of the Board – Athletic

Committee), Shelby McKenzie (LSU Legal Counsel and Partner at Taylor Porter), Joe Alleva

(Vice-Chancellor and Director of Athletics), Miriam Segar (Senior Associate A.D./Senior Woman

Administrator), Vicki Crochet ( Partner at Taylor Porter) and Bob Barton (Managing Partner

Taylor Porter) met to discuss the Taylor Porter investigation of  Miles and after multiple in person

meetings, emails, text messages and phone calls the enterprise agreed to not take any action against

Miles and not to inform the full Board of Supervisors. *See Exhibit2.*

139.    In Taylor Porter's written report, Miles' name appears as 'XXX" in the Taylor Porter

investigation in order to hide his identity and parts of the report that states Miles engaged in explicit

sex acts with Student 2 were blacked out to shield Miles from a possible criminal investigation for

a sex crime and any written directives given to Miles about his conduct were exchanged between

Taylor Porter and Miles' lawyers in order to shield the documents from public documents requests.

*See* Exhibit 2.

140.    The enterprise directed the written report be hidden in Taylor Porter's downtown Baton

Rouge Offices. Upon information and belief Taylor Porter is not the designated Custodian of

Public Records for LSU per *La. R.S. 44.1 et al.*  and at all material times Taylor Porter has never

been designated the Custodian of Public Records for LSU per *La. R.S. 44.1 et al.* The RICO

Defendants buried the Miles investigation off campus away from the public in order to shield the

Miles investigation from the Title IX reporting requirements and possible criminal investigation.

141.    Attorney Stanley Jacobs, in a March 9, 2021, *Sports Illustrated Article "Former LSU

Board Member Goes Inside Decision to Keep Les Miles"* stated  the Enterprise met "multiple

times" in face-to-face meetings"  and had "countless phone calls" to discuss the matter and

deliberate on Miles' future and that "Attorneys along with Jenkins demanded he and other board members keep the ordeal secret and the matter was never reported to the United States Department of Education,  LSU Campus Police or state law enforcement officials.

142.    The predicate acts involved in the following scheme include, inter alia, violations of 18 U.S.C. § 1341, 18 U.S.C. § 1343, 18 U.S.C. § 1510, 18 U.S.C. § 1512, 18 U.S.C. § 1951 and 18 U.S.C. § 1952.

**Scheme 2:  Scheme to Obstruct Justice and Prevent Lawful of Reporting Les Miles**

143.    Plaintiff alleges that on information and belief that sometime in May 2012 Vicki Crochet and Miriam Segar discussed changing a failing grade for a student who had accused Miles of sexual harassment and Crochet on May 5, 2013, called Human Resources Director A.G. Monaco ("Monaco") and asked that he help convince a professor to let the student retake a failed quiz after the student accused Miles of sexual harassment. Crochet told Monaco he could not speak a word of their conversation and refused to keep the investigation a secret or instruct the professor to rescind the failing grade. Monaco reported Crochet's phone call to LSU Provost Stuart Bell and LSU Vice President Robert Kuhn and the three of them agreed to inform William Jenkins, but Jenkins took no actions. Sometime in June 2013 Monaco informed new President F. King Alexander about Crochet's call but he took no actions and the May 15, 2013 investigation was never forwarded to LSU's HR Department nor was any mention of the sexual harassment investigation ever placed in Miles' personnel record per LSU policy.

144.    In June 2013 Taylor Porter had multiple meetings, phone calls and emails with F. King Alexander, Miriam Segar, Miles' legal counsel, student family and legal counsel and the Board of Supervisors to update them on settlement discussions between Miles, the student and LSU. *See* Exhibit 3.

145.     Plaintiff alleges on information and belief in July 2013, the enterprise facilitated and participated in settlement negotiations between Miles and the student who complained Miles sexual harassed her and on July 1, Vicki Crochet and Bob Barton met in New Orleans with Miles' legal counsel and the legal counsel of the student to discuss financial settlement and throughout July 2013 Taylor Porter had multiple meetings, phone calls and emails with F. King Alexander, Miriam Segar, Miles' legal counsel, the student's family and legal counsel and the Board of Supervisors to update them on settlement discussions between Miles, the student and LSU. *See* Exhibit 3.

146.     On information and belief Taylor Porter is in possession of billing records and documents that show actual settlement amount to student and the parties that provided financial support to the enterprise to bribe or otherwise influence student from moving forward with her Title IX and criminal complaint.

147.     The predicate acts involved in the following scheme include, inter alia, violations of 18 U.S.C. § 1341, 18 U.S.C. § 1343, 18 U.S.C. § 1951 and 18 U.S.C. § 1952.

**Scheme 3:  Scheme to Defraud Government**

148.     The Board of Supervisors agreed to pay Taylor Porter eighty ($80,000.00) thousand dollars for the fraudulent sexual harassment investigation of Miles and Taylor Porter's billing records show it charged LSU for work that was done to further the scheme to hide the Miles investigation from the reporting requirement of Title IX and to shield its written report from public documents request and this fraudulent activity was conducted by mail, email and phone. *See* Exhibit 3.

149.     Plaintiff alleges that on information and belief that, since 2013 to April 2021, Taylor Porter has billed LSU and taxpayers hundreds of thousands of dollars for work that was done to

further the racketeering enterprise, which was approved with the full knowledge and approval of the Board of Supervisors.

150.     On information and belief LSU in April 2021 LSU fired Taylor Porter after 80 years of representation for its role in directing a fraudulent sexual harassment investigation of Miles and hiding the written report of the investigation in its offices as a result of the release of the *Husch Blackwell Report*.

151.     On information and belief, sometime in March 2021, F. King Alexander stated in an Oregon State University Board of Supervisor's meeting that LSU "siloed" Title IX cases involving high profile football players and from 2013 to present the Board of Supervisors have approved of and submitted annually fraudulent Title IX reports to various federal agencies that did not include complaints filed against high profile football players and coaches by U.S. mail and email.

152.     The predicate acts involved in the following scheme include, inter alia, violations of 18 U.S.C. § 1341, 18 U.S.C. § 1343, 18 U.S.C § 1503, 18 U.S.C. § 1510, 18 U.S.C. § 1951 and 18 U.S.C. § 1952.

**Scheme 4:  Ongoing Scheme to Evade Title IX Investigations and Reporting**

153.     Plaintiff on information and belief alleges that sometime after 2013, members of the Board of Supervisors opted into racketeering enterprise to hide Title IX and sexual harassment investigations and evade compliance with its Title IX obligations. F. King Alexanders stated in a March 17, 2021, Oregon State Board of Supervisors meeting that shortly after he was hired in 2016 the Board of Supervisors informed him of the 2013 Miles sexual harassment investigation conducted by Taylor Porter and they did not have enough information to take action against him.

154.     From 2013 to present none of the LSU Athletics-related reporting policies, forms and acknowledgement of the University's Title IX Coordinator required athletic employees to report sex-based misconduct to the University's Title IX Coordinator and on June 4, 2015, an LSU law professor sent a letter to President F. King Alexander documenting concerns about how LSU was illegally mishandling Title IX complaints and Alexander and the Board of Supervisors took no actions on her recommendations. *See* Exhibit 1.

155.     In September 2016 former Title IX Coordinator Jennie Stewart reported to senior leaders at LSU that the University's Title IX staffing was behind peer institutions and that she needed additional resources to avoid potential harm including litigation and Alexander and the Board of Supervisors took no actions on her recommendations. *See* Exhibit 1.

156.     On August 30, 2016, President F. King Alexander created a task force of students, faculty and staff to review Title IX policies and Alexander and Board of Supervisors took no action to implement the task force's recommendations. *See* Exhibit 1.

157.     In 2017 the Tiger Athletic Foundation hired the Dan Beebe Group to conduct an independent assessment of human relations risks including Title IX to LSU's Athletic Department and Alexander and the Board of Supervisors took no actions to implement its findings. *See* Exhibit 1.

158.     In September 2017 LSU's Office of Internal Auditor issued a report titled "Oversight and Prevention of Sexual Misconduct" which included nine recommendations and several findings on handling Title IX and sexual harassment complaints and Alexander and the Board of Supervisors took no action to implement them. *See* Exhibit 1.

159.     In 2018 the consulting firm Baker Tilly conduced an "Athletics Risk Assessment" and one of the top risks identified was the lack of reporting procedures for Title IX. Alexander and the

Board of Supervisors took no actions on their recommendations. *See* Exhibit 1.

160.    In 2019 the Board of Supervisors retained Morgan, Lewis & Bockius LLP to conduct a privilege and confidential review of LSU's Title IX policies and Alexander and the Board of Supervisors never shared the report with LSU's Title IX office or the Athletic Department. *See* Exhibit 1.

161.    October of 2020, *USA Today* submitted a public documents request to LSU for the unredacted copy of the 2016 police report that names former star running back Darrius Guice and the Board of Supervisors refused to respond to the request and *USA Today* successfully sued LSU for its release and in  state district court the judge ruled LSU " was unreasonable, arbitrary and capricious in its refusal and delay and the redacted manner in which documents were produced" and ordered LSU to pay USA Today $10,000 in attorney fees and additionally $6,200 in civil penalties.

162.    In 2021, *USA Today* submitted a public documents request for documents from the Taylor Porter investigation and LSU refused to turn them over. *USA Today* subsequently successfully sued LSU for its release.

163.     This continued pattern of racketeering is further demonstrated, in April 2021, LSU's Medical School Employees in Shreveport Louisiana filed an EEOC complaint alleging Chancellor Dr. E. Ghali suppressed sexual harassment allegations that involved students and retaliated against faculty members who reported the illegal behavior.

164.    The predicate acts involved in the following scheme include, inter alia, violations of 18 U.S.C. § 1341, 18 U.S.C. § 1343, 18 U.S.C. § 1951 and 18 U.S.C. § 1952.

**Scheme 5:  Ongoing Scheme to Control LSU Athletics and Avoid Title IX**

165.     In 2013 LSU's Athletics Department created $397.5 million in sales in Baton Rouge, Louisiana.  In 2019 the LSU football program generated $92 million in revenue.  LSU football, in 2020, generated $50 million in profit. LSU is a member of the Power 5 conferences that generated more than $2.9 billion in combined revenue in fiscal year 2019.  In 2020, LSU was compensated $4,200,000 million for the football team winning the College Football National Championship. Control of LSU Athletics is the power to award millions of dollars in contracts to state and national companies and F. King Alexander, on March 17, 2021, stated there was a great deal of intervention in athletics by the Board of Supervisors.

166.     Louisiana's elected officials have historically sought to exert influence and control over LSU Athletics. The 16-member Board of Supervisors are appointed by the Governor of the State of Louisiana. On information and belief in 2011 Governor Bobby Jindal ("Jindal") called the President of LSU and instructed him to "no matter what it takes" retain Miles when another university was attempting to lure him from LSU and sometime in 2011 Jindal called the President of LSU and instructed him not to make a counteroffer to retain athletic director Joe Alleva who was being offered another position at a competing university. In November 2015 Jindal intervened to save Miles' job; Jindal tweeted "*@LSUCoachMiles is a great coach and a better man. He is a fantastic ambassador for our state. I hope he remains our coach.*" and in 2015 Miles campaigned for Bobby Jindal's re-election. RICO Defendants used wire and mail fraud and bribery in a racketeering scheme to control LSU Athletics that affected interstate commerce.

167.     James Williams ("Williams"), then-Chairman of the Board of Supervisors and then-Chairman of the Athletic Committee Mary Leach Werner ("Werner") and two other unnamed Board Members, opted into the racketeering enterprise by furthering the scheme to control LSU

athletics.

168.     On information and belief in April 2019 Williams, Werner and two unnamed board members  met with  F. King Alexander in Juban's, a restaurant in Baton Rouge and directed him to fire Athletic Director Joe Alleva and hire Scott Woodward  and Williams wrote on a napkin the amount of Woodward's salary and handed it to Alexander and told him this is what Woodward was to be paid and then directed Alexander promote Verge Ausberry and increase his salary from $250,000 to $500,000 annually in furtherance of the scheme to control LSU athletics.

169.     Williams, Werner and the unnamed board members violated the Southern Association of Colleges and Schools *Rule 5.2 (b)* that states the university's chief executive "has ultimate responsibility for and exercise appropriate control over the institution's intercollegiate athletic program" in furtherance of the scheme to control LSU athletics.

170.     On information and belief Alexander met with Alleva and told him the "board leadership has hired a new athletic director and I've got to fire you" and on May 6, 2019, the Board of Supervisors hired Woodward at the salary Williams had written down on the napkin and promoted and increased Ausberry's salary to $ 500,000 from $250,000.

171.     On May 5, 2021 F. King Alexander in the *Baton Rouge Business Report  King Alexander: Restaurant meeting with key board members a "Monday night massacre'* speaking about the May 6, 2019 meeting at Juban's stated:

> *It violates university policy, accreditation standards, to have a small number of board members-without others knowing-that they had worked out a deal and…were paying him substantially more than we were paying Alleva…I have never experienced anything like it in 20 years as a public university president. To replace an athletic director without myself or anyone on my staff knowing about it is quite an extraordinary intrusion into university*

*governance and shared governance."*

172.    On information and belief, the enterprise hired Woodward as Athletic Director and raised Ausberry's salary one hundred percent to maintain control of LSU Athletics, its lucrative revenue generation, control over the hiring and firing of Athletic employees and the continued hiding of Title IX investigations and, in March 2021, F. King Alexander stated in an Oregon State Board of Supervisors meeting that, "only the Board of Supervisors at LSU can hire and fire the football coach."

173.    In 2021, Williams was named Chairman of the Committee to select a new President of the LSU System and Chancellor of the Baton Rouge Campus and Werner and Ausberry were appointed to the committee to further the enterprise scheme to control the athletic department.

174.    The predicate acts injured plaintiff's business and property include, *inter alia*, violations of 18 U.S.C. § 1341, 18 U.S.C. § 1343, 18 U.S.C. §1510, 18 U.S.C. 1512, 18 U.S.C. § 1513, 18 U.S.C § 1513 (e) 18 U.S.C. § 1951 and 18 U.S.C. § 1952.

**Scheme 6:  Scheme to Damage Sharon Lewis' Employment and Employability**

175.    Plaintiff became aware of the enterprise racketeering scheme with the publishing of the *Husch Blackwell Report* in March 2021 and, shortly thereafter, the publishing of the Taylor Porter written investigation report of Les Miles in March 2021 by *USA Today.*

176.    Plaintiff is the only employee in LSU Athletic Department that has ever reported Title IX complaints including a complaint to the Miriam Segar against Verge Ausberry - for verbal harassment and verbally abusing plaintiff and a complaint to Title IX Officer that Segar and Ausberry be investigated for failing to make mandatory reports and no action has ever been taken.

177.    Plaintiff continually reporting Title IX complaints to her superiors was a direct threat to

the enterprise scheme to "silo" Title IX investigations in the athletic department and the enterprise intentionally targeted plaintiff for retaliation by interfering in her employment livelihood as spelled out in detail in this amended complaint made a part of herein.

178.    On October 1, 2018, LSU opened a fraudulent PM-73 investigation against plaintiff for failure to report a Title IX complaint involving LSU football player Drake Davis. Jeffrey Scott, Title IX Lead Investigator intentionally failed to interview multiple material witnesses and determined that Miriam Segar and Verge Ausberry were the only two "material observers." *See Exhibit1.* Segar and Ausberry gave false testimony plaintiff was aware that Davis had assaulted his girlfriend and did not report it to the Title IX office even though she had been instructed by Segar after she filed a complaint against Miles to report all future Title IX reports to her.  F King Alexander, on March 17, 2021, stated that a memorandum had been issued by LSU to all athletic employees that all Title IX complaints were to be directed to Segar.  Ausberry openly reprimanded plaintiff regarding a Title IX incident of LSU football player Derrius Guice where Ausberry repeatedly told plaintiff "to tell Miriam Segar and no one else". *See* Exhibit 1. Ausberry and Segar failed to inform the investigator that all Title IX complaints in the athletic department be directed to them, to intentionally interfere and damage plaintiff employment. *See* Exhibit 1.

179.    Scott concluded plaintiff failed to follow the mandatory Title IX reporting requirements based on the fact "Two Material Observers" denied that the respondent ever reported the information to them, even though plaintiff had identified two witnesses who saw her report the matter to *Segar* and neither witness was interviewed. *See* Exhibit 1. Plaintiff appealed Scott's decision to the Title IX Coordinator Stewart and on January 19, 2019, she denied her appeal on the basis there was no evidence that plaintiff had made a Title IX complaint.  Plaintiff appealed the decision.

180.     On January 29, 2019, plaintiff submitted an appeal and Stewart forwarded Ms. Lewis'
appeal to Human Resources including to Deputy Title IX Coordinator for Employees Lindsay
Madatic for "next steps" and to LSU's in-house legal counsel. Plaintiff's appeal included detailed
accounts of abuse by Verge Ausberry, but LSU did not investigate and therefore LSU violated
Title IX. *See* Exhibit 1. Human Resources determined Scott's investigation was fraudulent and in
consultation with LSU attorney communicated to plaintiff the discipline was removed "from the
file" *See* Exhibit 1.

181.     The PM-73 (Title IX) violation remains in plaintiff's personnel file to intentionally
interfere with and damage plaintiff's employment and employability. On December 11, 2020,
plaintiff's legal counsel requested a copy of the full PM-73 (Title IX) investigation of Ms. Lewis
by email and, on December 15, 2020, Tetyana Hoover emailed plaintiff's attorney that "LSU is
currently reviewing" the request. LSU has never responded to plaintiff's public document request.

182.     In March 2021, after the *Husch Blackwell Report* was released Ausberry was suspended
for 30 days and Segar was suspended for 21 days for their failures to properly report and investigate
allegations of sexual misconduct and domestic violence at LSU and, in April 2021 Ausberry was
removed from attending LSU's football games for his role in the Athletics Department's failure to
investigate sexual misconduct and domestic violence at LSU.

183.     The PM-73 (Title IX) investigation of plaintiff has been reported in local and national
media and LSU has never issued a public statement that the PM-73 findings was overturned and,
in April 2021, plaintiff was named as a defendant in a class action lawsuit over LSU's failure to
properly report and investigate allegations of sexual misconduct and domestic violence at LSU
and as a Senior Athletic official with a PM-73 (Title (IX) violation in her personnel record and
whose name is associated with a national sex scandal, her career and opportunity for advancement

in NCAA athletics has been destroyed.

184.　　Plaintiff's employment has been injured and interfered with by predicate acts, inter alia causing loss of salary, loss of benefits, loss of promotion, loss of employment opportunities and damage to her professional reputation.

185.　　As a result to a culmination of the above described schemes and conspiracy, LSU received federal funds despite its repeated, deliberate and intentional refusal to comply with Title IX and meet all necessary requirements to receive such funding.

## Count 1: Violation of 18 U.S.C. § 1962 (c)

186.　　Garrett "Hank" Danos, Robert "Bobby" Yarborough, Stanley Jacobs, James Williams, Mary Leach Werner, Joe Alleva, William Jenkins, F. Alexander King, Scott Woodward, Miriam Segar, Verge Ausberry, Shelby McKenzie, Vicki Crochet, Bob Barton and Board of Supervisors Louisiana State University, who operated, managed and participated in the conduct of the affairs of a RICO (Defendants) by engaging in a pattern of racketeering activity, comprised of repeated predicate acts as listed above.

187.　　By reason of the RICO Defendants violation of 18 U.S.C. § 1962 (c), plaintiff has been injured in her business and property, entitling her to recover her actual and consequential damages in an amount to be proven at trial, treble damages, attorney fees and costs. Additionally, by their willful and intentional actions to dismantle LSU's Title IX infrastructure and refusal to investigate Title IX complaints other students, faculty and employees of the LSU system have been damaged in their business and property.

## Count 2: Violation of 18 U.S.C. § 1962 (d)

188.　　As evidenced by their acts and omissions set forth above, the RICO Defendants agreed

and conspired to participate in the conduct of the affairs of the enterprise through a pattern of racketeering, in violation of 18 U.S.C. § 1962 (d).

189.    By reason of the RICO Defendants' violation of 18 U.S.C. § 1962 (d), plaintiff has been injured in her business and property, entitled her to recover her actual and consequential damages, in an amount to be proven at trial, treble damages, attorney fees and costs. Additionally, by their willful and intentional actions to dismantle LSU's Title IX infrastructure and refusal to investigate Title IX complaints other students, faculty and employees of LSU have been damaged in their business and property.

## **Vicarious Liability**

190.    The doctrine of vicarious liability is well-established doctrine of agency law whereby principals are liable when their agents act with apparent authority and commit torts. Plaintiff recognizes that on a general level courts have been concerned about imposing vicarious liability upon organizations for the acts of their agents would defeat one purpose of RICO-the purpose protecting organizations form the infiltration of racketeering activity- which manifest itself in the prohibition on direct liability mandated by the enterprise distinctiveness requirement. Although the overriding intent of RICO is acknowledged, plaintiff urges that the court should consider whether the RICO Defendants' actions herein are sufficiently representative of the organizations to implicate a corresponding goal of RICO-protecting the public from those who would unlawfully use an organization as a vehicle through which unlawful activity is committed. In this instance plaintiff shows that the RICO defendants herein managed and controlled the RICO enterprise by virtue of their senior management positions. Each had specific knowledge of, or was recklessly indifferent toward, the unlawful activity. Given the Board of Supervisors and Senior Administrators involved, their degree of participation in the schemes, as well as Louisiana State

42

University benefit from the schemes, vicarious liability should be imposed on Louisiana State University. Given the number of high-level partners involved, their degree of participation in the schemes, as well as Taylor Porter's benefit from the schemes, vicarious liability should be imposed on Taylor Porter.

## 42 U.S.C. § 1981

191.      That the allegations of fact in paragraph 1 through 189 inclusive, are re-plead and reasserted herein as though set forth *in extenso.*

192.      For the purposes of 42 U.S.C. § 1981 claims asserted herein, the defendants are: Louisiana State University, a recipient of federal funds and the Board of Supervisors of Louisiana State University ("1981 Defendants").

193.      From 2009 to present, plaintiff has suffered a continuing pattern of hostile work environment based on her race as an African-American.

194.      Plaintiff was continually subjected to Miles' racist and homophobic conduct. In a meeting with Miles in her office, he demanded plaintiff fire a male student worker because he looked gay. Plaintiff reported this incident to her superiors and no action was taken. Plaintiff received a phone call from a student worker who was African-American and was upset because Miles told her to leave the building because she was ugly. Plaintiff reported this incident to her superiors, but they took no action.

195.      From 2009 to present, plaintiff reported the hostile work environment to her immediate supervisors, but they took no action.

196.      Plaintiff has made several attempts to meet with Athletic Director Scott Woodward to discuss the hostile work environment, but Woodward has refused to meet with her.

197.    On May 5, 2021 F. King Alexander in the *Baton Rouge Business Report  King Alexander: Restaurant meeting with key board members a "Monday night massacre'* stated that LSU had a "racist culture."

## LEGAL CAUSE OF ACTION

198.    Plaintiff pleads that all her discriminatory injuries and damages were caused by the Defendant's intentional violations of various Federal Statutes which are pled herein above or alternatively by negligence and gross negligence of the executives, agents, and managers of the defendants and University.

199.    Plaintiff pleads and asserts entitlement to damages pursuant to the legal theories of failure to train, vicarious liability and respondent superior for acts and omissions of LSU and the LSU Board of Supervisors by individual defendants acting at the direction or on behalf of LSU for any and all causes of actions asserted herein.  Plaintiff further pleads and asserts entitlement to damages as a direct and proximate cause of LSU and the LSU Board of Supervisors and their employees, agents, assigns and successors for the intentional and ongoing deliberate failure to comply with its own policies and governing regulations.

200.    Plaintiff herein state a cause of action based on Hostile Work Environment based 42 U.S.C.  § 1981.

## PLAINTIFF PLEA FOR DAMAGES AND REMEDIES

A.  Plaintiff seeks past and future lost wages and benefits.

B.  Plaintiff seeks damages for emotional pain and distress and mental anguish.

C.  Plaintiff seeks damages for humiliation and suffering of discrimination.

D.  Plaintiff seeks damages for loss of enjoyment of life and inconvenience.

E.  Plaintiff seeks damages for loss of earning potential.

F.  Plaintiff seeks damages to her physical health and mental health.

G.  Plaintiff seeks treble damages under 20 U.S.C. §1681(Title IX) and 18 U.S. § 1962 (c) and (d). and any and applicable state laws.

H.  Plaintiff seeks punitive damages under 42 U.S.C. § 1981.

I.  Plaintiff seeks reasonable attorney fees and cost of suit pursuant to 20 U.S.C. §1681(Title IX), 18 U.S.C § 1962 (c) and (d), 42 U.S. C. § 1981 and applicable state laws.

J.  Plaintiff seeks damages of injury to their reputation, character, economic opportunities and defamation.

K.  Plaintiff seeks injunctive relief to stop the violation of law and to require defendants to provide a workplace free of discrimination and racketeering and to make the Plaintiff whole in her job, duties and opportunities for advancement.

## JURY DEMAND

Plaintiff demands trial by jury.

## PRAYER FOR RELIEF

Plaintiff Sharon Lewis, respectfully prays for judgment against Defendants, individually, jointly and severally, for an amount of no less than $50,000,000 million together with legal interest, reasonable attorneys' fees and costs against Louisiana State University and all named Defendants, pursuant to 20 U.S.C. § 1681 (Title IX) and 42 U.S. § 1981 and with respect to RICO the following:

I)    Declaring that the RICO Defendants' conduct constituted violations of 18 U.S.C § 1961 et seq.;

II)   Determine plaintiff's injuries are due to the RICO Defendants' actions and holding not only the RICO Defendants but Louisiana State University and Taylor Porter

(with vicarious liability) liable, jointly, severally and in solido for the plaintiff's actual and consequential damages shown at trial; and

III)  Providing reasonable restrictions on future activities or conduct of the RICO Defendants.

<div style="margin-left:40%">

Respectfully submitted:

*/s/ Larry English*
Larry English, LSB No. 22772
Larry English, Attorney at Law
423 W. 127 Street, 7th Floor
New York, New York 10027
917-531-3909
englishlaw2008@gmail.com


*/s/ Tammye C. Brown*
Tammye C. Brown, LSB No. 29108
Campbell Brown Law & Consulting
1220 E. Northside Drive, Suite 170-176
Jackson, Mississippi 39211
601-703-8911
601-703-8999 (fax)
tbrown@campbellbrownlaw.com


*/s/ Bridget Brown*
Bridgett Brown, LSB No. 18815
BROWN & ASSOCIATES
418 DeSoto Street
Alexandria, Louisiana 71301
lawyer4u.bridgett@gmail.com

</div>