## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **SHARON LEWIS** | **CIVIL ACTION NO.  3:21-CV-00198** |
| **VERSUS** | **JUDGE SUSIE MORGAN** |
| **LOUISIANA STATE UNIVERSITY, ET AL.,** | **MAGISTRATE JUDGE RICHARD L. BOURGEOIS** |
| | **JURY DEMAND** |

## SECOND AMENDED COMPLAINT
## AND JURY DEMAND

THE HONORABLE JUDGE OF SAID COURT

NOW INTO COURT, through undersigned counsel, comes plaintiff, Sharon Lewis, who is of the full age of majority and domiciled in the Parish of East Baton Rouge  respectfully represents:

## PARTIES AND JURISDICTION

1. Plaintiff SHARON LEWIS is an African American woman and citizen of the United States and a resident of Louisiana and is an employee of Louisiana State University who has played a vital role in LSU Football Recruiting since 2002 and all times relevant to this cause of action.

Made Defendants herein are:

2. Defendant, Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (the "Board," "Defendant Board" or "BOS" or "LSU"), is a public constitution corporation organized and existing under the laws of the State of Louisiana to operate, manage and control the LSU public university system, including its campus in Baton Rouge, with its principal place of business located at 3810 West Lakeshore Drive, Baton Rouge, Louisiana 70808. LSU is a recipient

of federal funds within the meaning of 20 U.S.C. §1681 (Title IX);

3. Defendant, William Shelby McKenzie, is a resident of Louisiana and of the full age of majority and is a partner at Taylor Porter and at various material times served as LSU's Lead Legal Counsel and made Defendant herein in his individual capacity;

4. Defendant, Vicki Crochet, is a resident of Louisiana and of the full age of majority and is a partner at Taylor Porter and at various material times served as LSU's Legal Counsel and made Defendant herein in her individual capacity;

5. Defendant, Robert "Bob" Barton, is a resident of Louisiana of the full age of majority and the Managing Partner at Taylor Porter and at various material times served as LSU's Legal Counsel and made Defendant herein in his individual capacity;

6. Defendant, Joseph "Joe" Alleva is of the full age of majority and at various material times served as Vice Chancellor and Director of Athletics and made Defendant herein in his individual capacity;

7. Defendant, Scott Woodward, is a resident of Louisiana and of the full age of majority and at various material times served as Athletic Director of LSU and made Defendant herein in his individual capacity;

8. Defendant, Verge Ausberry, is a resident of Louisiana and of the full age of majority and at various material times served as Executive Deputy AD/Executive Director of External Relations and made Defendant herein in his individual capacity;

9. Defendant, Miriam Segar, is a resident of Louisiana and of the full age of majority and at various material times served as Senior Associate Athletic Director at LSU and made Defendant herein in her individual capacity;

10. John Does (1-10) are other Defendants who may be identified through the course of litigation and Plaintiff reserves the right to amend the Complaint to add Defendants as they become known.

2

11. Jane Does (11-20) are other Defendants who may be identified through the course of litigation and Plaintiff reserves the right to amend the Complaint to add Defendants as they become known.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because this litigation involves claims arising under Title IX of the Education Amendments of 1972, 20 U.S.C § 1681, and this being an action which arises under 18 U.S.C. § 1961 -1968, 901(A) of Title IX of the Organized Control Act of 1970 as amended, otherwise known as RICO and Title VII of the Civil Rights Act of 1964

13. Personal jurisdiction and venue are predicated upon 18 U.S.C. § 1965, and 28 U.S.C. § 1391, and other applicable venue statutes since the defendants are residents of, have an agent or agents, or transact affairs in this district and because a substantial part of the events and omissions giving rise to this case and the damages sustained by Plaintiff occurred in East Baton Rouge Parish, Louisiana, which is part of the United States District Court for the Middle District of Louisiana.

## OPERATIVE FACTS

14. Plaintiff, SHARON LEWIS, has played a vital role in LSU's Football Recruiting since 2001. Ms. Lewis is a 1991 graduate of LSU who was a student worker in the Athletic Department and an All-SEC heptathlete and high jumper for LSU's national championship women's track and field team. Ms. Lewis was hired as the Coordinator for Recruiting Operations in 2001 under Nick Saban. Ms. Lewis was promoted to Assistant Athletics Director for Football Recruiting and Alumni Relations in 2007. Ms. Lewis has recruited the top football players in the nation to play football at the highest level in college football for nearly 20 years. Ms. Lewis remained the Assistant Athletic Director for Football Recruiting and Alumni Relations for nearly 13 years. Ms. Lewis was given a new title as Associate Athletics Director for Football Recruiting and Alumni Relations in August 2020. Her

duties included management of full-time employees as well as 35-40 student workers.  Ms. Lewis also oversees all special events associated with recruiting, such as pregame and postgame events, dinners, banquets and social outings for official visits. Additionally, she manages student workers to help with the day-to-day recruiting tasks and planned activities. Ms. Lewis' recruitment program has been consistently ranked in the top five (5) in the SEC and top five (5) nationally, except in 2013 and 2018. Ms. Lewis oversees all of LSU's Football on-campus recruiting activities and manages the recruiting staff. Due to the success of the football recruiting program under Ms. Lewis' leadership, LSU won 2003 National Championship (Nick Saban); 2007 National Championship (Les Miles); 2007 SEC Championship (Les Miles); 2011 SEC Championship (Les Miles); 2011 National Championship Game (Les Miles); 2019 SEC Championship (Ed Orgeron) and 2020 National Championship (Ed Orgeron). Ms. Lewis modified the expectations for the student workers to require student workers wear suits, dress more professionally and develop administrative skills.

15. Plaintiff alleges she engaged in protected activity by reporting complaints of Title IX violations and sex discrimination and defendants retaliated against her in compensation, promotions and inadequate support.

16.  Plaintiff alleges she has been intentionally discriminated against and she is entitled to compensatory damages and punitive damages.  Plaintiff, an African-American, asserts LSU and the Board of Supervisor have engaged in unlawful discrimination with malice or with reckless indifference to federally protected rights to which she is entitled.

17. Plaintiff alleges there has been a continuing pattern of discrimination against Plaintiff and African-American employees that continues to exist at the initiation of this action.

18. Plaintiff alleges the wrongful acts, pled herein, were either intentionally, directly or tacitly ratified, approved, encouraged and endorsed by Board of Supervisors, Senior Administrators of LSU or alternatively, the intentional discriminatory acts of agents and employees were ignored by upper and middle management with negligence and gross negligence, which contributed to the cause, the harm, the damage and this is the basis of this complaint and subject action.

19. Miriam Segar ("Segar") was the Athletics Department designee to receive and investigate Title IX related complaints or reports of complaints at all relevant times herein.

20. Verge Ausberry ("Ausberry") was plaintiff's immediate supervisor at all relevant times herein.

21. Robert Barton  (Barton) advised LSU's Athletic Department on Title IX Issues.

22. Vicki Crochet advised LSU's Athletic Department on Title IX Issues.

### *The Husch Blackwell*

23. On November 2020 LSU retained the Husch Blackwell law firm to investigate the school's handling of several Title IX-related incidents as well as LSU's Title IX policies and procedures.

24. On March 5, 2021, Husch Blackwell issued its investigative report and finding (hereinafter referred to as "Husch Blackwell Report" or "Husch Blackwell."[1]

25. The Husch Blackwell Report found although Sharon Lewis was the only employee to report Title IX complaints in LSU's Athletic Department, she is the only Athletic employee that a PM-73 Investigation was ever initiated against.

26. Until the release of the report in March 2021, plaintiff was unaware  the Board of Supervisors  had

---

[1] Attached as Exhibit 1

knowledge of the pervasive harassment, heightened risk of retaliation plaintiff, students and employees suffered for reporting Title IX complaints. Plaintiff was also unaware of the severe institutional level of procedural deficiencies that avoided discipline for athletic coaches and athletic officials that retaliated against plaintiff for filing Title IX complaints, creating a basis to impute knowledge of Title IX violations and other wrongs to the Board of Supervisors.

27. The Husch Blackwell Report found  "Various incidents of athletics-related misconduct have not been appropriately reported to the University's Title IX Coordinator."

### **FACTUAL BASIS FOR CLAIMS**
**Title IX, Civil RICO and Title VII**

28. Plaintiff adopts and incorporate by reference the previously plead paragraphs as if fully plead herein.

29. Plaintiff was issued a Right  To Sue Letter by the EEOC on January 3, 2022, and Plaintiff timely amends this complaint to include Title VII claims. *See Exhibit 6 Right to Sue Letter.*

30. After the hiring of head coach Les Miles (Miles) in 2005, Miles, in his first meeting with plaintiff, made racist comments and stated he "prefers the blonde over the brunette." Shortly after, Miles hired Shelley Roberts who was a white, blonde female to lead LSU's football recruitment and stated to plaintiff, "now that's the face of recruiting."  Miles selected Shelly based solely on her appearance after spotting her in the Athletics building. Miles later ordered plaintiff to fire Shelly because he did not like Shelley wearing sweat suits to work, but plaintiff refused to comply with his demand.

31. Plaintiff became concerned Miles had an inappropriate fixation on female student workers and plaintiff reported her concerns to Ausberry, her immediate supervisor, who asked plaintiff to give him details but took no actions.

32. Miles complained to plaintiff about the appearance of the female students on the recruiting staff and told plaintiff there were "too many Black girls," "fat girls" and "ugly girls" employed in LSU's Athletics and ordered plaintiff to fire them. Plaintiff again refused to comply. Miles stated to plaintiff, the student female workers she hired looked like a "bad bowling team." That comment became a joke among the coaching staff and throughout the football operations building and senior athletic administration staff, including the cleaning staff.

33. On November 21, 2010, Miles stated in a staff meeting with the coaches and athletics department staff, he had ugly girls here and stated when he was at Oklahoma State,[2] he took over interviewing student female workers and hired them himself. Plaintiff felt embarrassed and isolated and immediately reported what was said in the meeting to her superior Verge Ausberry, who took no action against Miles for those and other racist and sexist statements.

34. Sometime in 2010 Miles also started labeling the female student workers as "AM and PM" girls and stated to plaintiff "there are two types of girls I like to hire: AM girls are the worker bee types. They are for filing, typing and in office work. The PM girls are the pretty girls, ones people like to look at and we need to use for recruiting events" and Miles directed plaintiff to hire "blondes with the big boobs." Plaintiff reported these comments to Verge Ausberry ("Ausberry") and was told "you are making too big a deal about the comments Coach Miles was making about the girls and you need to just worry about doing your job and I hired prettier girls." Frank Wilson, Running Back Coach, met with plaintiff with others present and directed them to tell plaintiff to "hire prettier girls, more light skinned black girls and that would stop Miles from bullying plaintiff."

---

[2] During Les Miles' tenure at Oklahoma State (2001-2004) the cowboys orange pride program provided female students as hostesses to recruits. The program was disbanded after allegations hostesses had sex with football recruits. *See* https://www.theadvocate.com/baton_rouge/sports/lsu/article_40f2f159-25ae-5612-b40b-cb0168122733.html, *citing* Sports Illustrated 9/13/2013 article entitled Special Report on Oklahoma State Football: Part 4 – The Sex.

Plaintiff complained to Bo Bahnsen, Sr. Associate Athletics Director, about Miles' sexist and racist comments, but was told maybe it was time for plaintiff to look for another job.

35. After LSU lost the 2011 National Championship game, Miles' fixation on student workers grew to an obsession and he complained to plaintiff the student female workers were "too fat," "too ugly," "too black" and demanded plaintiff hire "blonde girls" with "big boobs." The student workers plaintiff hired were fairly evenly split racially between African-American and Caucasian but Miles only communicated with the Caucasian student workers. Plaintiff reported Miles' sexist and racist comments to her superiors and no action was taken.

36. Sometime in 2012, Miles told an Athletics official to inform plaintiff he would take over the hiring of female student workers and the interviews would take place in his office at night and requested plaintiff set up the interviews. In a meeting with Sam Nadar and Haleh Samadnouri, plaintiff expressed concerns that Miles' plan to interview student female workers at night in his office was inappropriate, but she was subsequently ordered by Ausberry to set up the night interviews between Miles and student female workers. Miles interviewed the female students at night in his office and went to sorority houses to recruit female student workers.

37. Miles interviewed about 15 to 20 female LSU students for student recruitment staff positions. Several of the girls interviewed by Miles reported to plaintiff Miles asked them about their sex life. One student interviewed by Miles stated he asked her if she were a virgin.

38. Plaintiff reported Miles' conduct to Ausberry, Sam Nader ("Nader") and Segar and was told by Ausberry, "if you don't like it here, leave." Plaintiff noticed her superiors became hesitant to meet with her after reporting Miles' racist and sexist comments. Ausberry told her several times she needed to go find another job and "she should have taken a job at Alabama.

39. Starting in 2009, Plaintiff complained to her immediate supervisors Miles was sexually harassing

female student workers and they failed to take any action to investigate or discipline Miles. Plaintiff complained to her immediate supervisors Miles was subjecting plaintiff and African-American students to racist insults and they failed to take any action to investigate or discipline Miles.

40. Sometime in 2013, a female student worker ("Student 1") came to plaintiff traumatized and very upset about something that happened when she was alone with Miles.  Student 1 stated Miles got on top of her in his office. Student 1 requested plaintiff's assistance in confronting Miles and plaintiff accompanied Student 1 to Miles' office where Student 1 stated to Miles, "you know what you did to me" and Miles repeatedly apologized to Student 1. Plaintiff immediately reported Student 1's allegations to Miriam Segar. Student 1 met with Miriam Segar, but she took no action. There is no record of Student 1's complaint about Miles being investigated in a manner consistent with the then-University policy.[3]

41. In February 2013, a second female student worker ("Student 2") reported to plaintiff she had received contact, via social media and text messages, from Miles. Plaintiff immediately reported Student 2's complaint about Miles to Segar and provided Segar with text messages from Miles to Student 2.

42. As part of the investigation, plaintiff was instructed to meet at Taylor Porter's offices in downtown Baton Rouge where she met with Vicki Crochet and when she asked, "what happens next?" Vicki Crochet told her it was legal because the student workers were of the "consenting age" and the reported conduct was "not illegal, maybe immoral." On May 15, 2013, Taylor Porter issued a written report which concluded Miles had not violated LSU's Sexual Harassment Policy nor his

---

[3] Exhibit 1

contract. *See* Taylor Porter's Written Investigation (hereinafter referred to as the "Miles Report").[4]

43. In around 2015, plaintiff filed a complaint (referenced herein as "Complaint 9") to Miriam Segar against Verge Ausberry for verbal harassment, emotional abuse, belittling and open humiliation of plaintiff.

44. Per a June 8, 2016, email to the Athletics Department staff, Joe Alleva, Athletics Director, instructed "staff members should not attempt to conduct any investigation or make any determination regarding alleged, reported or suspected misconduct. Instead, you are required to report all potential issues so that they are properly addressed by trained university officials. Please report these issues to either Miriam Segar, Sr. Associate Athletics Director Student Services or Wendy Nall, Assistant Athletics Director HR. Both of these individuals have been trained in Title IX law and can help facilitate the proper reporting that is required by law and university policy."

45. Plaintiff received notice of the nude photograph of Samantha Brennan's (referenced herein as "Student 3") complaint in 2016. Plaintiff reported the complaint to Segar.

46. In or about the Fall of 2016, plaintiff received a report of misconduct of a football player from Calise Richardson (referenced herein as "Student 4") regarding a drink tossing incident at a local bar. The Richardson complaint was reported to plaintiff, Keva Soil-Cormier and Ya'el Lofton. As instructed by Athletics Department leadership, plaintiff reported Richardson's complaint to Segar. Plaintiff was specifically instructed not to conduct investigations of such complaints and did not conduct an investigation of Richardson's complaint.

47. In or around May 2016, female student worker (referenced herein as "Student 5") complained to plaintiff of Earl Chevalier, a member of the athletics department coaching staff, seeking to date or

---

[4] Attached as Exhibit 2

otherwise pursue an inappropriate relationship with the student worker.  Plaintiff reported Student 5's complaint to Segar.

48. Another student (referenced herein as "Student 6") complained of Title IX related misconduct to plaintiff in January or February 2017.  Plaintiff reported Student 6's complaint to Segar as repeatedly instructed.

49. In or around December 2017, plaintiff received the Gloria Scott (referenced herein as "Complaint 8") complaint and reported the complaint, along with text messages, to Segar and Ausberry.

50.  In 2018, plaintiff received another complaint of a female student worker threatening a male student (referenced herein as "Student 7") with Title IX type misconduct.  Plaintiff reported Student 7's complaint to Segar.

51. In 2019 plaintiff filed a Title IX complaint with Jeffery Scott, Title IX Officer requesting Segar and Ausberry be investigated for failing to make mandatory Title IX reports and no action has ever been taken.

**<u>BOARD OF SUPERVISORS FAILED TO MEET ITS TITLE IX OBLIGATIONS</u>**

52. Plaintiff adopts and incorporate by reference the previously plead paragraphs as if fully plead herein.

53. Title IX has been in effect since 1972 and has required institutions like LSU to designate a Title IX Coordinator since 1975. Title IX prohibits retaliation for reporting sexual misconduct and sex discrimination complaints.  Further, LSU's obligations under Title IX requires notice that Title IX prohibits retaliation against those who report, such as Plaintiff.

54. The Office of Civil Rights ("OCR"), a division of the United States Department of Education ("DOE"), is responsible for the implementation, interpretation and enforcement of Title IX. The

DOE was authorized by Congress, pursuant to 20 U.S.C.A. § 1682, to promulgate regulations to govern the implementation, interpretation and enforcement of Title IX.

55. According to OCR's *2001 Guidance*, a responsible employee includes any employee: who has the authority to take action to redress sexual violence; who has been given the duty of reporting incidents of sexual violence or any other misconduct by students to the Title IX coordinator or other appropriate school designee; or whom a student could reasonably believe has this authority or duty.

56. On April 4, 2011, OCR in the DOE issued a Dear Colleague Letter ("DCL"), a "significant guidance document," on sexual harassment and sexual violence intended to provide educational institutions with clarity as to the requirements they must follow in order to be in compliance with the DOE. In this 2011 OCR guidance, LSU was again reminded that a failure to adhere to the requirements outlined in the DCL could result in the loss of federal funding for an educational institution. The DCL also outlines OCR's recommendations regarding complainant safety. The DCL states, "Title IX requires a school take steps to protect the complainant as necessary, including taking interim steps before the final outcome of the investigation. The school should take these steps promptly once it has notice of a sexual harassment or violence allegation." The DCL specifically addressed retaliation and the risk of retaliation by the alleged perpetrator or his or her associates. As part of its Title IX obligations, LSU was required to have policies and procedures in place to protect against retaliatory harassment.

57. The 2014 OCR Questions and Answers on Title IX and Sexual Violence again offered guidance to institutions like LSU.

58. OCR further provided guidance about Title IX requirements to publish a policy against sex discrimination, designate a Title IX coordinator and adopt and publish grievance procedures.

59. The Title IX regulations outline three (3) key procedural requirements that LSU must: (1) disseminate a notice of nondiscrimination; (2) designate at least one (1) employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX and (3) adopt and publish grievance procedures providing for the prompt and equitable resolution of student and employee sex discrimination complaints.

60. The DCL required LSU to submit to OCR copies of all grievances filed by students and employees alleging sexual harassment or violence, and providing OCR with documentation related to the investigation of each complaint, such as witnesses interviews, investigator notes, evidence submitted by the parties, investigative reports and summaries, any final disposition letters, disciplinary records and documentation regarding any appeals.

61. LSU intentionally, deliberately, strategically and systematically refused to comply with Title IX and the DCL guidance and, instead, took steps to evade its Title IX obligations.  Despite Title IX requirements since 1975 and the DOE's multiple guidance documents, during the relevant time frame alleged herein, LSU did not have a full-time Title IX coordinator until 2016, Jennie Stewart.[5] However, LSU designated Segar, the Senior Associate Athletics Director of Student Services, to receive reports of sexual harassment and sexual assault for the Athletics Department.

62. At all times relevant herein, Miriam Segar was the designee in the Athletics Department to receive sexual harassment and sexual assault reports.  At all times relevant herein, Plaintiff reported sexual harassment and sexual assault complaints from female student workers in the Athletics Department to Miriam Segar.

63. Pursuant to LSU's Football Operations Policies and Procedures Paragraph 8, "[i]f an employee

---

[5] LSU's first attempt at a Title IX Coordinator was in 2014 with the interim designation of Jim Marchand, one of its General Counsel. Gaston Renoso, Assistant Vice President of Human Resource Management was also designated as the Title IX Coordinator and Deputy Coordinator of Human Resource Management.

becomes aware that a student-athlete is arrested, engages in misconduct unbecoming of a student-athlete, is involved with any recruiting violations or participates in a hazing activity, it is imperative that Sr. Associate Athletics Director Student Services, Miriam Segar, is notified immediately but no later than 24 hours after the event occurs."

64. On June 4, 2015, an LSU law professor sent a letter to then-President F. King Alexander and the University Title IX personnel and expressed concern about the legality of PM-73 (LSU's Title IX policy). The letter specifically advised the policy "fails to provide for the 'Prompt and Equitable' Resolution of Complaints;" "does not contain timeframes, whatsoever, relative to formal resolution procedures. Nor does it require LSU to provide any such timeframes." The 2015 law professor's letter ultimately advised LSU's Title IX policy defects were unlawful, inexcusable and must be remedied. LSU's leadership did nothing to address the unlawful defects in its policy. [6]

65. Per a June 8, 2016 email to the Athletics Department staff, Joe Alleva, the Athletics Director, instructed "staff member should not attempt to conduct any investigation or make any determination regarding alleged, reported or suspected misconduct. Instead, you are required to report all potential issues so that they are properly addressed by trained university officials. Please report these issues to either Miriam Segar, Sr. Associate Athletics Director Student Services or Wendy Nall, Assistant Athletics Director HR. Both of these individuals have been trained in Title IX law and can help facilitate the proper reporting that is required by law and university policy."

66. The Tiger Athletic Foundation ("TAF") at LSU engaged the Dan Beebe Group "to conduct an Independent Assessment of human relations risks, including misconduct prevention policies and programs applicable" to both "Louisiana State University's Athletics Department and Louisiana State University." The March 2016 Dan Beebe Group report to Tom Skinner, LSU's General

---

[6] Exhibit 1

Counsel, again made Title IX policy recommendations.

67. Again, LSU's leadership did nothing to address its unlawful Title IX practices.

68. In August 2016, President Alexander created a Task Force to review LSU's Title IX "policies, practices and procedures" and to submit a report to President Alexander by July 1, 2017. This Presidential Task Force made 17 Title IX policy recommendations in a February 2017 report.

69. Again, LSU's leadership did nothing with the Task Force's report and recommendations. [7]

70. Although Title IX has been federally mandated since 1975, Louisiana State University hired its first Title IX Coordinator, Jennie Stewart, in February 2016.[8] Stewart quickly realized the grave Title IX defects and presented recommendations in September 2016 to King Alexander, President; Tom Skinner, General Counsel and Daniel Layzell, Chief Financial Officer. Stewart recommended LSU invest resources to its woefully anemic Title IX program, including a lead investigator's position. A year and a half later LSU hired a Title IX investigator, Jeffery Scott.

71. In 2017, LSU's Office of Internal Audit issued a report regarding practices to ensure compliance with Title IX obligations. This Internal Audit Report was sent to President Alexander, General Counsel Tom Skinner and Title IX Coordinator Jennie Stewart.

72. Again, LSU's leadership did nothing with the findings in that audit report.[9]

73. In 2018, LSU consulted the Baker Tilly firm to conduct an "Athletics Risk Assessment." This time LSU did not maintain a report of those findings or do anything to address Title IX related concerns.

74. Again, LSU's leadership continued to show deliberate indifference and deliberate disregard for

---

[7] Exhibit 1

[8] LSU's first attempt at a Title IX Coordinator was in 2014 with the interim designation of Jim Marchand, one of its General Counsels. Gaston Renoso, Assistant Vice President of Human Resource Management was also designated as a Title IX Coordinator and Deputy Coordinator of Human Resource Management.

[9] Exhibit 1

and therefore, deliberately failed to comply with its Title IX obligation.

75. In 2019, LSU's Board of Trustees retained Morgan Lewis & Bockius, LLP (Morgan Lewis) "to conduct a privileged and confidential review of LSU's Title IX policies and Practices as they apply to LSU's Athletics Department." Morgan Lewis sent a findings report to Tom Skinner, LSU's General Counsel, on September 16, 2019. This time, LSU received a report complimentary of its defective and unlawful Title IX "structure" and Morgan Lewis reported "LSU has a good structure in place to receive and investigate/resolve PM-73 (Title IX Policy) complaints, as well as substantial resources and support services for those involved in PM-73 (Title IX Policy) complaints, investigations and adjudication processes." Nevertheless, even though the Morgan Lewis report provided recommendations, LSU's leadership never shared the Morgan Lewis findings with the Title IX office or the Athletics Department.

76. LSU hired Morgan Lewis to provide them with a favorable review of their defunct Title IX program. Despite the misleading favorable review, LSU again deliberately disregarded Title IX recommendations.

77. LSU has repeatedly and intentionally tolerated, inadequately addressed and been deliberately indifferent to students, employees, faculty and plaintiff's complaints of sexual harassment and Title IX violations.

78. LSU's Title IX policy referenced herein as PM-73 has consistently been wholly inadequate to provide a prompt and equitable response; eliminate the risk of retaliation for those who report and prevent administrators from engaging in victim-blaming. LSU further violated its inadequate policy; failed to comply with Title IX and actively concealed the sexual misconduct of Miles and football players by engaging and conspiring with outside counsel to circumvent and evade compliance with their policy and applicable federal and state law to avoid disclosure.

16

79. LSU admits its policies for handling complaints were unclear and employees didn't receive proper training for roles they held."[10]

80. LSU's deliberate indifference to allegations of sexual harassment and sexual assault made Plaintiff and those who reported vulnerable to and ultimately the subject of retaliation.

81. Miriam Segar was the designated employee to receive Title IX reports for the Athletics Department at LSU.[11]

**COUNT I**
**Violation of Title IX**
**Retaliation**
**20 U.S.C. §§ 1681 et seq**
**(Board of Supervisors)**

82. Plaintiff adopts and incorporate by reference the previously plead paragraphs as if fully plead herein.

**Adverse employment action**.

83. In November of 2020 plaintiff went to Ausberry to complain about repeatedly being denied a promotion and Ausberry told plaintiff she was not being promoted because "you use the word Title IX too much and people are afraid of you."

84. In December 2020, plaintiff again went to Verge Ausberry and asked why she was not being promoted and Ausberry screamed at plaintiff "You will never be promoted because you file Title IX complaints. You even filed one against me" and Ausberry then told one of plaintiff's co-workers who was present, "don't be like her, she is known around here as the angry black woman." At both meetings Ausberry told plaintiff you can complain to Scott Woodward but "he is my boy."

---

[10] See Galligan Statement in 3/18/2021 AP article entitled "Governor supports LSU response to sexual misconduct report."

85. Sometime in March 2021, in a staff meeting, plaintiff asked to serve on a committee that was drafting policies on managing Title IX complaints and was told it would not be appropriate for her to be on that committee.

86. Sometime in March 2021, in a staff meeting discussing the Husch Blackwell Report, it was stated in plaintiff's presence the Athletics Department needed to have a Title IX policy for "Tattletales."

87. From 2020 to 2021 plaintiff was denied access to resources and support of administrative staff and subjected to repeated disciplinary actions because of her repeated complaints of Title IX violations in the Athletics Department.

Lewis Termination

88. Sometime in 2013 Running Back Coach Frank Wilson came into Plaintiff's office, closed the door and pulled out his erect penis and asked her to touch it and Plaintiff reported the incident to Miriam Segar and Verge Ausberry and they failed to investigate or take any action.

89. Sometime in 2013 Frank Wilson kissed a female employee without her permission and Plaintiff reported the incident to Miriam Segar and Verge Ausberry and they failed to investigate or take any action.

90. From 2012 to 2016 Frank Wilson sexually harassed Plaintiff, female students and workers and Plaintiff reported this conduct to Verge Ausberry and Miriam Segar and they failed to investigate or take any action.

91. In December 2021 the LSU Board of Supervisors approved the hiring of Frank Wilson as Associate Head Coach and on January 5, 2022, LSU Athletic Director Scott Woodward terminated Sharon Lewis, who had reported Frank Wilson for sexual assault. Sharon Lewis termination violated Title IX and state law.

18

92. Until the release of the report in March 2021, plaintiff was unaware the Board of Supervisors had knowledge of the pervasive harassment, heightened risk of retaliation plaintiff, students and employees suffered for reporting Title IX complaints. Plaintiff was also unaware of the severe institutional level of procedural deficiencies that avoided discipline for athletic coaches and athletic officials that retaliated against plaintiff for filing Title IX complaints, creating a basis to impute knowledge of Title IX violations and other wrongs in the Athletic Department to the Board of Supervisors.

93. As a direct and proximate result of retaliation against plaintiff's reports of sexual misconduct by coaches and athletic officials, plaintiff has suffered and continue to suffer medical expenses associated with mental and physical health treatment, inconvenience, insults, mental distress, humiliation, anxiety, emotional and physical pain and suffering, loss of employment opportunities and benefits, loss of other economic or non-economic damages, for which she is entitled to just compensation.

94. Plaintiff is entitled to monetary compensation for violations of Title IX against the Board of Supervisors.

## COUNT II
### Civil RICO
### 18 U.S.C. § 1962 (c) and (d)
### Alleva, Woodward, Ausberry, Segar, Crochet, Barton, McKenzie )

95. Plaintiff adopts and incorporate by reference the previously plead paragraphs as if fully plead herein.

### Introduction
### The Pedagogy of Athleticism

96. In the May 7, 2021 in *The Advocate: Why dethroning top officials has not changed culture*

*at LSU, where 'secrecy continues'* F. King Alexander in a meeting with Remy Starns, Chairman-elect of the LSU Board of Supervisors, to discuss issues facing LSU stated: "*Remy Starns slammed his hand down on the table and said that* "All of these things will take care of themselves if we win a national championship."

LSU Football Team

97. LSU is a member of the Power 5 conferences that generated more than $2.9 billion in combined revenue in fiscal year 2019.

98. In 2020 LSU was compensated  $4,200,000 dollars for the football team's victory at the NCAA Football National Championship.

99. In 2019 the LSU football program generated $92 million in revenue and the LSU football program in 2020 generated $50 million in profit.

100.    Nationwide popularity and high dollar value television agreements have paved the way for the construction of unprecedented college football stadiums and basketball arenas[12] and In July 2019 LSU's Athletic Department unveiled a new $28 million locker room for the football team complete with nap pods, a pool, a theater and performance nutrition center for athlete recovery. LSU now ranks number seven for football facilities in the nation according to website 247 sports.

101.    In 2012 LSU's Athletic Department generated an estimated $331.6 million for local Louisiana businesses and in 2013 the Department created $397.5 million in sales in Baton Rouge, Louisiana.

BOS  Influence over LSU Football

102.    The Louisiana State University Board of Supervisors (BOS ) approves the appointment

---

[12] The Value of Amateurism, Marquette Sports Law Review (2018)

and all other personnel actions relating to Head Coaches and Athletic Directors and appointment and all other personnel actions relating to Coaches other than Head Coaches with a salary of $250,000 or above.

103.    The BOS sets the General Policy on tickets, parking permits and tradition funds for athletic events including complimentary and priority ticketing for VIPs including state officials who are given the option to purchase the best available seats and each BOS member gets three complimentary tickets to each game in press box seating or limited access seating.

104.    The BOS Athletic Committee is referred matters of policy concerning intercollegiate athletics and  the Chairman of the Athletic Committee is the most prestigious appointment on the BOS.

105.     The Athletic Committee  exerts significant influence over the hiring and firing of  the Director of Athletics and Head Football Coach positions and in March 2021 Alexander stated in an Oregon State Board of Supervisors meeting, "only the Board of Supervisors at LSU can hire and fire the football coach" and there was a great deal of  interference "from the Board in Athletics.[13]

106.    When LSU officials learned LSU's women's basketball Coach Pokey Chatman was having a sexual relationship with one of her players, the school gave her two hours to resign.

107.    In 2013, the year Miles was accused of sexually harassing student workers, the BOS amended his seven year contract  to increase his salary to $4.3 million of which LSU would pay an additional  $150,000 each year into an account owned and controlled by LSU and Miles could collect funds in the account totaling $750, 000 after serving the first five years of the contract.  If

---

[13] https://leadership.oregonstate.edu/trustees/meetings/board-meeting-03172021

Miles was fired without cause, the buyout would be $15 million, if he was terminated prior to December 13, 2015, it would drop to $12.9 million for the contracts fourth and fifth year and $8.6 million for the sixth year and $4.3 million for the seventh. And, in addition, Miles received millions of dollars in outside deals including a shoe contract.

108.    On September 26, 2017, the FBI arrested ten people, including four college basketball assistant coaches, as part of an investigation into bribes (pay for play) and other corruption that routinely occur in college athletics and one year later, on October 24, 2018, a jury convicted three of those arrested. LSU's men's basketball coach Will Wade was implicated in the sweeping probe of college basketball corruption and a transcript of a wiretapped conversation that included Wade was read aloud at the first of two federal trials in October 2018; Wade remains employed at LSU.[14]

Governors influence over LSU's Football program

109.    The 16-member Board of Supervisors are nominated by the Governor of the State of Louisiana and confirmed by the Louisiana State.

110.    In 2011 Governor Bobby Jindal ("Jindal") called the President of LSU and instructed him to "no matter what it takes" retain Miles when another university was attempting to lure him from LSU.

111.    In 2011 Jindal called the President of LSU and instructed him not to make a counteroffer to retain athletic director Joe Alleva who was being offered another position at a competing university.

112.    In 2012 Miles campaigned for Bobby Jindal's re-election and in November 2015 Jindal intervened to save Miles' job; Jindal tweeted "@*LSUCoachMiles* is a great coach and a better

---

[14] https://www.si.com/college/2021/03/25/will-wade-lsu-basketball-fbi-scandal-investigation

*man. He is a fantastic ambassador for our state. I hope he remains our coach*."

113.      In September 2016 Les Miles was terminated twenty-four hours after he lost to Auburn and according to his contract he received a $12.9 million buyout.

<u>Title IX capture and kill scheme to protect LSU's Football program</u>

114.      In 2013 Alleva designated Segar as the individual in Athletic Department to whom all Title IX Complaints were to be reported and in 2018 sent a memorandum reminding LSU Athletic employees to report all Title IX complaints to Segar.[15]

115.      Vicki Crochet and Robert Barton of Taylor Porter advised the Athletic Department and LSU on Title IX issues

116.      On December 7, 2012 the OCR in Docket #06-11-6001 LSU Compliance review sent a letter to Jenkins, Barton and Segar notifying them of OCR's disposition of a compliance review of LSU and on information and belief OCR on April 24, 2015 sent Alexander, Segar and Barton the Dear Colleague Letter as responsible persons for Title IX at LSU.

117.      From 2012 to present Crochet, Barton and Segar as part of their participation in the operation and management of the enterprise, engaged in a scheme to capture Title IX complaints filed against football coaches, star football players and senior athletic officials and conceal them from official Title IX proceedings.

118.      In March 2021 former LSU President F. King Alexander stated LSU's Athletic Department handled Title IX complaints "differently" and were "siloing maybe 6 or 7 percent" of all Title IX complaints.[16]

---

[15] See Exhibit 4 Alleva 2018 Memorandum
[16] https://leadership.oregonstate.edu/trustees/meetings/board-meeting-03172021

119.     On February 2, 2021 U.S. Department of Education notified LSU that it was conducting an off-site campus crime program review of the University and issued a written request for access to the records of staff, and students of LSU to evaluate LSU's compliance with the Jeanne Clery Disclosure of Campus Security Policy and Campus.

120.     Sometime in April 2021, after the release of the Hush Blackwell Report,  the Office the Office for Civil Rights (OCR)  opened a directed investigation to examine whether the Louisiana State University is in compliance with the requirements of Title IX of the Education Amendments of 1972 (Title IX) with regard to the university's response to student complaints of sexual assault and harassment.  OCR's investigation is examining the university's handling of student complaints of sexual assault and harassment from the 2018-2019 academic year to present."

## Violation 18 U.S.C. 1962 (c) and 1962 (d )

121.     Plaintiff herein asserts her right to a private cause of action under 18 U.S. Section 1962 (c) and (d).

122.     Joe Alleva (Alleva), Scott Woodward (Woodward) Miriam Segar (Segar), Verge Ausberry (Ausberry), Shelby McKenzie (McKenzie), Vicki Crochet (Crochet), Bob Barton (Barton) is a RICO enterprise within the meaning of 18 U.S.C. § 1961 (4) that is engaged in and affects interstate commerce.

123.     The associate in-fact enterprise is separate and distinct from Louisiana State University.

124.     Department of Education Title IX proceedings are "official proceedings" as defined under 18.U.S.C. § 1515 (a)(1)(C).

125.     The Department of Education (DOE) acting through its Office of Civil Rights (OCR) is the administrative agency charged with administering Title IX.[17]

---

[17] https://www2.ed.gov/about/offices/list/ocr/docs/tix_dis.html

126.    LSU Students and employees may file complaints of sexual misconduct directly with OCR.[18]

127.    LSU's Title IX Coordinator is mandated by DOE and as its representative is authorized to exercises independent jurisdiction over Title IX. [19]

128.    The Dear Colleague Letter required LSU to report all reports of sexual harassment to OCR.

129.    Alleva on information and belief at various material times served as the Vice-Chancellor and Director of Athletics and in such capacity participated in the operation and management of the enterprise's affairs.

130.    Woodward on information and belief at various material times served as the Director of Athletics at Texas A&M University and LSU and in such capacity participated in the operation and management of the enterprise's affairs.

131.    Segar on information and belief at various material times served as the Associate Athletics Director and Senior Women's Administrator and Title IX Coordinator in the LSU Athletic Department and in such capacity participated in the operation and management of the enterprise's affairs.

132.    Ausberry on information and belief at various material times served as Associate Athletics Director, the Executive Deputy Athletics Director and Executive Director of External Relations and in such capacity participated in the operation and management of the enterprise's affairs.

133.    McKenzie on information and belief at various material times served as LSU's in-house

---

[18] https://www2.ed.gov/about/offices/list/ocr/docs/howto.html?src=rt; https://www2.ed.gov/about/offices/list/ocr/qa-complaints.html
[19] Doc. No. 125-2, p. 10

legal counsel and partner at Taylor Porter and advised LSU on Title IX and legal matters and in such capacity participated in the operation and management of the enterprise's affairs.

134.     Crochet, on information and belief at various material times advised LSU Athletic Department on Title IX and legal matters and in such capacity participated in the operation and management of the enterprise's affairs.

135.      Barton, on information and belief at various material times advised LSU Athletic Department on Title IX and legal matters and in such capacity participated in the operation and management of the enterprise's affairs.

136.     This complaint alleges, *inter alia,* violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § § 1961-1968, and is brought by plaintiff in connection with a series of schemes, devised, conducted and/or participated in by the individual defendants (sometimes referred to as the "defendant persons" or "RICO Defendants" or "enterprise"), each of whom participated in the enterprise. The individual defendant persons conducted or participated, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering and conspired to do so, all to the detriment of the business and property of the plaintiff.

137.     During the relevant times set forth herein, the individual defendants conspired with one another to destroy plaintiff's property rights in her business and employment. The multifarious racketeering activities through which the broad objectives of the individual defendants were carried out through interstate travel and the use of other instrumentalities of interstate commerce consisted of a complex pattern of individual transactions and groups of transactions. It was part of the scheme to capture and kill Title IX complaints against coaches, star football players and senior athletic officials initiated by plaintiff, employees, students, faculty and

26

others that the defendants would and did agree to conspire together with the others to devise and participate in a plan of deceit, deception and whereby they would and did abuse their positions of trust and fiduciary relationships with the plaintiff, students, employees, faculty and others; they would and did abuse the discretion granted to them and breached their obligations of loyalty and fidelity and their duty to act honestly and faithfully in the best interests of the plaintiff, employees, students, faculty and others, and they would and did use false and fraudulent pretenses, representations and promises calculated to deceive persons of ordinary prudence and due care and made material non-disclosures and concealments of facts and information, all so as to unlawfully, intentionally and with intent to defraud, that is, knowingly and with specific intent to deceive in order to control LSU's Football program for the specific purpose to award legal fees to McKenzie, Crochet and Barton, direct millions of dollars in concession contracts to associates and gain financial and political power by favoring political and business leaders with tickets to LSU football games including SEC and National Championship games.

138.     In carrying out the schemes to knowingly conceal Title IX complaints and investigations from official Title IX proceedings, tamper with witnesses to dissuade their testimony in official Title IX proceedings, conceal documents from an official Title IX proceedings, defraud LSU through fraudulent legal bills, control LSU's football program and target plaintiff's business and employment for reporting Title IX complaints, the individual defendants engaged, inter alia, in conduct in violation of the following laws:

     a.  18 U.S.C. § 1341 (relating to mail fraud);

     b.  18 U.S.C. § 1343 (relating to wire fraud);

     c.  18 U.S.C. § 1512 (relating to tampering with a witness, victim or an informant);

     d.  18 U.S.C. § 1513 (relating to retaliating against a witness, victim or an informant);

   e. 18 U.S.C. § 1952 (relating to interstate travel in aid of racketeering);

139. The enterprise, since 2013 to 2021, utilized the above predicate acts to control the LSU

football program, retaliate against employees and students who reported Title IX and criminal

complaints against coaches and star football players and capture and kill Title IX complaints

against coaches, star football players and athletic officials.

## A. SCHEMES

140. The predicate acts involved in the following scheme include, inter alia, violations of 18

*U.S.C. § 1341, 18 U.S.C. § 1343, 18 U.S.C. § 1512*

### Scheme 1: Scheme to corruptly obstruct, influence and impede
### an official DOE Title IX proceeding

141. Plaintiff adopts and incorporate by reference the previously plead paragraphs as if fully

plead herein.

142. Vicki Crochet and Robert Barton were at all material times during the scheme to

conceal the Miles Investigation were conducting an independent investigation  in an official Title

IX proceeding as directed by the Department of Education.

143. Shelby McKenzie  at all material times during the scheme to conceal the Miles

Investigation served a dual role as LSU's General Counsel and a partner at Taylor Porter.

144. Segar at all material times during the scheme to conceal the Miles Investigation was the

official Title IX Coordinator in LSU's Athletic Department as directed by the Department of

Education.

145. In 2012 and 2013 two student workers complained to plaintiff  Miles had sexually

harassed them and Student 1 stated to plaintiff and another Athletics department staff member

Miles got on top of her in his office on his couch. Plaintiff reported students' complaints to Segar

and Ausberry and subsequently Alleva reported students' complaints to LSU President William Jenkins.

146.     McKenzie with Jenkins' full knowledge and consent, designated his law partners Crochet and Barton to conduct an independent Title IX investigation of Miles, which violated LSU's *Title IX and Sexual Misconduct Policy* that states "Any investigation or complaints involving student athletes or Athletics Personnel shall be handled and/or investigated by the LSU Title IX Coordinator."

147.     The Husch Blackwell Report stated about Crochet and Barton's designation to conduct an independent Title IX investigation of Miles:

> " *This designation raises conflicts of interest concerns  as it is not clear how the firm could have been neutral in the investigation. There was also no provision in the applicable Title IX policy for these sorts of investigations to be outsourced to third parties.*"[20]

148.     Barton and Crochet coordinated the Title IX investigation of Miles with Miriam Segar and issued a written report (herein after referred to as the "Miles Report"[21]) that concluded:

a. "Student 1" was employed in Football Operations

b. Student 1 reported she had a phone call and other reactions with Les Miles that made her uncomfortable.

c. Miles had Student 1 baby sit for him, which is a violation of LSU policy.

d. Student 1 reported  on one occasion when she was babysitting Miles' children, he ended up staying with the children instead and asked to join them when they went to a movie.

e. Student 1 reported she stayed at Miles' apartment when she had some problems with her apartment.

f. Student 1 reported a window was broken in Les Miles' apartment and Miles made her uncomfortable when he asked her to accompany him to check on the window repair.

---

[20] Exhibit 1
[21] Attached as Exhibit 2

g. "Student 2" was hired to work in recruiting and a couple of days after she began to receive Facebook messages from Miles.

h. In March 2013 Student 2 had a meeting with Miles in his office regarding her future plans and no one else was in the office.

i. Miles told Student 2 she could work for him on his personal business when she graduated.

j. Miles told Student 2 to enter her phone number but to use an alias and he would do the same with her number.

k. Miles initiated text messages with Student 2.

l. Student 2 met Miles off campus; got in his vehicle; and the two of them rode around.

m. Miles suggested they go to a hotel together and mentioned his condo as another meeting place.

n. Miles drove Student 2 behind the Athletics Complex, parked the car, engaged in a sex act and kissed her twice.

o. In 2012 Miles participated in interviewing female student employees

p. Miles made it clear he wanted female student workers to be attractive and blonde.

q. Miles told senior athletic supervisors female students who were not attractive and blonde were to be given fewer hours or terminated.

149.    In the Miles Report  Miles' name appears as 'XXX"  in order to hide his identity and sections of the report stating Miles engaged in explicit sex acts with Student 2 were blacked out to shield Miles from a possible criminal investigation for a sex crime.

150.    The Miles Report failed to include Plaintiff's report that a complainant student told her that Miles had gotten on top of her in his office.

151.    The Miles Report concluded Miles had not violated Title IX, criminal statutes or the moral clause in his $30 million employment contract.

Co-Conspirators First Agreement

152.    On May 15, 2013 Danos (Chairman of the Board of Supervisors), Yarborough (Board

Chairman Elect), Jacobs (Chairman of the Board – Athletic Committee), McKenzie (LSU In-House Legal Counsel and Partner at Taylor Porter), Alleva (Vice-Chancellor and Director of Athletics), Segar (Senior Associate A.D./Senior Woman Administrator and Athletic Title IX Coordinator), Crochet ( Partner at Taylor Porter and Title IX investigator ) and Barton (Managing Partner Taylor Porter and Title IX investigator) met to discuss the Miles Report and after multiple in person meetings, emails, text messages and phone calls individually agreed to and accepted the recommendation of Barton and Crochet not take any action against Miles and not to inform the full Board of  Supervisors and agreed to conceal the Miles Investigation from an official Title IX proceeding.[22]

153.     The Title IX investigation of Miles' sexual misconduct was never forwarded to LSU's HR Department nor was any mention of the sexual harassment investigation ever placed in Miles' personnel record per LSU policy.

154.     Jacobs, in a March 9, 2021, *Sports Illustrated Article "Former LSU Board Member Goes Inside Decision to Keep Les Miles"* stated he and his co-conspirators met  "multiple times" in face-to-face meetings"  and had "countless phone calls" to discuss the matter and deliberate on Miles' future and that "Attorneys along with Jenkins" demanded he and other board members keep the Title IX investigation secret.

155.     Segar admitted to Husch Blackwell that " she did not report any" that were made against Miles and Husch Blackwell determined "This was an error"[23]

156.     Jenkins, Danos, Yarborough and Jacobs violated *LSU By-Law 9 (A) (1)* that requires" *any matter having a significant long-term impact directly and indirectly*" on any campus required the

---

[22] Exhibit 2
[23] Exhibit 1

full board approval.

157.     In April 2021 the Board of Supervisors passed a resolution expressing disapproval of Jacobs, Yarborough and Danos for their participation in the concealment of the Miles Title IX Investigation.

158.     In March 2021 BOS member Lee Mallet who was also a BOS member in 2013 stated about the concealment of the Miles Title IX Investigation: *"I am tired of being blamed for a situation over which I had no control and wasn't even told about."*[24]

159.     The Husch Blackwell Report concluded the Miles Investigation was not handled "*in a manner consistent with then-existing legal guidance, well recognized best practices, and institutional policy.*"[25]

160.     The Title IX investigation of Miles' sexual misconduct from 2013 to 2021 has never been reported to Department of Education Office of Civil Rights (OCR) as per OCR guidelines.

161.     Barton, Crochet, McKenzie, Miles, Danos, Yarborough, Jacobs, Jenkins, Alleva and Segar each individually knowingly violated *18 U.S.C. § 1512 (c) (2)* and *18 U.S.C. § 1512 (K).*

        Wire Fraud

162.     In furtherance of the scheme to conceal the Miles Investigation from an official Title IX proceeding, Barton, Crochet, Miles and Segar used telephone and email communications affecting interstate commerce and Barton, Crochet, McKenzie, Miles, Danos, Yarborough, Jacobs, Jenkins, Alleva and Segar each individually knowingly violated *18 U.S.C. § 1343* including but not limited to:[26]

---

[24] https://www.theadvocate.com/baton_rouge/news/education/article_50b5f770-97df-11eb-950f-3f13d1718c43.html
[25] Exhibit 1
[26] See Exhibit 3 Taylor Porter Billing Records;  Exhibit 5 Plaintiffs' RICO Case Statement

| From | To | Date | Content |
|------|-----|------|---------|
| Crochet | Ginsberg | 4/05/2013 | Emails on meeting with Ginsberg on April 10, 2013 |
| Crochet | Ginsberg | 4/18/2013 | Telephone call in furtherance of scheme to hide Miles Investigation |
| Crochet | Ginsberg, Segar | 5/03/2013 | Email on the status of scheme to hide Miles Investigation |
| Crochet | Ginsberg | 5/16/2013 | Email on the status of scheme to hide Miles Investigation |
| Crochet | Ginsberg | 5/15/2013 | Telephone call on the status of scheme to hide Miles Investigation |
| Crochet | Ginsberg | 5/28/2013 | Email on the status of scheme to hide Miles Investigation |
| Crochet | Ginsberg, Alleva | 5/29/2013 | Email on the status of scheme to hide Miles Investigation |
| Crochet | Ginsberg | 5/29/2013 | Email on the status of scheme to hide Miles Investigation |
| Crochet | Ginsberg | 5/29/2013 | Telephone call on the status of scheme to hide Miles Investigation |
| Crochet | Ginsberg | 5/30/2013 | Email on the status of scheme to hide Miles Investigation |
| Crochet | Alleva, Ginsberg | 6/13/2013 | Telephone call on the status scheme to hide Miles Investigation |
| Crochet | Ginsberg | 8/01/2013 | Telephone call on the status of scheme to hide Miles Investigation |
| Crochet | Ginsberg | 8/02/2013 | Email on the status of scheme to hide Miles Investigation |
| Crochet | Ginsberg | 8/06/2013 | Email on the status of scheme to hide Miles Investigation |

| | | | |
|---|---|---|---|
| Crochet | Segar, McKenzie Ginsberg | 8/06/2013 | Email on the status of scheme to hide Miles Investigation |
| Crochet | Ginsberg, McKenzie | 8/07/2013 | Telephone call on the status of scheme to hide Miles Investigation |
| Crochet | Ginsberg | 8/07/2013 | Multiple Emails on the status of scheme to hide Miles Investigation |
| Crochet | Ginsberg | 8/08/2013 | Email on the status of scheme to hide Miles Investigation |
| Crochet | Ginsberg | 8/09/2013 | Email on the status of scheme to hide Miles Investigation |
| Ginsberg | Crochet | 8/15/2013 | Email on status of scheme to hide Miles Investigation |
| Crochet | Ginsberg | 8/19/2013 | Email on the status of scheme to hide Miles Investigation |
| Crochet | Ginsberg | 8/21/2013 | Email on the status of scheme to hide Miles Investigation |
| Crochet | Ginsberg, Segar | 8/22/2013 | Multiple Emails on the status of scheme to hide Miles Investigation |
| Crochet | Ginsberg. | 8/22/2013 | Multiple Emails on the status of scheme to hide Miles Investigation |
| Crochet | Ginsberg. | 8/23/2013 | Emails on the status of scheme to hide Miles Investigation |

| | | | |
|---|---|---|---|
| Crochet | Ginsberg | 8/23/2013 | Emails on the status of scheme to hide Miles Investigation |
| Crochet | Ginsberg, Alleva | 8/26/2013 | Emails on the status of scheme to hide Miles Investigation from Title IX reporting requirements |
| Crochet | Ginsberg | 8/28/2013 | Emails on the status of scheme to hide Miles Investigation |
| Crochet | Ginsberg, McKenzie | 8/29/2013 | Emails on the status of scheme to hide Miles Investigation |
| Ginsberg | Crochet | 9/04/2013 | Email on the status of scheme to hide Miles Investigation |
| Crochet | Ginsberg | 9/04/2013 | Email on the status of scheme to hide Miles Investigation |
| Crochet | Ginsberg | 9/10/2013 | Email on the status of scheme to hide Miles Investigation |
| Crochet | Ginsberg, Yarborough | 9/10/2013 | Email on the status of scheme to hide Miles Investigation |

Mail Fraud

163.    In furtherance of the scheme to conceal the Miles Investigation from an official Title IX proceeding, Barton and Miles used United States Postal Service affecting interstate commerce and Barton and Miles each individually knowingly violated *18 U.S.C. § 1341* including but not limited

to:[27]

| From | To | Date | Content |
|------|-----|------|---------|
| Miles Attorney | Barton | 3/19/13 | Letter in furtherance of the scheme to hide Miles investigation |

164.     In response to plaintiff reporting  student workers complaint of Miles' sexual harassment, Alleva, Segar and Ausberry conspired with Miles to place plaintiff under Miles'  direct supervision and Miles in conspiracy with Alleva, Ausberry and Segar, targeted  plaintiff's employment by denying her pay raises, bonuses and promotions and  when plaintiff complained to Ausberry about Miles' failure to promote her and award her deserved pay raises, bonuses, and promotions, Ausberry told plaintiff to find another job.

165.     As part of the Title IX investigation of Miles, plaintiff was instructed to meet Crochet at Taylor Porter offices in downtown Baton Rouge and when she asked what happens next, Crochet told plaintiff Miles' conduct was not a violation of Title IX  because the student workers were of the "consenting age" and Miles'  conduct was "not illegal, maybe immoral."

166.     It was not until March 2021 when plaintiff read in *The Advocate* the Miles Report and Taylor Billing Records[28] and the Husch Blackwell Report, plaintiff realized Barton, Crochet, McKenzie, Miles, Danos, Yarborough, Jacobs, Jenkins, Alleva and Segar  had conspired to conceal the Miles Title IX investigation from an official DOE Title IX proceedings to protect Miles' employment and to target  plaintiff's property interest in her employment and business by denying her pay raises, bonuses and promotions in retaliation for her reporting Miles' sexual misconduct.

167.     The predicate acts involved in the following scheme include, inter alia, violations of 18

---

[27] Exhibit 3;  Exhibit 5
[28] Attached as Exhibit 3

*U.S.C. § 1341, 18 U.S.C. § 1343, 18 U.S.C. § 1512.*

### Scheme 2: Scheme to conceal Miles Report from an
### official DOE Title IX proceeding

168.     Plaintiff adopts and incorporate by reference the previously plead paragraphs as if fully plead herein.

169.      Crochet and  Barton were at all material times during the scheme to conceal the Miles Report conducting an independent investigation as part of an official DOE Title IX proceeding as directed by the Department of Education.

170.     Shelby McKenzie at all material times during the scheme to conceal the Miles Report served a dual role as LSU's General Counsel and a partner at Taylor Porter.

171.     Segar at all material times during the scheme to conceal the Miles Report was the official Title IX Coordinator in LSU's Athletic Department as directed by the Department of Education.

         <u>Co-Conspirators Second Agreement</u>

172.     At the May 15, 2013 meeting,  Barton, Crochet, McKenzie, Miles, Danos, Yarborough, Jacobs, Jenkins, Alleva and Segar agreed Crochet and Barton would conceal the Miles Report in their offices off campus away from public documents request and an official Title IX proceeding.

173.      Barton, Crochet, McKenzie, Miles, Danos, Yarborough, Jacobs, Jenkins, Alleva and Segar knowingly violated *18 U.S.C. § 1512 (c)(1),18 U.S.C. § 1512 (c) (2)* and *18 U.S.C. § 1512 (K)*.

174.     On April 29, 2013 Miles, Ginsberg,  Hardin, Barton, Crochet and Alleva agreed to conceal the Miles Report in Ginsberg, Hardin, Barton and Crochet's offices off campus away from public documents request and an official Title IX proceeding.[29]

---

[29] Exhibit 2

175.     Ginsberg, Hardin, Crochet and Barton concealed the Miles Report in their law offices from 2013 to 2021, until they were forced to release it by the court.[30]

176.     Ginsberg, Hardin, Barton, Crochet and Alleva each individually knowingly violated *18 U.S.C. § 1512 (c)(1),18 U.S.C. § 1512 (c) (2)* and *18 U.S.C. § 1512 (K)*.

<u>Board of Supervisors</u>

177.     On August 5, 2020 *USA Today* submitted a public documents request for the Campus Police report on Darrius Guice to Interim President Thomas Galligan (Galligan), the custodian of records for LSU in accordance with *La. R.S. 44:32* and the Board of Supervisors refused to produce the police report. The state court found LSU "was unreasonable, arbitrary and capricious in its refusal and delay and the redacted manner in which the documents were produced.[31]

178.     On December 14, 2020 *USA Today* submitted a public documents request for the Miles Report to Interim President Thomas Galligan (Galligan), the custodian of records for LSU in accordance with *La. R.S. 44:32* and on January 14, 2021 LSU responded that the Miles Report was not subject to public documents request and on January 19, 2021*USA Today* filed a writ of mandamus against LSU and Galligan petitioning they be ordered to comply with *La. R.S. 44:32* and produce the Miles Report.[32]

179.     On information and belief the full BOS in furtherance of the scheme to conceal the Miles Report from an official Title IX proceedings directed Crochet and Barton to oppose *USA Today's* writ of mandamus and directed Crochet and Barton to notify Ginsberg and Hardin per the April 29, 2013 agreement between Miles, Ginsberg, Hardin, Barton, Crochet and Alleva and on February

---

[30] *Kenny Jacoby v. Galligan*, Suit No. 703746, 19th JDC Parish of East Baton Rouge
[31] See *Kenny Jacoby & S.B. v. Thomas Galligan et al* C-700649 21/D, 19th JDC Parish of East Baton Rouge
[32] *Kenny Jacoby v. Galligan*, Suit No. 703746

4, 2021 Ginsberg on behalf of Miles filed a petition to intervene in *Kenny Jacoby v. Galligan*, opposing *USA Today's* public documents request in furtherance of  the scheme to conceal the document from an official Title IX proceeding.

180.     In furtherance of the scheme to conceal the Miles Report from an official Title IX proceeding the full Board of Supervisors, Miles, Crochet and Barton knowingly violated of *18 U.S.C. § 1512 (c)(1),18 U.S.C. § 1512 (c) (2)* and *18 U.S.C. § 1512 (K)*.

<u>Wire Fraud</u>

181.     In furtherance of the scheme to conceal the Miles Report from an official Title IX proceeding, Barton, Crochet, McKenzie, Miles, Danos, Yarborough, Jacobs Jenkins, Alleva and Segar knowingly used telephone and email communications affecting interstate commerce and Barton, Crochet, McKenzie, Miles, Danos, Yarborough, Jacobs Jenkins, Alleva and Segar each individually violated *18 U.S.C. § 1343* including but not limited to:[33]

| <u>From</u> | <u>To</u> | <u>Date</u> | <u>Content</u> |
| --- | --- | --- | --- |
| Barton | Ginsberg | 8/22/2013 | Emails discussing "revisions to directive letter  proposed by coach's counsel" in which Miles will agree to certain disciplinary terms and in return the RICO Defendants will conceal the Miles Report |

<u>Mail Fraud</u>

182.     In furtherance of the scheme to conceal the Miles Report from an official Title IX proceeding, Barton, Crochet and Miles knowingly used the United States Postal Service and Federal Express affecting interstate commerce and  Barton, Crochet, McKenzie, Miles, Danos,

---

[33] Exhibit 3;  Exhibit 5

Yarborough, Jacobs Jenkins, Alleva and Segar each individually knowingly violated *18 U.S.C. § 1341* including but not limited to:[34]

| From | To | Date | Content |
|------|-----|------|---------|
| Barton, Crochet | Ginsberg | 8/29/2013 | Federal Express Letter directing Ginsberg and Hardin to conceal Miles Report from an official Title IX proceeding and public documents request in their offices |

183.　　　It was not until March 2021 when plaintiff read in *The Advocate* the Miles Report, Taylor Billing Records  that  Barton, Crochet, McKenzie, Miles, Danos, Yarborough, Jacobs, Jenkins, Alleva and Segar  had conspired to conceal the Miles Report from an official Title IX proceeding to protect Miles' employment and  to  target  plaintiff  by denying her pay raises, bonuses and promotions in retaliation for her reporting Miles' sexual misconduct.

184.　　　Miles, Ginsberg, Hardin, Barton, Crochet and Alleva each individually knowingly violated *18 U.S.C. § 1512 (c)(1),18 U.S.C. § 1512 (c) (2)* and *18 U.S.C. § 1512 (K)*.

185.　　　The predicate acts involved in the following scheme include, inter alia, violations of *18 U.S.C. § 1341, 18 U.S.C. § 1343, 18 U.S.C. § 1512, 18 U.S.C. § 1951*

**Scheme 3:  Scheme to tamper with witness in an official Title IX proceeding**

186.　　　Plaintiff adopts and incorporate by reference the previously plead paragraphs as if fully plead herein.

187.　　　Crochet and Barton at  all material times during the scheme to tamper with a witness in

---

[34] Exhibit 3;  Exhibit 5

an official Title IX proceeding were conducting an independent investigation as part of an official Title IX proceeding as directed by the Department of Education.

188.     Segar at all material times during the scheme to tamper with a witness in an official Title IX proceeding was the official Title IX Coordinator in LSU's Athletic Department, the Miles Investigation  as directed by the Department of Education.

Change student grade

189.     May 5, 2013, Crochet and Segar called Human Resources Director A.G. Monaco ("Monaco") and asked him to help convince a professor to let the student who filed a Title IX complaint against Miles, retake a failed quiz to corruptly dissuade student from testifying in Title IX proceedings against Miles and Crochet told Monaco he could not speak a word of their conversation, but Monaco refused to keep the conversation a secret or instruct the professor to rescind the failing grade and Monaco reported Crochet's phone call to LSU Provost Stuart Bell and LSU Vice President Robert Kuhn and the three of them agreed to inform William Jenkins, but Jenkins took no actions and in June 2013 Monaco informed new President F. King Alexander about Crochet's call, but Alexander took no actions.

190.      Crochet,  Segar, Jenkins and Alexander each individually knowingly violated *18 U.S.C. § 1512 (b )(1), 18 U.S.C. § 1512 (b )( (2 ) (A), U.S.C. § 1512 (c) (2) and 18 U.S.C. § 1512 (K)*.

Meeting in New Orleans

191.     On or about July 1, 2013 Ginsberg, Complainant Student attorney travelled to New Orleans to meet Vicki Crochet and Bob Barton to discuss the exchange of money with student to corruptly dissuade student from testifying in Title IX proceedings against Miles.

192.     In furtherance of the scheme to tamper with a witness in an official DOE Title IX proceeding Crochet, Barton and Miles each individually knowingly violated *18 U.S.C. § 1951*

41

<u>Dissuade student from testifying in an official DOE Title IX proceeding</u>

193.      Barton, Crochet, McKenzie, Miles, Danos, Yarborough, Jacobs, Jenkins, Alleva and

Segar had multiple meetings, phone calls and emails with Miles' legal counsel, the student's family

and legal counsel to discuss the exchange of money to dissuade her from testifying against Miles

in an official Title IX proceeding and on information and belief Miles and student reached a private

settlement in 2013.

194.      Sometime in 2013 Miles and student who filed a Title IX complaint against Miles

exchanged money to dissuade her from testifying in an official Title IX proceeding.

195.      On February 24, 2021 LSU Vice-President of Communications Jim Sabourin stated about

the exchange of money between Miles and student "we have heard about settlement, but LSU is

not a party to it and we have not seen it.[35]

196.      Barton, Crochet, McKenzie, Miles, Danos, Yarborough, Jacobs, Jenkins, Alleva and

Segar  each individually knowingly violated *18 U.S.C. § 1512 (b )(1), 18 U.S.C. § 1512 (b )( (2 )*

*(A), U.S.C. § 1512 (c) (2),  18 U.S.C. § 1512 (K).*

Wire Fraud

197.      In furtherance of the scheme to tamper with a witness in a Title IX proceeding Barton,

Crochet, McKenzie, Miles, Danos, Yarborough, Jacobs, Jenkins, Alleva and Segar used United

States Mail,  telephone and email communications affecting interstate commerce and Barton,

Crochet, McKenzie, Miles, Danos, Yarborough, Jacobs, Jenkins, Alleva and Segar each

individually knowingly violated *18 U.S.C. § 1343* including but not limited to:[36]

| From | To | Date | Content |
|------|-----|------|---------|

---

[35] See https://www.theadvocate.com/baton_rouge/sports/lsu/article_596f5cfe-7646-11eb-8cb0-733b53e58af8.html
[36] Exhibit 3; Exhibit 5

| | | | |
|---|---|---|---|
| Ginsberg | Crochet | 7/02/2013 | Email  on meeting in New Orleans with Miles Lawyer, Student's Lawyer to facilitate a financial settlement between Miles and Student |
| Crochet | Ginsberg | 7/03/2013 | Email on meeting in  New Orleans to facilitate a financial settlement between Miles and Student |
| Barton | Student's Lawyer | 7/03/2013 | Telephone call  on meeting in New Orleans with Miles Lawyer, Student's Lawyer to facilitate a financial settlement between Miles and Student |
| Crochet | Ginsberg | 7/05/2013 | Email on meeting in New Orleans to facilitate a financial settlement between Miles and Student |
| Barton | Crochet, Student Lawyer | 7/05/2013 | Telephone call  on meeting to facilitate a financial settlement between Miles and Student |
| Crochet | Ginsberg | 7/06/2013 | Email on meeting in  New Orleans to facilitate a financial settlement between Miles and Student |
| Crochet | Ginsberg, Unknown McKenzie | 7/08/2013. | Multiple Emails on  meeting in New Orleans with Miles Lawyer, Student Lawyer |
| Crochet | Jacobs, Ginsberg,  McKenzie | 7/09/2013 | Telephone call  on meeting  to facilitate a financial settlement between Miles and Student |
| Barton | Crochet, Alleva  Segar, Miles Lawyer | 7/09/2013 | Emails on revising LSU policies that facilitated the |

|  |  |  | RICO Defendants ability to conceal the Miles Investigation |
|---|---|---|---|
| Barton | Crochet, Miles Lawyer Student Lawyer | 7/10/2013 | Emails  to facilitate a financial settlement between Miles and Student |
| Crochet | Ginsberg, McKenzie, Unknown | 7/10/2013 | Telephone call  on meeting to facilitate a financial settlement between Miles and Student |
| Crochet | Ginsberg, McKenzie, | 7/12/2013 | Telephone call  on meeting to facilitate a financial settlement between Miles and Student |
| Crochet | Ginsberg | 7/12/2013 | Email  on meeting to facilitate a financial settlement between Miles and Student |
| Barton | Crochet, Miles Lawyer | 7/12/2013 | Telephone calls  to update on calls with Student's Lawyer to facilitate a financial settlement between Miles and Student |
| Crochet | Ginsberg | 7/15/2013 | Email  on meeting to facilitate a financial settlement between Miles and Student |
| Crochet | Ginsberg | 7/22/2013 | Email  to facilitate a financial settlement between Miles and Student |
| Barton | Miles Lawyer | 7/23/2013 | Multiple Emails  on financial settlement between Miles and Student |
| Crochet | Ginsberg | 7/25/2013 | Email  to facilitate a financial settlement between Miles and Student to bribe Student |
| Crochet | Ginsberg | 7/26/2013 | Telephone call to facilitate a |

| | | | financial settlement between Miles and Student |
|---|---|---|---|
| Crochet | Ginsberg | 7/26/2013 | Email to facilitate a financial settlement between Miles and Student |
| Barton | Miles Lawyer, Crochet | 7/26/2013 | Telephone Conference on financial settlement between Miles and Student |

198.      It was not until February and March 2021 when plaintiff read in *The Advocate* the Miles Report, Taylor Billing Records, Monaco's account of Crochet and Segar contacting him to pressure a professor to allow student who complained of sexual harassment against Miles to retake an exam and that Miles had reached a private settlement with a student who accused him of sexual harassment that she realized Barton, Crochet, McKenzie, Miles, Danos, Yarborough, Jacobs, Jenkins, Alleva and Segar had conspired to tamper with a witness in an official DOE Title IX proceeding to protect Miles' employment and  to  target  plaintiff's property interest in her employment and business by denying her pay raises, bonuses and promotions in retaliation for her reporting Miles' sexual misconduct.

199.      The predicate acts involved in the following scheme include, inter alia, violations of 18 *U.S.C. § 1341, 18 U.S.C. § 1343.*

**Scheme 4:  Scheme by Crochet, Barton and McKenzie to defraud LSU**

200.      Plaintiff adopts and incorporate by reference the previously plead paragraphs as if fully plead herein.

201.      Crochet and  Barton were at all material times during the scheme to defraud LSU conducting an independent investigation as part of an official Title IX proceeding as directed by the Department of Education.

202.    Shelby McKenzie  at all material times during the scheme to defraud LSU served a dual role as LSU's General Counsel and a partner at Taylor Porter.

203.    In furtherance of the conspiracy to conceal the Miles Investigation from an official Title IX proceeding, Crochet and Barton submitted invoices by United States Mail to LSU for eighty ($80,000.00) thousand dollars which included the following material omissions:

(1) Barton and Crochet conducted a Title IX investigation of Miles for sexual misconduct and concealed it from an official Title IX proceeding and the full BOS;

(2)  Barton and Crochet concealed the Miles Report in their offices from an official Title IX proceeding; and

(3) Barton, Crochet and McKenzie facilitated an exchange of money between Miles and complainant student to dissuade her from testifying against Miles in an official Title IX proceeding.

204.    On information and belief McKenzie, in his dual role as LSU's General Legal Counsel and a partner at Taylor Porter with the full knowledge and consent of Jenkins, approved the fraudulent invoices for payment by LSU.

205.    LSU relied on Crochet, Barton, McKenzie and Jenkins' misrepresentation that Crochet and Barton conducted legitimate legal work on behalf of LSU.

206.    In furtherance of the scheme to submit fraudulent billing records to LSU,  Barton, Crochet, McKenzie and Jenkins used United States Mail, telephone and email communications affecting interstate commerce and Crochet, Barton, McKenzie and Jenkins  each individually knowingly violated  *U.S.C. § 1343* and 1341 including but not limited to:[37]

---

[37] Exhibit 3; Exhibit 5

Wire Fraud

| From | To | Date | Content |
|---|---|---|---|
| Barton, Crochet | LSU | 3/31/13 | Emailed billing invoices with material omissions |
| Crochet, Barton | LSU | 3/31/13 | Emailed billing invoices with material omissions |
| Barton, Crochet | LSU | 4/29/13 | Emailed billing invoices with material omissions |
| Crochet, Barton | LSU | 4/30/13 | Emailed billing invoices with material omissions |
| Barton, Crochet | LSU | 5/31/13 | Emailed billing invoices with material omissions |
| Crochet, Barton | LSU | 5/31/13 | Emailed billing invoices with material omissions |
| Barton | LSU | 6/27/13 | Emailed billing invoices with material omissions |
| Crochet, Barton | LSU | 6/30/13 | Emailed billing invoices with material omissions |
| Barton | LSU | 7/02/13 | Emailed billing invoices with material omissions |
| Crochet | LSU | 7/31/13 | Emailed billing invoices with material omissions |
| Barton | LSU | 8/31/13 | Emailed billing invoices with material omissions |
| Crochet | LSU | 8/31/13 | Emailed billing invoices with material omissions |
| Barton, Crochet | LSU | 9/30/13 | Emailed billing invoices with material omissions |
| Barton, Crochet | LSU | 10/30/13 | Emailed billing invoices with material omissions |

Mail Fraud

| From | To | Date | Content |
|------|-----|------|---------|
| Barton, Crochet | LSU | 3/31/13 | Mailed billing invoices with material omissions |
| Crochet, Barton | LSU | 3/31/13 | Mailed billing invoices with material omissions |
| Barton, Crochet | LSU | 4/29/13 | Mailed billing invoices with material omissions |
| Crochet, Barton | LSU | 4/30/13 | Mailed billing invoices with material omissions |
| Barton, Crochet | LSU | 5/31/13 | Mailed billing invoices with material omissions |
| Crochet, Barton | LSU | 5/31/13 | Mailed fraudulent billing invoices with material omissions |
| Barton | LSU | 6/27/13 | Mailed billing invoices with material omissions |
| Crochet, Barton | LSU | 6/30/13 | Mailed billing invoices with material omissions |
| Barton | LSU | 7/02/13 | Mailed billing invoices with material omissions |
| Crochet | LSU | 7/31/13 | Mailed billing invoices with material omissions |
| Barton | LSU | 8/31/13 | Mailed billing invoices with material omissions |
| Crochet | LSU | 8/31/13 | Mailed billing invoices with material omissions |
| Barton, Crochet | LSU | 9/30/13 | Mailed billing invoices with material omissions |
| Barton, Crochet | LSU | 10/30/13 | Mailed billing invoices with material omissions |

207.     In April 2021 LSU fired the Taylor Porter law firm after 80 years of representation for its

role in concealing the Title IX investigation of Miles from the full BOS and official Title IX proceedings.

208.     It was not until March 2021 when plaintiff read in *The Advocate* the Miles Report, Taylor Billing Records,  she realized  Barton, Crochet, McKenzie and Jenkins,  as part of the scheme to cover up the Miles Title IX investigation,  Barton, Crochet, McKenzie and Jenkins conspired to defraud LSU out of eighty-thousand dollars in furtherance of the scheme to conceal the Miles Investigation and Miles Report to protect Miles' employment and to  target  plaintiff's  property interest in her employment and business by denying her pay raises, bonuses and promotions in retaliation for her reporting Miles' sexual misconduct.

209.     The predicate acts involved in the following scheme include, inter alia, violations of 18 *U.S.C. § 1341, 18 U.S.C. § 1343.*

### Scheme 5: Ongoing  Scheme to control LSU's Football Program in violation of *18 U.S.C. 1961 (d)*

210.     Plaintiff adopts and incorporate by reference the previously plead paragraphs as if fully plead herein.

#### Williams, Werner, Dampf, Starns, Woodward and Ausberry

211.     On or about  April 16, 2019 Chairman of LSU Board Of  Supervisors James Williams (Williams),  Chairman of the Athletic Committee Mary Leach Werner (Werner), Chairman-elect of the LSU Board of Supervisors Robert Dampf (Dampf) and Remy Voisin Starns  (Starns)  met LSU President  F. King Alexander in a backroom at  Juban's Creole Restaurant in Baton Rouge and directed him to fire Athletic Director Joe Alleva and hire Texas A&M Athletic Director Scott

Woodward.[38]

212.     At the meeting Williams wrote on a cocktail napkin the amount of Woodward's salary, handed it to Alexander and told him "This is what we're paying our new athletic director" and Williams then directed Alexander to "take care of Verge" and the next day Alexander met with Alleva and told him the "board leadership has hired a new athletic director and I've got to fire you."

213.     Before LSU announced Alleva's firing LSU Tiger Athletic Founder Richard Lipsey confirmed to the USA Today Network Alleva had been terminated when he stated "*Yes it's done. I expect an official announcement from LSU either later today or Thursday morning.*"

214.     On April 17, 2019 LSU announced Woodward was replacing Alleva as Athletic Director and on the same day Jacobs stated in *The Daily Advertiser* about Alleva's firing "*I tried to take him out years ago, but I swung and missed. And now it looks like the board and administration have finally got it. I tried fervently.*".

215.     On May 6, 2019 the BOS, without conducting a national search or interviewing any other candidate, the BOS hired Woodward and awarded him a six-year, $7.95 million employment contract.

216.     Alexander stated the "backroom four" ordered him to protect and promote Ausberry and less than three weeks after Woodward was hired, Ausberry was promoted to Executive Athletic

---

[38] https://www.chronicle.com/article/in-a-back-room-lsus-board-pushed-for-a-sports-shake-https://www.theadvocate.com/baton_rouge/sports/lsu/article_0e1d6916-add8-11eb-8fa2-a34ad4d2c61f.html; https://www.businessreport.com/business/king-alexander-restaurant-meeting-with-key-board-members-a-monday-night-massacre; https://www.wrkf.org/show/talk-louisiana/2021-05-05/wednesday-may-5th-f-king-alexander

Director and his salary increased from $250,000 to $500,000 annually.[39]

217.        Williams, Werner, Dampf, Starns, Woodward and Ausberry violated the Southern Association of Colleges and Schools *Rule 5.2 (b)* that states the university's chief executive "has ultimate responsibility for and exercise appropriate control over the institution's intercollegiate athletic program."

218.        On May 5, 2021 F. King Alexander in the *Baton Rouge Business Report  King Alexander: Restaurant meeting with key board members a "Monday night massacre'* speaking about the April 16, 2019 meeting at Juban's stated:

> *It violates university policy, accreditation standards, to have a small number of board members-without others knowing-that they had worked out a deal and…were paying him substantially more than we were paying Alleva…I have never experienced anything like it in 20 years as a public university president. To replace an athletic director without myself or anyone on my staff knowing about it is quite an extraordinary intrusion into university governance and shared governance."*

219.        On March 26, 2021 Dampf and Leach testified under oath at the Louisiana Select Senate Committee on Women and Children and Leach was questioned about the April 2019 Juban's meeting and Dampf, who was sitting next to Werner, failed to inform the Committee he was in attendance at the "backroom" meeting at Juban's and gave testimony that suggested he had little or no interest in LSU Athletics.[40]

220.        On information and belief Williams, Werner, Dampf, Starns, and Ausberry in April 2019

---

[39] https://www.theadvocate.com/baton_rouge/sports/lsu/article_0e1d6916-add8-11eb-8fa2-a34ad4d2c61f.html
[40] See https://senate.la.gov/s_video/videoarchive.asp?v=senate/2021/03/032621SCWC_0

retaliated against Alleva's employment for writing emails in 2013 to Jenkins that Miles should be terminated for sexual misconduct.

221.    On information and belief Williams, Werner, Dampf and Starns in furtherance of the scheme to control LSU's Football program promoted Ausberry and doubled his salary in order to appease Ausberry for not being promoted into the Athletic Director job as he had been promised and to ensure his continued participation in the operation and management of the criminal enterprise.

222.    On information and belief in April 2019 Williams, Werner, Dampf, Starns, Woodward and Ausberry knew of the enterprise common plan to control the LSU Football program.

223.    On information and belief in April 2019 Williams, Werner, Dampf, Starns, Woodward and Ausberry knew Crochet, Barton, Ginsberg and Hardin concealed the Miles Report in their offices from an official Title IX proceeding.

224.    On information and belief in April 2019 Williams, Werner, Dampf, Starns, Woodward and Ausberry knew of the associate in-fact enterprise in 2013 and tampered with a witness in an official Title IX proceeding.

225.    On information and belief in April 2019 Williams, Werner, Dampf, Starns, Woodward and Ausberry knew of the associate in-fact enterprise' common plan to retaliate against witnesses to intimidate them from testifying in official Title IX proceedings

226.    On information and belief Williams, Werner, Dampf, Starns, Woodward and Ausberry in April 2019 were aware of the associate in-fact enterprise' common plan to control LSU's lucrative Football program for the individual RICO Defendants personal gain in legal fees, salaries, awarding concession contracts to their associates and to gain political favor by awarding political and business leaders with tickets to LSU's football games.

227.     On information and belief Williams, Werner, Dampf, Starns, Woodward and Ausberry used United States Mail, email and telephone affecting interstate commerce to facilitate the scheme to fire Alleva, hire Woodward and promote Ausberry to continue control of the LSU Football program.

<u>Woodward and Ausberry targeted plaintiff's employment</u>

228.     From 2019 to present Woodward and Ausberry continued the enterprise's retaliation against plaintiff denying her pay raises, bonuses and  promotions.

229.     In November of 2020 plaintiff went to Ausberry to complain about repeatedly being denied promotions and Ausberry told plaintiff she was not being promoted because "you use the word Title IX too much and people are afraid of you" and told plaintiff you can complain to Scott Woodward but "he is my boy."

230.     In December 2020, plaintiff again went to Verge Ausberry and asked why she was not being promoted and Ausberry replied "You will never be promoted because you file Title IX complaints. You even filed one against me" and told plaintiff you can complain to Scott Woodward but "he is my boy."

231.     In furtherance of the scheme to control the LSU football program and to damage plaintiff's property interest in her employment and business Williams, Werner, Dampf,  Starns, Woodward, Alexander and Ausberry each individually knowingly violated *18 U.S.C. 1961 (d)*.

<u>Board of Supervisors</u>

232.     On December 14, 2020 *USA Today* submitted a public documents request for the Miles Report to Interim President Thomas Galligan (Galligan), the custodian of records for LSU in accordance with  *La. R.S. 44:32* and on January 14, 2021 LSU responded that the Miles Report

was not subject to public documents request and on January 19, 2021 *USA Today* filed a writ of mandamus against LSU and Galligan petitioning they be ordered to comply with *La. R.S. 44:32* and produce the Miles Report.

233.     On information and belief the full BOS directed Crochet and Barton to oppose *USA Today's* writ of mandamus and directed Crochet and Barton to notify Ginsberg and Hardin per the April 29, 2013 agreement between Ginsberg, Hardin, Barton, Crochet and Alleva and on February 4, 2021 Ginsberg, on behalf of Miles, filed a petition to intervene in *Kenny Jacoby v. Galligan*, opposing *USA Today's* public documents request in furtherance of the scheme to conceal the document from an official Title IX proceeding.

234.     After the release of the Husch Blackwell Report Alexander stated: "*The board leadership wants accountability and transparency now, and they're the ones who met me in the back room of Juban's. They're trying blame the Bobby Jindal (board members) for secrecy and the secrecy still continues.[41]*

235.     In 2021, Williams was named Chairman of the Search Committee to select a new President of the LSU System and Chancellor of the Baton Rouge Campus and Werner and Ausberry were also appointed to the committee;[42] Dampf and Starns voted on the selection of a new President.

236.     In furtherance of the scheme to conceal the Miles Report from official Title IX proceedings the LSU Board of Supervisors knowingly violated *18 U.S.C. 1962 (d)*.

237.     The predicate acts injured plaintiff's business and property include, *inter alia*, violations

---

[41] https://www.theadvocate.com/baton_rouge/sports/lsu/article_0e1d6916-add8-11eb-8fa2-a34ad4d2c61f.html
[42] https://lailluminator.com/2020/12/17/lsu-official-who-didnt-report-domestic-violence-remains-on-presidential-search-committee/

of *18 U.S.C. § 1341, 18 U.S.C. § 1343,  18 U.S.C. 1512* and *18 U.S.C. § 1513*

**Scheme 6:  Scheme to target Sharon Lewis' business and employment**

238.      Plaintiff adopts and incorporate by reference the previously plead paragraphs as if fully

plead herein.

<u>Lewis reported Title IX violations against coaches and athletic officials</u>

239.      From 2011 to present plaintiff is the only employee in LSU's Athletic Department who

has reported Title IX complaints and the RICO Defendants targeted her business and employment

in retaliation.

240.      Sometime in 2013 after plaintiff filed Title IX complaints against Miles, she filed a

complaint against Segar and Ausberry for failing to make mandatory reports of Title IX violations

and the Title IX office did not initiate a mandatory Title IX investigation.

241.      Segar confirmed to Husch Blackwell after plaintiff reported Miles' sexual misconduct

plaintiff filed a Title IX complaint with her  for harassment and other inappropriate treatment by

Athletic officials including a specific complaint against Ausberry.[43]

242.      Sometime in 2015, plaintiff filed a Title IX complaint  to Miriam Segar against Verge

Ausberry who was targeting her for verbal harassment, emotional abuse, belittling and open

humiliation in retaliation for brining Title IX complaints against Miles and others and Segar took

no action in violation of Title IX .

<u>RICO Defendants targeted plaintiff for filing Title IX complaints</u>

243.      In 2013 after plaintiff reported Miles' sexual misconduct  Alleva, Miles, Ausberry and

Segar conspired to place plaintiff under the direct supervision of Miles, putting him in control  of

---

[43] Exhibit 1

deciding plaintiff's pay raises, promotions and bonuses and when plaintiff complained about the restructuring to Verge Ausberry, he told her she should look for another job.

244.     In 2013 once Miles was cleared of any wrongdoing by LSU, Miles began to immediately target plaintiff's employment by leaving plaintiff out of recruiting meetings and off emails that pertained to recruiting and when plaintiff requested she be allowed to attend an NCCA meeting on compliance, she was denied. Plaintiff complained about the retaliation and hostile environment to her superiors, but they took no action.

245.     After reporting Miles for racist and sexist comments, plaintiff 's superiors became hesitant to meet with her and Ausberry told her several times she needed to go find another job and Ausberry told plaintiff "she should have taken a job at Alabama."

246.     Sometime in 2013 after plaintiff filed a Title IX complaint against Miles, Bo Bahnsen wrote up plaintiff for a purported NCAA violation by Brick Haley, assistant football coach, while Haley was traveling in Texas but plaintiff was not present and was not aware of the purported prohibited act(s).

247.     Sometime in 2013, after plaintiff filed a Title IX complaint against Miles, Bo Bahnsen wrote up plaintiff when Johanna Trees, secretary for defensive coaches, supposedly broke an NCAA rule by walking a prospective student athlete down the tiger walk but plaintiff was not present and was not aware of the prohibited activity.

248.     Sometime in 2013 Bo Bahnsen, Joe Avella and Verge Ausberry ordered plaintiff to sign fraudulent reprimand letters, but plaintiff refused.

249.     Sometime in February 2013 after plaintiff filed Title IX complaints against Miles, plaintiff met Ausberry and Alleva to discuss NCAA rules violations regarding a recruit and in the

meeting Ausberry and Alleva concluded  plaintiff had nothing to do with setting up a meeting with the recruit and a former LSU basketball player, however Alleva and Ausberry later approached plaintiff and directed her to meet with Bo Bohansen and LSU's lawyer.

250.      A week after the Alleva and Ausberry conversation Bo Bohansen contacted plaintiff and asked her to come to his office where he introduced her to Bob Barton and Barton explained to plaintiff she violated NCAA rules by facilitating a meeting with a recruit and former LSU basketball player and plaintiff once again explained she did not facilitate the meeting between the recruit and the former LSU basketball player and Barton nevertheless attempted to pressure plaintiff into signing a statement that she violated NCAA rules and plaintiff told Barton "I should not be forced to sign a statement that I know is not true" and plaintiff left the meeting.

251.      After plaintiff filed Title IX complaints against Miles and Ausberry, Alleva refused to meet with plaintiff to address her complaint Miles, Ausberry and others were retaliating against her and Alleva denied plaintiff pay raises, bonuses and promotions from 2013 to 2019.

252.      Sometime in 2017, Joe Alleva refused to send plaintiff to an NFL meeting as a representative of LSU and when she asked to meet with him, he included Ausberry and Segar in order to intimidate plaintiff from bringing anymore complaints against Ausberry and others for retaliation.

253.      In furtherance of the enterprise scheme to injure plaintiff business and employment from 2019 to present Woodward refused to meet with plaintiff to address her complaint Ausberry was verbally harassing and intimidating her for bringing Title IX complaints against him and Woodward and Ausberry denied plaintiff pay raises, bonuses and promotions.

254.      In August 2020 Plaintiff was promoted to Associate Athletic Director of Football Recruiting and Alumni Relations but received no increase in pay although her responsibilities were

increased injuring her business and property.

255.     In November of 2020 plaintiff went to Ausberry to complain about repeatedly being denied a promotion and Ausberry told plaintiff she was not being promoted because "you use the word Title IX too much and people are afraid of you."

256.     In December 2020, plaintiff again went to Verge Ausberry and asked why she was not being promoted and Ausberry screamed at plaintiff "You will never be promoted because you file Title IX complaints. You even filed one against me." At both meetings Ausberry told plaintiff you can complain to Scott Woodward but "he is my boy."

<u>Fraudulent -73-73 Investigation of Lewis</u>

257.     Segar at all material times was the official Title IX Coordinator in LSU's Athletic Department as directed by the Department of Education guidelines.

258.     Crochet and Barton at all material times during the fraudulent PM-73 Investigation against Lewis advised LSU and LSU Athletic Department on all Title IX issues.

259.     PM-73 Investigations are official DOE Title IX proceedings.

260.     On October 1, 2018, LSU's Title IX coordinator initiated a PM-73 investigation based on Segar and reporting plaintiff was aware LSU football player Drake Davis assaulted his girlfriend and did not report it to the Title IX office although they knew she was instructed by Athletic Director Alleva and Ausberry that all Title IX complaints in the Athletic Department were to be directed to Segar.

261.     Segar and Ausberry in furtherance of the criminal enterprise common plain to injure Plaintiff's employment and business gave materially false statements to a Title IX investigator that Plaintiff did not inform them concerning Complainant 1 allegations against Drake Davis.

262.    In a November 8, 2018, interview with the Title IX investigator Segar in furtherance of the criminal enterprise common plan to injure Plaintiff's employment and business, falsely stated that Plaintiff "never reported any Title IX/Sexual Misconduct issue to her.

263.    In a November 9, 2018, interview with the Title IX investigator Ausberry stated when Complainant 1 came to him about Drake Davis "that he immediately told her that he didn't want to hear anymore and that she needed to speak with Miriam Segar."

264.    LSU athletic employee Soil-Cromier informed the Title IX investigator that she witnessed plaintiff "pick up the phone" and call Segar.

265.    The Title IX investigator in his report stated "Two material observers (Segar and Ausberry) deny that Respondent (Lewis) ever reported" the allegations against Drake Davis.

266.    As a result of Ausberry and Segar's material omissions in an official DOE Title IX proceeding, in furtherance of the criminal enterprise common plan to injure Plaintiff's employment and business, LSU's Title IX office found that "there is sufficient evidence to prove that Respondent Sharon Lewis violated LSU's Title IX and Sexual Misconduct Policy PM-73"

267.    Husch Blackwell Report stated the rationale of the Title IX office for finding Plaintiff violated LSU's Title IX and Sexual Misconduct Policy PM-73""confusing."[44]

268.    Scott, Title IX Lead Investigator, intentionally failed to interview multiple material witnesses plaintiff named and determined Miriam Segar and Verge Ausberry were the only two "material observers" that warranted testifying in the investigation.[45]

269.    Husch Blackwell concluded that Scott's failure to interview Soil-Cormier who Lewis had

---

[44] Exhibit 1
[45] Exhibit 1

listed as a material witness " a error."[46]

270.    On December 6, 2018, Plaintiff appealed Scott's decision to the Title IX Coordinator.

271.    On January 15, 2019, the Title IX coordinator denied Lewis appeal.

272.    On January 23, 2019, Plaintiff submitted an appeal  and it was forwarded to Human Resource Management for adjudication including to Deputy Title IX Coordinator for Employees Lindsay Madatic for "next steps" and to LSU's in-house legal counsel.

273.    Plaintiff's appeal included detailed accounts of abuse by Ausberry, but the Title IX office did not open a Title IX investigation of Ausberry.

274.    Human Resources determined Scott's investigation was fraudulent and in consultation with LSU's in-house  attorney communicated to plaintiff the discipline was removed "from the file," however the PM-73 investigation remains in plaintiff's personnel file to intentionally damage plaintiff's property interest in her employment and business.

275.    Husch Blackwell found that "no one at the University formally investigated Lewis complaints regarding her work environment and potential retaliation, and no investigation of any other Athletics official-including Segar and Ausberry- for failure to report a Title IX concern under PM-73.[47]

276.    On December 11, 2020, plaintiff's legal counsel requested a copy of the full PM-73 (Title IX) investigation of Ms. Lewis by email and, on December 15, 2020, Tetyana Hoover emailed plaintiff's attorney stating "LSU is currently reviewing" the request and LSU has never provided plaintiff with a copy of the full PM-73 investigation in violation of Title IX guidelines.

---

[46] Exhibit 1
[47] Exhibit 1

277.     On information and belief as attorneys advising LSU Athletic Department on all Title IX issues, Crochet and Barton were aware of Segar and Ausberry's material omissions in an official DOE Title IX proceeding and knowingly conspired with Segar and Ausberry to damage Plaintiff's employment and business.

278.     Despite being the only employee in LSU's Athletic Department to report Title IX violations, plaintiff is the only athletic employee whom a PM-73 investigation has been opened against.

279.     Interim LSU President Thomas Galligan on March 10, 2021 testified under oath at the Louisiana Senate Select Committee on Women and Children Segar and Ausberry "*did not tell the truth*" about their involvement concealing Title IX violations in the Athletic Department.[48]

280.     In March 2021, after the *Husch Blackwell Report* was released Ausberry was suspended for 30 days and Segar was suspended for 21 days for their failures to properly report and investigate allegations of sexual misconduct and domestic violence at LSU and, in April 2021 Ausberry was removed from attending LSU's football games for his role in the Athletics Department's failure to investigate sexual misconduct and domestic violence at LSU.

281.     Segar and Ausberry remain employed at LSU.

282.     On information and belief Segar, Ausberry, Crochet and Barton in furtherance of the criminal enterprise' common plan to retaliate against plaintiff and injure her property interest in her employment and business each individually knowingly violated *18 U.S.C. 1512 (c ) (2)* and *18 U.S.C. 1512 (k),*

Wire Fraud

---

[48] https://senate.la.gov/s_video/videoarchive.asp?v=senate/2021/03/031021SCWC_0;

283.    In furtherance of the scheme to injure plaintiff's business and employment through a

in an official DOE Title IX proceeding RICO actor Jeffrey Scott used email communications

affecting interstate commerce and knowingly violated  *18 U.S.C. 1343* by sending the following

emails:[49]

| From | To | Date | Content |
|------|-----|------|---------|
| Scott | Lewis | 10/5/2018 | Email notifying Lewis that a PM-73 Investigation is being initiated against her |
| Scott | Lewis | 11/16/2018 | Email of Final Report Of fraudulent PM-73 Investigation that contained material omissions that Segar was designated as the person that all Title IX complaints were to be forwarded to. |
| Scott | Lewis | 11/20/2018 | Email of Final Report Of fraudulent PM-73 Investigation that contained material omissions that Segar was designated as the person that all Title IX complaints were to be forwarded to. |
| Scott | Lewis | 1/11/2019 | Email on fraudulent PM-73 Investigation of Lewis. |

Mail Fraud

284.    In furtherance of the scheme to injure plaintiff's property interest in her business and

employment in an official DOE Title IX proceeding  RICO actor Jeffrey Scott used the United

States Mail affecting interstate commerce and knowingly violated  18 U.S.C. 1341 by sending the

---

[49] Exhibit 4

following:[50]

| From | To | Date | Content |
|------|-----|------|---------|
| Scott | Lewis | 11/16/2018 | Final Report Of Fraudulent PM-73 Investigation that contained material omissions that Segar was designated to receive all Title IX complaints in Athletic Department |

Physical threats and intimidation

285.     Sometime in 2013, Miles threatened to punch plaintiff "in her motherfucking mouth" in retaliation for plaintiff bringing a Title IX complaint against him to influence, delay and prevent her testimony in an official Title IX proceeding.

286.     Football operation employees confirmed to Husch Blackwell they witnessed Ausberry 'hollering' and 'screaming' at Lewis over the last several years.[51]

287.     Ausberry from 2013 to 2021 verbally abused and intimidated plaintiff for bringing a Title IX complaint against him to influence, delay and prevent her testimony in an official Title IX proceeding.

288.     Miles and Ausberry knowingly used threats, intimidation to induce plaintiff from testifying in official Title IX proceedings in violation of *18 U.S.C. 1512 ( 2 ) (A), 18 U.S.C. 1512 (2) (B)* and *18 U.S.C. 1512 (k)*.

289.     In furtherance of the enterprise's common plan to target plaintiff by injuring her property interest in her employment and business, Miles and Ausberry each individually knowingly violated

---

[50] Exhibit 4
[51] Exhibit 1

*18 U.S.C. 1512 (k),  (B), 18.U.S.C. 1513 (b) (1)* and *18.U.S.C. 1513 (f).*

<u>Plaintiff's property interest in her employment irreparably damaged</u>

290.    The PM-73 (Title IX) investigation of plaintiff has been reported in local and national media and LSU has never issued a public statement that the PM-73 findings was overturned.

291.    On June 25, 2021, Plaintiff  was named as a defendant in a class action lawsuit against LSU Owens et al v. LSU et al No. 3:21-cv-00242 over LSU's failure to properly report and investigate allegations of sexual misconduct and domestic violence.

292.     Plaintiff, a senior athletic official, who is both African-American and a woman, now has a PM-73 (Title (IX) violation in her personnel record,  is a named defendant in a Title IX class action lawsuit; her name has repeatedly been associated with a national sex scandal  and as a result plaintiff's opportunity for advancement in Power 5 NCAA Football athletics has been destroyed.

293.    It was not until March 2021 when plaintiff read in *The Advocate* the Miles Report, Taylor Porter Billing Records, and the Husch Blackwell Report did plaintiff realize she was being denied pay raises, bonuses and promotions  from 2013 to present as part of a common plan by the RICO Defendants to retaliate against her for filing Title IX complaints against Miles, Ausberry, Segar star football players and others.

294.    The injuries to plaintiff's  business and property include, inter alia, interference with her right to earn a living, loss pay, loss of benefits, loss of promotions, loss of bonuses, loss of career in Power 5 Athletics, exposure from lawsuits and damage to her employment and business as a result of the activities of the RICO  Defendants.

295.    It was reasonably foreseeable by RICO Defendants the RICO violations stated herein, would directly and proximately injure her property interest in her employment and business and

being denied pay raises, bonuses, promotions and her employment destroyed in Power 5 NCAA

Athletics were a natural consequence of the defendants RICO violations previously plead herein.

## Count 1: Violation of 18 U.S.C. § 1962 (c)

296.     James Williams, Mary Leach Werner, Joe Alleva, Scott Woodward, Miriam Segar, Verge

Ausberry, Shelby McKenzie, Vicki Crochet, Bob Barton and operated, managed and participated

in the conduct of the affairs of the RICO enterprise by engaging in a pattern of racketeering

activity, comprised of repeated predicate acts as listed above.

297.     By reason of the RICO Defendants violation of 18 U.S.C. § 1962 (c), plaintiff has been

injured in her business and property, entitling her to recover her actual and consequential damages

in an amount to be proven at trial, treble damages, attorney fees and costs.

## Count 2: Violation of 18 U.S.C. § 1962 (d)

298.     As evidenced by their acts and omissions set forth above, the RICO Defendants agreed

and conspired to participate in the conduct of the affairs of the enterprise through a pattern of

racketeering, in violation of 18 U.S.C. § 1962 (d).

299.     By reason of the RICO Defendants' violation of 18 U.S.C. § 1962 (d), plaintiff has been

injured in her business and property and entitled to recover her actual and consequential damages,

in an amount to be proven at trial, treble damages, attorney fees and costs. Additionally, by their

willful and intentional actions to conceal  the sexual harassment investigation of Head Football

Coach Les Miles and the Miles Report  from an official Title IX proceeding,  tamper with a witness

in an official Title IX proceeding,  control LSU Football program, shield coaches and star football

players sexual harassment and criminal complaints from the reporting requirements of Title IX

and official Title IX proceedings and to target plaintiff's employment and business in retaliation

for reporting Title IX complaints against coaches and star football players, plaintiff, students,

faculty and employees of LSU have been damaged in their business and property.

## COUNT III

Race Discrimination
Title VII of the Civil Rights Act of 1964
(LSU Board of Supervisors)

300.    Plaintiff adopts and incorporates by reference the previously plead factual allegations  in the preceding paragraphs as if fully plead herein.

301.    Plaintiff is African-American and from May 8, 2020, to present Plaintiff  was discriminated against because of her race.[52]

302.    As a direct and proximate result of race discrimination she has suffered and continue to suffer medical expenses associated with mental and physical health treatment, inconvenience, insults, mental distress, humiliation, anxiety, emotional and physical pain and suffering, loss of employment opportunities and benefits, loss of other economic or non-economic damages, for which she is entitled to just compensation.

303.    Plaintiff is entitled to monetary compensation for violations of Title VI race discrimination against the Board of Supervisors.

## COUNT IV

Sex Discrimination
Title VII of the 1964 Civil Rights Act
(LSU Board of Supervisors)

304.    Plaintiff adopts and incorporates by reference the previously plead factual allegations  in the preceding paragraphs as if fully plead herein.

305.    Plaintiff is African-American Female and from May 8, 2020, to present Plaintiff  was

---

[52] See EEOC Charge Statement attached as Exhibit 5

discriminated against and harassed because of her sex. [53]

306.    As a direct and proximate result of sex discrimination she has suffered and continue to suffer medical expenses associated with mental and physical health treatment, inconvenience, insults, mental distress, humiliation, anxiety, emotional and physical pain and suffering, loss of employment opportunities and benefits, loss of other economic or non-economic damages, for which she is entitled to just compensation.

307.    Plaintiff is entitled to monetary compensation for violations of Title VI sex discrimination against the Board of Supervisors.

COUNT V

Hostile Work Environment
Title VII of the 1964 Civil Rights Act
(LSU Board of Supervisors)

308.    Plaintiff adopts and incorporates by reference the previously plead factual allegations  in the preceding paragraphs as if fully plead herein.

309.    Plaintiff alleges she has been subjected to discreet discriminatory acts and has experienced a racially hostile work environment throughout her employment since 2005 to present, including unlawful harassment for the relevant time periods referenced herein.[54]

310.    From 2005 to present plaintiff  reported to her Supervisors  complaints of retaliation and harassment and hostile environment created by Les Miles, Verge Ausberry and others, but her Supervisors failed to investigate or take any action.

311.    In 2020 and 2021 Plaintiff's coworkers expressed their concern over Ausberry's hostile

---

[53] See EEOC Charge Statement attached as Exhibit 5
[54] See EEOC Charge Statement attached as Exhibit 5

treatment of plaintiff to the senior leadership of the athletics department, but they took no actions and  in interviews with Husch Blackwell "Football Operations employees confirmed witnessing Ausberry hollering and screaming at plaintiff over the course of the last several years."[55]

312.    There were multiple reports of a lack of institutional oversight on Title IX compliance in LSU's athletic Department and Board of Supervisors actions and inactions subjected plaintiff to additional retaliation and created a hostile working environment in the athletic department.

313.    As a direct and proximate result of hostile work environment she has suffered and continue to suffer medical expenses associated with mental and physical health treatment, inconvenience, insults, mental distress, humiliation, anxiety, emotional and physical pain and suffering, loss of employment opportunities and benefits, loss of other economic or non-economic damages, for which she is entitled to just compensation.

314.    Plaintiff is entitled to monetary compensation for violations of Title VI hostile work environment against the Board of Supervisors.

COUNT VI

Retaliation
Title VII of the 1964 Civil Rights Act
(LSU Board of Supervisors)

315.    Plaintiff adopts and incorporates by reference the previously plead factual allegations  in the preceding paragraphs as if fully plead herein.

316.    From 2012 to present Plaintiff was subjected to ongoing acts of retaliation for reporting acts of race discrimination and sex discrimination by Supervisors in LSU Athletic Department. [56]

---

[55] Exhibit 1
[56] See EEOC Charge Statement attached as Exhibit 5

317.      Defendants actions in this instance was sufficient to dissuade Plaintiff and other employees from reporting violations of Title VII.

318.      As a direct and proximate result of  ongoing acts of retaliation she has suffered and continue to suffer medical expenses associated with mental and physical health treatment, inconvenience, insults, mental distress, humiliation, anxiety, emotional and physical pain and suffering, loss of employment opportunities and benefits, loss of other economic or non-economic damages, for which she is entitled to just compensation.

319.      Plaintiff is entitled to monetary compensation for violations of Title VII retaliation against the Board of Supervisors.

<u>COUNT VI</u>
Pay Discrimination
Title VII of the 1964 Civil Rights Act
(LSU Board of Supervisors)

320.      Plaintiff adopts and incorporate by reference the previously plead paragraphs as if fully plead herein.

321.      From 2020 to 2022 plaintiff has received significantly lower compensation than her similarly situated male co-workers, despite this fact she has played a significant role in LSU's Football success. [57]

322.       In August 2020 Plaintiff was promoted to Associate Athletic Director of Football Recruiting and Alumni Relations but received no increase in pay although her responsibilities were increased.

323.      Plaintiff is entitled to monetary compensation for violations of Title VII pay

---

[57] See EEOC Charge Statement attached as Exhibit 5

discrimination against the Board of Supervisors.

## LEGAL CAUSE OF ACTION

324.        Plaintiff pleads all her discriminatory injuries and damages were caused by the Defendant's intentional violations of various Federal Statutes which are pled herein above or alternatively by negligence and gross negligence of the executives, agents and managers of the defendants and University.

325.        Plaintiff pleads and asserts entitlement to damages pursuant to the legal theories of failure to train, vicarious liability and respondent superior for acts and omissions of LSU Board of Supervisors by individual defendants acting at the direction of or on behalf of LSU Board of Supervisors for any and all causes of actions asserted herein.  Plaintiff further pleads and asserts entitlement to damages as a direct and proximate cause the LSU Board of Supervisors and their employees, agents, assigns and successors for the intentional and ongoing deliberate failure to comply with its own policies and governing regulations.

## PLAINTIFF'S PLEA FOR DAMAGES AND REMEDIES

For all the foregoing reasons, plaintiff prays for judgment against defendants as follows:

A.  Plaintiff seeks past, present and future economic and non-economic damages in an amount to be determined at trial;

B.  Plaintiff seeks past wages, bonuses and promotions (18 U.S. § 1962 (c) and (d)) and Title VII;

C.  Plaintiff seeks past, present, and future general, special, incidental and consequential damages in an amount to be determined at trial;

D.  Plaintiff seeks any appropriate statutory damage;

E.  Plaintiff seeks cost of this suit;

F.   Plaintiff seeks interest based on damages, as well as pre-judgment and post-judgment interest as allowed by law;

G.   Plaintiff seeks damages for emotional pain and distress and mental anguish;

H.   Plaintiff seeks damages for humiliation and suffering of discrimination;

I.   Plaintiff seeks damages for loss of enjoyment of life and inconvenience;

J.   Plaintiff seeks damages for loss of earning potential;

K.   Plaintiff seeks damages to her physical health and mental health;

L.   Plaintiff seeks treble damages under 20 U.S.C. §1681(Title IX) and 18 U.S. § 1962 (c) and (d). and any and applicable state laws;

M.   Plaintiff seeks reasonable attorneys' fees, costs and interest to the fullest extent allowed by law;

N.   Plaintiff seeks liability *in solido* among all defendants;

O.   Plaintiff seeks damages of injury to their reputation, character, economic opportunities and defamation;

P.   Plaintiff seeks injunctive relief to stop the violation of law and to require defendants to provide a workplace free of discrimination and racketeering and to make the Plaintiff whole in her job, duties and opportunities for advancement; and

Q.   Plaintiff seeks all additional and/or further relief as this Court deems just and equitable under the circumstances.

## JURY DEMAND

Plaintiff demands jury by trial

## PRAYER FOR RELIEF

Plaintiff Sharon Lewis respectfully prays for judgment against Defendants, individually, jointly and severally, for an amount of no less than $50,000,000 million together with legal interest,

reasonable attorneys' fees and costs against Louisiana State University and all named Defendants, pursuant to *20 U.S.C. § 1681 (Title IX)* and with respect to RICO the following:

I)      Declaring the RICO Defendants' conduct constituted violations of 18 U.S.C § 1961 et seq.;

II)     Determine plaintiff's injuries are due to the RICO Defendants' actions and holding not only the RICO Defendants liable, jointly, severally and in solido for the plaintiff's actual and consequential damages shown at trial; and

III)    Providing reasonable restrictions on future activities or conduct of the RICO Defendants.

Respectfully submitted:

*/s/ Larry English*
Larry English, LSB No. 22772
Larry English, Attorney at Law
423 W. 127 Street, 7th Floor
New York, New York 10027
917-531-3909
englishlaw2008@gmail.com

/s/ *Albert Van-Lare*
Albert Van-Lare NYSB No. 3974169
125 Maiden Lane, Suite 510
New York, New York 10038
vanlareesq@aol.com
 (212) 608-1400