## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

**SHARON LEWIS,**                                                    **CIVIL ACTION**
   **Plaintiff**

**VERSUS**                                                                **NO. 21-198-SM-RLB**

**LOUISIANA STATE UNIVERSITY, ET AL.,**
   **Defendants**

### ORDER AND REASONS

On March 4, 2022, Plaintiff Sharon Lewis (Plaintiff) filed her Second Amended Complaint and first amended RICO Case Statement.[1] Plaintiff alleges, among other things, claims for relief arising out of alleged violations of the Racketeer Influenced Corrupt Organizations Act ("RICO").[2] Now pending before the Court are the following:

> Motion to dismiss the civil RICO claims in the Second Amended Complaint for failure to state a claim, filed by Defendants Robert Barton, Vicki Crochet, and William Shelby McKenzie (the "TP Defendants");[3]

> Motion to dismiss the civil RICO claims in the Second Amended Complaint for failure to state a claim, filed by Defendant Verge Ausberry("Ausberry");[4]

> Motion to dismiss the civil RICO claims in the Second Amended Complaint for failure to state a claim, filed by Defendant Miriam Segar ("Segar");[5]

> Motion to dismiss the civil RICO claims in the Second Amended Complaint for failure to state a claim, filed by Defendant Joseph Alleva ("Alleva");[6] and

> Motion to dismiss the civil RICO claims in the Second Amended Complaint for failure to state a claim, filed by Scott Woodward ("Woodward").[7]

---

[1] R. Doc. 219.
[2] 18 U.S.C. § 1961 *et seq.*
[3] R. Doc. 224. Plaintiff filed an opposition. R. Doc. 231. The Taylor Porter Defendants filed a reply. R. Doc. 242.
[4] R. Doc. 225. Plaintiff filed an opposition. R. Doc. 239. Ausberry did not file a reply.
[5] R. Doc. 226. Plaintiff filed an opposition. R. Doc. 237. Segar filed a reply. R. Doc. 246.
[6] R. Doc. 227. Plaintiff filed an opposition. R. Doc. 240. Alleva filed a reply. R. Doc. 244.
[7] R. Doc. 228. Plaintiff filed an opposition. R. Doc. 236. Woodward filed a reply. R. Doc. 245.

## BACKGROUND

Because the background facts are extensively set forth in the Court's September 10, 2021 Order and Reasons,[8] and the Court's December 2, 2021 Order and Reasons,[9] the Court will set forth only the procedural developments that have occurred since the December 2, 2021 Order and Reasons was issued.

In its December 2, 2021 Order and Reasons, the Court, among other things, ordered that Plaintiff "may seek leave of Court on or before Friday, December 10, 2021, to file a Second Amended Complaint" to, *inter alia*, "amend her civil RICO claims against William Shelby McKenzie, Vicki Crochet, Robert Barton . . . Joseph Alleva, Miriam Segar, Verge Ausberry, and Scott Woodward, in their individual capacities."[10] The Court further ordered that on or before Friday, December 10, 2021, Plaintiff may seek leave of Court to file her first amended RICO Case Statement into the record.[11] The Court's December 2, 2021 Order and Reasons further provided that "[i]f Plaintiff timely requests leave to file her Second Amended Complaint, the motions to dismiss filed by William Shelby McKenzie, Vicki Crochet, Robert Barton, James Williams, Mary Leach Werner, Miriam Segar, Verge Ausberry, and Scott Woodward, to the extent seeking dismissal of Plaintiff's civil RICO claims based on injuries discovered on or after April 8, 2017, will be denied as moot without prejudice."[12]

On December 10, 2021, Plaintiff filed a motion for leave to file her Second Amended Complaint and first amended RICO Case Statement, attaching her proposed Second Amended Complaint and first amended RICO Case Statement to the motion for

---

[8] R. Doc. 107.
[9] R. Doc. 165.
[10] R. Doc. 165 at pp. 53–54.
[11] *Id.* at p. 54.
[12] *Id.*

leave.[13] The Court denied the motion because "[t]he proposed Second Amended Complaint fail[ed] to comply with the Court's December 2, 2021 Order and Reasons."[14] The Court set a telephone status conference for Monday, December 20, 2021 to discuss Plaintiff's proposed Second Amended Complaint.[15]

On December 17, 2021, Plaintiff filed a "Motion to Alter or Amend Judgment,"[16] asking the Court to reconsider the portion of its December 2, 2021 Order and Reasons[17] that dismissed, with prejudice, Plaintiff's civil RICO claims against Leslie Miles ("Miles), Garrett Danos ("Danos"), Robert Yarborough ("Yarborough"), Stanley Jacobs ("Jacobs") and William Jenkins ("Jenkins"). Oppositions to Plaintiff's motion to alter or amend were filed by Leslie Miles,[18] the TP Defendants,[19] Garrett "Hank" Danos, Stanley Jacobs, and Robert "Bobby" Yarborough,[20] Miriam Segar,[21] and William "Bill" Jenkins.[22] Plaintiff filed replies.[23] On January 19, 2022, the Court issued an Order and Reasons denying Plaintiff's "Motion to Alter or Amend Judgment."[24] In the Court's January 19, 2022 Order and Reasons, the Court ordered that on or before Thursday, January 27, 2022, Plaintiff may seek leave to file a Second Amended Complaint and first amended RICO Case Statement.[25]

On January 26, 2022, Plaintiff filed a motion for leave to file her Second Amended

---

[13] R. Doc. 166.
[14] R. Doc. 167.
[15] *Id.*
[16] R. Doc. 168.
[17] R. Doc. 165.
[18] R. Doc. 170.
[19] R. Doc. 171.
[20] R. Doc. 172.
[21] R. Doc. 173.
[22] R. Doc. 174.
[23] R. Docs. 175, 176, 177, 178, and 180-1.
[24] R. Doc. 185.
[25] *Id.* at pp. 7–8.

Complaint and first amended RICO Case Statement, attaching her proposed Second Amended Complaint and first amended RICO Case Statement to the motion for leave.[26] Oppositions to the motion for leave were filed by the TP Defendants,[27] the Board of Supervisors of Louisiana State University, Mary Leach Werner, and James Williams,[28] Verge Ausberry,[29] Scott Woodward,[30] Joseph Alleva,[31] and Miriam Segar.[32] Plaintiff did not file replies.

On February 9, 2022, Plaintiff appealed the Court's January 19, 2022 Order and Reasons to the United States Court of Appeals for the Fifth Circuit.[33] The Fifth Circuit dismissed Plaintiff's appeal based on lack of jurisdiction, and the mandate issued on May 20, 2022.[34]

On February 24, 2022, Plaintiff filed a motion for voluntary dismissal, with prejudice, of her claims against Mary Leach Werner and James Williams.[35] On February 25, 2022, the Court granted the motion, thereby dismissing, with prejudice, Plaintiff's claims against Mary Leach Werner and James Williams.[36]

Also on February 25, 2022, the Court held a video status conference, and during the status conference, the parties discussed Plaintiff's January 26, 2022 motion for leave and whether Plaintiff's proposed Second Amended Complaint and first amended RICO Case Statement complied with the Court's December 2, 2021 Order and Reasons.[37] During

---

[26] R. Doc. 190.
[27] R. Doc. 192.
[28] R. Doc. 193.
[29] R. Doc. 194.
[30] R. Doc. 195.
[31] R. Doc. 193.
[32] R. Doc. 194.
[33] *Lewis v. LSU*, Docket No. 22-30072 (5th Cir).
[34] *Id*. at R. Doc. 00516298191.
[35] R. Doc. 209.
[36] R. Doc. 210.
[37] *See* R. Doc. 212 at p. 2.

the status conference, the Court denied Plaintiff's January 26, 2022 motion for leave, and in the Minute Entry following the status conference, the Court ordered that, on or before Friday March 4, 2022, Plaintiff shall file a motion for leave to file a Second Amended Complaint and first amended RICO Case Statement to incorporate the corrections, clarifications, and additions discussed during the status conference.[38]

On March 3, 2022, Plaintiff filed a motion for leave to file her Second Amended Complaint and first amended RICO Case Statement, attaching her proposed Second Amended Complaint and first amended RICO Case Statement to the motion for leave.[39] On March 4, 2022, the Court granted Plaintiff's motion for leave.[40] On that same date, Plaintiff's Second Amended Complaint and first amended RICO Case Statement were filed into the record.[41] The Court denied, without prejudice, the motions to dismiss Plaintiff's first amended complaint filed by William Shelby McKenzie, Vicki Crochet, Robert Barton, James Williams, Mary Leach Werner, Miriam Segar, Verge Ausberry, Scott Woodward, and Joseph Alleva.[42]

On March 4, 2022, the Court issued a briefing schedule providing that Defendants shall file any motions to dismiss Plaintiff's Second Amended Complaint on or before Friday, March 25, 2022, that Plaintiff's opposition to any motion shall be filed within 10 days of the filing of the motion, and that the mover may file a reply memorandum in support of its motion to dismiss within five days of the filing of Plaintiff's opposition.[43]

Plaintiff's Second Amended Complaint alleges, inter alia, a private cause of action

---

[38] *See id.*
[39] R. Doc. 217.
[40] R. Doc. 218.
[41] R. Doc. 219.
[42] R. Doc. 251.
[43] *See* R. Doc. 220.

for damages under RICO against the TP Defendants, Verge Ausberry, Miriam Segar, Scott Woodward, and Joseph Alleva.[44] Specifically, Plaintiff alleges two types of RICO claims— namely, a substantive racketeering claim pursuant to 18 U.S.C. §1962(c),[45] and a conspiracy-to-commit racketeering claim under 18 U.S.C. § 1962(d).[46]

Plaintiff alleges Joseph Alleva, Scott Woodward, Miriam Segar, Verge Ausberry, Shelby McKenzie, Vicki Crochet, and Bob Barton constitute a RICO enterprise.[47] Plaintiff alleges the individual defendants engaged in conduct in violation of the following laws:

a. 18 U.S.C. § 1341 (mail fraud);

b. 18 U.S.C. § 1343 (wire fraud);

c. 18 U.S.C. § 1512 (concealing documents or obstructing official proceedings);

d. 18 U.S.C. § 1513 (retaliation against a witness, victim, or an informant); and

e. 18 U.S.C. § 1952 (interstate travel in aid of racketeering).[48]

Plaintiff alleges the enterprise, existing from 2013 to 2021, "utilized the above predicate acts to control the LSU football program, retaliate against employees and students who reported Title IX and criminal complaints against coaches and star football players and capture and kill Title IX complaints against coaches, star football players and athletic officials."[49]

On March 25, 2022, motions to dismiss the civil RICO claims in Plaintiff's Second Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) were filed by the TP

---

[44] R. Doc. 219 at ¶¶ 95–299.
[45] *Id*. at ¶¶ 296–297.
[46] *Id*. at ¶¶ 298–299.
[47] *Id*. at ¶ 122.
[48] *Id*. at ¶ 138.
[49] *Id*. at ¶ 139.

Defendants,[50] Verge Ausberry,[51] Miriam Segar,[52] Joseph Alleva,[53] and Scott Woodward.[54]

## RULE 12(b)(6) STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court may dismiss a complaint, or any part of it, for failure to state a claim upon which relief may be granted if the plaintiff has not set forth factual allegations in support of her claim that would entitle her to relief.[55] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[56] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[57] The court, however, does not accept as true legal conclusions or mere conclusory statements, and "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."[58] "[T]hreadbare recitals of elements of a cause of action, supported by mere conclusory statements" or "naked assertion[s] devoid of further factual enhancement" are not sufficient.[59]

In summary, "[f]actual allegations must be enough to raise a right to relief above the speculative level."[60] "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not

---

[50] R. Doc. 224.
[51] R. Doc. 225.
[52] R. Doc. 226.
[53] R. Doc. 227.
[54] R. Doc. 228.
[55] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007).
[56] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).
[57] *Id.*
[58] *S. Christian Leadership Conference v. Supreme Court of the State of La.*, 252 F.3d 781, 786 (5th Cir. 2001) (citing *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993)).
[59] *Iqbal*, 556 U.S. at 663, 678 (citations omitted).
[60] *Twombly*, 550 U.S. at 555.

show[n]'—that the pleader is entitled to relief."[61] "Dismissal is appropriate when the complaint 'on its face show[s] a bar to relief.'"[62]

In deciding a Rule 12(b)(6) motion to dismiss a civil RICO claim, a district court "must consider the well pleaded facts of the complaint, including the RICO case statement filed pursuant to the standing order."[63]

Ordinarily, causation is a fact issue resolved by the finder of fact rather than in a Rule 12(b)(6) motion to dismiss. However, proximate cause is a legal issue, not a fact issue, in cases involving civil RICO claims[64] because RICO is a statutory tort remedy reflecting unique "ideas of what justice demands, or of what is administratively possible and convenient."[65] As a result, it falls within the competence of this Court to decide whether legal causation exists at the Rule 12(b)(6) stage in a civil RICO case.[66]

## LAW AND ANALYSIS

18 U.S.C. § 1964(c) provides that "any person injured in his person or property by reason of a violation of Section 1962" may recover treble damages and a reasonable attorney's fee.[67] Plaintiff's civil RICO claims are based upon violations of 18 U.S.C. §§ 1962(c) and (d),[68] which provide as follows:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or

---

[61] *Id.* (quoting FED. R. CIV. P. 8(a)(2)).

[62] *Cutrer v. McMillan*, 308 F. App'x 819, 820 (5th Cir. 2009) (per curiam) (quotations omitted).

[63] *Dixon v. Ford Motor Credit Co.*, 1999 U.S. Dist. LEXIS 2089, at *4 (E.D. La. Feb. 24, 1999) (citing *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992)).

[64] *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 269 (1992); *see also Brandeburg v. Seidel*, 859 F.2d 1179 (4th Cir. 1988), *overruled on other grounds*, 517 U.S. 706 (1996).

[65] *Holmes*, 503 U.S. at 269.

[66] *Brandenburg*, 859 F.2d at 1189.

[67] 18 U.S.C. § 1964(c).

[68] *See* R. Doc. 219 at ¶¶ 95–299; *see also id. at* ¶ 121 ("Plaintiff asserts claims for violations of U.S.C. Sec. 1962(c) and (d)."); R. Doc. 8 at ¶ 108 ("Plaintiff herein asserts her right to a private cause of action under 18 U.S.C. Section 1962(c) and (d).").

collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.[69]

To state a RICO claim based on a violation of § 1962(c), a plaintiff is required to allege a "RICO person" engaged in the "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."[70] To state a RICO claim based on a violation of § 1962(d), a plaintiff must allege "(1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendants knew of and agreed to the overall objective of the RICO offense."[71] Moreover, the "failure to plead the requisite elements of . . . a § 1962(c) violation implicitly means that [the plaintiff] cannot plead a conspiracy to violate [that] section."[72]

"Racketeering activity," as relevant to this case, encompasses those federal crimes listed in 18 U.S.C. § 1961(1)(B), including mail fraud, wire fraud, evidence tampering, retaliation, and interstate travel in aid of racketeering.[73] To constitute a "pattern" of racketeering activity, there must be "at least two acts of racketeering activity," the last of which occurred within ten years of the prior act of racketeering activity.[74]

## I.    A RICO plaintiff must plausibly allege she suffered injury and her damages were proximately caused by a RICO violation.

An individual has a civil RICO claim under 18 U.S.C. § 1964(c), and a right to recover treble damages and an attorney's fee, "[i]f the defendant engages in a pattern of racketeering activity in a manner forbidden by [§ 1962], and the racketeering activities

---

[69] 18 U.S.C. § 1962(c), (d).
[70] *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 495 (1985).
[71] *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 203 (5th Cir. 2015).
[72] *Nolen v. Nucentrix Broadband Networks Inc.*, 293 F.3d 926, 930 (5th Cir. 2002).
[73] 28 U.S.C. § 1961(1).
[74] 18 U.S.C. § 1961(5).

injure the plaintiff in his business or property."[75] The injury must be "by reason of," or caused by, a violation of § 1962.[76] Thus, § 1964(c) imposes two requirements on the plaintiff's right to recover, namely, damage to business or property and causation.[77]

Some courts in the past have referred "to the independent § 1964(c) requirements of damages and causation as 'standing.'"[78] The use of the phrase "standing" to refer to statutory requirements has been referred to as "prudential standing,"[79] rather than constitutional standing. The Supreme Court in *Lexmark International, Inc. v. Static Control Components* explained that a better way of phrasing the inquiry is to ask whether the plaintiff has a cause of action under the statute, which is plainly not a jurisdictional inquiry.[80] Rather than examining jurisdiction, the Supreme Court explained, the inquiry should be whether the plaintiff has stated a cause of action by alleging damage to business or property and causation. The *Lexmark* court "construed federal causes of action in a variety of contexts," including in the civil RICO context, "to incorporate a requirement of proximate causation."[81] Under a proximate cause analysis, courts ask "whether the harm

---

[75] *Sedima, S.P.R.L.,* 473 U.S. at 495.

[76] 18 U.S.C. § 1964(c).

[77] *Id.* (providing a right of action to "*[a]ny person injured . . . by reason of*" the conduct constituting the RICO violation); *see also Sedima,* 473 U.S. at 479.

[78] *Green v. Morningstar Inv. Mgmt. LLC,* No. 17 C 5652, 2019 WL 216538, at *2 (N.D. Ill. Jan. 16, 2019). Each of the Defendants argues Plaintiff lacks standing to bring her civil RICO claims. The Defendants argue Plaintiff alleges employment-related injuries and personal injuries that are not cognizable under RICO, and that Plaintiff fails to allege how such injuries were proximately caused by predicate acts of racketeering. *See, e.g.*, R. Doc. 227-1 at p. 6. The Defendants argue Plaintiff admits in her second amended complaint that her damages are the direct and proximate result of retaliatory acts taken against her for reporting Title IX violations. *See, e.g.*, R. Doc. 224-2 at pp. 12–13.

[79] Prudential standing, while not rooted in Article III of the U.S. Constitution, is judicially derived by the Supreme Court. *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 126 (2014). It encompasses "at least three broad principles: 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.'" *Id.* (citing *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (internal quotations omitted)).

[80] *Id.*

[81] *Id.* at 132 (citing *Holmes v. Securities Investor Protection Corporation,* 503 U.S. 258, 268–70 (1992)).

alleged has a sufficiently close connection to the conduct the statute prohibits."[82] Proximate cause, in this context, "is employed . . . as a limiting principle intended to stymie a flood of litigation, reserving recovery for those who have been directly affected by a defendant's wrongdoing."[83]

"RICO standing" then, as the phrase was used by the Defendants in their motions to dismiss, is not a jurisdictional matter, and, instead, is "properly characterize[d] as the usual pleading stage inquiry: whether the plaintiff has plausibly pled a cause of action under RICO."[84] To plead the elements of a civil RICO claim under § 1964(c), a plaintiff must plead a § 1962 violation and injury to business or property proximately caused by a RICO violation.[85] The plaintiff bears the burden of establishing proximate cause and damages.[86] "Any recoverable damages occurring by reason of a violation of . . . [Section 1962] must flow from the commission of the predicate acts."[87] With respect to the causation requirement, "a RICO predicate offense must not only [be] a but for cause of [plaintiff's] injury, but it must be the proximate cause as well."[88] To survive a Rule 12(b)(6) motion, a civil RICO plaintiff must sufficiently plead an injury resulting directly from the alleged RICO violation.[89]

The Fifth Circuit has made it clear that proximate cause for purposes of RICO does not turn on the question "of foreseeability; instead, a plaintiff must demonstrate the

---

[82] *Id.* at 133.

[83] *St. Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*, 967 F.3d 295, 300 (3rd Cir. 2020).

[84] *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 887 (10th Cir. 2017). *See also HCB Fin. Corp. v. McPherson*, 8 F.4th 335, 339 (5th Cir. 2021) (explaining that "a motion to dismiss for lack of statutory standing is analyzed under Rule 12(b)(6), not Rule 12(b)(1)").

[85] *Cullom v. Hibernia National Bank*, 857 F.2d 1211, 1214-1215 (5th Cir. 1988).

[86] *Arroyo v. Oprona, Inc.*, 736 F. App'x 427, 429 (5th Cir. 2018); *Jackson v. NAACP*, 546 F. App'x 438, 442 (5th Cir. 2013).

[87] *Cullom*, 857 F. 2d at 1215 (quoting *Sedima S.P.R.L v. Imex Co.*, 473 U.S. 474, 497 (1985)).

[88] *Jackson v. NAACP*, 546 F.. Appx. 438, 442 (5th Cir. 2013) (internal quotations omitted).

[89] *See 6315 Mag., LLC v. Flot Nola, LLC*, No. CV 20-1472, 2020 WL 4922361, at *10 (E.D. La. Aug. 21, 2020) (citing *Sedima* 473 U.S. at 496.

alleged RICO violation 'led directly' to her injuries."[90] The Fifth Circuit has explained that the proximate cause requirement is met when "the alleged violation 'led directly' to the injuries."[91] The proximate cause requirement "forces the plaintiff to demonstrate a direct relation between the injury suffered and the alleged injurious conduct. Thus, the concept of direct injury refers to the relationship between the [plaintiff's] injury and the defendants' actions."[92] Courts frequently look to cases addressing the proximate cause requirement in the antitrust context as informing the proximate cause analysis under RICO.[93]

The Court will now examine Supreme Court precedent addressing proximate cause under civil RICO. First, in *Holmes v. Securities Investor Protection Corporation*, Securities Investor Protection Corporation ("SIPC") brought civil RICO claims against Robert G. Holmes and 75 others (collectively, "Holmes"), alleging Holmes manipulated stock prices.[94] SIPC was obligated to reimburse customers of certain broker-dealers if the broker-dealers were unable to meet their financial obligations to their customers.[95] Stock prices plummeted after Holmes' stock manipulation was detected, and, as a result, two broker-dealers were unable to meet their financial obligations to their customers. SIPC, as insurer against the loss sustained by the broker-dealers' failure to meet their obligations to their customers, was on the hook for nearly $13 million in customer claims. The United States Supreme Court ruled SIPC could not recover against Holmes under

---

[90] *Molina-Aranda v. Black Magic Enters., L.L.C.*, 983 F.3d 779, 784–85 (5th Cir. 2020).

[91] *Id.* at 784 (first citing *Anza v. Identical Steel Supply Corp.*, 547 U.S. 451, 461, (2006) and then citing *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 10, 12 (2010) (plurality opinion)).

[92] *Firestone v. Galbreath*, 976 F.2d 279, 285 (6th Cir. 1992), *certified question answered*, 67 Ohio St. 3d 87, 616 N.E.2d 202 (1993).

[93] *See, e.g., Holmes v. Securities Investor Protection Corporation,* 503 U.S. 258, 267 (1992) (stating that it has been "repeatedly observed" that "Congress modeled § 1964(c) on the civil action provision of the federal antitrust laws."); *see also Allstate Ins. Co. v. Seigel*, 312 F. Supp. 2d 260, 267.

[94] 503 U.S. at 262–63 (1992).

[95] *Id.* at 261.

civil RICO for Holmes' illegal stock manipulation. The Supreme Court held that, to state a civil RICO claim, a plaintiff must show that a RICO predicate act is not only the but for cause of the injury, but also the proximate cause of the injury.[96] The Supreme Court further held that that RICO's proximate cause analysis presents a legal, as opposed to a factual, issue.[97] The Court explained that proximate cause requires "some direct relation between the injury asserted and the injurious conduct alleged," and that a causal link that is "too remote," "purely contingent," or "indirect," is insufficient.[98] Applying the standard to the facts before it, the Supreme Court concluded that Holmes' stock manipulation conspiracy directly harmed only the broker-dealers, and that SIPC's injury was too remote to satisfy RICO's requirement of a direct causal link.

In *Anza v. Ideal Steel Supply Corp.*, the United States Supreme Court considered a RICO claim brought by Ideal Steel Supply ("Ideal") against its competitor, National Steel Supply ("National"), alleging that National had defrauded the State of New York by failing to charge and remit sales taxes.[99] Ideal's theory was that National was able to undercut Ideal's prices by not charging state taxes to its cash-paying customers, and that National's resultant lower prices drew customers to National and away from Ideal, causing Ideal to lose sales and suffer business losses.[100] Ideal argued that, by submitting fraudulent tax returns to state authorities, National engaged in a pattern of mail and wire fraud in violation of RICO.[101] The Supreme Court first explained that the real victim of National's

---

[96] *Id.* at 268.

[97] *Id.* (stating that, in the context of RICO, "we use 'proximate cause' to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts. At bottom, the notion of proximate cause reflects ideas of what justice demands, or of what is administratively possible and convenient.") (internal quotations and citations omitted).

[98] *Id.* at 271, 274.

[99] 547 U.S. 451, 453–54 (2006).

[100] *Id.* at 454–55.

[101] *Id.* at 454.

mail and wire fraud was the State of New York because the State was being defrauded and losing tax revenue.[102] The Supreme Court further explained "[t]he cause of Ideal's asserted harm" was "a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the state),"[103] and that, as a result, the alleged RICO violation did not lead directly to Ideal's injuries.

Finally, in *Hemi Group, LLC v. City of New York, N.Y.,* the City of New York filed civil RICO claims against Hemi Group ("Hemi"), alleging Hemi failed to file customer information with the State of New York as required under federal law.[104] Hemi was a New Mexico based company selling cigarettes online to residents of the City of New York.[105] The State of New York authorized the City of New York to impose its own taxes on cigarettes.[106] Out-of-state cigarette vendors such as Hemi were not required to charge, collect, or remit the cigarette tax; instead, the City was responsible for collecting the cigarette tax directly from the customers.[107]  To help the City gather information to assist in collecting back taxes on cigarettes directly from customers, the Jenkins Act required out-of-state cigarette vendors to register and file reports with the state tobacco tax administration, listing the name, address, and quantity of cigarettes purchased by state residents.[108] The City and the State of New York had an agreement under which the State forwarded to the City information obtained by the State pursuant to Jenkins Act disclosures, and that information helped the City track down cigarette purchasers who did not pay their cigarette taxes. Hemi did not file Jenkins Act information with the State,

---

[102] *Id.* at 458.
[103] *Id.*
[104] 130 S.Ct. 983, 986 (2010).
[105] *Id.*
[106] *Id.* at 987.
[107] *Id.*
[108] *Id.*

and as a result, the State could not pass on the information to the City. The City argued Hemi's failure to file customer information with the State of New York constituted mail and wire fraud, which caused the City to lose millions in unrecovered cigarette taxes.[109]

The Supreme Court reasoned the proximate cause requirement was not met because the City's harm was the customer's failure to pay taxes, and the conduct constituting the alleged fraud was Hemi's failure to file Jenkins Act reports with the State.[110] Thus, the Supreme Court concluded "the conduct directly causing the harm was distinct from the conduct causing the fraud."[111] The Supreme Court went on to note that the disconnect between the asserted injury and the alleged fraud was even sharper than in *Anza*, because, in *Anza*, the same party (namely, National) had both engaged in the conduct causing the harm and the fraudulent act, and the *Anza* Court nevertheless found the disconnect between the fraudulent act and the harm-causing act sufficient to defeat Ideal's RICO Claim. In *Hemi*, the court explained the disconnect was even greater than in *Anza* because

> the City's theory of liability rests not just on separate *actions*, but separate actions carried out by separate *parties*. The City's theory thus requires that we extend RICO liability to situations where the defendant's fraud on the third party (the State) has made it easier for a *fourth* party (the taxpayer) to cause harm to the plaintiff (the City). Indeed, the fourth-party taxpayers here only caused harm to the City in the first place if they decided not to pay taxes they were legally obligated to pay. Put simply, Hemi's obligation was to file the Jenkins Act reports with the State, not the City, and the City's harm was directly caused by the customers, not Hemi. We have never before stretched the causal chain of a RICO violation so far, and we decline to do so today.[112]

---

[109] *Id.*
[110] *Id.* at 990.
[111] *Id.*
[112] *Id.* (emphasis in original).

Moving to the Fifth Circuit's rulings, in *Waste Management of Louisiana, L.L.C. v. River Birch, Inc.*, the plaintiff, Waste Management of Louisiana, L.L.C., brought civil RICO claims alleging that the defendants, River Birch, Inc., Albert Ward, Frederick Heebe, and Highway 90, L.L.C., bribed former New Orleans Mayor Ray Nagin, through a $20,000 campaign contribution, to shut down a landfill opened in New Orleans in the aftermath of Hurricane Katrina.[113] The plaintiff was the operator of the shuttered landfill, and the defendants owned and operated competing landfills.[114] Plaintiff alleged the closure of its landfill at Chef Menteur Highway caused it to lose business that accrued to the benefit of its competitor, the River Birch landfill.[115] The defendants filed a motion for summary judgment, and the district court held a reasonable jury could not find the alleged bribe was the but for and proximate cause of Nagin's decision to shut down the plaintiff's Chef Menteur landfill.[116] The plaintiff appealed the district court's order granting defendant's motion for summary judgment to the Fifth Circuit.[117] On appeal, the defendants argued the district court correctly granted summary judgment because there was no evidence the $20,000 bribe proximately caused Mayor Nagin to close the plaintiff's landfill.[118] With respect to the civil RICO causation requirements, the Fifth Circuit explained that civil RICO demands the plaintiff establish both but for and proximate causation.[119] With respect to proximate cause, the Fifth Circuit explained there must be "some direct relation between the injury asserted and the injurious conduct alleged," and the central question courts must ask with respect to proximate cause is

---

[113] 920 F.3d 958, 961 (5th Cir. 2019).
[114] *Id.*
[115] *Id.*
[116] *Id.*
[117] *Id.*
[118] *Id.* at 969.
[119] *Id.* at 965.

"whether the alleged violation led directly the plaintiff's injuries."[120] The proximate cause requirement, as applied in the *Waste Management* case, required the plaintiff to carry its burden of proving[121] the payment to Mayor Nagin was the "but for cause and proximate cause of [Nagin's] decision to shutter the landfill," which specifically required the plaintiff to establish "its damages were a foreseeable and natural consequence[122] of Defendants' action."[123]

In *Allstate Insurance Company v. Plambeck*, the Fifth Circuit affirmed a jury verdict based on an instruction to the jury stating the causation requirement in terms of proximate cause, and holding that proof of reliance by the plaintiff is not required. The court summarized the proximate cause requirements as formulated by other courts of appeals, none of which require reliance:

> The First Circuit identified directness as the prime directive of proximate cause and laid out three functional factors to help analyze whether an injury was sufficiently direct: whether there are concerns about proof resulting from the level of attenuation; avoiding multiple recoveries and the difficult apportionment calculations courts would have to make; and whether the societal interest in policing the injurious behavior justifies finding proximate causation. In re Neurontin Mktg. & Sales Practices Litig., 712 F.3d 21, 35–40 (1st Cir.2013). The Sixth Circuit looks to whether "the defendants' fraudulent acts were a substantial and foreseeable cause of the injuries alleged." Brown v. Cassens Transp. Co., 546 F.3d 347, 357 (6th Cir.2008). And the Seventh Circuit similarly states that RICO proximate cause is designed for those situations "when too many unexpected things had to happen between the defendant's wrongdoing and the plaintiff's injury, in order for the injury to occur." BCS Servs., Inc. v. Heartwood 88, LLC, 637 F.3d 750, 754 (7th Cir.2011).[124]

---

[120] *Id.*

[121] The proximate cause issue in *Waste Management of Louisiana* was presented to the court on a motion for summary judgment, and not on a motion to dismiss. *See id.*

[122] The Fifth Circuit no longer considers foreseeability to be a part of the proximate cause analysis. *See Molinda-Aranda v. Black Magic Enterprises, L.L.C.*, 983 F.3d 779, 784 (5th Cir. 2020).

[123] *Waste Management of Louisiana, L.L.C.*, 920 F.3d at 965 (internal citations omitted). The Fifth Circuit ultimately reversed the district court's grant of summary judgment, explaining that a jury could reasonably find, based on the plaintiff's summary judgment evidence, that the defendants' $20,000 bribe proximately caused Mayor Nagin to close the plaintiff's landfill. *Id.* at 969–70.

[124] 802 F.3d 665, 676 (5th Cir. 2015).

The Fifth Circuit recently addressed the requirement of proximate causation in the civil RICO context in *Molinda-Aranda v. Black Magic Enterprises, L.L.C.*[125] Migrant workers in *Molinda-Aranda* brought an action against their employer alleging it violated, among other laws, RICO when it fraudulently obtained H-2B visas for its employees by claiming they would be employed as construction workers.[126] In reality, the defendant assigned the migrant workers to drive trucks.[127] Plaintiffs alleged this fraud caused their employer to unlawfully make deductions to their paychecks and withhold overtime wages.[128] The defendant brought a motion to dismiss at the district court level under Rule 12(b)(6), which was granted.[129] On appeal, the Fifth Circuit affirmed the dismissal because the proximate causation prong underpinning the civil RICO claim failed.[130] Specifically, the Fifth Circuit held "[t]he proximate causation standard in th[e] [civil RICO] context is not one of foreseeability; instead, the plaintiff must demonstrate that the alleged violation 'led directly' to the injuries."[131] As a result, the plaintiff's allegations taken as true did "not support a conclusion that their underpayment injuries were directly caused by [Defendant's] alleged fraud in obtaining H-2B visas."[132] Instead, the plaintiff's injuries were caused by the underpayment itself, not by the alleged violation of RICO, which failed the "directly led" to injury test.[133]

The proximate cause analysis in a RICO action filed by a former employee is much the same. "Innumerable courts, including the Fifth Circuit and the United States Supreme

---

[125] 983 F.3d at 783.
[126] *Id.*
[127] *Id.*
[128] *Id.* at 785.
[129] *Molinda-Aranda v. Black Magic Enterprises, L.L.C*, No. CV 16-476, 2017 WL 7693454, at *4 (W.D. TX June 26, 2017).
[130] *Molinda-Aranda*, 983 F.3d at 785.
[131] *Id.* at 784.
[132] *Id.* at 784–85.
[133] *Id.* at 785.

Court, have held that employees who are discharged for reporting or refusing to participate in a pattern of racketeering activity do not have standing to sue their employers under 18 U.S.C. § 1964(c)" because "the injuries flowing from the employer's retaliatory conduct were not sufficiently proximate to the alleged RICO violations to confer standing upon the employee."[134] For example, in *Cullom v. Hibernia National Bank*, the plaintiff, Cullom, sued his employer, Southwest National Bank of Lafayette ("SNB"), and Hibernia National Bank ("Hibernia"), alleging that SNB and Hibernia, as part of a fraudulent scheme, engaged and conspired to engage in several acts of mail fraud and securities fraud.[135] The scheme consisted of Hibernia's sale and attempt to sell to other banks substantial short term participations in its loan portfolio shortly before the end of the reporting period, coupled with Hibernia's plan to repurchase the loan participations shortly after the end of the same period.[136] Thereby, Hibernia would reduce its loan portfolio while increasing its cash position, with the result that Hibernia favorably and materially distorted both its loan loss reserve size and its liquidity position.[137] Cullom was aware of the fraudulent effects of these activities on financial statements, and he also knew that the Comptroller of the Currency prohibited such actions.[138] In March of 1986, Hibernia informed Cullom it intended to sell and repurchase one hundred fifteen million dollars in temporary loan participations to SNB.[139] Cullom became concerned Hibernia was asking him and SNB to get involved in illegal activity, and Cullom sought advice from

---

[134] *Jones v. Enter. Rent A Car Co. of Texas*, 187 F. Supp. 2d 670, 676–77 (S.D. Tex. 2002) (citing *Sedima v. Imrex Co., Inc.,* 473 U.S. 479, 497 (1985). Although the court mentions "standing," it is clear the inquiry is one of proximate cause.
[135] 859 F.2d 1211, 1212 (5th Cir. 1988).
[136] *Id.*
[137] *Id.*
[138] *Id.* at 1213.
[139] *Id.*

independent legal counsel.[140] Cullom ultimately refused to participate in the scheme, and, on April 30, 1986, SNB informed Cullom he must resign or be fired because "he refused to participate and cooperate in the purchase of the loan participations from Hibernia and because he sought the advice of independent legal counsel."[141] With his hand thus forced, Cullom immediately submitted his resignation.[142]

Thereafter, Cullom filed civil RICO claims against SNB and Hibernia, alleging he was constructively discharged because he refused to participate in illegal activity, and that because of his constructive discharge, he had standing to bring civil RICO claims.[143] The Fifth Circuit held that Cullom lacked standing to sue under civil RICO.[144] The Court reasoned the proximate cause requirement was not met because Cullom's injury (the discharge) did not flow from the commission of predicate acts of racketeering.[145] The Fifth Circuit, in reaching its conclusion that Cullom lacked standing, analogized to cases from other circuits dealing with persons who reported RICO violations and were fired for such reporting,[146] including *Pujol v. Searson/Am. Express Inc.*[147] and *Nodine v. Textron, Inc.*[148] The Fifth Circuit summarized *Pujol* and *Nodine* as follows:

> In *Pujol*, the plaintiff-appellant, Pujol, was a top executive at Shearson (Puerto Rico), and in his position, Pujol noticed serious deficiencies in the "internal controls" of both Shearson companies in Puerto Rico. Pujol notified top management of the situation, but he refused to sign an explanatory letter to clients because he felt that the letter did not represent a full disclosure of the situation. Pujol also notified Shearson executives that a number of banking transactions involving the misuse of funds had occurred. Pujol was instructed not to take any corrective action and not to report the irregularities to the appropriate authorities. At a meeting, Pujol

---

[140] *Id.*
[141] *Id.*
[142] *Id.*
[143] *Id.*
[144] Id.
[145] *Id.*
[146] *Id.* at 1215.
[147] 829 F.2d 1201 (1st Cir. 1987).
[148] 819 F.2d 347 (1st Cir. 1987).

submitted a letter to Shearson executives stating that Shearson's legal counsel should be consulted as to whether the internal audit's findings should be reported to the appropriate authorities. Pujol sent copies of the letter to Shearson's legal counsel and to other Shearson executives. Immediately after submitting the letter, Pujol was temporarily "suspended." Shearson changed the locks on Pujol's office door, seized and copied Pujol's personal files, revoked Pujol's American Express card, retained more than $35,000 in Pujol's account with Shearson, and accused Pujol of being directly involved in the irregularities discovered. In its opinion, the First Circuit noted that Pujol's complaint did not allege that he was injured by the predicate acts but rather alleged that he was fired, slandered and otherwise injured because of the actions he took to report and to stop the illegal schemes. Further, the court held that Pujol alleged sufficient predicate acts—securities fraud and mail and wire fraud—but that the acts that injured Pujol . . . were not caused by the predicate acts alleged in the complaint within the meaning of Sedima's causation requirement.[149]

. . .

In *Nodine*, the plaintiff-appellant, Nodine, was an area manager, and he discovered that his company was committing routine violations of Canadian customs laws. Nodine reported these violations to his superiors and to Textron's legal department. Also, Nodine signed a compliance letter stating that he knew of the Canadian customs violations, and when asked to change his statement, he refused to do so. Thereafter, Nodine was harassed at work, passed over for promotions and salary increases, and was finally discharged. . . . The court in Nodine held that Nodine's injury was not a result of the alleged RICO violations—mail and wire fraud, obstruction of justice, obstruction of a criminal investigation, and interference with commerce—but rather Nodine's injury resulted from Textron's decision to fire him after he reported the customs scheme to his superiors.[150]

The Fifth Circuit, agreeing with the reasoning employed in *Pujol* and *Nodine*, held that Cullom failed to allege a causal nexus between his injury and the predicate acts, and that the acts that injured Cullom were the same as the alleged predicate acts of securities fraud and mail fraud.[151] Instead, the Court concluded Cullom's injury resulted from SNB's decision to fire him after he refused to participate in the alleged scheme, and that neither Cullom's injury nor SNB's decision to fire him resulted from the alleged predicate acts.

---

[149] Cullom, 859 F.2d at 215 (emphasis in original) (citing *Pujol*, 829 F.2d at 1202–03, 1205).
[150] *Id.* at 1216 (emphasis in original) (internal quotations omitted) (citing *Nodine*, 819 F.2d at 347–49).
[151] *Id.*

*Cullom*, *Pujol*, and *Nodine* establish that "[w]histle blowers do not have standing to sue under RICO for the injury caused by the loss of their job."[152]

In this case, Plaintiff alleges Defendants committed crimes constituting racketeering activity" within the meaning of 18 U.S.C. § 1961(1), arguing each crime is a distinct predicate act falling within the purview of RICO.[153] Specifically, Plaintiff alleges Defendants engaged in the following predicate acts of racketeering activity: mail fraud under 18 U.S.C. § 1341; wire fraud under 18 U.S.C. § 1343; concealing documents or obstructing official proceedings under 18 U.S.C. § 1512;[154] retaliation against a witness, victim, or an informant under 18 U.S.C. § 1513; and interstate travel in aid of racketeering under 18 U.S.C. § 1952.[155] To carry the burden of establishing the commission of the alleged predicate acts proximately caused Plaintiff's injuries under § 1964(c), Plaintiff must allege factual content, which, taken as true, establishes Defendants' violations led directly to her injuries.[156]

The Court will now summarize, based on the allegations of the Second Amended Complaint and first amended RICO Case Statement, the acts the Plaintiff alleges constitute the RICO violations and the injuries Plaintiff alleges she suffered. Then, the

---

[152] *Id.*

[153] *See, e.g., Jones v. Enter. Rent A Car Co. of Texas,* 187 F. Supp. 2d 670, 675 n.1 (S.D. Tex. 2002) (explaining that "RICO defines 'racketeering activity' as any offense listed in 18 U.S.C. § 1961(1). These offenses are often referred to as 'predicate acts,' and primarily include crimes indictable under federal law, although a lesser number are punishable under state law.").

[154] Plaintiff labels the alleged § 1512 violation as "relating to tampering with a witness, victim or an informant." *See* R. Doc. 219 at ¶ 138. Plaintiff also alleged violations of § 1512(c) in her complaint, which involves concealing documents from, or otherwise obstructing, official proceedings. *See, e.g., id.* at ¶ 161. Further, Plaintiff repeatedly alleges Defendants "concealed" the Miles investigation and Miles Report from "official Title IX proceedings."

[155] *Id.* at ¶ 138.

[156] *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 606 (5th Cir. 1998) ("To state a civil RICO claim . . . a plaintiff must allege: (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. As a preliminary matter, however, a plaintiff must establish that he has standing to sue. . . . [A] RICO plaintiff must satisfy two elements—injury and causation.").

Court will determine whether Plaintiff's allegations, taken as true, support a conclusion that her injuries were directly, or proximately, caused by the predicate acts.

## II.   **Plaintiff's allegations regarding predicate acts and her injuries.**

The Court initially notes that, in its December 2, 2021 Order and Reasons, the Court held Plaintiff's civil RICO claims based on injuries that were discovered, or that should have been discovered, before April 8, 2017, are time barred.[157] Despite Plaintiff's allegations in the Second Amended Complaint regarding conduct beginning in 2013 and continuing until 2021, the cognizable injuries are those occurring after April 8, 2017.[158]

Plaintiff alleges the predicate acts described below constituted RICO violations and that these actions proximately caused her injuries.[159]

### A.   **18 U.S.C. § 1512(c)(1)—concealing documents from an official proceeding:[160]**

- Plaintiff alleges Miles, Ginsberg, Hardin, Barton, Crochet, and Alleva concealed the Miles Report by not responding to public records requests by news organizations.[161]

- Plaintiff alleges Alleva, Segar, Ausberry, McKenzie, Crochet and Barton "participated in, directed and facilitated the scheme to conceal the sexual harassment investigation of Head Football Coach Les Miles and the Miles Report from an official Title IX proceeding."[162]

---

[157] R. Doc. 165 at pp. 42–51, 53.

[158] For the purpose of completeness, the Court has included all the allegations in its analysis.

[159] Plaintiff also alleged Woodward, Williams, and Werner conspired to direct LSU President F. King Alexander to fire Alleve and replace him with Woodward and to protect and promote Verge Ausberry. The Plaintiff alleges this was a violation of 18 U.S.C. 1961(d). The Court assumes the Plaintiff intended to cite 18 USC 1962(d) which makes it unlawful for a person to conspire to violate the provisions of subsections (a), (b), or (c). A violation of 1962(d) is not a predicate act.

[160] Plaintiff alleges the U.S. Department of Education ("DOE") was conducting an off-campus crime program review of LSU. R. Doc. 219 at ¶ 119. Plaintiff also alleges the DOE opened a direct investigation to examine whether LSU was complying with the requirements of Title IX. *Id.* at ¶ 120. Plaintiff alleges Crochet and Barton were conducting an independent investigation in a Title IX proceeding. *Id.* at ¶ 142. Plaintiff alleges the PM-73 investigation of her was an official proceeding. R. Doc. 219-10 at p. 3. It is not necessary for the Court to determine whether there was an ongoing "official proceeding" under 18 U.S.C. § 1512.

[161] R. Doc. 219 at ¶¶ 174–179. The Plaintiff alleges the LSU Board of Supervisors concealed the Miles Report and a police report from *USA Today*. R. Doc. 219 at ¶¶ 177-179. The LSU Board of Supervisors is not a defendant in the RICO claim.

[162] R. Doc. 219-10 at pp. 2–7. Plaintiff alleges Jenkins, Danos, Yarborough, Jacobs, Alexander, Ginsberg, Hardin, and Miles also engaged in this conduct. *Id.* at pp. 8–11, 14.

- Plaintiff alleges Alleva and Segar "directed Crochet and Barton to conceal the Miles Report in their law office from an official Title IX proceeding from 2013 to 2021."[163]

- Plaintiff alleges Alleva "conspired with Miles to conceal the Miles Investigation in Miles' lawyers' law offices from an official Title IX proceeding from 2013 to 2021."[164]

- Plaintiff alleges McKenzie "conspired with Crochet and Barton to conceal the Miles Report in their law office from an official Title IX proceeding from 2013 to 2021."[165]

- Plaintiff alleges Crochet and Barton "concealed the Miles Report in [their] law office from an official Title IX proceeding from 2013 to 2021."[166]

- Plaintiff alleges "Defendants met to discuss the Miles Report and after multiple in person meetings, emails, text messages and phone calls individually agreed to conceal the Miles Investigation from an official Title IX proceeding."[167]

### B.    18 U.S.C. § 1512(c)(2)—otherwise obstructing, influencing, or impeding an official proceeding:

- Plaintiff alleges that on October 1, 2018 Ausberry, Segar, Crochet, and Barton instituted a fraudulent PM-73 Title IX investigation against her[168] and that the investigation was an official proceeding.[169]

- Plaintiff alleges Segar and Ausberry "knowingly gave false and misleading testimony in an official PM-73 investigation (Title IX) by failing to inform the investigator that all Title IX complaints in the athletic department were to be directed to Segar."[170]

- Plaintiff alleges Segar and Ausberry did not inform the PM-73 investigation of Complainant 1's allegations against Drake David.[171]

- Plaintiff alleges Segar falsely informed the PM-73 investigation that Plaintiff "never reported any Title IX/Sexual Misconduct issue to her."[172]

---

[163] *Id.* at pp. 2–3.
[164] *Id.* at p. 2.
[165] *Id.* at pp. 4–5.
[166] *Id.* at p. 6.
[167] *Id.* at p. 17.
[168] R. Doc. 219 at ¶ 260. PM-73 is LSU's Title IX policy.
[169] *Id.* at ¶ 259. It is not necessary for the Court to determine whether this was an official proceeding.
[170] R. Doc. 219-10 at pp. 3-4, 20. Plaintiff's allegations concerning the allegedly "fraudulent" PM-73 investigation opened against her in October 2018 for failure to report a Title IX complaint involving former LSU football player Drake Davis are not time barred because "[t]he injury associated with the 'fraudulent' Title IX investigation into Plaintiff was discovered by Plaintiff less than four years ago, and, as a result, such injury is not time barred." R. Doc. 165 at p. 45. Plaintiff alleges Scott also engaged in this conduct. R. Doc. 219-10 at p. 13.
[171] R. Doc. 219 at ¶ 261.
[172] *Id.* at ¶ 262.

### C.  18 U.S.C. §§ 1512(a), 1512(b) and 1513—tampering with, or retaliating against, a witness victim or informant, in an official proceeding:

- Plaintiff alleges "Barton, Crochet, McKenzie, Miles, Danos, Yarborough, Jacobs, Jenkins, Alleva, and Segar had multiple meetings, phone calls and emails with Miles' legal counsel, the student's family, and legal counsel to discuss the exchange of money to dissuade [a student] from testifying against Miles in an official Title IX proceeding and on information and belief that Miles and the student reached a private settlement in 2013."[173]

- Plaintiff alleges on May 5, 2013, Crochet and Segar "pressured a professor" to allow a student who filed a Title IX complaint against Miles to "retake a failed quiz to corruptly dissuade [the] student from testifying in Title IX proceedings against Miles."[174]

- Plaintiff alleges Ausberry "harassed, screamed at and intimidated plaintiff to dissuade her from testifying in official Title IX proceedings from 2005 to 2021."[175]

- Plaintiff alleges from 2013 to 2021, Ausberry "verbally abused and intimidated plaintiff for bringing a Title X complaint against him to influence, delay and prevent her testimony in an official Title IX proceeding."[176]

### D.  18 U.S.C. § 1341—mail fraud:[177]

- Plaintiff alleges on March 19, 2013, Miles' attorney sent Barton a "[l]etter in furtherance of the scheme to hide [the] Miles investigation."[178]

- Plaintiff alleges on August 29, 2013, Barton and Crochet mailed to Ginsberg a "[l]etter directing Ginsberg and Hardin to conceal [the] Miles Report from an official Title IX proceeding and public documents request in their office."[179]

- Plaintiff alleges in 2013, McKenzie, Crochet, and Barton "participated in, directed and facilitated the scheme by Vicki Crochet, Robert Barton and Shelby McKenzie to defraud LSU out of eighty ($80,000.00) thousand dollars by submitting fraudulent

---

[173] R. Doc. 219 at ¶ 193.

[174] *Id.* at ¶ 189.

[175] R. Doc. 219-10 at pp. 4, 20. Plaintiff alleges Miles, now dismissed, also engaged in this conduct. *Id.* at p. 9.

[176] R. Doc. 219 at ¶ 287,

[177] Plaintiff attached a spreadsheet to her second amended complaint which Plaintiff alleges sets forth "with particularity" the "circumstances constituting mail fraud and wire fraud." R. Doc. 219-10 at p. 17; *see* R. Doc. 219-11.

[178] R. Doc. 219 at ¶ 163. This letter "sent" by Miles' attorney is listed under "Mail Fraud." *Id.* at p. 35. The Court assumes the allegation is that the letter was sent by mail.

[179] *Id.* at ¶ 182.

invoices to LSU with material omissions of the Title IX investigation of Les Miles,"[180] and that, in furtherance of this scheme to defraud LSU, at various times in 2013, Barton and Crochet "mailed billing invoices [to LSU] with material omissions."[181]

- Plaintiff alleges on November 16, 2018, LSU's Title IX lead investigator Jeffrey Scott, who is not a defendant in this action, mailed Plaintiff a "final report of [the] fraudulent PM-73 investigation that contained material omissions that Segar was designated to receive all Title IX complaints in the Athletic Department."[182]

### E.    18 U.S.C. § 1343—wire fraud:

Plaintiff attached a spreadsheet to her Second Amended Complaint which Plaintiff alleges sets forth the "circumstances constituting mail fraud and wire fraud."[183] With the exception of the mail fraud allegations set forth in Section D above, the approximately five hundred remaining entries on the spreadsheet attached to Plaintiff's Second Amended Complaint all relate to alleged wire fraud.[184] These wire fraud allegations are based on emails sent and received by Crochet and Barton in 2013 and 2014, and telephone calls from 2013 and 2014 between Defendants and various other individuals relating to the 2013 Miles investigation, the 2013 Miles Report, and the 2013 settlement between Miles and one of the student complainants.[185] Reproduced below are the first few entries of Plaintiff's spreadsheet, which are representative of all the wire fraud entries:

| From | To | Date | Content |
|---|---|---|---|
| Barton | Witnesses and Student | 3/15/2013 | Email was sent in furtherance of conspiracy to hide Miles investigation |
| Barton | Alleva, Segar, McKenzie | 3/18/2013 | Telephone conversation in furtherance of |

---

[180] *Id*. at ¶ 203.
[181] *Id*. at ¶ 206. Plaintiff alleges Jenkins, now dismissed, also engaged in this conduct. *Id.*
[182] *Id*. at ¶ 284.
[183] R. Docs. 219-11, 219-10 at p. 17.
[184] R. Doc. 219-11.
[185] *See Id.*

| | | | conspiracy to hide Miles investigation |
|---|---|---|---|
| Barton | Alleva, Segar, McKenzie | 3/18/2013 | Email was sent in furtherance of conspiracy to hide Miles investigation |
| Barton | Crochet, McKenzie | 3/19/2013 | Email was sent in furtherance of conspiracy to hide Miles investigation |
| Barton | Crochet, McKenzie | 3/19/2013 | Telephone conversation in furtherance of conspiracy to hide Miles investigation[186] |

The above-described examples fairly represent the remaining instances of alleged wire fraud as set forth in Plaintiff's spreadsheet.

Plaintiff also alleges that in 2018 email communications were sent to her by Jeffrey Scott relating to the PM-73 investigation into the Plaintiff.[187] Reproduced below are the emails allegedly sent by Jeffrey Scott to Plaintiff:

In furtherance of the scheme to injure plaintiff's business and employment through an official DOE Title IX proceeding RICO actor Jeffrey Scott used email communications affecting interstate commerce and knowingly violated 18 U.S.C. 1343 by sending the following emails:

| From | To | Date | Content |
|---|---|---|---|
| Scott | Lewis | 10/5/2018 | Email notifying Lewis that a PM-73 Investigation is being initiated against her. |

---

[186] *Id.* at p. 1.
[187] R. Doc. 219 at ¶¶ 283-284.

| | | | |
|---|---|---|---|
| Scott | Lewis | 11/16/2018 | Email of Final Report Of fraudulent PM-73 Investigation that contained material omission that Segar was designated as the person that all Title IX complaints were to be forwarded to. |
| Scott | Lewis | 11/20/2018 | Email of Final Report Of fraudulent PM-73 Investigation that contained material omission that Segar was designated as the person that all Title IX complaints were to be forwarded to. |
| Scott | Lewis | 1/11/2019 | Email on fraudulent PM-73 Investigation[188] |

**F.    18 U.S.C. § 1952—traveling in aid of interstate commerce:**

- Plaintiff alleges Danos, Yarborough, Jacobs, Alleva, Miles, Segar, Crochet, Barton, Jenkins, and McKenzie traveled in interstate commerce.[189]

- Plaintiff alleges Barton and Crochet met in New Orleans with Ginsberg and the student's father and attorney to facilitate the exchange of money to bribe the student into dropping her complaint against Miles.[190]

**G.    Plaintiff's alleged injuries:**

As explained above, Plaintiff may bring claims only for injuries to her business or property occurring after April 8, 2017.

---

[188] R. Doc. 219 at ¶¶ 283–284.
[189] R. Doc. 219-10 at pp. 18–19.
[190] *Id.* at p. 19.

Plaintiff alleges the injuries to her employment and business are interference with her right to earn a living, loss of pay raises, loss of promotions, loss of bonuses, loss of benefits, loss of career in Power 5 Athletics, loss of professional development opportunities, and exposure from lawsuits.[191]

The Court notes that much of the damage Plaintiff alleges under the RICO count in her Second Amended Complaint is not traced back by her to any particular RICO violation. For the most part, Plaintiff has offered only the conclusory statement that the Defendants' conduct directly and proximately damaged Plaintiff's business and property interest in her employment.[192] In many instances, what Plaintiff identifies as RICO damage may be recovered only under her Title IX  and Title VII retaliation and termination claims.[193] Throughout the Second Amended Complaint, Plaintiff repeatedly alleges Defendants "target[ed] plaintiff's property interest in her employment and business by denying her pay raises, bonuses and promotions *in retaliation for her reporting Miles' sexual misconduct.*"[194] Further, Plaintiff alleges she went to Ausberry in November and December of 2020 to complain about, and inquire into, her lack of promotions, and she alleges Ausberry told her she was not being promoted because she "use[s] the word Title IX too much," and that she would "never be promoted because [she] file[s] Title IX complaints."[195] Plaintiff further alleges "[f]rom 2011 to present plaintiff is the only employee in LSU's Athletic Department who has reported Title IX complaints and the RICO Defendants targeted her business and employment in retaliation."[196]

---

[191] R. Doc. 219 at ¶¶ 164, 183, 198, 208, 294. R. Doc. 219-10 at pp. 16 and 25. Plaintiff does not request damages for her termination under her civil RICO claim.
[192] *See* R. Docs. 219 and 219-10.
[193] *Id.* at ¶¶ 242-254.
[194] *Id.* at ¶¶ 166, 183, 198, 208 (emphasis added).
[195] *Id.* at ¶¶ 229–230.
[196] Id. at ¶ 239. Plaintiff has pending claims against the Board for retaliation in violation of Title IX. *See generally id.*

In addition, although Plaintiff claims the Defendants' RICO violations have caused her emotional distress, such damages are not recoverable in a RICO action under the "business or property" limitation in Section 1964(c).[197]

### III.    Plaintiff's allegations, taken as true, do not support the conclusion that her injuries were proximately caused by predicate acts of racketeering activity.

Having identified Plaintiff's alleged injuries and Defendants' alleged predicate acts, the Court will now determine whether, taking the allegations as true, the Court concludes the injuries were proximately caused by the predicate acts. As set forth above, in the context of RICO, to satisfy the proximate cause requirement at the pleading stage, the Plaintiff's allegations, taken as true, must support the conclusion that the predicate acts led directly to the Plaintiff's injuries.[198]

### A.    Plaintiff's injuries were not proximately caused by the Defendants' acts of concealing the Miles investigation and Report from the public or from the full Board of Supervisors.

Plaintiff described her injuries resulting from the concealment of the Miles Report and investigation as being that, prior to his termination in 2016, Miles denied her pay raises, bonuses, and promotions;[199] left her out of recruiting meetings and off emails relating to recruiting; and denied her opportunities to attend professional meetings.[200] Plaintiff also alleges the concealment of the Miles Report and investigation led to her injury in 2017 when Alleva refused to send her to an NFL meeting as a representative of LSU.[201] Finally, Plaintiff alleges the concealment caused her injury from 2019 to the present when Woodward and Ausberry denied her pay raises, bonuses, and

---

[197] 28 U.S.C. 1964(c).
[198] *Molina-Aranda v. Black Magic Enters., L.L.C.,* 983 F.3d 779, 784–85 (5th Cir. 2020).
[199] R. Doc. 219 at ¶ 228.
[200] *Id.* at ¶ 224.
[201] *Id.* at ¶ 252.

promotions.[202]

During oral argument, the Court attempted to draw out from Plaintiff's counsel the basis of his argument that Plaintiff's injuries described above were proximately caused by the alleged RICO predicate acts.[203] Plaintiff's counsel first identified Plaintiff's injuries to her employment as lack of promotions from 2013 to 2021, harm to her business reputation, denial of opportunities to attend conferences, and denial of resources in her employment.[204] The Court asked Plaintiff's counsel to explain how these injuries were directly caused by the Defendants' predicate acts, and to list the specific RICO violations that caused Plaintiff's injuries.[205] Plaintiff's counsel responded that in 2013 several Defendants agreed to conceal an investigation into an official Title IX proceeding with the purpose of covering up Miles' conduct to protect Miles, and that, once they concealed Miles' conduct, the Defendants placed Plaintiff directly under Miles' supervision and Miles began to damage Plaintiff's employment by denying her promotions and pay raises.[206] Plaintiff's counsel later argued the predicate acts done to cover up the Miles investigation resulted in Miles being placed in charge of Plaintiff and "empowered" Miles to deny Plaintiff promotions and pay raises establishing that proximate cause exists.[207]

Even if the Court accepts as true that the Miles Report and investigation were "concealed" from the public at large and from the Board of Supervisors, as alleged, Plaintiff has not shown how these acts led directly to *her* injuries--interference with her right to earn a living, loss of pay raises, loss of promotions, loss of bonuses, loss of benefits, loss of career in Power 5 Athletics, loss of professional development

---

[202] *Id.* at ¶¶ 164, 255.
[203] R. Doc. 253 at p. 41.
[204] *Id.* at pp. 41–42.
[205] *Id.* at p. 43.
[206] *Id.* at pp. 43–44.
[207] *Id.* at p. 44.

opportunities, and exposure from lawsuits. Instead, the concealment harmed others. The first alleged violation, failure to produce a document in response to a public records request, harmed the newspaper or newspapers making the requests. The second alleged violation, failure to provide the Miles Report to the full Board of Supervisors, harmed the Board of Supervisors.[208]

If we consider what had to happen between the Defendants' alleged wrongdoing and the Plaintiff's injury in order for the injury to occur, it becomes clear the wrongful conduct did not proximately cause the Plaintiff's injuries. Plaintiff's argument appears to be that the concealment of the Miles investigation and Report led to Miles continuing to be the head football coach at LSU; which led to Miles being named Plaintiff's supervisor; which led to his having the power to and denying her pay raises, bonuses, promotions, and professional development opportunities; which led to Miles being in a position to continue to harass students; which led to Plaintiff making complaints against Miles and others; which led to Miles, Alleva, Woodward, and Ausberry denying her pay raises, bonuses, promotions, and professional development opportunities. The RICO proximate cause requirement is designed to deny recovery in situations such as this one "when too many unexpected things had to happen between the defendant's wrongdoing and the plaintiff's injury, in order for the injury to occur."[209] The Plaintiff has not met her burden of showing her injuries were proximately caused by the Defendants' acts of concealing the Miles Report and Miles investigation.

---

[208] The Plaintiff does have Title IX and Title VII claims pending against the LSU Board of Supervisors. *Id.* at ¶¶ 300–323.

[209] *BCS Servs., Inc. v. Heartwood* 88, LLC, 637 F.3d 750, 754 (7th Cir.2011).

**B.    Plaintiff's injuries were not proximately caused by the Defendants' acts of otherwise obstructing an "official proceeding."**

Plaintiff alleges Ausberry and Segar violated 18 U.S.C. § 1512(c)(2) by instituting a fraudulent PM-73 investigation against her, by knowingly giving "false and misleading testimony in an official PM-73 investigation (Title IX) and by failing to inform the investigator that all Title IX complaints in the athletic department were to be directed to Segar." Plaintiff also alleges Ausberry and Segar failed to inform the investigator that all Title IX complaints in the athletic department were to be directed to Segar; failed to inform the PM-73 investigation of Complainant 1's allegations against David Drake; and falsely informed the PM-73 investigator that Plaintiff never reported any Title IX/sexual misconduct issue to Segar.

In her pleadings, Plaintiff described her injuries resulting from this conduct as her having a PM-73 investigation noted in her personnel file, which she claims is damaging to her business and property, including interference with her right to earn a living, loss of pay, loss of benefits, loss of promotions, loss of bonuses, loss of career in Power 5 Athletics, and exposure from lawsuits.[210] At the oral argument on the Defendants' motions to dismiss, in response to questioning by the Court, Plaintiff's counsel identified no additional injuries resulting from the PM-73 investigation.

If we consider what had to happen between the Defendants' alleged wrongdoing and the Plaintiff's injury in order for the injury to occur, it becomes clear the wrongful conduct did not proximately cause the Plaintiff's injuries. Plaintiff's argument appears to be that Defendants' failure to inform the investigator that all Title IX complaints in the athletic department were to be directed to Segar, that Complainant 1 had made allegations

---

[210] R. Doc. 219 at ¶¶ 274, 294.

against David Drake, and that Segar had falsely informed the PM-73 investigation that Plaintiff never reported any Title IX/sexual misconduct issue to her, led to LSU's Title IX office finding "there is sufficient evidence to prove that Respondent Sharon Lewis violated LSU's Title IX and Sexual Misconduct Policy PM-73;[211] which led the Title IX Lead Investigator to intentionally fail to interview multiple material witnesses and to determine Segar and Ausberry were the only two "material observers" that warranted testimony in the investigation;[212] which led to the LSU Title IX coordinator denying Plaintiff's appeal;[213] which led to the LSU Title IX office not opening an investigation of Ausberry;[214] which led to Plaintiff being denied a full copy of the LSU Title IX investigation;[215] which led to Ausberry and Segar denying Plaintiff pay raises, bonuses, promotions, and professional development opportunities. The RICO proximate cause requirement is designed to deny recovery in situations such as this one "when too many unexpected things had to happen between the defendant's wrongdoing and the plaintiff's injury, in order for the injury to occur."[216] The Plaintiff has not met her burden of showing her injuries were proximately caused by the acts of Ausberry and Segar relating to obstructing the PM-73 investigation. Plaintiff fails to show how this conduct led directly to her alleged injuries.

### C. **Plaintiff's injuries were not proximately caused by the Defendants' acts of tampering with, or retaliating against, a witness, victim, or informant.**

Plaintiff alleges the Defendants violated 18 U.S.C. §§ 1512(a), 1512(b) and 1513 – tampering with, or retaliating against, a witness, victim, or informant – when, in 2013,

---

[211] R. Doc. 219 at ¶ 266.
[212] *Id.* at ¶ 268.
[213] *Id.* at ¶ 271.
[214] *Id.* at ¶ 273.
[215] *Id.* at ¶ 276.
[216] *BCS Servs., Inc. v. Heartwood* 88, LLC, 637 F.3d 750, 754 (7th Cir.2011).

Miles reached a private settlement with a student who accused him of sexual harassment "to dissuade [the student] from testifying against Miles in an official Title IX proceeding."[217] Plaintiff alleges Defendants "facilitated the exchange of money between Miles and the student who accused [Miles] of sexual misconduct, to bribe her into dropping her complaint against Miles."[218] Plaintiff alleges Crochet and Segar "pressured" an LSU professor to let a student-complainant retake a failed quiz.[219] Plaintiff alleges Ausberry "harassed, screamed at and intimidated plaintiff to dissuade her from testifying in official Title IX proceedings from 2005 to 2021."[220]

The Plaintiff has identified her damages as loss of pay raises, loss of promotions, loss of bonuses, loss of benefits, loss of career in Power 5 Athletics, and exposure to lawsuits. Plaintiff has not specifically alleged any additional injuries she suffered as the result of this conduct. Plaintiff has provided absolutely no evidence or explanation of how the private settlement between Miles and a student complainant led directly to Plaintiff's injuries. Neither has Plaintiff explained how the Defendants pressuring a professor to let a student complainant retake an examination led directly to those injuries.

If we consider what had to happen between the Defendants' alleged wrongdoing and the Plaintiff's injury in order for the injury to occur, it becomes clear the wrongful conduct did not proximately cause the Plaintiff's injuries. Plaintiff's argument appears to be that settling with a student complainant, convincing a professor to allow a student complainant to retake an examination, and dissuading Plaintiff from testifying at an official Title IX proceeding led to Miles continuing to be the head football coach at LSU;

---

[217] R. Doc. 219 at ¶ 193.
[218] R. Doc. 219-10 at p. 18.
[219] R. Doc. 219 at ¶ 189.
[220] R. Doc. 219-10 at pp. 4, 20; R. Doc. 219 at ¶ 287.

which led to Miles being named Plaintiff's supervisor; which led to his having the power

to and denying her pay raises, bonuses, promotions, and professional development

opportunities; which led to Miles being in a position to continue to harass students; which

led to Plaintiff making complaints against Miles and others; which led to Miles, Alleva,

Woodward, and Ausberry denying her pay raises, bonuses, promotions, and professional

development opportunities. The RICO proximate cause requirement is designed to deny

recovery in situations such as this one "when too many unexpected things had to happen

between the defendant's wrongdoing and the plaintiff's injury, in order for the injury to

occur."[221] The Plaintiff has not met her burden of showing her injuries were proximately

caused by the Defendants' acts of tampering with, or retaliating against, a witness, victim,

or informant.

**D.** **Plaintiff's injuries were not proximately caused by the Defendants' acts of mail fraud and wire fraud.**

Plaintiff alleges mail communications sent as part of the alleged plan to cover up

the Miles investigation and Report—which she claims amount to mail fraud—injured her.

Plaintiff also alleges mail fraud occurred when Crochet and Barton sent Ginsberg and

Hardin a letter by Federal Express directing them to conceal the Miles Report from an

official Title IX proceeding and from public documents.[222] Plaintiff  alleges mail fraud

took place when Crochet and Barton mailed allegedly fraudulent legal bills to LSU.[223]

---

[221] *BCS Servs., Inc. v. Heartwood* 88, LLC, 637 F.3d 750, 754 (7th Cir.2011).

[222] R. Doc. 219 at ¶ 182.

[223] There are issues with Plaintiff's allegations of wire fraud based on these invoices, separate and apart from whether she has alleged proximate cause. First, the allegations concern events that took place in 2013 and 2014. Second, rather than quoting the actual content of each billing entry that Plaintiff alleges constitutes wire fraud, Plaintiff has provided her own "interpretation" of the content of each entry and speculated about the fraudulent nature of the underlying communication referenced in the billing entry. For example, Plaintiff alleges wire fraud was committed on March 15, 2013, when Barton sent an email to "witnesses and student" "in furtherance of [the] conspiracy to hide [the] Miles investigation."[223] In reality, the Taylor Porter corresponding billing entry for the invoice reads: "Conference with VMC and Miriam re: summary of interviews today and yesterday. Emails re: follow-up telephone conference with witnesses and complainant."[223] As another example, Plaintiff alleges wire fraud was committed on March 18, 2013 when

Plaintiff alleges mail fraud occurred on November 16, 2018 when LSU's Title IX lead investigator Jeffrey Scott, who is not a defendant in this action, mailed Plaintiff a "final report of [the] fraudulent PM-73 investigation that contained material omissions that Segar was designated to receive all Title IX complaints in the Athletic Department."[224]

Plaintiff alleges wire fraud took place when the Defendants used telephone and email communications to conceal the Miles investigation and Report, to arrange for a student who filed a complaint against Miles to retake her examination, and to facilitate a private settlement with another student.[225] The Plaintiff also alleges wire fraud occurred when invoices for legal fees were sent by email from Taylor Porter to LSU in 2013 and 2014.[226] Finally, Plaintiff alleges wire fraud occurred when in 2018 email communications were sent to her by Jeffrey Scott relating to the PM-73 investigation into the Plaintiff and the report "contained [a] material omission that Segar was designated as the person that all Title IX complaints were to be forwarded to.".[227]

Plaintiff alleges the mail and wire fraud caused her injury by leading to the denial of her pay raises, bonuses, and promotions.[228] Plaintiff was not a target of mail fraud or wire fraud—that is, she did not receive mail or wire communications from the Defendants containing a misrepresentation that caused her to suffer a loss, and she was not a victim of fraud perpetrated through mail or wire, or any such similar scheme carried out using

---

Barton, Alleva, Segar and McKenzie had a "telephone conversation in furtherance of [the] conspiracy to hide [the] Miles investigation."[223] In reality, the Taylor Porter corresponding billing entry for the invoice reads: "Prepare for and attend meeting with Coach's counsel. Telephone conferences with Joe, Miriam and WSM re: same. Emails re: meeting this afternoon. Meet with VMC, WSM, Joe and Miriam re: update and date for update of Bof S."[223] Obviously, the billing entries do not refer to the parties having email and telephone conversations in furtherance of a conspiracy to hide the Miles Investigation.

[224] *Id.* at ¶ 284.
[225] *Id.* at ¶ 198.
[226] The same is also true with respect to Plaintiff's mail fraud allegations.
[227] R. Doc. 219 at ¶¶ 283-284.
[228] *Id.* at ¶¶ 183 and 208.

mail or wire. With the exception of the Jeffrey Scott emails to her regarding the PM-73 investigation, the acts of mail and wire fraud alleged by Plaintiff had nothing to do with her and could not have injured her in any way—she was not a recipient of the communication, she is not alleged to have been referenced in any communication, she was not targeted directly or indirectly by any communication, and she did not rely to her detriment on a misrepresentation in any communication.

For the reasons set forth in Section A above, any mail or wire fraud relating to concealment of the Miles Report or investigation did not lead directly to Plaintiff's injuries. For the reasons set forth in Section C above, using telephone and email communications to arrange for a student who filed a complaint against Miles to retake her examination and to facilitate a private settlement with another student did not lead directly to Plaintiff's injuries.

Even assuming fraudulent legal bills were mailed to LSU by Barton, Crochet, and McKenzie, the victim of that fraud is LSU, not Plaintiff. The Plaintiff has offered no evidence or explanation of how this mail fraud led directly to Plaintiff's injuries.

Plaintiff has offered no evidence or explanation of how Jeffrey Scott mailing Plaintiff a copy of the final report from the PM-73 investigation, which did not reflect that Segar was designated to receive all Title IX complaints in the Athletic Department, led directly to her damages.

E.   **Plaintiff's injuries were not proximately caused by Defendants' travel in interstate commerce.**

Plaintiff alleges Barton and Crochet met in New Orleans with Ginsberg and the settling student's father and attorney to facilitate the exchange of money to bribe the

student into dropping her complaint against Miles.[229] For the reasons set forth above in Section C, Plaintiff's injuries were not proximately caused by Defendants' travel in interstate commerce to facilitate the settlement with the student.

In sum, Plaintiff has not made allegations that, if accepted as true, establish that the concealment of the Miles' investigation and Report, the submission of "fraudulent" legal bills to LSU, the settling of a complaint by a student and traveling in interstate commerce to facilitate the settlement, arranging for a student to retake an examination, instituting a PM-73 investigation of Plaintiff, or giving false testimony in a PM-73 investigation of Plaintiff, proximately caused her injuries. Plaintiff's theory of the case would have the Court extend RICO liability to a situation in which the Defendants' alleged fraud on a third party (the Board of Supervisors and the public) made it easier for a fourth party (Miles and other Defendants) to cause harm to the Plaintiff. The Court's research has not disclosed a single case sanctioning stretching the causal chain of a RICO violation so far, and this Court refuses to be the first.

## IV.   **The Court will not grant Plaintiff leave to amend her civil RICO claims.**

Leave to amend should be freely granted unless a plaintiff has acted with "undue delay, bad faith or dilatory motive" in seeking leave to amend; the plaintiff has made "repeated failure[s] to cure deficiencies by amendments previously allowed;" "undue prejudice [will result] to the opposing party by virtue of allowance of the amendment;" or the amendment would be completely futile.[230] The probability that undue delay, bad faith, undue prejudice, and futility may be playing a role becomes greater each time a complaint

---

[229] R. Doc. 219-10 at p. 19.
[230] *Foman v. Davis*, 371 U.S. 178, 182 (1962).

is amended.[231] Moreover, leave to amend should be denied if "the defect is simply incurable or the plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so."[232] If "the plaintiffs have already alleged their best case," the trial court may deny leave to further amend.[233] Generally, courts should give plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case under Rule 12(b)(6).[234]

It is within the district court's discretion under Rule 15 to deny leave to amend if the amendment would be futile.[235] The Fifth Circuit has held futility means "the amended complaint would fail to state a claim upon which relief could be granted."[236] To determine futility, therefore, the Fifth Circuit applies "the same standard of legal sufficiency as applies under Rule 12(b)(6)."[237] To survive a Rule 12(b)(6) motion to dismiss, the complaint must state a claim for relief that is plausible on its face.[238] A claim is facially plausible when it contains sufficient factual content for the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."[239] In determining whether facial plausibility is met, the court looks to the factual allegations supporting the necessary elements of the plaintiff's claim, and does not assume the truth of conclusory statements.[240] Factual assertions are presumed to be true, but "labels and conclusions" or

---

[231] *StoneEagle Servs., Inc. v. Valentine*, No. 3:12-CV-1687-P, 2013 WL 12123938, at *1 (N.D. Tex. Mar. 21, 2013).

[232] *Hart v. Bayer Corp.*, 199 F.3d 239, 247 n.6 (5th Cir. 2000) (citing *O'Brian v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 675-76 (2d Cir. 1991)).

[233] *Pierce v. Hearne Indep. Sch. Dist.*, 600 F. App'x 194, 200 (5th Cir. 2015).

[234] *Id.*

[235] *Stripling v. Jordan Prod. Co.*, LLC, 234 F.3d 863, 872–73 (5th Cir. 2000) (first citing *Martin's Herend Imports, Inc. v. Diamond & Gem Trading U.S. Am. Co.*, 195 F.3d 765, 770 (5th Cir. 1999) and then citing *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 524 (5th Cir. 1994)).

[236] *Id.* at 873.

[237] *Id.*

[238] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

[239] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

[240] *Iqbal*, 556 U.S. at 679.

"a formulaic recitation of the elements of a cause of action" alone are not enough to withstand a Rule 12(b)(6) motion.[241]

Plaintiff has filed three complaints and two RICO case statements. Plaintiff has failed to plead with particularity after being given repeated opportunities to do so. To grant Plaintiff an additional opportunity to amend would cause undue prejudice to Defendants.

In addition, the Court finds that any further amendment of the civil RICO claims in this case would be futile. Plaintiff's injuries are far too remote from any alleged racketeering activity to satisfy the proximate cause requirement. A claim for relief "requires more than labels and conclusions,"[242] and Plaintiff's Second Amended Complaint and amended RICO Case Statement do not even attempt to establish a causal link between Defendants' alleged predicate acts of racketeering (concealing, obstructing, witness tampering, witness retaliation, mail fraud, wire fraud, and traveling in interstate commerce) and her alleged injuries (damage to her employment and business through interference with her right to earn a living, loss of pay raises, loss of promotions, loss of bonuses, loss of benefits, loss of career in Power 5 Athletics, and exposure from lawsuits). For this reason, Plaintiff's civil RICO claims should be dismissed for failure to state a claim.

## **CONCLUSION**

Accordingly;

**IT IS ORDERED** that the motions to dismiss Plaintiff's civil RICO claims, filed

---

[241] *Id.* at 678.
[242] *Twombly*, 550 U.S. at 555.

by Robert Barton, Vicki Crochet, and William Shelby McKenzie,[243] Verge Ausberry,[244] Miriam Segar,[245] Joseph Alleva, [246] and Scott Woodward[247] are **HEREBY GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff Sharon Lewis's civil RICO claims in her Second Amended Complaint[248] and first amended RICO Case Statement[249] are **HEREBY DISMISSED WITH PREJUDICE.**

New Orleans, Louisiana, this 16th day of June, 2022.

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[243] R. Doc. 224.
[244] R. Doc. 225.
[245] R. Doc. 226.
[246] R. Doc. 227.
[247] R. Doc. 228.
[248] R. Doc. 219.
[249] R. Doc. 219-10.