# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

**SHARON LEWIS,**                                    **CIVIL ACTION NO. 3:21-cv-00198**
                        Plaintiff

                                                     **DISTRICT JUDGE**
**v.**                                               **SUSIE MORGAN**

**BOARD OF SUPERVISORS OF**                          **MAGISTRATE JUDGE**
**LOUISIANA STATE**                                  **RICHARD L. BOURGEOIS, JR.**
**UNIVERSITY,** *ET AL.,*
                        Defendants

## <u>MEMORANDUM IN SUPPORT OF</u>
## <u>MOTION FOR RULE 11 SANCTIONS</u>

### MAY IT PLEASE THE COURT:

Defendants, W. Shelby McKenzie, Vicki M. Crochet, and Robert W. Barton (hereinafter collectively the "TP Defendants")[1] respectfully submit this Memorandum in Support of their Motion for Rule 11 Sanctions against Plaintiff, Sharon Lewis ("Plaintiff" or "Lewis") and her counsel, Tammye C. Brown, Bridgett Brown, Larry English and Albert Van-Lare ("Plaintiff's Counsel"), for violating Rule 11 of the Federal Rules of Civil Procedure by failing to conduct a reasonable pre-filing investigation of the law and facts before asserting an unsupported RICO claim against the TP Defendants. The factual and legal allegations found in her Complaint (ECF No.1), First Amended Complaint (ECF No. 8), Second Amended Complaint (ECF No. 219), RICO Case Statement (ECF No. 45) and First Amended RICO Case Statement (ECF No. 219-10) are implausible and were filed for improper purposes; namely, that Lewis and her counsel have consistently attempted to try this case in the media, as opposed to in court. Because Plaintiff's claims as pled are objectively unreasonable in light of clear precedent, Rule 11 sanctions should be imposed against both Plaintiff and her counsel.

---

[1] Plaintiff correctly dismissed Taylor Porter Brooks & Phillips LLP ("Taylor Porter") with prejudice on August 9, 2021 (ECF No. 77). As used herein, the "Taylor Porter Defendants" refers to Taylor Porter and the TP Defendants.

## I.    INTRODUCTION

RICO is fundamentally a criminal statute.[2]  Although §1964(c) creates a civil cause of action, the racketeering activity giving rise to RICO liability is criminal in nature.[3]  Plaintiff and her counsel are consequently alleging that the TP Defendants have committed serious criminal offenses.  As set forth in detail in the TP Defendants' Memorandum in Support of Motion to Dismiss (ECF No. 60-1), Reply Memorandum (ECF No. 92), and Memorandum in Support of Rule 12(b)(6) Motion to Dismiss (ECF No. 224-2), Plaintiff's broad-brush, speculative, and conclusory allegations are clearly insufficient to allege that TP Defendants participated in predicate criminal acts necessary to support any civil RICO claim.  Plaintiff's case is a hostile work environment suit, not a RICO case.  The entire premise of Plaintiff's case is that Lewis allegedly suffered an employment-related injury because she reported Title IX violations to her employer, LSU.  Lewis clearly has no RICO claims against the TP Defendants.

In considering the sufficiency of civil RICO allegations, courts "must be mindful of the devastating effect such claims may have on defendants."[4]  "'Because the mere assertion of a RICO claim has an almost inevitable stigmatizing effect on those named as defendants,' courts should strive to flush out frivolous RICO allegations at an early stage of the litigation."[5]  As a result, a court must carefully scrutinize the pleading allegations of a RICO plaintiff like Lewis.

---

[2] The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO") was adopted in 1970 as Title IX of the Organized Crime Control Act of 1970. The purpose of the statute was to combat long-term organized crime, such as the mafia. Senate Committee on the Judiciary, Report on Organized Crime Control Act of 1969, S Rep No. 617, 91st Cong, 1st Sess 76-78 (1969); *see, e.g.*, *Oscar v. University Students Co-Op Ass'n*, 965 F.2d 783, 786 (9th Cir.) *cert denied*, 506 U.S. 1020 (1992). The statute proscribes criminal infiltration of legitimate businesses. 18 U.S.C. § 1962.

[3] *See Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 641 (2008)(RICO "provides a private right of action for treble damages to '[a]ny person injured in his business or property by reason of a violation' of the Act's criminal prohibitions."); *Rogers v. McDorman,* 521 F.3d 381, 387 (5ᵗʰ Cir. 2008)("civil RICO liability is dependent upon a defendant's committing criminal RICO acts").

[4] *Manhattan Telecommunications Corp., Inc. v. DialAmerica Marketing, Inc.*, 156 F. Supp. 2d 376, 380 (S.D.N.Y. 2001); *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) ("Civil RICO is an unusually potent weapon—the litigation equivalent of a thermonuclear device.").

[5] *Allen v. New World Coffee, Inc*., No. 00-2610, 2001 WL 293683, at *3 (S.D.N.Y. Mar. 27, 2001) (quoting *Schmidt v. Fleet Bank*, 16 F. Supp.2d 340, 346 (S.D.N.Y. 1998)).

Any reasonable legal or factual inquiry into possible civil RICO claims against the TP defendants would have revealed that no legal or factual basis exists for such claims—especially in light of the Fifth Circuit's heightened RICO pleading requirements.  Rather than analyze and investigate first before holding a press conference and naming the Taylor Porter Defendants in a publicly filed Complaint alleging criminal conduct and seeking "no less than $50,000,000 [*sic*] million" in damages, Plaintiff and her counsel deliberately chose—not once but at least three times—to file first and investigate later.[6] Indeed, even after being instructed by the Honorable Judge Morgan during a status conference with all counsel not to make public comments about this litigation, on March 28, 2022, Larry English gave a radio interview in which he publicly announced that "the LSU Athletic Department for the last 10 years has been run by a criminal enterprise."  See attached Exhibit C.

Significantly, Plaintiff and her counsel have recognized and admitted that their claims against Taylor Porter are not "legitimate."  Plaintiff voluntarily dismissed her claims against Taylor Porter with prejudice on August 11, 2021 (ECF No. 77).  And, on August 10, 2021, when asked why Plaintiff dismissed Taylor Porter as a defendant, Plaintiff's counsel Larry English told the media that "You don't want to process claims against an entity [Taylor Porter] you do not have legitimate claims against."  See attached Exhibit B, Baton Rouge Business Report, "Daily Report," 8/10/21.  At all material times, each of the TP Defendants were practicing law on behalf of their law firm, Taylor Porter.  Plaintiff makes no credible allegations to the contrary.  Without any evidence whatsoever that W. Shelby McKenzie, Vicki M. Crochet, or Robert W. Barton were rogue attorneys acting on their own for purely personal reasons, the dismissal of Taylor Porter

---

[6] As set forth in detail in the TP Defendants' most recent memorandum in support of their Rule 12(b)(6) motion (ECF No. 224-2, p. 6), counting all of Lewis' amended complaints, attempted amendments, amended RICO statements, and opposition memoranda filed herein, Lewis has been given more than twenty (20) opportunities to plead a claim against the TP Defendants.

with prejudice speaks volumes.  Despite repeated attempts to have Plaintiff dismiss her baseless claims against the TP Defendants, Plaintiff and her counsel refuse to do so.  As a result of their ill-advised choice to file a frivolous RICO suit against the TP Defendants—and to maintain it—both Plaintiff and her counsel should be sanctioned under Rule 11.

## II.    PLAINTIFF'S BASELESS RICO ALLEGATIONS

As succinctly described by the TP Defendants in their supporting memorandum to dismiss Lewis' RICO claims, Plaintiffs' factual and legal allegations against them are absurd and nonsensical.  (ECF No. 224-2, pp. 1-5).  According to Plaintiff's Complaint (ECF No. 1), Amended Complaint (ECF No. 8), Second Amended Complaint (ECF No. 219), RICO Case Statement (ECF No. 45) and First Amended RICO Case Statement (ECF No. 219-10), in 2013 the Taylor Porter Defendants were hired by LSU to conduct an investigation and provide legal advice surrounding certain allegations made by an LSU student and employee of the Athletic Department ("Student 2") against then head football Coach Les Miles.  For approximately seven (7) months, from March 2013 until September 2013, the TP Defendants did exactly what they were hired to do as attorneys: they interviewed material witnesses, analyzed relevant contracts, conducted legal research regarding the issues involved, communicated with counsel for Student 2 and counsel for Coach Miles, made recommendations, and regularly reported their findings to LSU's acting President, LSU's incoming President, LSU's Athletic Director, members of LSU's Athletic Department, and at least three (3) members of the LSU Board of Supervisors, including its Chair, incoming Chair, and head of its athletic committee.  Far from being hired by and reporting to a secretive, underground criminal syndicate within the very large LSU System, as Plaintiff erroneously suggests, the TP Defendants were hired by, worked for, and reported to the very highest executives

and authorities at LSU in 2013.[7]   And when their work was completed, far from destroying or "burying" their May 15, 2013, formal report to LSU, the TP Defendants secured this report, along with their entire file materials, at Taylor Porter's office—just as is done every day by attorneys across this state and nation.   At all times during and after the TP Defendants' investigation, the privacy rights guaranteed under applicable law to both Student 2 and Coach Miles were honored and protected by LSU and all concerned.   Indeed, to this day, independent counsel for Student 2 has insisted that her identity and the specifics of her allegations be kept strictly confidential— subject to threatened litigation against LSU if her privacy rights were not protected.   Likewise, in 2013, independent counsel for Coach Miles insisted on confidentiality as well and threatened suit if LSU violated his privacy rights.

Because Plaintiff and her Counsel choose to ignore that Student 2 had the right to demand anonymity during the course of the TP Defendants' investigation in 2013 and to insist that her complaints be kept confidential then and now, they wrongly accuse the TP Defendants as being part of an illicit cover-up.   As a student employee, Student 2's records would properly be treated as student educational records.   The Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. §1232g, governs the confidentiality of student educational records; the regulations regarding FERPA are found at 34 C.F.R. Part 99.   FERPA defines student educational records to include "[r]ecords relating to an individual in attendance at the agency or institution who is

---

[7] As a matter of common sense, professional ethics, and customary practice, Plaintiff's allegations that the TP Defendants "controlled" or somehow orchestrated the ultimate decisions and conduct of LSU regarding the events surrounding Student 2's allegations against Coach Miles are ridiculous.   Each of the individuals to whom the TP Defendants reported regarding their investigation (with the possible exception of Miriam Segar) were authorized to make the ultimate determinations regarding, *inter alia*, whether to fire Coach Miles "for cause," whether not to fire Coach Miles, whether to discipline Coach Miles, whether to inform the public regarding Student 2's allegations, whether to inform the entire LSU Board of Supervisors of the situation, *etc*.   To allege, as Plaintiff does, that the TP Defendants (the attorney) controlled LSU (their client) to such an extent that they were actually making these ultimate decisions would be to turn the traditional attorney-client relationship on its head.   It is the attorney's job and responsibility to advise and inform her client to the best of her abilities under the circumstances; it is the client's job and obligation to make the ultimate decision regarding how best to proceed.   Nowhere is it written or mandated that a client must follow her attorney's advice.

employed as a result of his or her status as a student are education records . . ."  34 C.F.R. Sec. 99.3.  Before LSU may disclose personally identifiable information from a student's education records, the student must "provide a signed and dated written consent" specifying the records that may be disclosed, the purpose of the disclosure, and the person to whom disclosure may be made. 34 C.F.R. Sec. 99.30.  Clearly both LSU and the TP Defendants were obligated to protect the confidentiality of Student 2 and her allegations regarding possible Title IX misconduct.

As discussed in more detail in the TP Defendants' Memoranda in Support of Motion to Dismiss (EFC No. 60-1 & 224-2), given the significant privacy rights of Student 2 and the legal constraints imposed upon LSU by applicable law, it was not illegal for LSU to hire the TP Defendants to investigate this matter in 2013.  It was not illegal for the TP Defendants to communicate with LSU privately regarding its investigation.  It was not illegal for Student 2 and Coach Miles to insist that this matter not be disclosed publicly.  And it certainly was not illegal for the TP Defendants to secure its formal report and file materials in its office.  In short, Plaintiff and her counsel cannot and do not point to any criminal conduct undertaken by the TP Defendants which support Plaintiff's preposterous RICO claims.

Instead of articulating exactly how each TP Defendant engaged in criminal conduct to support their RICO allegations, Plaintiff and her counsel simply recite a laundry list of predicate acts necessary to support a theoretical civil RICO claim[8] and make conclusory allegations regarding a "conspiracy" between the named defendants over a more than twelve (12) year period. Plaintiff's RICO Case Statements (ECF No. 45 & ECF No. 219-10) add nothing to her woefully inadequate allegations made in her Complaints; and Exhibit 1 (ECF No. 45-1 & 219-3) to her RICO Case Statement is truly outrageous.  In an effort to respond to this Honorable Court's RICO Order (ECF No. 15), Plaintiff and her counsel misrepresent the billing records of the TP

---

[8] See Para. 138(a) through (e) of Plaintiff's Second Amended Complaint (ECF No. 219).

Defendants, completely fabricate self-serving and speculative "dialogues" and descriptions that support their baseless allegations, and then claim that their baseless and offensive musings somehow support their RICO claims.  See attached Exhibit A (also ECF No. 60-2 & 224-1), which is a comparison of defendants' actual billing records to Plaintiff's gross mischaracterization of the same.  It is not enough to allege that imaginary predicate acts were possibly committed by somebody at some time and in some manner in furtherance of a hypothetical RICO enterprise.  As set forth in detail in the TP Defendants' Memoranda in Support of Motion to Dismiss (EFC No. 60-1 & 224-2), Plaintiff and her counsel do not even attempt to allege specific facts to show who, when, where, and how each TP Defendant supposedly engaged in mail fraud, wire fraud, obstruction of criminal investigation, tampering with a witness, retaliating against a witness, interfering with commerce, or traveling across state lines to advance the racketeering enterprise. As such, Plaintiff's attempt to assert a civil RICO claim against the TP Defendants is wholly deficient.

### III.    LAW AND ARGUMENT

#### A.    Rule 11 Standard

This Honorable Court should impose Rule 11 sanctions if Plaintiff and/or Plaintiff's Counsel failed to make a reasonable inquiry into the facts and law before signing and filing a pleading. Fed. R. Civ. P. Rule 11(b); *Snow Ingredients v. SnoWizard*, 833 F.3d 512, 528 (5th Cir. 2016); *Smith v. Our Lady of the Lake Hospital, Inc*., 960 F.2d at 439, 444 (5th Cir. 1992); *Wolfington v. Reconstr. Ortho. Assoc. II*, 275 F.Supp.3d 584, 590 (E.D. Pa. 2017).  The standard for determining the "reasonableness" of the inquiry is an objective one focused upon whether Plaintiff and/or Plaintiff's Counsel's knowledge or belief at the time of the filing was well grounded in law and fact.  *See SnoWizard*, 833 F.3d at 528; *Wolfington*, 275 F.Supp3d at 590.

7

"RICO should not be construed to give a pleader license to bully and intimidate nor to fire salvos from a loose cannon. Irresponsible or inadequately considered allegations should be met with severe sanctions pursuant to Rule 11."[9] Plaintiff's counsel had a duty to investigate the facts and the law before filing suit. Plaintiff and her counsel cannot choose to "file first and investigate later."[10] Rule 11's duty of reasonable pre-complaint inquiry is not satisfied by rumor or speculation. Sanctions are proper and warranted if outrageous allegations are made without any basis in law or fact.[11] There should be no doubt that Plaintiff and her counsel should be sanctioned here.

Numerous federal courts have sanctioned plaintiffs and/or their counsel under Rule 11 for alleging insufficient civil RICO claims against attorneys who, like the TP Defendants here, were simply providing legal services to their client.[12] Several decisions within the Eastern District of Louisiana have imposed Rule 11 sanctions in RICO cases when a reasonable investigation would have revealed that the RICO claims were without legal or factual support.[13] Importantly, this Court has imposed sanctions when a reasonable investigation would have revealed that the RICO

---

[9] *Foval v. First National Bank of Commerce in New Orleans, et al.*, 1987 WL 7912 (E.D. La. 1987); *reversed and remanded on other grounds*, 841 F.2d 126 (5th Cir. 1988)(*quoting Saine v. A.I.A., Inc.*, 582 F.Supp.2d 1299, 1306 (D.Colo. 1984)).

[10] *Hale v. Harney*, 786 F.2d 688, 692 (5th Cir. 1986).

[11] *Bankers Trust Co. v. Old Republic Insurance Co*., 959 F.2d 677, 683 (7th Cir. 1992); *see also Stewart v. RCA Corp*., 790 F.2d 624, 633 (7th Cir. 1986) (finding that "Rule 11 requires lawyers to think first and file later, on pain of personal liability."); *Rand v. AnaConda-Ericsson, Inc.*, 623 F. Supp. 176, 189-190 (E.D.N.Y. 1985).

[12] *See, e.g*., *Rowe v. Gary*, 773 Fed.Appx. 500 (11th Cir. 2019); *Haviland v. Specter*, 561 Fed.Appx. 146 (3rd Cir. 2014); *White v. Clay*, 2001 WL 1450675 (6th Cir. 2001); *Barker v. Bank One, Lexington*, 156 F.3d 1228, 1998 WL 466437 (6th Cir. 1998)(noting no valid appeal of trial court's sanctions against plaintiff as to claims against the attorney defendants); *Pelletier v. Zweifel*, 921 F.2d 1465 (11th Cir. 1991); *Hartz v. Friedman*, 919 F.2d 469 (7th Cir. 1990); *San Juan Regional Medical Center v. 21st Century Cent. Ins. Co*., 2020 WL 6146445 (D. N.Mex. 2020) and 2021 WL 960546 (D. N.Mex. 2021); *Sheshtawy v. Conserv. Club of Houston, Inc*. 2016 WL 10880233 (S.D. Tex. 2016); *Watkins v. Smith*, 2013 WL 655085 (S.D. NY 2013); *Martin v. Bravenec*, 2012 WL 12877959 (W.D. Tex. 2012); *Hutchinson v. Hahn*, 2007 WL 2572224 (N.D. Okla. 2007); *Sathianathan v. Smith Barney, Inc*., 2007 WL 576097 (S.D. NY 2007); *Lindquist v. Chapman*, 2007 WL 420128 (N.D. Cal. 2007); *Carousel Foods of America, Inc. v. Abrams & Co., Inc*., 2006 423 F.Supp.2d 119 (S.D. NY 2006); *Curtis v. Duffy*, 742 F.Supp. 34 (D. Mass. 1990); *Scott v. Major*, 1990 WL 21319 (N.D. NY 1990).

[13] *See, e.g., In re Taxable Mun. Bond Litig., No. MDL 963*, 1994 WL 34924, at *6 (E.D. La. Feb. 3, 1994); *Moore v. Astra Pharm. Prods., Inc*., Civ. A. No. 91-2206, 1992 WL 245678, at *3 (E.D. La. Sept. 15, 1992).

allegations were "clearly foreclosed" by long standing Fifth Circuit precedent. *Bruno v. Starr, Civ. A. No. 05-1887*, 2006 WL 2631861, at *4 (E.D. La. Sept. 12, 2006).

> **B.** **Fifth Circuit's Heightened Pre-Filing Duty to Investigate RICO Claims**

Because RICO claims involve "complex litigation" and "high legal costs," the Fifth Circuit places an even greater duty to investigate on an attorney before she files a RICO claim. *Chapman & Cole v. Itel Container International B. V*., 865 F.2d 676, 685 (5th Cir. 1989). In *Chapman*, the Fifth Circuit upheld the awarding of sanctions against an attorney and his client for asserting RICO claims "without enough concrete evidence to bring a cause of action ..." *Id*. at 604. In recognizing an attorney's heightened duty to do a pre-filing investigation before asserting a RICO claim, the Fifth Circuit stated:

> Given the resulting proliferation of Civil RICO claims and the potential for frivolous suits in search of treble damages, greater responsibility will be placed on the bar to inquire into the factual and legal bases of potential claims or defenses prior to bringing such suit or risk sanctions for failing to do so.

*Id*. at 685. The Fifth Circuit's "greater responsibility" rule has been quoted and applied in numerous Louisiana federal cases.[14]

In *Bruno*, this Court recognized a plaintiff's heightened pre-filing duty in a RICO case and set forth the basic framework for analyzing whether to impose Rule 11 sanctions:

> This Court is acutely concerned with the interaction of Rule 11 and RICO. Rule 11 requires that any factual claim made have evidentiary support, which is particularly compelling when a claim, such as RICO, alleges criminal conduct.  Furthermore, the Fifth Circuit views an attorney's duty under Rule 11 as particularly important in RICO cases. There is a greater possibility of abuse and, as a result, the Court places a heightened responsibility on attorneys to inquire into the factual and legal bases of potential claims or defenses prior to bringing such suit or risk sanctions for failing to do so.

---

[14] *See, e.g., Stumpf v. Greater New Orleans Expressway Com'n*, 1997 WL 304826 (E.D. La. 1997); *Orleans Parish School Bd. v. Angelic Asset Management*, 2004 WL 1713872 (E.D. La. 2004); *Coates v. First Guaranty Bank*, 2008 WL 2468337 (M.D. La. 2008); *Moore v. Astra Pharmaceutical Products, Inc*., 1992 WL 245678 (E.D. La. 1992); *Bruno v. Starr*, 2006 WL 2631861 (E.D. La. 2006); *Smith v. Our Lady of the Lake Hosp., Inc*., 960 F.2d 439 (5th Cir. 1992).

In this Rule 11 motion, Defendants allege that [Plaintiff's counsel] did not make a reasonable inquiry into the applicable law. To determine the reasonableness of a legal inquiry, the Court considers the time available to the attorney, the plausibility of the legal view contained in the document, the *pro se* status of the litigant and the complexity of the legal and factual issues raised.  Here, the plaintiff is not a *pro se* litigant and RICO law is very complex. However, the legal views contained in [Plaintiff's] pleadings are not plausible in light of the Fifth Circuit's RICO precedents.  In its opinion affirming this Court's decision regarding the Defendants' motion to dismiss, the Fifth Circuit said that "Bruno's claims as plead are clearly foreclosed by [its] precedent," because there was no pleading of continuity.

Since the RICO claims were so "clearly foreclosed" by Fifth Circuit precedent, [Plaintiff's counsel] likely put little effort into researching the applicable law. To avoid sanctions, an attorney must conduct a reasonable inquiry into the relevant law.  The imposition of Rule 11 sanctions for inadequate legal support for a claim is based on a standard of objective reasonableness under the circumstances, not the attorney's good faith belief that there is proper legal support for the claim.  A reasonable inquiry certainly would reveal long standing precedent. Failure to find such clearly applicable law and/or not even mention or try to distinguish it points to a lack of effort on the part of [counsel] in verifying that the RICO claims were well grounded in the law. Thus, he violated Rule 11.

*Id.* at *4 (citations omitted).  As is laid bare in the TP Defendants' Memoranda in Support of Motion to Dismiss (EFC No. 60-1 & 224-2), because Plaintiff and her counsel have failed on numerous occasions to allege specific facts in support of her RICO claims or advance a reasoned argument for the extension of existing law, Plaintiff's RICO claims against the TP Defendants are "clearly foreclosed" by Fifth Circuit precedent.  In fact, given Plaintiff's willingness to characterize the TP Defendants' billing records as being "fraudulent" and "in furtherance of [a] conspiracy to hide Miles investigation" without any basis whatsoever, Plaintiff's Amended Complaints are woefully inadequate and fatally flawed pleadings that deserve Rule 11 sanctions.

### C.    Plaintiff Counsel's Frivolous Contentions of Law

As set forth in detail in the TP Defendants' Memoranda in Support of Motion to Dismiss (ECF No. 60-1 & 224-2), there are numerous reasons why Plaintiff's RICO claims should be summarily dismissed as a matter of law.[15]  Although any one of these legal deficiencies is

---

[15] These reasons include:  that Plaintiff's RICO claims are implausible; that Plaintiff lacks standing; that Plaintiff's claims are time-barred; that Plaintiff fails to adequately plead "conduct" of a RICO enterprise; that Plaintiff fails to satisfy the "person-enterprise distinction" essential to any RICO claim; that Plaintiff fails to allege a pattern of

sufficient to warrant dismissal of her RICO claims, when taken as a whole, they demonstrate the gross and wanton inadequacy of Plaintiff's allegations. Because no reasonable attorney would conclude that Plaintiff has a plausible civil RICO claim against the TP Defendants given the current state of applicable law and the facts as alleged by Plaintiff, Plaintiff's Counsel should be sanctioned pursuant to Rule 11(b)(2).

For example, other than attempting to detail the TP Defendants' role in the discrete 2013 investigation of Student 2 and Coach Miles, Plaintiff does not allege that the TP Defendants were involved in the numerous other "schemes" described in her Amended Complaint which allegedly occurred between 2009 and 2021.[16] In and of itself—and accepting all of Plaintiff's erroneous factual allegations as true for purposes of argument only—the TP Defendants' conduct in 2013 as alleged by Plaintiff cannot and does not give rise to any cause of action against them, much less a civil RICO claim. Simply stated, and putting aside that Plaintiff's RICO claims are facially prescribed as a matter of law, that the TP Defendants did legal work for LSU regarding a specific incident in 2013 cannot be the basis for any civil RICO claim against them.

Plaintiff and her counsel utterly fail to plead that the TP Defendants were a meaningful part of any "pattern of racketeering" necessary to state—much less prove—a civil RICO claim.[17] In determining whether a pattern for RICO purposes has been alleged against any particular defendant, the court considers only the alleged offenses in which that particular defendant was allegedly involved or for which that particular defendant bears some responsibility.[18] A discrete

---

racketeering with continuity; and that Plaintiff fails to allege how any of her alleged damages were proximately caused by any conduct by the TP Defendants.

[16] Indeed, all of the conduct allegedly undertaken by the TP Defendants as described in Plaintiff's RICO Case Statement (ECF No. 45) occurred in 2013. Moreover, all of the billing records and emails involving the TP Defendants are dated 2013. *See* ECF No. 45-1.

[17] *See Agency Hold. Corp. v Malley-Duff & Assoc., Inc.*, 483 U.S. 143, 154 (1987)(The "heart of any RICO complaint is the allegation of a pattern of racketeering."); See also, ECF No. 60-1, pp. 13-19.

[18] *See, e.g., Blue Cross & Blue Shield of N.J. v. Phillip Morris, Inc.*, 113 F.Supp.2d 345, 368 (E.D.N.Y. 2000); *Banks v. Wolk*, 918 F.2d 418 (3rd Cir. 1999); *Feinstein v. RTC*, 942 F.2d 34 (1st Cir. 1991)("In the absence of any demonstrable [overlap], the plaintiffs' claim that these episodes were successive segments in a single scheme

investigation undertaken by a particular defendant or a defendant's sporadic involvement in a larger pattern of racketeering activity undertaken by others simply does not give rise to a civil RICO claim against a defendant who was not continuously involved in the allegedly criminal conduct.

A recitation of the many other "schemes" which—according to Plaintiff's own factual allegations—the TP Defendants were not involved with in any way, reveals the undeniable deficiency of Plaintiff's civil RICO allegations against the TP Defendants. According to the specific allegations of Plaintiff's Amended Complaint:

➢ TP Defendants were not the employer of Plaintiff at any time, and Plaintiff asserts no Title IX or § 1981 claims against them (ECF No. 219);

➢ TP Defendants were neither involved with nor responsible for any of the "discreet discriminatory acts" that Plaintiff has allegedly suffered since 2005 (ECF No. 219, ¶ 309 p. 67);

➢ TP Defendants were neither involved with nor responsible for the "racially hostile work environment" that Plaintiff has allegedly suffered since 2005 (ECF No. 219, ¶ 309, p. 67);

➢ TP Defendants were not and are not alleged to be "LSU Leadership" as asserted by Plaintiff (ECF No. 219, ¶ 64, 65, 67, 69, 72, 74, 75 pp. 14-16);

➢ TP Defendants were not involved in the 2015 complaint by Plaintiff to Miriam Segar against Verge Ausberry (ECF No. 219, ¶ 43, p. 10);

➢ TP Defendants were not involved in the allegations or investigations surrounding Student 3 in 2016 (ECF No. 219, ¶ 45, p. 10); Student 4 in 2016 (ECF No. 219, ¶ 46, p. 10); Student 5 in 2016 (ECF No. 219, ¶ 47, p. 10); Student 6 in 2017 (ECF No. 219, ¶ 48, p. 11); or Student 7 in 2018 (ECF No. 219, ¶ 50, p. 11);

➢ TP Defendants were not involved in the "Ausberry Retaliation" which allegedly occurred between 2012 and 2021 (ECF No. 219, ¶¶ 228 - 230, pp. 53);

➢ TP Defendants were not involved in the allegations or investigations surrounding Drake Davis in October 2018 (ECF No. 219, ¶ 260, p. 58);

---

implicating the defendants' collective actions is nothing more than a conclusory assertion which need not be honored . . . ."); *Emess Capital, LLC v. Rothstein*, 2011 WL 13214302 (E.D. Fla. 3/9/11).

➢ TP Defendants were not involved in the retaliation by Woodward and Ausberry which allegedly took place between 2019 and 2021 (ECF No. 219, ¶¶ 228 - 231, p. 53);

➢ TP Defendants were not involved in the "Adverse Employment Action" allegedly taken against her by her employer and others over the course of her long and ongoing employment at LSU (ECF No. 219, ¶¶ 83-94, pp. 17-19);

➢ TP Defendants were not involved with anything having to do with Plaintiff allegedly receiving "significantly lower compensation" during her employment (ECF No. 219, ¶ 321, p. 69);

➢ TP Defendants were not involved in the "Ongoing Scheme to Control LSU's Football Program," that Plaintiff alleges continues through today (ECF No. 219, ¶¶ 210 - 227, pp. 49-53);

➢ TP Defendants were not involved in the "Scheme to Target Sharon Lewis' Business and Employment" that Plaintiff alleges continues to harm her career through today (ECF No. 219, ¶¶ 238 - 295, pp. 55-65);

By utterly failing to allege how the TP Defendants were involved in the numerous other alleged "schemes" of the many other named defendants that allegedly occurred over a twelve (12) year period, Plaintiff and her counsel clearly fail to allege a continuous pattern of racketeering activity against the TP Defendants for RICO purposes.

Similarly, Plaintiff alleges that the TP Defendants "abuse[d] the discretion granted to them and breached their obligations of loyalty and fidelity [*sic*] and their duty to act honestly and faithfully in the best interests of the [P]laintiff[.]" ECF No. 219, ¶137. Again, this is not a predicate act under §1961(1). But more than that, Plaintiff's claim is clearly unfounded. Because the TP Defendants were hired by LSU—a fact that Lewis readily admits—Lewis would have no attorney-client relationship with them. Lewis has not alleged any facts that would lead a reasonable person to believe that an attorney-client relationship may have existed between her and the TP Defendants. Therefore, the TP Defendants owed no duty to Lewis. Regardless, non-qualifying "wrongs" allegedly committed against Lewis that do not constitute "predicate acts" under §1961(1) cannot form the basis for a RICO claim.

13

Furthermore, notably absent from Plaintiff's Amended Complaint is any factual support that the TP Defendants had any personal knowledge of or personally participated in any of the predicate acts or other "schemes" in which they, according to Plaintiff's own allegations, did not participate. The Fifth Circuit requires that to be a RICO "person," there must be an assertion of facts that the person actually committed the predicate acts.[19] Again, Plaintiff's Amended Complaint does not allege that the TP Defendants committed any specific predicate act, let alone a pattern of them. Any objectively reasonable legal analysis regarding the plausibility of any civil RICO claim against the TP Defendants would have caused a reasonable attorney not to name the TP Defendants in any civil RICO lawsuit.

### D.    Plaintiff's False and Offensive Allegations of Fact

Because no reasonable person or attorney would allege obviously false and speculative factual allegations against the TP Defendants as found in Plaintiff's Amended Complaints, both Plaintiff and Plaintiff's Counsel should be sanctioned pursuant to Rule 11(b)(3). Just as Plaintiff's woefully inadequate legal conclusions against the TP Defendants warrant Rule 11 sanctions, Plaintiff and her counsel make numerous factual allegations that are inaccurate and untrue. Had Plaintiff and her counsel bothered to do the most rudimentary factual investigation before accusing the TP Defendants of being part of a criminal enterprise, they would have not asserted civil RICO claims against the TP Defendants.

In ¶ 42 of her Amended Complaint, Plaintiff alleges:

> On May 15, 2013, Taylor Porter issued a written report which concluded Miles had not violated LSU's Sexual Harassment Policy nor his contract. *See* Taylor Porter's Written Investigation attached hereto as Exhibit 2.

---

[19] "It is not enough for a plaintiff to file a RICO claim, chant the statutory mantra, and leave the identification of predicate acts to the time of trial." *Synergy v. Zarro*, 329 F. Supp. 2d 701, 712 (W.D.La. July 20, 2004), quoting *N. Bridges Assocs., Inc. v. Boldt*, 274 F. 3d 43 (1st Cir. 2001); *accord, Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F. 2d 580, 584 (5th Cir. 1992); *Ahmed v. Rosenblatt*, 118 F.3d 886 (1st Cir. 1997); *see also Zito v. Leasecomm Corp.*, 2003 WL 22251352, at *13 (S.D.N.Y. Sept. 30, 2003) ("to state a violation of §1962(c) by any defendant, plaintiffs must allege that that defendant personally committed two or more predicate acts," as defined in 18 U.S.C. § 1961(1)).

(ECF No. 219, ¶ 42).  Nowhere in Exhibit 2 (ECF No. 219-2) is found a statement made by any TP Defendant that "Miles had not violated LSU's Sexual Harassment Policy."  Instead, this report states that "there can be little doubt that the conduct, if true, is inappropriate and unacceptable. Even accepting XXX's version of events, it appears that he has shown poor judgment in placing himself (and the student employee) in a situation in which the student employee might be uncomfortable and/or he can be subject to such complaint."  (ECF No. 219-2, p. 9).[20] This hardly supports Plaintiff's erroneous allegation that the TP Defendants concluded that Coach Miles did not violate LSU's policies regarding sexual harassment.

Moreover, and significantly, whether the TP Defendants, acting as attorneys for LSU, did or did not conclude—based upon their investigation and analysis of existing law—that Coach Miles did or did not violate this or that policy, is not a criminal act that can support Plaintiff's RICO claim.  This is the day-to-day work of attorneys:  they investigate, research the law, and advise clients on their options regarding how to proceed under the then existing circumstances. Regardless of what legal advice the TP Defendants did or did not give to LSU, in the final analysis, it was LSU's decision to fire, reprimand, or discipline Coach Miles as LSU deemed appropriate.[21]

---

[20] Indeed, the May 15, 2013 memorandum submitted by the TP Defendants to LSU recommends that a number of "remedial steps" be taken to "address some of the problematic behaviors which have occurred"; these recommended steps include:  issuing a written directive to Coach Miles; prohibiting Coach Miles from having any one-on-one contact with student employees; prohibiting social media interactions; excluding Coach Miles from the hiring process involving student workers; mandatory counselling regarding "appropriate boundaries with students and student employees"; implementation of written guidelines regarding interactions with student workers.  ECF No. 219-2, pp. 9-10.

[21] Importantly, Taylor Porter never advised LSU that it could not or should not fire Les Miles.  Rather, as would any responsible counsel, the TP Defendants advised LSU concerning the effects and ramifications of a decision to terminate or not terminate Miles, with a focus on the terms of his written employment contract.  That contract provided certain grounds for termination that would rise to the level of "cause."  Any termination for cause would relieve LSU of its obligation to pay Miles liquidated damages or any other amounts under the contract, while a termination without cause would have obligated LSU to pay Miles liquidated damages of $15 million.  The TP Defendants' evaluation was that LSU would have difficulty establishing cause for termination, particularly given Student No. 2's demand for confidentiality ("We do not believe under existing law and the terms of the contract there is cause to . . . terminate the contract.  Further complicating the situation is the fact that Student No. 2 is adamant that her identity remain confidential and she would likely be an unwilling witness if contested issues arose related to LSU's relationship with [Miles])."  ECF No. 219-2, p. 9.  Thus, Taylor Porter's opinion was that if LSU chose to terminate Miles' employment, it would likely be unable, in litigation, to establish cause under the employment contract.

In ¶ 149 of her Second Amended Complaint, Plaintiff alleges:

> In the Miles Report Miles' name appears as 'XXX' in order to hide his identity and sections of the report stating Miles engaged in explicit sex acts with Student 2 were blacked out to shield Miles from a possible criminal investigation for a sex crime. *See* Exhibit 2.

(ECF No. 219, ¶ 149).  It is pure, rank speculation for Plaintiff to allege that "parts of the report that states Miles engaged in explicit sex acts with Student 2 were blacked out to shield Miles from a possible criminal investigation for a sex crime."  First, Plaintiff does not know what language was actually redacted from the May 2013 report by the Honorable Judge Chip Moore in the prior public records proceeding in state court; therefore, her allegation that it pertained to "explicit sex acts" is reckless conjecture on her part.  If that were not enough, Plaintiff goes on to speculate that this redacted language would have landed Coach Miles in the middle of a "criminal investigation for a sex crime."  Such blatant and outrageous disregard for the truth and reputations of, not only the TP Defendants and Coach Miles, but for the entire LSU community, should subject Plaintiff and her counsel to Rule 11 sanctions.  No reasonable person or attorney would assume the worst and make such scurrilous factual allegations with absolutely no evidentiary basis.

In ¶ 146 of her Second Amended Complaint, Plaintiff alleges:

> McKenzie with Jenkins' full knowledge and consent, designated his law partners Crochet and Barton to conduct an independent Title IX investigation of Miles, which violated LSU's *Title IX and Sexual Misconduct Policy* that states "Any investigation or complaints involving student athletes or Athletics Personnel shall be handled and/or investigated by the LSU Title IX Coordinator."

(ECF No. 219, ¶ 146).  First, in 2013 when the TP Defendants were hired by LSU to investigate the circumstances surrounding Student 2's allegations, LSU did not have a Title IX Coordinator and did not have a "Title IX and Sexual Misconduct Policy."  Plaintiff's own Second Amended Complaint alleges that LSU did not have an interim Title IX Coordinator until 2014 (ECF No. 219, ¶ 61, p. 13, fn.5) and did not have a "full-time Title IX coordinator until 2016" (ECF No. 219, ¶

61, p. 13). Given that Plaintiff had been employed by LSU since 2001 and was a "responsible employee" charged with the duty of reporting any complaints of sexual harassment to the proper authority, Plaintiff's failure to plead these material facts accurately is particularly egregious. Evidently, Lewis and her counsel were more interested in how her factual allegations read, than in whether they were accurate and truthful.

Moreover, and more significantly, there is nothing improper or unusual about universities like LSU "outsourcing" investigations surrounding allegations of sexual misconduct to outside law firms or consultants—especially in high-profile cases involving publicly known figures like Coach Miles. The use of an outside investigator like the TP Defendants was certainly not prohibited in 2013; indeed, the 2011 Dear Colleague Letter prompted universities to use outside investigators more regularly when conducting such investigations. The 2011 Dear Colleague Letter (which was in effect from April 4, 2011 through September 22, 2017) emphasized the flexibility afforded to universities in structuring its investigation process, which "will vary depending upon the nature of the allegations, the age of the student or students involved . . . , the size and administrative structure of the school, and other factors."[22] A Department of Education (DOE) "Q&A" Document from 2014 noted that Title IX does not "specif[y] who should conduct the investigation," so long as the investigator has "training or experience in handling complaints of sexual violence and in the school's grievance procedures."[23] In reviewing the resolution of complaints filed with the DOE Office of Civil Rights (OCR), OCR accepts the use of outside investigators.[24] The current Title

---

[22] *See* Dear Colleague Letter (2011). https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf

[23] *See* Questions and Answers on Title IX and Sexual Violence (April 29, 2014) (also noting that a school is afforded "flexibility in how it structures the investigative process"). Available at: https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf

[24] *See, e.g., In re Moreno Valley College* (May 18, 2016) (approving investigation procedures applied by outside investigator, but finding University out of compliance for lack of promptness and other issues), available at: https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/09152341-a.pdf; *In re Cabrillo College* (Jan. 4, 2017) (finding University out of compliance for failing to post public notice about identity of Title IX coordinator, but not making any adverse finding regarding the University's process of using an

IX regulations explicitly allow outsourcing of such investigations.[25]  Once again, Plaintiff and her

counsel did not do even the most minimal homework required by federal law before filing their

baseless civil RICO suit.

      In ¶ 172 of her Second Amended Complaint, Plaintiff alleges:

> At the May 15, 2013 meeting, Barton, Crochet, McKenzie, Miles, Danos,
> Yarborough, Jacobs, Jenkins, Alleva and Segar agreed Crochet and Barton would
> conceal the Miles Report in their offices off campus away from public documents
> request and an official Title IX proceeding.

(ECF No. 219, ¶ 172).  That attorneys maintain their client's file at their office—as opposed to the

client's office—is standard, customary practice.[26]  That the TP Defendants maintained some of

LSU's records without being designated as the "Custodian of Public Records for LSU" pursuant

to a state statute is immaterial.  Indeed, in late 2020 and early 2021, when —for the first time— a

public records request was made upon LSU for certain records relating to the investigation

regarding Student 2, LSU responded to this request and called upon the TP Defendants to produce

the items subject to the Public Records Request, first to LSU, and then during the course of a

pending lawsuit, to the requesting reporter as directed by the Court and as agreed to by and between

the parties.[27]  No one—including the TP Defendants—ever hid, destroyed, or buried any records

as falsely alleged by Plaintiff.[28]

---

outside investigator regarding Title IX matters), available at:
https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/09162278-a.pdf;
*In re La Sierra University* (June 8, 2018) (accepting use of an outside investigator, but finding University out of
compliance for other reasons), available at:
https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/09162314-a.pdf.
[25] See Page 5 of a "Q&A" from the DOE (January 15, 2021), which refers to the Preamble to the new Title IX
regulations that give "significant flexibility" to universities to hire and use "professionals  outside" of the university's
employ.  Available at:  https://www2.ed.gov/about/offices/list/ocr/docs/qa-titleix-part2-20210115.pdf.
[26] This is especially true where, as here, the client (LSU) had neither a Title IX office nor a General Counsel at the
time the report was rendered.
[27] It is worth noting that the client (LSU) had the right to object to this public records request, whether on the grounds
of privilege, privacy rights, or otherwise—not Taylor Porter.
[28] The last paragraph of the May 15, 2013 report (ECF No. 219-2) openly discusses the best strategy to minimize the
legal risk of public disclosure given that everyone involved (*i.e.*, Student 2, her family, Coach Miles, and LSU) wanted
to maintain the confidentiality of this investigation and report.  Nothing prevented Student 2 (nothing prevents Student
2 today) from making public allegations if she wanted to do so.  LSU, however, as discussed *supra* at pp. 3-6, may

As evidenced by Plaintiff's self-serving and completely speculative interpretation of the TP Defendants' billing records found in Exhibit 1 to her RICO Case Statement (ECF No. 45-1 & ECF 219-3), Plaintiff and her counsel have no issue making up evidence out of whole cloth.  *See* attached Exhibit A; previously filed as ECF No. 60-2 & 224-1.  And again—in what now appears to be a pattern of fashioning her factual pleadings to draw media attention regardless of whether they are true or not—Plaintiff goes on to allege that they "believe" the TP Defendants may have "bribed" or "otherwise influenced" Student 2 from pursuing her allegations against Coach Miles further.  To characterize a private settlement between Student 2 and Coach Miles—to which neither LSU nor the TP Defendants contributed a penny—as a "bribe" is unconscionable.  The TP Defendants respectfully suggest that Plaintiff's feckless conduct easily rises to the level of sanctionable conduct pursuant to Rule 11.

In ¶ 203 of her Second Amended Complaint, Plaintiff alleges:

> In furtherance of the conspiracy to conceal the Miles Investigation from an official Title IX proceeding, Crochet and Barton submitted invoices by United States Mail to LSU for eighty ($80,000.00) thousand dollars which included the following material omissions:
> (1)Barton and Crochet conducted a Title IX investigation of Miles for sexual misconduct and concealed it from an official Title IX proceeding and the full BOS;
> (2)Barton and Crochet concealed the Miles Report in their offices from an official TitleIX proceeding; and
> (3)Barton, Crochet and McKenzie facilitated an exchange of money between Miles and complainant student to dissuade her from testifying against Miles in an official Title IX proceeding. *See* Exhibit 3.

---

not disclose the identity of Student 2 or the circumstances of this situation without risk of violating the significant privacy rights of Student 2—not to mention Coach Miles or others involved.  As acknowledged by this report, while the Taylor Porter Defendants expressed that they were "acutely sensitive to the confidentiality concerns" of all concerned, they simultaneously acknowledged that "there is no guarantee that such a document might not have to be produced either as a result of a public records request or other legal proceeding."  The Taylor Porter Defendants respectfully suggest that actors in a criminal racketeering "enterprise" do not memorialize such opinions, and then preserve the evidence to be produced some eight (8) years later.  Again, far from destroying or burying their report and file, the Taylor Porter Defendants preserved it, as mandated by their code of professional conduct.

(ECF No. 219, ¶ 203).  In fact, LSU paid the TP Defendants for the legal work they performed for LSU between approximately March to September 2013.  As attorneys themselves, Plaintiff's counsel should know that this is standard practice.  As a simple reading of the firm's billing records (ECF Nos. 219-4, 5, 6) and the May 15, 2013 report (ECF No. 219-2) evidence, there was nothing "fraudulent" about the investigation conducted by the TP Defendants for LSU, and once again, Plaintiff's factual allegations and characterizations of events are implausible by any objective standard.  Indeed, Plaintiff's offensive accusation that the TP Defendants submitted "fraudulent billing records" may subject Plaintiff's Counsel to discipline by the LSBA and/or the ODC.  Is there no limit to what Plaintiff and her counsel will "make up" in a desperate effort to avoid summary dismissal?

### E.    Plaintiff Filed Her Second Amended Complaint for Improper Purposes

Plaintiff's patently frivolous suit against the TP Defendants is made even more egregious given that Lewis and her counsel have consistently attempted to try this case in the media, as opposed to in court.  Plaintiff's Counsel here called a press conference on the courthouse steps in Baton Rouge before filing suit,[29] during which she publicly criticized Taylor Porter and suggested that LSU should fire the firm.  This conduct raises serious questions about the motives of Plaintiff and her counsel.[30]  On February 7, 2022, Larry English appeared as a guest on WRKF's Talk Louisiana, wherein he publicly discussed the case at length with host Jim Engster, openly made allegations against LSU, and disclosed—for the first time—that Lewis would be asserting new, sensational allegations against an LSU football coach.  Attached as Exhibit B is a transcript of this 2/7/22 interview of Larry English.

---

[29] See https://www.youtube.com/watch?v=l3DgUgPge5A for a video of this press conference.
[30] As astutely pointed out by the court in *Katzman,* "Rule 11 exists in part to protect defendants and the court from wasteful, frivolous and harassing lawsuits . . . .  Rule 11's deterrence value is particularly important in the RICO context, as the commencement of a civil RICO action has 'an almost inevitable stigmatizing effect' on those named as defendants." *Katzman v. Victoria's Secret Catalogue,* 167 F.R.D. 649, 660 (S.D.N.Y. 1996).

During a February 25, 2022, status conference, after being informed of Plaintiff's Counsel's public radio interview, Honorable Judge Morgan instructed Larry English and all counsel to "be quiet" and not to make public statements regarding this pending suit.  Opting not to follow Judge Morgan's advice, on March 28, 2022, Larry English again appeared as a guest on WRKF's Talk Louisiana and publicly complained that "the LSU Athletic Department for the last 10 years has been run by a criminal enterprise." Attached as Exhibit C is a transcript of this 3/28/22 interview of Larry English.

 In *Katzman v. Victoria's Secret Catalogue,* 167 F.R.D. 649 (S.D.N.Y. 1996), the court imposed sanctions against plaintiffs for filing a Complaint based "solely on the conclusory allegation that defendants engaged in mail fraud." *Id.* at 655.[31] In connection with the suit, plaintiffs' counsel appeared on several television programs and was quoted in several print media regarding their allegations of defendant's wrongdoing and the lawsuit they had commenced.  In concluding that plaintiffs' claim under RICO did not constitute a "good faith attempt to extend existing law," the court explained:

> Plaintiffs' counsel offers no explanation or argument for why this otherwise wholly deficient claim should be viewed as an argument for the extension of present RICO requirements. Plaintiffs' RICO claim is not a reasoned argument for the extension of the law but merely a woefully inadequate and fatally flawed pleading. . . .  As even a cursory examination of the requirements for bringing suit under RICO would have revealed the impossibility of the claim's success, Plaintiffs' filing was objectively unreasonable and therefore constitutes a Rule 11 violation.

*Id.* at 660 (citations omitted).[32] In *Katzman,* the court determined that the "total lack of substance in the plaintiffs' RICO claims and the egregious and unjustified neglect of the required statutory

---

[31] Among other things, in *Katzman*, plaintiffs asserted RICO claims and mail fraud claims against the defendants for alleged unlawful discrimination in pricing structures by sending catalogs which contained different discount offers to different groups of customers. After unsuccessfully culling plaintiffs' original and amended complaints and case statement for specific fraudulent misrepresentations or material omissions, the court determined that the plaintiffs' allegations were inadequate and failed to provide any factual basis for their conclusory allegations of fraudulent intent.

[32] *See also Chemiakin v. Yefimov,* 932 F.2d 124, 126 (2d Cir.1991) (where claims are so far deficient in alleging statutory requirements, whether the violation is deliberate or merely the result of "extraordinarily shoddy" research, the filing warrants the imposition of sanctions).

elements gives rise to the inference that the action was filed for improper purposes." *Id.* at 661. The court specifically condemned plaintiffs' counsel's "publicity" of the case and noted that defendants "were made to respond to a patently meritless complaint and to suffer unwarranted adverse publicity." *Id.*

Just like counsel's actions in *Katzman*, Plaintiff's Counsel's conduct in repeatedly seeking the media spotlight reveals that Plaintiff's suit was filed for the improper purpose of seeking publicity and harassing the TP Defendants. Yet another reason that strongly supports Rule 11 sanctions.

## IV.    CONCLUSION AND PRAYER FOR RELIEF

As this memorandum lays bare, Plaintiff and her counsel have made frivolous allegations against the TP Defendants without any basis in law or fact. Because Plaintiff's Amended Complaint is objectively unreasonable, Plaintiff and her counsel should be sanctioned appropriately pursuant to Rule 11.[33] The TP Defendants specifically request and pray that:

> After the dismissal of Plaintiff's meritless suit against them and after a finding by this Honorable Court that Rule 11 sanctions are appropriate, the TP Defendants respectfully request: (a) that they be given an opportunity to submit evidence regarding the amount of attorneys' fees and litigation expenses incurred because of Plaintiff's frivolous suit; and (b) that, after allowing Plaintiff to respond and/or following a contradictory hearing, Plaintiff and her counsel be cast in judgment for the full amount of attorneys' fees and litigation expenses sustained by the TP Defendants as a result of Plaintiff's sanctionable conduct.

More than 21 days have passed since service was made of this Rule 11 Motion,[34] and Plaintiff has not voluntarily dismissed her RICO claim. Therefore, for the foregoing reasons, the TP Defendants' Motion for Rule 11 Sanctions should be GRANTED, and sanctions in the form of

---

[33] Once a violation of Rule 11 has been established, it is within the court's broad discretion to "fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991); *see* Fed. R. Civ. P. 11, advisory comm. note (1983 amendments).

[34] A copy of this Motion and Memorandum in Support of Motion for Rule 11 Sanctions was served upon Plaintiff and her counsel on March 31, 2022, pursuant to Federal Rule of Civil Procedure 5(b)(2) and 11(c). See Exhibit D attached hereto and undersigned counsel's Certificate of Service found on the TP Defendants' Motion for Rule 11 Sanctions.

attorneys' fees, litigation expenses, and any other award deemed appropriate by this Honorable Court should be imposed against Sharon Lewis and her counsel, Tammye C. Brown, Bridgett Brown, Larry English and Albert Van-Lare, for violating Rule 11.

Filed this 21st day of June, 2022.


**WALTERS, PAPILLION,
THOMAS, CULLENS, LLC**

*/s/ J. E. Cullens, Jr.*
J. E. CULLENS, JR. (La. #23011)
DARREL J. PAPILLION (La. #23243)
RENEE C. CRASTO (La. #31657)
12345 Perkins Road, Bldg. 1
Baton Rouge, Louisiana 70810
Tel: 225.236.3636
Fax: 225.236.3650
cullens@lawbr.net
papillion@lawbr.net
crasto@lawbr.net

**JONES WALKER LLP**

*/s/ Brandon K. Black*
BRANDON K. BLACK (La. #24298)
PAULINE F. HARDIN (La. # 6542)
JOHN GUENARD (La. #36483)
445 North Blvd., Suite 800
Baton Rouge, Louisiana 70802
Tel: (225) 248-2128
Fax: (225) 248-3128
bblack@joneswalker.com
phardin@joneswalker.com
jguenard@joneswalker.com

***Counsel for Defendants, W. Shelby McKenzie, Vicki M. Crochet, and Robert W. Barton***

## CERTIFICATE OF SERVICE
## UPON PLAINTIFF AND HER COUNSEL

Pursuant to Rule 11(c)(2) and Rule 5(b), the undersigned counsel certifies that a copy of the foregoing Motion for Rule 11 Sanctions and Memorandum in Support of Motion for Rule 11 Sanctions was served on plaintiff, Sharon Lewis, and her counsel, Tammye C. Brown, Bridgett Brown, Albert Van-Lare and Larry English, via Certified U.S. Mail, via U.S. Mail, postage pre-paid, and via email to the following addresses:

Tammye C. Brown
Campbell Brown Law & Consulting
1220 E. Northside Drive, Suite 170-176
Jackson, Mississippi 39211
tbrown@campbellbrownlaw.com

Bridgett Brown
BROWN & ASSOCIATES
418 DeSoto Street
Alexandria, Louisiana 71301
Lawyer4u.bridgett@gmail.com

Larry English
Attorney at Law
423 W. 127 Street, 7th Floor
New York, New York 10027
917-531-3909
englishlaw2008@gmail.com

Albert Van-Lare
Attorney at Law
125 Maiden Lane, Suite 510
New York, NY 10038
vanlareesq@aol.com

On the 31st day of March, 2022.

/s/ J.E. Cullens, Jr.

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing was served on all counsel of record using the Court's CM/ECF system this 21st day of June, 2022.

/s/ J. E. Cullens, Jr.

J.E. Cullens, Jr.