| | |
|---|---|
| SHARON LEWIS | Civil Action No: 21-198-BAJ-RLB |
| Plaintiff | |
| V. | JUDGE SUSIE MORGAN |
| BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY ET. AL. | MAGISTRATE JUDGE RICHARD L. BOURGEOIS |

MOTION TO LEAVE TO FILE SECOND SUPPLEMENTAL
OPPOSTION TO LOUISIANA STATE UNIVERSITY BOARD OF SUPERVISORS
MOTION FOR PROTECTIVE ORDER

NOW INTO COURT, comes Plaintiff Sharon Lewis, through undersigned counsel, files this motion for leave, respectfully requesting that this court grant her leave to file attached Second Supplemental Memorandum in Opposition to Louisiana State University Board of Supervisors (BOS)Motion for Protective Order (R.Doc. 289 ). The reason for this motion are set forth in the memorandum in Support filed contemporaneously. The LSU Board of Supervisors oppose this motion to leave.

WHEREFORE PREMISES CONSIDERED, Plaintiff Sharon Lewis pray that this court grant the foregoing Motion granting her Motion To Leave to file Second Supplemental Memorandum in Opposition to Louisiana State University Board of Supervisors Motion for Protective Order

Respectfully submitted:

*/s/ Larry English*
Larry English, LSB No. 22772
LARRY ENGLISH, ATTORNEY AT LAW
423 W. 127 Street, 7th Floor
New York, New York 10027
917-531-3909
englishlaw2008@gmail.com

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing was served on all counsel of record using the Court's CM/ECF system on December 11, 2022.

*/s/ Larry English*

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA
BATON ROUGE DIVISION

SHARON LEWIS                                           Civil Action No: 21-198-BAJ-RLB

Plaintiff

V.                                                          JUDGE SUSIE MORGAN

BOARD OF SUPERVISORS OF LOUISIANA      MAGISTRATE JUDGE RICHARD
STATE UNIVERSITY ET. AL.                       L. BOURGEOIS

Defendant

### SECOND SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO MOTION FOR PROTECTIVE ORDER BY LOUISIANA STATE UNIVERSITY THE BOARD OF SUPERVISORS

MAY IT PLEASE THE COURT:

       The LSU Board of Supervisors (BOS) knowingly failed to produce documents to Plaintiff that she had requested in multiple discovery request, until the District Court intervened[1]. This Second Supplemental Memorandum incorporates those documents that support Plaintiff's arguments the crime-fraud exception waived attorney-client privilege as to the Miles Report, Taylor Porter Billing Records, Robert Barton and Vicki Crochet deposition testimony:

### R.S. 14:133 (Filing or maintaining false public records) and R.S. 14:120 (Corrupting Influence)

The essential elements of R.S. 14:133[2] as they pertain to the crime-fraud exception are as follow:

    1. *Filing or depositing for record in any public office or with any public official, or the*

---

[1] The attached exhibits were required to be listed in the BOS Rule 26 disclosures.
[2] It was also a violation of § 1512(c)(2).

1

*maintaining as required by law, regulation, or rule, with knowledge of its falsity, of any of the following:*

2. *Any document containing a false statement or false representation of a material fact.*

On February 28, 2013 Miriam Segar (Segar) wrote a memo to file attached as exhibit 1[3]. This document is a detail account of Student 2 allegations against Les Miles. Among the allegations that Student 2 alleged was that Miles promised her if she had sex with him, he would hire her as his "marketer". This is consistent with Sharon Lewis report to Segar in July 2012 that Student 1 reported to her, Miles promised Student 1 Lewis job, if she had sex with him.[4] Segar testified in her deposition that she worked with Barton and Crochet on the investigation of Miles. In the Miles Report Segar, Crochet and Barton made false statements and false representation of material fact when they concluded Miles had not violated any laws or his employment contract.[5]

In 2020 *USA Today* filed a lawsuit for the release of the Miles Report. Crochet and Barton were forced to file the Miles Report with LSU Custodian of records. This satisfies the first and second element of R.S. 14:133.[6]

**R.S. 14: 118 (public bribery).**

The essential elements of R.S. 14:118 as they pertain to the crime-fraud exception are as follows:

1. *The giving or offering to give, directly or indirectly, anything of apparent present or prospective value to any of the following persons, with the intent to influence his conduct in relation to his position, employment, or duty:*
2. *Public officer, public employee, or person in a position of public authority.*

---

[3] Exhibit 2 attached herein also confirms Segar's account.
[4] See R.Doc 304-5 p.1
[5] See R.Doc. 219-2 p.9
[6] *State v. Carpenter*, 772 So.2d 200, 207 (La. 3rd Cir. 2000).

3. *Witness, or person about to be called as a witness, upon a trial or other proceeding before any court, board, or officer authorized to hear evidence or to take testimony.*

On May 28, 2013 Student 2 lawyers sent a demand letter to Barton, Crochet and Peter Ginsberg requesting $2.15 million dollars to settle their claims against LSU and Miles.[7] The Taylor Porter Billing Records[8] show on August 2, 2103, August 7, 2013 and August 13, 2013 Crochet, Barton and Ginsberg negotiating and finalizing release/settlement agreement with Student 2 to influence her testimony in a Title IX investigation. This satisfies the first element of R.S. 14: 118. Student 2 was a complainant and witness in a Title IX investigation. This satisfies the second element of R.S. 14:118.[9]

Additionally, Segar and Barton were not working as attorneys but according to the Miles Report, they "assumed the role usually undertaken by the Human Resource Department."[10] The then existing PS-73 policy[11] required all Title IX complaints be referred to Human Resources. Thus, Crochet and Barton were working as agents of LSU's HR Department conducting a Title IX Investigation, not as attorneys providing legal advice. For the stated reasons the crime-fraud exception waived attorney client privilege to the Miles Report, Taylor Porter Billing Records, Robert Barton and Vicki Crochet deposition testimony.

---

[7] Demand Letter attached as Exhibit 2.
[8] R.Doc. 219-6 p. 12 (See September 13, 2013 Invoice)
[9] *State v. Hingle*, 677 So. 2d 603 (La. 2nd Cir. 1996) *writ denied*, 96-1969 (La.1/10/97), 685 So.2d 141; This is also a violation of § 1512 (c )(2)
[10] R.Doc. 219-2 p. 5
[11] R. Doc. 304-5 p.6

Respectfully submitted:

*/s/ Larry English*
Larry English, LSB No. 22772
LARRY ENGLISH, ATTORNEY AT LAW
423 W. 127 Street, 7th Floor
New York, New York 10027
917-531-3909
englishlaw2008@gmail.com

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing was served on all counsel of record using the Court's CM/ECF system on December 11, 2022.

*/s/ Larry English*

EXHIBIT 1

**Thursday, February 28, 2013:**
Was notified by Mark Ewing that Lofton and Lewis had called and there was an issue that had occurred with a female student worker involving potential inappropriate contact with LSU staff member.

Segar called Lewis and requested to meet with the student. Segar, Nall, Lewis and Lofton met with [Redacted] (sophomore from Ohio). [Redacted] is a student worker with Football program and has primarily worked with Football recruiting staff and is supervised by Sharon Lewis. [Redacted] has worked with football since Spring 2012 semester.

[Redacted] stated that when first meeting Coach Miles she felt he was attracted to her and remembers that he was flirtatious and in one instance touched her knee and thigh while speaking with her in the office during Spring 2012. On March 12, 2012, Coach Miles messaged her directly through her Facebook account. Messages were exchanged between both parties from March 2012 to May 2012.

[Redacted] indicated that she was uncomfortable being alone with Coach Miles and did not work directly with him until recently when asked to work because Lofton was out on sick leave.

On February 7, 2013, [Redacted] was working for Coach Miles and at one point during the day, Coach Miles asked her to come into his office and sit with him. They began a conversation about her future goals and she indicated that she was majoring in Marketing. Coach Miles replied that he needed a "marketer" to work for him and told her that she could work for him. He told her he didn't think his agent was creative enough to market him and someone like herself could be helpful. He told her that she could get a percentage of all new endorsement deals she was able to negotiate. Coach Miles asked her for her cell number so they could keep in touch to discuss potential job options.

[Redacted] says that Coach Miles gave her his personal cell number (225-588-5183) and told her to put him in her address book as "Lee" and he would add her to his address book as "[Redacted]".

On February 8 @ 12:59pm, Miles text (from his personal phone) "Enjoyed our visit very much". Text messages continued through February 21, 2013. Around February 20th [Redacted] indicates that Coach Miles told her "let me know if this is too much and I will back off".

[Redacted] indicates that on February 21 at approximately 7pm she agreed to meet Coach Miles. The text messages indicate that a phone call occurred while she was on her way to campus at 6;59 pm, "Gonna call in 10-15". The response was "Good". The decision was made to meet in the COOP parking lot on Burbank. Her intention was to tell him that things needed to end and he asked her to take a ride with him. She agreed to go for a ride with him and they drove around Baton Rouge for approximately 45 minutes. During this time, [Redacted] indicates that she asked him if he was happy in his marriage and he said that he was very happy, but also attracted to her. [Redacted] said that she commented that people could see them riding in the car together and she asked him if he was nervous about that and he said that he was not and that if anyone questioned him he would say she was his daughter. [Redacted] also said that he drove her past L'auberg Casino and told her he could "get a room" anytime she wanted. He also drove by his condo and told her that his in-laws were visiting for the next several weeks, but after they left the condo was also an optional place for them to meet. [Redacted] also said he asked her if she wanted to go eat, but warned that they could not sit together since that would raise awareness, but that they could sit fairly close and have a conversation.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BOS-024045

■ indicated that Coach Miles told her about a trip that he had planned with some friends to Costa Rica and told her he would like her to come and would get her a room if she wanted to make the trip.

After driving around BR, Coach Miles drove her to back of Football Ops Building and told her he wanted to see who was still working. He drove behind the Ops building and wooden fence and parked the car. ■ said that he then kissed her twice very intimately. ■ says the kiss was not desired and she was very upset it occurred. On February 21 @8:15 pm, Coach Miles sent text message "Great time!".

■ reported being very uncomfortable with what had happened and has not responded to the last 4 texts he has send her. She did not want to see him and did no report for work the week of February 25 and had made the decision to resign her position. However, on February 28 she met with Lewis and told her about the issue and circumstances of last couple of weeks.

■ indicated that she participated in flirting with Coach Miles because she wanted to see how far he would "take" things.

■ has decided not to work for remainder of Spring 2013, but I assured ■ that we could reassign her if she desired and she said maybe in the future, but she didn't want job at this time.

■ was also provided a copy of PS-73 (sexual harassment policy) and advised that she had the right to file an official complaint with the University. ■ said that she did not want her parents to know about the issue with Coach Miles as she feared that both would potentially physically harm Coach Miles. I offered free psychological services for her.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BOS-024046

EXHIBIT 2

## Vicki M. Crochet

**From:** Charles Peckham <cpeckham@peckhampllc.com>
**Sent:** Wednesday, May 29, 2013 8:21 AM
**To:** Robert W. Barton; Vicki M. Crochet
**Cc:** Steve Heninger; Wayne Ferrell
**Subject:** LSU - Les Miles

Mr. Barton and Ms. Crochet:

I called this morning to introduce myself but neither of you were available. With Mr. Wayne E. Ferrell, Jr. of Jackson, Mississippi and Mr. Steve Heninger of Birmingham, Alabama, I represent a young lady with a complaint against LSU and LSU Head Coach Les Miles. You are already aware of the matter as you are conducting the factual investigation. My call was also as a professional courtesy to let you know that you will be receiving a letter today advising of the nature of our representation so that you can properly advise your client in order that they can obtain counsel to defend. It would be helpful if you would forward your factual investigation report to me as soon as practicable.

You are welcome to call me at your convenience at the below office number.

Charles H. Peckham



Peckham|PLLC

### Charles H. Peckham
**ATTORNEY**

Board Certified
in Labor and Employment Law by the
Texas Board of Legal Specialization

Two Bering Park
800 Bering Drive, Suite 220
Houston, Texas 77057

713.574.9044 – office
713.493.2255 – fax
713.298.5504 – cell
cpeckham@peckhampllc.com

1

Charles H. Peckham

**<image001.jpg>**

BOS-024086



TWO BERING PARK
800 BERING, SUITE 220
HOUSTON, TEXAS 77057
713.574-9044 PHONE
713.493.2255 FACSIMILE

WWW.PECKHAMPLLC.COM
CPECKHAM@PECKHAMPLLC.COM

MARY A. MARTIN
SENIOR COUNSEL

CHARLES H. PECKHAM
SHAREHOLDER

BOARD CERTIFIED
IN LABOR AND EMPLOYMENT LAW
BY THE TEXAS BOARD OF LEGAL
SPECIALIZATION

OF COUNSEL:

WAYNE E. FERRELL, JR.
L.L.M. AVIATION AND SPACE LAW
LAW OFFICE OF WAYNE E. FERRELL, JR
405 TOMBIGBEE STREET
JACKSON, MISSISSIPPI 39201
LICENSED IN MISSISSIPPI ONLY

May 28, 2013

*VIA OVERNIGHT MAIL*

Robert W. Barton
Vicki M. Crochet
TAYLOR PORTER
451 Florida Street
Baton Rouge, Louisiana 70801

Peter R. Ginsberg
PETER R. GINSBERG LAW, LLC
12 E. 49th Street, 30th Floor
New York, New York 10017

   RE: **Redacted** *v. Les Miles a/k/a "Lee", Louisiana State University and the Board of Supervisors of the University of Louisiana System*

Dear Ms. Crochet and Messrs. Barton and Ginsberg:

  Mr. Steve Heninger, Mr. Wayne E. Ferrell, Jr. and I have been hired to represent Miss **Redacted**, a student of Louisiana State University and a former employee of the athletic department of Louisiana State University and the Board of Supervisors of the University of Louisiana System (hereinafter collectively "LSU"), in a matter of which you are already aware.

  LSU's counsel and an LSU NCAA compliance officer have already spent several hours interviewing Miss **Redacted** ostensibly as part of a confidential investigation into whether or not Les Miles, the LSU Head Football Coach, the athletic department and/or LSU generally were at fault in the abuse of trust, grooming and sexual harassment of Miss **▮** and other LSU students and employees. Coach Miles' own counsel, Mr.

*RULE 408 CONFIDENTIAL SETTLEMENT OFFER*

Ginsberg above, also traveled to Miss [Redacted] parents' home in Ohio to discuss this serious matter.

Miss [Redacted] and her father were told they would be informed of the results of the LSU investigation. That was months ago. There has been no report to Miss [Redacted] as to the result of any such investigation. Nothing came either from Mr. Ginsberg's visit. Thus, action is now required.

The facts that are available to us are that in the early spring of 2012, Coach Les Miles caused his LSU-paid staff to collect applications from potential student workers to be employees of the athletic department in football recruiting and in Coach Miles' office. Specifically, Coach Miles personally visited various sororities, picked for their status as top sororities on campus, in order to identify female students he might desire.

After that time, Coach Miles used his staff to contact these young women to attend an interview process. During that process, Coach Miles called individual girls into an isolated area and interviewed each young student in private.

He did just this with [Redacted], a young member of Kappa Kappa Gamma sorority. In Les Miles' private interview of Miss [Redacted], he ingratiated himself to her, flattered her and flirted with her. By design, Coach Miles asked questions that an older more savvy and mature woman would have understood as harassing and inappropriate. Coach Miles intended and did search for private facts to seek the pliability of his prey. Coach Miles asked if [Redacted] had a boyfriend, asked if she minded being 'hit on' by football players and how she would handle it, and made comments about the softness of her hair. He was warm, friendly, charming and flattering; he spoke to Miss [Redacted] on her level.

Not surprisingly, [Redacted] shortly received a call that she had been hired by Coach Miles to work for the athletic department at LSU.

In the athletic department, some of the young women worked in recruiting and a very select few worked directly with Coach Miles in his private offices. Some of the young women worked in both areas. [Redacted] was hired to exclusively work in Coach Miles' office.

On her very first day, Coach Miles began again to flirt and ingratiate himself with Miss [Redacted] by chatting with her in the social media messaging world of Facebook.

His place as a successful, powerful, mature and knowing dynamic man paying attention to the young co-ed girl from a small town in Ohio worked wonders. As intended, [Redacted] looked up to Coach Miles as an employer, teacher, mentor, friend and confidant. Coach Miles used his position as a means to manipulate and control this young girl. As [Redacted] was a young student, she was instantly infatuated with the attention of Coach Miles and the power he represented at LSU.

*RULE 408 CONFIDENTIAL SETTLEMENT OFFER*

After weeks of flirting via messaging and in person, the attentions of Coach Miles faded. It was during this time that Coach Miles had begun the same manipulation and grooming of another young female student in his employ. LSU and Coach Miles are fully aware of this young lady as Coach Miles not only manipulated her, but had her living in an LSU-supplied condominium and there jumped on her in a sexual fashion. LSU also 'investigated' this harassment by Coach Miles and did nothing to prevent him from striking again[1]. It is our present understanding that this harassment ended in late 2012 when the student complained to LSU. At that time, Coach Miles allegedly branded this young female student as a liar and himself as a victim.

With no institutional control by LSU, beginning again in late 2012 and early 2013, Coach Miles again turned his attentions to Miss ███. His attentions included repeated social media stalking, touching of Miss ███ on the shoulders, arms and knees as well as comments to her regarding her physical beauty. On February 8, 2013, Coach Miles created a time in which he could be alone with Miss ███ by being in his office when he was not scheduled to be there so he could have Miss ███ sit and talk with him alone in his office. In that meeting, Coach Miles proposed that Miss ███ could run a marketing scheme involving several collegiate head coaches taking a cruise with fans. He told Miss Redacted that she stood to make in the millions of dollars as her part of the profits. He explained that he would need to have her cell phone number in order to talk to her privately about the business proposition and that he could not get her number from the athletic department staff as that would 'arouse suspicion'. She gave him the number and he asked her to enter the number in his cell phone. In doing so, he said that she should put her name as " Redacted " as no one would ask questions if that name came up on his phone since that was also the last name of his agent. He explained also that her friends would ask questions about the marketing matters if his name showed on her phone, so she was to enter his number on her phone as '███'. At the end of that meeting, Coach Miles hugged Redacted by pressing her whole body and her breasts against him and rubbing her back. In this manner, Coach Miles began to continue to sexualize the relationship and desensitize Miss ███ to his touching and groping.

Coach Miles continued his pressure on Miss ███ now by instant messaging or 'texting' her on her cell phone. He worked to groom her at all times of the day and night, wherever he was located.

On February 21, 2013, Coach Miles sought to pursue the matter farther. Under the guise of this marketing scheme, after flattering and manipulating her, after having desensitized her to his sexual advances and sensing a time to take advantage of this grooming, he sought to have time with Redacted in private and away from potential exposure as being the sexual manipulator he clearly showed himself to be.

---

[1] We note that this is not the first time that a professor at LSU has been accused of sexual misconduct with a student. In the 2011 Marc Boudreaux matter, reportedly several accusations were made by various students before LSU finally took action – but LSU's actions did not prevent others, such as Coach Miles, from acting out sexually with students and employees.

*RULE 408 CONFIDENTIAL SETTLEMENT OFFER*

On that evening, he picked up Miss ▮▮▮▮ in his Cadillac Escalade at a college bookstore and drove her around Baton Rouge. He took her by the condominium provided him by LSU and expressed that they could meet there in private and be alone together. He took her by the L'Auberge Casino Hotel Resort and suggested that the management there would get them a suite at no cost so they could have privacy and massage one another. He talked to her about traveling with him to Costa Rica. He then took her back on campus near the Football Operations office and parked in an area he had confirmed was not covered by security cameras. He put his hand underneath the top of the back of her blouse touching her bare skin and the back of her bandeau. Coach Miles then leaned over into the passenger seat and kissed **Redacted** – now barely 19 years old – sticking his tongue in her mouth. She did not kiss back, but she was stunned and said nothing. He started in again and she recoiled, but he still forcibly kissed her. She then sought an excuse to leave the car. She thought of one and he drove her back to the bookstore.

As soon as she left the car he texted her again expressing his pleasure. She was stunned and shocked. She responded in kind to buy time to think – to figure what she could do to stop him.

When she returned to work after reporting ill to avoid the workplace while she could gather her thoughts and summon her courage, she told her supervisor what had happened. It was clear this was not the first time a report had been made to LSU about Coach Miles' actions with young female students. LSU then began its newest investigation.

LSU has wholly failed to establish and enforce proper guidelines for the conduct of its staff at the highest levels. When reports were made by another student employee about the sexual misconduct of Les Miles, nothing was done to stop him from hurting others with his sexual grooming and manipulation. Les Miles' case is a textbook case of sexual manipulation and grooming.

Grooming is known in the literature to have six general steps (though this number increases or decreases based upon the particular journal). The first is targeting the victim – looking for someone who suits the fancy of the manipulator. He looks for someone who is far from parental supervision by physical or emotional distance. The second is gaining the person's trust. This is a matter of speaking to the person at their level, such as through social media, and in language of the younger person's age. In this step, the groomer acts as an investigator or spy – learning about the victim in a stealth-like manner. The groomer learns about the likes and dislikes of the victim, offers to help the victim or even her parents.

In the third step, the groomer attempts to fill a need in the victim. He will attempt to become more important and idealized in the younger person's life. Extra attention and even affection mark this stage. In the fourth step, the younger person is isolated. The groomer may communicate privately with the victim through social media and attempt to

*RULE 408 CONFIDENTIAL SETTLEMENT OFFER*

hide the communications. The groomer will create situations in which the groomer and victim are alone. The groomer attempts to make the victim feel loved or appreciated in a way that is missing in the victim's life.

In the fifth step, the groomer begins to sexualize the relationship. The groomer may lightly touch the victim on the shoulders, arms or knee. These are touchings that may cause the victim to think the groomer is just a "touchy" person. The groomer tries to desensitize the victim to touch and sexual conversation so that the younger victim sees the groomer as a more sexual being and to define the relationship in more sexual and special terms. This step also exploits the natural curiosity of a younger person and the natural feelings of stimulation and excitement. In this step, the groomer seeks to advance the sexual activity, from touching, to kissing, and ultimately to more intimate sexual acts. Be clear, this is not a mutual relationship between two consenting parties. This is the result of manipulation and control.

In the sixth step, the groomer then builds on the other steps to maintain control. The unspoken (or in some cases spoken) threat is that if the groomer is exposed, no one will believe the victim and her life and reputation will be ruined. The younger person is now ensnared and entangled. The groomer has the victim confused about whether or not she is somehow guilty of creating the situation. Self-doubt and fear of the victim keeps the groomer in control and the victim quiet. The fear of being labeled as the aggressor, the instigator; the fear of being retaliated against with life and reputation ruined; the fear of embarrassment and hurting family; all of these are the tools of the groomer to keep the victim under control.

Where Les Miles failed is in the last step. [Redacted] realized that she was being manipulated and that what Les Miles was doing was improper, immoral, unfair to his family and to her. [Redacted] will no longer be victimized or allow others to be victimized by Les Miles. She will no longer allow him to be unfaithful to his own family. She refuses to allow LSU to sweep the acts of this sexual predator, stalker and groomer under the rug. She refuses to allow Coach Les Miles or LSU to continue to victimize her or others.

We see the following as the way to remedy the problem in the past and in the future. Consider this a Rule 408 demand to resolve any and all claims of harassment, assault, discrimination, retaliation etc. that Miss [Redacted] may have as against Coach Miles and LSU.

As to Coach Miles:

1. He will attend inpatient treatment for sexual addiction.
2. He will attend outpatient treatment for sexual addiction once every two years for the remainder of his career in professional coaching at the collegiate level.
3. He will attend sensitivity training once every two years for the remainder of his career in professional coaching at the collegiate level.

*RULE 408 CONFIDENTIAL SETTLEMENT OFFER*

4. He will attend training on awareness of and prevention of grooming by sexual predators once every two years for the remainder of his career in professional coaching at the collegiate level.
5. He will attend training on victimization once every two years for the remainder of his career in professional coaching at the collegiate level.
6. He will no longer be allowed to be in a private or one-on-one situation with any student, student athlete, student employee or employee. He will abide by the mantra of "two-deep" supervision such that he is not to be alone without another non-student adult present when with a student, student athlete or student employee. The non-student adult may not be an employee that is subject to the hire/fire/employment advancement or demotion at Les Miles's direction. This will continue at LSU at any institution for which he works.
7. He will no longer hire or fire student employees working in the athletic department, football program or anywhere at an institution for which he works.
8. He will no longer interview student employees for work in the athletic department, football program or anywhere at an institution for which he works.
9. He will no longer attend any sorority function at LSU or at any institution for which he works.
10. He will not engage in any e-mail, phone conversation or like communication with any student, student athlete or student employee without a non-student member of LSU staff being also involved in the communication via carbon copy or inclusion in the conversation. Such monitoring person may not be an employee that is subject to the hire/fire/employment advancement or demotion at Les Miles's direction.
11. He will not engage in any social media (Facebook, texting, or like communication method) with any student, student athlete or student employee.
12. He will cease having access to LSU-paid housing in Baton Rouge for his own use other than one single-family home also occupied by his family.
13. As to numbers 2-11 above, Les Miles must notify any future collegiate institution for which he works that the above restrictions and requirements apply to him for the remainder of his professional collegiate coaching career.

As to LSU:

1. LSU will review and revise its polices and procedures for all staff as to grooming, sexual harassment, appropriate/inappropriate interaction with students and employees.
2. LSU will review and revise its institutional control of staff and set up an office, independent of review by any department and employee over which/whom it has oversight, to monitor, inspect, and make recommendation regarding discipline of staff for violation of LSU polices and/or procedures on grooming, sexual harassment, appropriate/inappropriate interaction with students and employees.

*RULE 408 CONFIDENTIAL SETTLEMENT OFFER*

3. LSU will institute a training program for all non-student staff regarding LSU polices and/or procedures on grooming, sexual harassment, appropriate/inappropriate interaction with students and employees. Staff will be required to attend such training within 90 days of hire and at least once each college semester during their employ.
4. LSU will institute a training program for all student staff regarding LSU polices and/or procedures on grooming, sexual harassment, appropriate/inappropriate interaction with students and employees. Student staff will be required to attend such training within 90 days of hire and at least once each college semester during their employ.
5. LSU will institute a training program for all students LSU polices and/or procedures on grooming, sexual harassment, appropriate/inappropriate interaction with students and employees. Students will be allowed and encouraged to attend such training.
6. LSU will hire a third-party non-governmental entity to receive and investigate reports of inappropriate conduct by LSU staff and/or students. This may not be LSU-hired counsel. That entity will institute a toll-free number for reporting to such entity. LSU will delegate to this entity the investigation of inappropriate sexual conduct by staff of LSU as against other staff or students. This entity will then make recommendations available to the appropriate department at LSU *and to the complaining party*. The fact findings (not the conclusions) of such investigatory report can be used by the complaining party in any subsequent legal or grievance action against LSU.
7. LSU will institute a non-binding grievance panel, run by the third-party non-governmental entity, that will first seek agreement on appropriate measures with LSU and the complaining party, second if no agreement can be reached make a recommendation that LSU must implement regardless of further legal or grievance rights, and that third allows the complaining party to pursue legal rights without the grievance being a bar to future legal action.
8. LSU will monitor Coach Les Miles to ensure that items on the list above related to Les Miles are implemented.
9. The physical office of the Head Coach, Les Miles, will not be an enclosed office but must either have no capacity for a door than can be closed or otherwise must have glass windows/walls that do not allow for privacy to the extent that Coach Miles (or any future head coach) can be hidden from view from outside his office while he is in his office.
10. LSU will immediately terminate the employ of Les Miles in all capacities should he violate any of the items on the list above related to him.

As a final measure, to make certain all these remedial measures are implemented and that Coach Les Miles and LSU have the incentive to comply and prevent future acts such as these, there must be a monetary component.

▮Redacted▮ has been groomed, sexually and emotionally manipulated and damaged. She is now in counseling and cannot return to LSU. These actions occurred to Miss ▮Redacted▮ while LSU knew or should have known that Head Coach Les Miles had

*RULE 408 CONFIDENTIAL SETTLEMENT OFFER*

previously sexually groomed, manipulated and harassed another young student-employee of football operations. Therefore, ▮Redacted▮, LSU and Head Coach Les Miles will execute full releases, mutual binding confidentiality agreements and the above terms will be put in place.

LSU and Les Miles, collectively, shall further pay to ▮Redacted▮ the amount of $2.15 million, which is only one-half Coach Les Miles' annual salary for just one year of his new seven-year contract.

We hope to discuss this with you on an immediate basis. Given some legal time constraints, we will be filing a charge with the Equal Employment Opportunity Commission before the end of July, and we anticipate filing it much sooner. We anticipate therefore having this entire matter resolved, if it can be amicably resolved, by mid-June at the latest. This demand therefore is revoked by its own terms on June 5, 2013 at 5:00p.m. CDT.

You may have no further direct contact with Miss ▮Redacted▮. Her family has also asked that contact with them be through this office. Please direct your response to this letter to the Houston, Texas address above. I look forward to hearing from you.

Sincerely,

Charles H. Peckham

cc.

Client

Wayne E. Ferrell, Jr.
LAW OFFICE OF WAYNE E. FERRELL, JR.
405 Tombigbee Street
Jackson, Mississippi 39201

Stephen D. Heninger
HENINGER, GARRISON, DAVIS, LLC
2224 1st Avenue North
Birmingham, Alabama 35203

*RULE 408 CONFIDENTIAL SETTLEMENT OFFER*

SHARON LEWIS                                          Civil Action No: 21-198-BAJ-RLB

Plaintiff

V.                                                    JUDGE SUSIE MORGAN

BOARD OF SUPERVISORS OF LOUISIANA                     MAGISTRATE JUDGE RICHARD
STATE UNIVERSITY ET. AL.                              L. BOURGEOIS

## ORDER

Considering the foregoing Motion to Leave To File a Second Supplemental Memorandum in Opposition to Louisiana Board Of Supervisors Motion for Protective Order.

IT IS ORDERED that Plaintiff Sharon Lewis Motion to Leave To File Second Supplemental Memorandum in Opposition to Louisiana Board Of Supervisors Motion for Protective Order is hereby granted.

IT IS SO ORDERED

New Orleans, Louisiana this _____ of_____2022.

_____
HONORABLE SUSIE MORGAN
UNITED STATES DISTRICT JUDGE