Exhibit 1

UNITED STAES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

ABBY OWENS, ET AL.
                    CASE NO.: 3:21-cv-00242
                    DIVISION WBV-SDJ
VERSUS           JUDGE WENDY B. VITTER
                    MAG. JUDGE JOHNSON
                    JURY DEMANDED

BOARD OF SUPERVISORS OF LOUISIANA STATE
UNIVERSITY AND AGRICULTURAL AND MECHANICAL
COLLEGE, ET AL

* * * * * * * * * * * * * * * * * * * * *

DAY 1 OF THE DEPOSITION OF

JENNIE STEWART

TAKEN AT PHELPS DUNBAR, 400 CONVENTION

STREET, BATON ROUGE, LOUISIANA 70801, ON

NOVEMBER 9, 2022, BEGINNING AT 9:03 A.M.

REPORTED BY:
    JENNIFER W. PICKETT
    CERTIFIED COURT REPORTER
    CERTIFICATE NUMBER 29011

```
 1          the messages go to the Title IX office.
 2          We wanted that to be front, center and
 3          clear and it wasn't.  The message was not
 4          to the contrary, it was just not robust
 5          and clear.
 6     Q    When you provided that feedback, was your
 7          feedback implemented?
 8     A    Stephanie Rempe was at the university
 9          newly during the time.  And I think that
10          going through that piece she, Miriam and
11          I sat down and we went through all the
12          feedback that we received from the group
13          I'd assembled and they were very open to
14          hearing it, concerned about it and wanted
15          to move swiftly on it.
16     Q    Do you know -- (connection issues)
17     A    I'm sorry, I'll ask for a repeat, there
18          was an interruption.
19   (Connection discussion)
20     Q    Sure.  So, my question was, do you know
21          specifically if that training was updated
22          to make it clear that folks should be
23          reporting to the Title IX office?
24     A    It was my understanding that was what was
25          going to happen.  Some time in 2020 I was
```

1   contacted by Dan Beebe who was actually
2   going to be doing the presentation.  He
3   called me by phone and said hey, we're
4   going to do presenting tomorrow.  I said
5   I wasn't aware you were coming to
6   present.  He said hey, let me send you
7   the slides.  You can take a look.  Let me
8   know any feedback.  And I said Dan, I've
9   had this discussion that reports were not
10  to go to Miriam.  Reports were to come to
11  Title IX.  I said I have a concern about
12  that and he said okay, well let me get
13  with them.  He said I agree with you.  I
14  said okay, perfect.  Miriam and I,
15  Stephanie Rempe and Winston Decuir had
16  met about this issue in October of 2020.
17  And I again said reports need to come
18  directly and the response and feeling was
19  that coaches aren't going to do that.
20  And so, I responded that if we can ask
21  Nobel Prize winners to do it, we in the
22  same token could ask coaches to do it.
23  That seemed reasonable.  So, I said my
24  position was not that we can't do it.  My
25  position is how can we do this.

1 Q What was the response?
2 A There was a proposal that -- and this was
3   not by Miriam. Miriam was designated.
4   She was filling a role that she was told
5   to do. This was not her leadership
6   design in this. The proposal was that we
7   consider athletics the same as we would
8   other campuses and just designate a
9   campus coordinator for them.
10 Q Okay. And so, did that come to pass?
11 A No.
12 Q Why not?
13 A I pushed back on that a great deal saying
14   that if all departments are part of this
15   campus, they needed to be treated
16   similarly, there needed to be no
17   difference either perceived or actual,
18   that athletics was not part of our
19   student community or part of our
20   employment community, that they should be
21   treated similarly, that they have to
22   report directly and there was still --
23 Q Go ahead, I'm sorry.
24 A -- Still disagreement on that piece,
25   which I was holding fast to -- reporting

```
 1          directly is the way to report.
 2  Q   Who was disagreeing with you?
 3  A   Winston Decuir disagreed with me.  It was
 4          his proposal to let athletics stand as a
 5          separate effectively institution for
 6          campus coordinator and that no reports --
 7          it was unreasonable to expect that
 8          everybody was going to report directly,
 9          that those should still go to Miriam.
10  Q   So, was there any resolution after this
11          meeting in October of 2020?
12  A   No.  No there wasn't.  There was still
13          disagreement.  I was still holding to the
14          position it'd come directly.
15  Q   So, as far as you know, during the time
16          that you were the Title IX coordinator no
17          directive was ever provided to athletics
18          to tell them to report directly to your
19          office?
20  A   I'll say this.  There were directives.
21          Tom Skinner, I and then-president
22          Alexander went to the president's
23          cabinet, which included then-sitting AD,
24          Joe Alleva and the directive was -- I
25          believe this may have been early in my
```

tenure. I can't speak specifically the year. It was sometime between my starting and COVID when Tom was still here. There were some concerns about reports not coming, that they should be reported elsewhere, up the food chain and Tom and then-president Alexander sent directly deans and vice-presidents, let me be clear. Every one of you is responsible for ensuring that your people know where to report. That reporting place is to the Title IX coordinator, no bones about it. It does not go up to someone else for review. If someone needs help in doing a report perhaps for their first time, assist them in doing their role by helping them report directly; is that clear? The answer was yes. Yes, that is clear.

Q And you said Joe Alleva was in that meeting; correct?

A Yes, he was. And then --

Q Go ahead. I'm sorry.

A I later learned that sometime in 2020 that shortly afterward there was an email

```
 1              circulated contrary to that, that
 2              indicated reporting to Miriam.
 3       Q      Got it.  And that email was circulated by
 4              Joe Alleva; correct?
 5       A      Had his name on it when I read it, yes.
 6       Q      So, when you first -- I'm trying to get
 7              the timeline down.  I'm going back to the
 8              Beebe Group, the training that was
 9              provided by them.  When did you first
10              raise concerns after -- so let me just
11              clarify, let me try and summarize here.
12              So, you first reviewed the Beebe training
13              sometime in 2016 or 2017; is that right?
14       A      2016, yes.
15       Q      At that time you provided feedback that
16              it needed to be more clear that reporting
17              needed to come directly to your office;
18              is that correct?
19       A      Correct.
20       Q      And it was your understanding or at least
21              you didn't have any reason to think
22              otherwise that that occurred; is that
23              correct?
24       A      I'm sorry, to be clear that what didn't
25              occur?
```

```
 1            to the best of our knowledge we
 2            identified that they had not received
 3            that information.  So, I would disagree
 4            with that piece.  Did we investigate it?
 5            No, but it was in the course of
 6            investigation determining did we need a
 7            piece for them and that answer was no.
 8            No indication that anyone at the
 9            university formally investigated Lewis'
10            complaints regarding the working
11            environment and is this in relation to
12            the Les Miles period?
13      Q     That was part of it and then throughout
14            her complaint she also was alleging that
15            there was retaliation against her because
16            what she stated was that she was
17            regularly bringing up Title IX concerns
18            and that folks in athletics, in
19            particular Miriam Segar and Verge
20            Ausberry, were essentially had tagged her
21            as like the Title IX complainer and that
22            she was missing out on opportunities and
23            things like that as a result of being
24            seen that way.  Did your office ever
25            investigate anything along those lines,
```

```
1        any retaliation against her for raising
2        Title IX concerns?
3   A    So, in the course of what we received, I
4        was not aware of the Les Miles issue as
5        it preceded my time.  So, when that was
6        the case, did we proceed to see if all of
7        the items that were being alleged had
8        previously been addressed through that
9        process?  We requested that through
10       general counsel and the answer there was
11       yes, that all of those had been
12       addressed.  So yes, there was a request
13       to see if those items had been addressed
14       and that answer there was yes.  So, it
15       wasn't a dropping the ball or failure to
16       proceed so our understanding was those
17       pieces had already been pursued.
18  Q    Did the Husch Blackwell folks ever ask
19       you these questions that I'm asking you
20       right now about all this?
21  A    They didn't ask me about Les Miles
22       because they were aware of the timing
23       that I started and that that preceded me.
24       I think those conversations were probably
25       with general counsel because that's
```