1              UNITED STATES DISTRICT COURT

2              MIDDLE DISTRICT OF LOUISIANA

3

SHARON LEWIS                    : CIVIL ACTION

4

VERSUS                          : NO. 21-198-SM-RLB

5

BOARD OF SUPERVISORS            : DECEMBER 11, 2023

6  OF LOUISIANA STATE
   UNIVERSITY AND AGRICULTURAL

7  AND MECHANICAL COLLEGE

8  =======================================================

9                  EXCERPTS OF TRIAL BY JURY:
                DEFENDANT'S OPENING STATEMENT

10     AND PLAINTIFF'S EXAMINATION OF JENNIFER STEWART
                BEFORE THE HONORABLE SUSIE MORGAN

11               UNITED STATES DISTRICT JUDGE
                          DAY 1

12
                  A P P E A R A N C E S

13

14  FOR THE PLAINTIFF:

15      LARRY ENGLISH, ATTORNEY AT LAW
        BY: LARRY ENGLISH, ESQUIRE

16      423 W. 127TH STREET, 7TH FLOOR
        NEW YORK, NEW YORK 10027

17

        ALBERT VAN-LARE, ESQUIRE

18      125 MAIDEN LANE, SUITE 510
        NEW YORK, NEW YORK 10038

19

20  FOR THE DEFENDANT:

21      PHELPS DUNBAR LLP
        BY: SUSAN W. FURR, ESQUIRE

22      BY: SHELTON DENNIS BLUNT ESQUIRE
        BY: GREGORY T. STEVENS, ESQUIRE

23      BY: MICHAEL B. VICTORIAN, ESQUIRE
        BY: MOLLY MCDIARMID, ESQUIRE

24      II CITY PLAZA
        400 CONVENTION STREET, SUITE 1100

25      BATON ROUGE, LOUISIANA 70802

1          REPORTED BY:   NATALIE W. BREAUX, RPR, CRR
                    UNITED STATES COURTHOUSE
2                       777 FLORIDA STREET
                  BATON ROUGE, LOUISIANA 70801
3                        (225) 389-3565
              NATALIE_BREAUX@LAMD.USCOURTS.GOV
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **(BEGINNING OF EXCERPT)** |
| 2 | **MR. VICTORIAN:**  MAY IT PLEASE THE COURT. |
| 3 | MEMBERS OF THE JURY, MY NAME IS MICHAEL |
| 4 | VICTORIAN.  MY COLLEAGUES AND I REPRESENT THE BOARD |
| 5 | OF SUPERVISORS. |
| 6 | WE'RE GOING TO INTRODUCE YOU TO |
| 7 | EVIDENCE AND PRESENT YOU WITH WITNESSES.  I CAN TELL |
| 8 | YOU NOW THAT THE FACTS MY COLLEAGUES AND I PRESENT TO |
| 9 | YOU ARE NOT GOING TO BE AS DRAMATIC AS THE STORY THAT |
| 10 | MR. ENGLISH JUST TOLD YOU.  OUR CLIENT'S STORY IS |
| 11 | MUCH SIMPLER AND WE DON'T HAVE TO WORK AS HARD TO |
| 12 | SELL IT TO YOU. |
| 13 | THE STORY THAT YOU JUST HEARD SOUNDS LIKE |
| 14 | IT'S BEEN MADE FOR TV.  IN A LOT OF WAYS IT HAS. |
| 15 | SHARON LEWIS AND HER ATTORNEYS AND HER PUBLICIST |
| 16 | PITCHED HER STORY IN THE MEDIA FIRST AND NOW SHE'S |
| 17 | TRYING TO SELL IT TO YOU.  THEIR PROBLEM IS THAT THE |
| 18 | TRUTH KEEPS GETTING IN THE WAY.  SO THEY MASSAGE SOME |
| 19 | OF THE FACTS, PLAY DOWN SOME OF THE FACTS, AND |
| 20 | OUTRIGHT OMIT OTHER FACTS.  BUT WHATEVER THE FACTS, |
| 21 | THEY NEVER LET THE TRUTH GET IN THE WAY OF A GOOD |
| 22 | STORY. |
| 23 | NOW, I DON'T ALL THE WAY KNOW IF SHARON |
| 24 | LEWIS IS TRYING TO FOOL YOU OR IF SHE'S ALREADY |
| 25 | FOOLED HERSELF.  BUT THIS LAWSUIT IS A HUSTLE. |

1   THAT'S WHY IT'S SO IMPORTANT FOR YOU TO LISTEN

2   CAREFULLY TO WHAT THE WITNESSES IN THIS CASE SAY, NOT

3   WHAT MR. VAN-LARE SAYS, NOT WHAT MR. ENGLISH SAYS.

4   THE WITNESSES AND THE EVIDENCE WILL TELL THE REAL

5   STORY.

6           LET ME GIVE YOU AN EXAMPLE.  ANYTHING

7   ABOUT TESTIMONY FROM LSU AND THE LEGISLATURE, THE

8   VIDEOS YOU JUST SAW, EVERYTHING ABOUT LSU'S OTHER

9   ATTORNEYS, A REPORT ABOUT LES MILES BEING STORED IN

10  SOME LAW OFFICE, THE HUSCH BLACKWELL REPORT,

11  INDIVIDUAL BOARD MEMBERS, YOU WILL LEARN THAT NONE OF

12  THAT HAS ANYTHING TO DO WITH SHARON LEWIS' CLAIMS IN

13  THIS LAWSUIT.

14          THIS LAWSUIT IS ABOUT SHARON LEWIS'

15  EMPLOYMENT.  SHE ALLEGES SHE WAS DISCRIMINATED

16  AGAINST WHEN SHE RECEIVED A PROMOTION IN AUGUST 2020.

17  SHE ALLEGES VERGE AUSBERRY, WHO SUPPORTED HER FOR

18  YEARS, SUBJECTED HER TO A HOSTILE WORK ENVIRONMENT.

19  AND SHE ALLEGES SHE WAS TERMINATED TO MAKE WAY FOR

20  FRANK WILSON AND OUT OF RETALIATION.  YOU WILL HEAR

21  FROM WITNESSES, AND WE WILL INTRODUCE EVIDENCE, THAT

22  MAKE CLEAR THOSE ALLEGATIONS ARE FALSE.

23          THE TRUTH IS:  SHARON LEWIS WAS AN

24  EMPLOYEE IN THE LSU FOOTBALL PROGRAM WHO LOST HER JOB

25  WHEN A NEW COACH CAME IN.  SHE WAS NEVER SUBJECTED TO

1    ANY FORM OF DISCRIMINATION OR HARASSMENT OR

2    RETALIATION.  BUT YOU HAVE TO MAKE SURE THAT YOU

3    DON'T GET LOST IN THEIR STORY.  YOU HAVE TO MAKE SURE

4    THAT YOU LISTEN FOR THE TRUTH.

5           LET ME SHARE SOMETHING WITH YOU.  THIS

6    IS A TIMELINE THAT INCLUDES SOME OF THE ALLEGATIONS

7    SHARON LEWIS MAKES IN THIS LAWSUIT.  MR. ENGLISH JUST

8    SPENT A LOT OF TIME TALKING ABOUT LES MILES.  WELL,

9    THE ALLEGATIONS AGAINST FRANK WILSON AND THE

10   ALLEGATIONS AGAINST LES MILES, ALL THAT OCCURRED IN

11   2013.  FRANK WILSON LEFT LSU IN 2016 AND LSU FIRED

12   LES MILES DURING THE SAME YEAR.  THOSE ALLEGATIONS

13   HAVE NO IMPACT ON THE OUTCOME OF THIS CASE.  EVEN IF

14   THEY WERE TRUE, THEY'RE TOO OLD TO MATTER FOR THIS

15   LAWSUIT.

16          IN THE YEARS THAT FOLLOWED LES MILES'

17   AND FRANK WILSON'S DEPARTURE FROM LSU, THE EVIDENCE

18   WILL SHOW THAT SHARON LEWIS CANNOT POINT TO A SINGLE

19   INCIDENT IN WHICH SHE WAS DENIED ANY PAY OR A

20   PROMOTION OR RECEIVED A NEGATIVE PERFORMANCE

21   EVALUATION.  IN MARCH 2021 LSU RELEASED THE HUSCH

22   BLACKWELL REPORT.  IT WAS AN INTERNAL ASSESSMENT OF

23   HOW LSU HANDLED TITLE IX ISSUES IN THE PAST.  SO THAT

24   YOU KNOW, TITLE IX PRIMARILY PROTECTS STUDENTS FROM

25   GENDER-BASED DISCRIMINATION.  THE HUSCH BLACKWELL

1   REPORT WAS ABOUT WHAT LSU NEEDED TO DO TO PROTECT

2   STUDENTS.  IT WASN'T ABOUT SHARON LEWIS.  BUT SHARON

3   LEWIS MADE SURE SHE WAS FIRST IN LINE TO FILE A

4   LAWSUIT TO CAPITALIZE ON ITS RELEASE.

5           IN ADDITION TO RAISING CLAIMS UNDER

6   TITLE IX, SHARON LEWIS ALSO ALLEGES CLAIMS UNDER

7   TITLE VII.  TITLE VII IS RELATED TO DISCRIMINATION IN

8   EMPLOYEES.  BOTH OF THOSE STATUTES HAVE WHAT ARE

9   CALLED STATUTES OF LIMITATIONS; BASICALLY PERIODS OF

10  TIME IN WHICH A PERSON HAS TO BRING THEIR CLAIMS IN

11  ORDER TO RECOVER.  FOR TITLE IX THAT PERIOD IN THIS

12  LAWSUIT BEGINS IN APRIL OF 2020.  FOR TITLE VII THAT

13  PERIOD BEGINS IN JUNE 2020.  THE JUDGE WILL INSTRUCT

14  YOU ON THE PARTICULARS OF THE LAW LATER ON.  BUT

15  SUFFICE IT TO SAY, MOST OF THE ALLEGATIONS SHARON

16  LEWIS WANTS TO MAKE IN THE LAWSUIT, INCLUDING THOSE

17  AGAINST LES MILES AND FRANK WILSON, ARE OUTSIDE OF

18  THAT TIME PERIOD.

19          SO, SHARON LEWIS HAD TO COME UP WITH

20  SOME KIND OF ALLEGATIONS TO FIT WITHIN THE WINDOW OF

21  TIME AFTER APRIL 2020.  SO SHE SAYS ONE TIME THAT

22  VERGE AUSBERRY CALLED HER AN ANGRY BLACK WOMAN.  SHE

23  SAYS THAT A PROMOTION SHE RECEIVED IN AUGUST 2020 IS

24  ACTUALLY A CASE OF DISCRIMINATION.  AND NOW SHE

25  CLAIMS THAT FRANK -- THAT THERE WAS AN ORCHESTRATED

1  PLAN TO GET RID OF HER TO MAKE WAY FOR FRANK WILSON.

2  NONE OF THOSE ALLEGATIONS ARE SUPPORTED BY THE FACTS

3  IN THIS CASE.  BUT THAT'S THE HUSTLE.  RIGHT?  THAT'S

4  HOW THEY SELL YOU A GOOD STORY.  NEVER MIND THE

5  TRUTH.

6          I WANT YOU TO UNDERSTAND WHERE SHARON

7  LEWIS FIT IN LSU'S ATHLETIC DEPARTMENT AND THE

8  FOOTBALL PROGRAM.  YOU JUST HEARD ABOUT HER BEING ONE

9  OF THE LARGEST ADMINISTRATORS IN THE COUNTRY.  WELL,

10 THE TRUTH IS THAT SHARON LEWIS WAS A MID-LEVEL

11 ADMINISTRATOR.  SHE SCHEDULED ON-CAMPUS VISITS FOR

12 FOOTBALL RECRUITS AND MET WITH PARENTS WHEN THEY CAME

13 TO VISIT; SHE MANAGED STUDENT WORKERS.  I'M NOT GOING

14 TO LIE; SHE WAS AN IMPORTANT PART OF THE RECRUITING

15 TEAM.  BUT ANY NOTION THAT SHE WAS RESPONSIBLE FOR

16 LSU'S FOOTBALL SUCCESS IS IRRATIONAL.

17         SHARON LEWIS WAS NOT A TALENT

18 EVALUATOR.  SHARON LEWIS WAS NOT A SCOUT.  SHE DIDN'T

19 HAVE ANY FOOTBALL-RELATED EXPERTISE.  DESPITE BEING A

20 MID-LEVEL ADMINISTRATOR IN THE FOOTBALL PROGRAM,

21 WHICH IS -- AGAIN, IS PART OF THE LARGER ATHLETIC

22 DEPARTMENT -- SHARON LEWIS WOULD LIKE YOU TO BELIEVE

23 THAT EVERYONE FROM THE PRESIDENT OF LSU, THE LSU

24 ATHLETIC DIRECTOR ON DOWN, PLUS THE ENTIRE BOARD OF

25 SUPERVISORS, THEY ALL ORCHESTRATED A CAMPAIGN OF

1    RETALIATION AGAINST HER.  LADIES AND GENTLEMEN, THE

2    EVIDENCE WILL SHOW THAT'S JUST NOT THE CASE.

3            LET ME TELL YOU ABOUT A FEW OF THE

4    PEOPLE THAT YOU'LL BE HEARING FROM IN THIS TRIAL.

5    VERGE AUSBERRY.  VERGE AUSBERRY IS THE EXECUTIVE

6    DEPUTY DIRECTOR FOR ATHLETICS AT LSU.  IT'S ABOUT AS

7    SENIOR LEVEL OF A POSITION AS EXISTS IN THE ATHLETIC

8    DEPARTMENT.  MR. AUSBERRY WILL TELL YOU THAT HE'S

9    KNOWN SHARON LEWIS FOREVER.  THEY WERE STUDENT

10   ATHLETES TOGETHER AT LSU IN THE LATE '80s AND EARLY

11   '90s.  SHARON LEWIS RAN TRACK AND VERGE AUSBERRY

12   PLAYED FOOTBALL.  AS A MATTER OF FACT, IT WAS VERGE

13   AUSBERRY WHO RECOMMENDED SHARON LEWIS BE HIRED IN THE

14   ATHLETIC DEPARTMENT IN 2021 -- IN 2001.  HE WAS, IN

15   LARGE MEASURE, THE REASONS THAT SHE RECEIVED THE

16   RAISES THAT SHE DID.

17           THE TWO OF THEM WERE FRIENDS.  VERGE

18   AUSBERRY WANTED TO HELP SHARON LEWIS' CAREER.  VERGE

19   AUSBERRY WILL TESTIFY, AND YOU WILL SEE TEXT

20   MESSAGES, THAT SHOW THEY CONFIDED IN EACH OTHER.

21   THEY TALKED ABOUT WORK, THEY TALKED ABOUT LIFE, THEY

22   TALKED ABOUT KIDS.  WHEN SHARON LEWIS WANTED

23   SOMETHING, SHE WENT TO VERGE AUSBERRY.  WHEN SHARON

24   LEWIS HAD A PROBLEM, SHE WENT TO VERGE AUSBERRY.

25           NOW, DESPITE THOSE DECADES OF

1   FRIENDSHIP, SHARON LEWIS WANTS YOU TO BELIEVE THAT

2   VERGE AUSBERRY DISCRIMINATED AGAINST HER.  SHE SAYS

3   THAT VERGE AUSBERRY PREVENTED HER FROM GETTING A PAY

4   RAISE THAT SHE WAS DUE.  AND SHE SAYS THAT VERGE

5   AUSBERRY DID ALL OF THAT BECAUSE SHARON LEWIS IS A

6   BLACK WOMAN.

7            WELL, LADIES AND GENTLEMEN, WHEN YOU

8   HEAR FROM VERGE AUSBERRY, YOU'LL UNDERSTAND THAT IS A

9   RIDICULOUS ALLEGATION.  VERGE AUSBERRY IS MARRIED TO

10  A STRONG BLACK WOMAN.  VERGE AUSBERRY'S PARENTS WERE

11  ACTIVE IN THE CIVIL RIGHTS MOVEMENT.  THE ALLEGATION

12  THAT VERGE AUSBERRY DISCRIMINATED AGAINST SHARON

13  LEWIS BECAUSE SHE IS BLACK OR A WOMAN IS RIDICULOUS.

14            NOW, I'M NOT TELLING YOU THAT VERGE

15  AUSBERRY AND SHARON LEWIS ALWAYS GOT ALONG.  THEY DID

16  NOT.  THERE MAY BE TESTIMONY THAT VERGE AUSBERRY AND

17  SHARON LEWIS ARGUED.  SOME PEOPLE MIGHT SAY THEY

18  YELLED AT EACH OTHER.  LADIES AND GENTLEMEN, FOOTBALL

19  PROGRAMS COMPETE AGAINST EACH OTHER FOR THE MOST

20  TALENTED FOOTBALL PLAYERS IN THE COUNTRY.  THIS IS A

21  HIGH-INTENSITY, HIGH-STRESS ENVIRONMENT.  AND NO

22  MATTER WHAT SHARON LEWIS OR HER LEGAL TEAM MAY

23  CONVEY, IT'S ESSENTIAL FOR YOU TO RECOGNIZE THAT SHE

24  WAS FAR FROM TIMID, FAR FROM PASSIVE.  WITNESSES WILL

25  TELL YOU THAT SHARON LEWIS WAS ALWAYS FOR SHARON

1    LEWIS.  SHE NEVER SHIED AWAY FROM CONFRONTATION.

2    EVEN WHEN FACED WITH THE MOST MINOR OF PERCEIVED

3    SLIGHTS, THAT'S WHO SHARON LEWIS IS, NOT A SHRINKING

4    VIOLET.

5                 MIRIAM SEGAR WORKS IN THE ATHLETIC

6    DEPARTMENT ALONGSIDE VERGE AUSBERRY.  SHE KNOWS

7    SHARON LEWIS AS WELL.  SHE'LL TELL YOU THAT SHARON

8    LEWIS WAS A CHRONIC COMPLAINER.  BUT THOSE COMPLAINTS

9    WEREN'T ABOUT STUDENTS OR ABOUT DISCRIMINATION.

10   SHARON LEWIS' COMPLAINTS WERE ABOUT WHAT SHARON LEWIS

11   FELT LIKE SHARON LEWIS WAS NOT GETTING.  MIRIAM SEGAR

12   IS ALSO GOING TO DISPEL ANY MYTHS THAT SHARON LEWIS

13   HAD CONCOCTED AROUND HER PROMOTION SOMEHOW BEING AN

14   ACT OF DISCRIMINATION.  SHARON'S PROMOTION IN AUGUST

15   OF 2020, WHICH YOU SAW ON THAT TIMELINE AND WHICH

16   I'LL BRING BACK UP SHORTLY, WAS JUST WHAT IT SOUNDS

17   LIKE:  IT WAS A TITLE PROMOTION, A TITLE PROMOTION

18   THAT SHE REQUESTED.

19                 SO NOW SHARON LEWIS IS COMPLAINING THAT

20   THE PROMOTION DID NOT COME WITH ENOUGH MONEY.  BUT

21   THE FACTS ARE THAT SHARON RECEIVED A PAY RAISE A FEW

22   MONTHS BEFORE THE PROMOTION IN APRIL.  THE PROMOTION

23   WAS IN AUGUST.  SHE GOT A PAY RAISE IN APRIL.  SO

24   THERE WAS NO JUSTIFICATION FOR GIVING HER ANOTHER PAY

25   RAISE.  MIRIAM SEGAR WILL ALSO TELL YOU SHE NEVER

1  RECEIVED ANY COMPLAINTS FROM SHARON LEWIS OR ANYONE

2  ELSE ABOUT FRANK WILSON.

3           YOU'LL HEAR FROM COACH BRIAN KELLY.

4  COACH KELLY WAS HIRED TO REBUILD LSU FOOTBALL.

5  RESTRUCTURING THE RECRUITING PROGRAM, OF WHICH SHARON

6  LEWIS WAS EMPLOYED, WAS PART OF A SYSTEM REBUILD.

7  KELLY WILL EXPLAIN WHY HE MADE THE DECISIONS THAT HE

8  DID, NONE OF WHICH HAVE ANYTHING TO DO WITH SHARON

9  LEWIS.  COACH KELLY DIDN'T EVEN KNOW SHARON LEWIS.

10           THE EVIDENCE WILL SHOW THAT SHARON

11  LEWIS WAS NOT LAID OFF BECAUSE OF DISCRIMINATION OR

12  RETALIATION.  WHEN COACH KELLY WAS BROUGHT IN, HE WAS

13  ALLOWED FREE REIN TO DESIGN LSU FOOTBALL AS AN

14  IMPROVED SYSTEM.  AS PART OF THAT REDESIGN, THERE

15  WERE LAYOFFS IN THE FOOTBALL DEPARTMENT, INCLUDING

16  SHARON LEWIS AND ALMOST 40 OTHER EMPLOYEES.  LONG-

17  TIME EMPLOYEES LIKE STRENGTH AND CONDITIONING COACH

18  TOMMY MOFFITT, OTHER WOMEN FROM THE DEPARTMENT LIKE

19  OLIVIA OHLSEN, TAM DAVIS, KEAVA SOIL-CORMIER, EVEN

20  FORMER PLAYERS LIKE COREY RAYMOND, EMPLOYEES WHO WERE

21  BLACK AND WHITE, MALE AND FEMALE, THEY WERE ALL LET

22  GO.

23           SEE, FOR BETTER OR WORSE, LSU ATHLETICS

24  AND LSU FOOTBALL IS A BUSINESS.  THE DECISION TO LET

25  GO -- LET SHARON LEWIS GO AND 40 OR SO OTHER MEMBERS

1   OF THE FOOTBALL DEPARTMENT WAS A BUSINESS DECISION BY

2   A NEW COACH FOCUSED ON RETURNING LSU TO SUCCESS.

3   PART OF THE FORMULA OF SUCCESS, ESPECIALLY AT THE LSU

4   LEVEL, IS THAT WHEN NEW COACHES COME IN, THEY BRING

5   THEIR PEOPLE WITH THEM.  COACH KELLY DID THE SAME

6   THING.  IT IS THE BUSINESS OF COLLEGE ATHLETICS AT

7   THE HIGHEST LEVEL.  AND NOTHING ABOUT SHARON LEWIS'

8   TERMINATION WAS ANY MORE SIGNIFICANT THAN THAT OF THE

9   OTHER 40 OR SO PEOPLE WHO LOST THEIR JOBS.  BUT THE

10  ONLY PERSON WHO FILED A LAWSUIT WAS SHARON LEWIS.

11          **THE COURT:**  MR. VICTORIAN, YOU'RE PAST YOUR

12  TIME.  ARE YOU CLOSE TO THE END?

13          **MR. VICTORIAN:**  YES, MA'AM, I'LL WRAP UP

14  NOW.

15          **THE COURT:**  YOU HAD 20 MINUTES.  WHAT

16  TIME -- I APOLOGIZE.  YOU'VE GOT FIVE MINUTES.

17          **MR. VICTORIAN:**  OKAY.  I WILL GO QUICKLY.

18          YOU'RE ALSO GOING TO GET A CHANCE TO

19  HEAR DIRECTLY FROM FRANK WILSON.  FRANK WILSON AND

20  SHARON LEWIS WORKED TOGETHER FROM 2009 TO 2015.  I

21  WANT TO TELL YOU SOMETHING ABOUT THE TIMING OF

22  WHAT -- THE COMPLAINTS THAT SHE'S MAKING AGAINST

23  FRANK WILSON.

24          WHEN SHARON LEWIS INITIALLY FILED HER

25  LAWSUIT, SHE CONTACTED FRANK WILSON AND ASKED HIM TO

1   TESTIFY AGAINST LES MILES.  HE SAID NO.  SHORTLY

2   THEREAFTER SHE ALLEGED FOR THE FIRST TIME -- SEVEN

3   YEARS AFTER IT ALLEGEDLY HAPPENED -- THAT FRANK

4   WILSON EXPOSED HIMSELF TO HER.  SHE DIDN'T DO THAT IN

5   ANY OF THE PREVIOUS OPPORTUNITIES THAT SHE HAD,

6   WHETHER IT WAS IN 2018 WHEN SHE WAS TALKING TO TITLE

7   IX INVESTIGATORS, WHETHER IT WAS TO HUSCH BLACKWELL

8   OR WHETHER IT WAS WITHIN THIS LAWSUIT THAT SHE FILED.

9   SHE HAD TO AMEND THE LAWSUIT TWICE IN ORDER TO GET IT

10  IN.  THE FIRST TIME IT WAS REVEALED WAS ON THE JIM

11  ENGSTER RADIO SHOW IN 2022.

12          LES MILES.  LES MILES DOES NOT MATTER.

13  THOSE CLAIMS ARE OLD, THEY'RE STALE, AND THEY DON'T

14  MATTER ON THE OUTCOME OF THIS CASE.  SO WHAT IS THIS

15  CASE REALLY ABOUT?  THIS CASE IS ABOUT WHETHER SHARON

16  LEWIS WAS SUBJECTED TO A HOSTILE WORK ENVIRONMENT.

17  IT'S ABOUT WHETHER SHE WAS DISCRIMINATED AGAINST OR

18  RETALIATED AGAINST.  THE ANSWER TO THOSE QUESTIONS IS

19  NO.

20          BUT WHAT DID HAPPEN TO SHARON LEWIS

21  WHILE SHE WAS AT LSU WAS THAT SHE HAD SUCCESS, A LOT

22  OF SUCCESS.  IN 2001 LSU HIRED HER AS A RECRUITING

23  COORDINATOR.  IN 2007 SHE WAS PROMOTED AS ASSISTANT

24  ATHLETIC DIRECTOR -- EXCUSE ME -- FOR RECRUITING AND

25  OPERATIONS AND ALUMNI RELATIONS.  IN AUGUST OF 2020

1  LSU PROMOTED HER AGAIN TO ASSOCIATE ATHLETIC

2  DIRECTOR.  THE EVIDENCE WILL SHOW IN VIRTUALLY EVERY

3  YEAR THAT LSU EMPLOYED SHARON LEWIS, SHE RECEIVED A

4  PAY RAISE.  IN NOVEMBER 2012, PAY RAISE; AUGUST 2013,

5  PAY RAISE; JULY 2014, PAY RAISE; NOVEMBER 2015, PAY

6  RAISE; JANUARY 2016, PAY RAISE; SEPTEMBER 2017, PAY

7  RAISE; SEPTEMBER 2018, PAY RAISE; APRIL 2020, PAY

8  RAISE.  BY THE TIME SHARON LEWIS GOT HER FINAL PAY

9  RAISE AT LSU, SHE WAS MAKING $125,000 A YEAR.

10            THE GLITTER AND GLAM IS OVER FOR SHARON

11  LEWIS NOW.  HER TIME IN ONE OF THE MOST PRESTIGIOUS

12  ATHLETIC DEPARTMENTS IN THE COUNTRY IS OVER.  ON

13  SOCIAL MEDIA SHARON LEWIS REFERS TO HERSELF AS THE

14  LSU BOSS LADY.  BEING CLOSE TO LSU ATHLETICS WAS A

15  HUGE PART OF HER IDENTITY.  BEING LAID OFF WHEN COACH

16  KELLY RESTRUCTURED THE FOOTBALL PROGRAM AND SHE LOST

17  ALL OF THAT, WELL, ALMOST 40 OTHER PEOPLE LOST THAT,

18  TOO.  THE DIFFERENCE IS:  SHARON LEWIS WANTS YOU TO

19  MAKE LSU PAY FOR THAT LOSS.  SHE AND HER ATTORNEYS

20  AND HER PUBLICIST HAVE BEEN WORKING FOR YEARS TO

21  DEVELOP A STORY THAT WOULD HIT FOR JUST THAT PURPOSE.

22  THEY'VE BEEN TALKING TO THE MEDIA AND ANYONE ELSE

23  THAT WILL LISTEN TO IT FOR TWO YEARS.

24            BUT A COURT OF LAW ISN'T LIKE TALKING

25  TO THE MEDIA.  IN A COURT OF LAW, A STORY HAS TO

1  STAND UP TO SCRUTINY.  IT HAS TO BE TESTED AND PROVEN

2  BY FACTS.  THE EVIDENCE WILL SHOW THAT SHARON LEWIS'

3  STORY DOES NOT MEET THAT BURDEN.  THE EVIDENCE WILL

4  SHOW THAT SHARON LEWIS' STORY IS BUILT ON BLIND

5  ALLEGATIONS FOR WHICH SHE EXPECTS TO RECOVER

6  MILLIONS.  THAT'S NOT JUST A GOOD STORY.  THAT'S A

7  HUSTLE.

8           THANK YOU FOR YOUR TIME.

9             * * * * * * * * *

10      **MR. ENGLISH:**  YOUR HONOR, PLAINTIFFS CALL

11 MS. JENNIE STEWART.

12        **(WHEREUPON, JENNIFER STEWART, BEING DULY**

13 **SWORN, TESTIFIED AS FOLLOWS.)**

14        **THE COURTROOM DEPUTY:**  PLEASE HAVE A SEAT.

15 AND STATE AND SPELL YOUR NAME FOR THE RECORD, PLEASE.

16        **THE WITNESS:**  MY NAME IS JENNIFER STEWART.

17 J-E-N-N-I-F-E-R, LAST NAME STEWART, S-T-E-W-A-R-T.

18      **MR. ENGLISH:**  MAY I BEGIN, YOUR HONOR?

19      **THE COURT:**  YES.

20              **DIRECT EXAMINATION**

21 BY MR. ENGLISH:

22   **Q**   GOOD MORNING, MS. STEWART.

23   **A**   GOOD AFTERNOON.

24   **Q**   MY NAME IS LARRY ENGLISH AND I REPRESENT THE

25 PLAINTIFF, SHARON LEWIS.

1          DO YOU KNOW MS. LEWIS?

2     **A**    ONLY BY ONE CASE IN OFFICE, NOT OTHERWISE.

3     **Q**    SO I'D LIKE TO TALK WITH YOU FIRST ABOUT

4  YOUR EDUCATION.  CAN YOU TELL THE JURY:  WHERE DID

5  YOU GO TO UNDERGRADUATE AT?

6     **A**    AT THE UNIVERSITY OF MISSISSIPPI IN OXFORD,

7  MISSISSIPPI.

8     **Q**    AND WHAT DID YOU STUDY?

9     **A**    SOCIAL WORK.

10    **Q**    AND DID YOU DO ANY OTHER -- DO YOU HAVE ANY

11 OTHER DEGREES?

12    **A**    I DO.  I HAVE A MASTER'S IN HIGHER EDUCATION

13 STUDENT PERSONNEL, ALSO FROM THE UNIVERSITY OF

14 MISSISSIPPI.

15    **Q**    DO YOU HAVE ANY OTHER DEGREES?

16    **A**    I DO.  I ALSO HAVE A THIRD.  J.D. FROM OHIO

17 NORTHERN UNIVERSITY.

18    **Q**    AND AFTER YOU -- WHEN DID YOU GRADUATE FROM

19 HIGH SCHOOL?  I MEAN -- HIGH SCHOOL.  WHEN DID YOU

20 GRADUATE FROM LAW SCHOOL?  I APOLOGIZE.

21    **A**    IN 2008.

22    **Q**    AND WHAT DID YOU DO AFTER YOU WERE -- AFTER

23 YOU GRADUATED FROM LAW SCHOOL?

24    **A**    I CONDUCTED A JOB SEARCH, AND MY JOB LANDED

25 ME IN THE OFFICE OF THE DEAN OF STUDENTS,

1  SPECIFICALLY THE OFFICE OF STUDENT ADVOCACY AND

2  ACCOUNTABILITY.  AND MY WORK THERE, I WAS CONSIDERED

3  THE CARE MANAGER, THEN LATER THE ASSISTANT DEAN OF

4  STUDENTS.  AND MY WORK FOCUSED ON WORKING WITH

5  STUDENTS IN CRISIS DISTRESS AND OF CONCERN.

6      Q    AND WAS THIS AT LSU?  WHERE WAS THIS AT?

7  WHERE WAS THE FIRST JOB AT?  I APOLOGIZE.

8      A    YES, THAT WAS AT LSU IN THE OFFICE OF THE

9  DEAN OF STUDENTS.

10     Q    AND THEN HOW LONG DID YOU STAY IN THAT

11 POSITION?

12     A    I WAS IN THAT POSITION FROM '09 TO 2016, SO

13 SEVEN YEARS.

14     Q    AND WHAT WAS YOUR NEXT POSITION AFTER THEN?

15     A    MY NEXT POSITION I WAS HIRED FOR WAS THE

16 TITLE IX COORDINATOR.

17     Q    AND YOU WERE HIRED IN 2016?

18     A    CORRECT.

19     Q    DID LSU HAVE A TITLE IX COORDINATOR BEFORE

20 2016?

21     A    THE PERSON NAMED PRIOR TO ME WAS NOT IN A

22 STAND-ALONE ROLE.  HIS NAME WAS JIM MARCHAND, AND --

23 BUT HE DID SERVE IN THE ROLE AS TITLE IX COORDINATOR.

24     Q    WAS THE OFFICIAL TITLE -- WAS HIS OFFICIAL

25 TITLE AS THAT OF TITLE IX COORDINATOR?

**1**     **A**   HE WAS THE DESIGNEE IDENTIFIED AS THE TITLE

**2** IX COORDINATOR.

**3**     **Q**   OKAY.  WE'LL COME BACK TO THAT.

**4**         CAN YOU TELL THE JURY YOUR TRAINING THAT YOU

**5** HAD IN TITLE IX BEFORE TAKING THAT POSITION.

**6**     **A**   SURE.  I HAD WORKED WITH STUDENTS IN CRISIS

**7** DISTRESS AND OF CONCERN BROADLY.  SO ALONG WITH THAT,

**8** OF COURSE, BEGAN WITH INDIVIDUALS WHO HAVE BEEN

**9** VICTIMIZED AT SOME POINT.  THAT COULD HAVE BEEN LONG

**10** AGO IN THEIR LIFETIME; THAT THEY WERE COMING TO TERMS

**11** WITH THE TRAUMA THAT THEY HAD ENCOUNTERED.  IT COULD

**12** HAVE BEEN MORE RECENT.  AND IT COULD HAVE BEEN NEARBY

**13** IN THE CAMPUS OR SOMEWHERE ELSE.

**14**         SO PEOPLE WHO HAD EXPERIENCED TRAUMA EITHER

**15** LONG AGO OR MORE RECENTLY, THAT WAS A PRETTY

**16** SIGNIFICANT COMPONENT OF CASELOAD.

**17**     **Q**   BUT DID YOU HAVE ANY SPECIFIC TRAINING

**18** BEFORE YOU TOOK THE JOB IN TITLE IX REGULATIONS AND

**19** LAW?

**20**     **A**   YES.

**21**     **Q**   COULD YOU TELL US --

**22**     **A**   OF COURSE.  SO ALONG WITH THAT WE HAVE TO

**23** KNOW NOT ONLY WHAT WE WOULD DO IN RESPONSE TO AN

**24** INDIVIDUAL BUT ALSO HOW WE WOULD HAVE TO REPORT.  SO

**25** FOR THE -- MY TIME SERVING IN THE OFFICE OF THE DEAN

1   OF STUDENTS, I WAS ALSO A RESPONSIBLE EMPLOYEE

2   REQUIRED TO REPORT ISSUES OF SEXUAL MISCONDUCT OR

3   ALSO OFFENSES INVOLVING MINORS.  SO WE DID THAT

4   TRAINING.

5         ALSO, IN ADDITION TO THAT THERE WERE

6   TRAININGS BY THE OFFICE OF CIVIL RIGHTS, DEPARTMENT

7   OF EDUCATION, THE ASSOCIATION OF STUDENT CONDUCT,

8   NASPA, ASCA AND THEN ALSO SOME BY NACUA.  AND THOSE

9   WERE PARTS -- NOT SO MUCH WEBCASTS AS THEY ARE NOW

10  BUT ALSO IN-PERSON TRAININGS AT NATIONAL CONFERENCES.

11    Q    HAD YOU HANDLED ANY ACTUAL REPORTS OF TITLE

12  IX VIOLATIONS BEFORE YOU TOOK THE JOB -- YOU WERE

13  PROMOTED TO THE JOB IN 2016?

14    A    I WAS INVOLVED IN TITLE IX CASES BEFORE

15  THAT, YES.

16    Q    COULD YOU EXPLAIN HOW WERE YOU INVOLVED IN

17  THOSE CASES?

18    A    SOMETIMES I WAS THE FIRST PERSON TO RECEIVE

19  A REPORT, SO I WAS THE FIRST PERSON IN THE

20  INSTITUTION TO RECEIVE SOMETHING THAT WOULD HAVE

21  FALLEN UNDER TITLE IX.  SOMETIMES I WAS NOT THE FIRST

22  PERSON, BUT I MIGHT HAVE BEEN REFERRED TO FROM MENTAL

23  HEALTH SERVICE OR IT COULD HAVE BEEN LIGHTHOUSE

24  PSYCHOLOGICAL SERVICES AT A POINT WHERE I'M PROVIDING

25  A SERVICE -- WHAT WE THEN CALLED INTERIM MEASURES,

1  NOW CALLED SUPPORTIVE MEASURES.  ALSO, NOT JUST

2  PROVIDING THAT BUT ALSO SHEPHERDING PEOPLE THROUGH A

3  FORMAL PROCESS, WHETHER THAT WAS IN AN INVESTIGATION

4  CRIMINALLY, WHETHER IT WAS AN INSTITUTIONAL ONE, AN

5  HR PROCESS, A STUDENT CONDUCT PROCESS, ANY TYPE OF

6  PROCESS THAT MIGHT HAVE EXISTED THAT THAT PERSON MAY

7  HAVE AVAILED THEMSELVES OF.

8      Q    LET'S TAKE A STEP BACK.  IS TITLE IX

9  REGULATIONS A STATE LAW OR A FEDERAL LAW?

10     A    THERE IS A -- IT'S A FEDERAL LAW.

11     Q    AND WHO ENACTED THE TITLE IX REGULATIONS?

12     A    DEPARTMENT OF EDUCATION.

13     Q    WERE THEY PASSED BY CONGRESS?  WAS THE

14  ACTUAL TITLE IX STATUTE PASSED BY CONGRESS?

15     A    I -- I CAN'T ANSWER THAT RIGHT NOW.  I'M

16  SORRY.

17     Q    OKAY.  WHO OVER- -- IN THE FEDERAL

18  GOVERNMENT, WHO OVERSEES TITLE IX REGULATIONS?  WHO

19  OVERSEES TITLE IX OVERSIGHT FOR UNIVERSITIES?

20     A    THE DEPARTMENT OF EDUCATION, THE OFFICE OF

21  CIVIL RIGHTS.

22     Q    AND THERE IS AN AGREEMENT BETWEEN THE

23  DEPARTMENT OF EDUCATION AND THE UNIVERSITY WHO

24  RECEIVES FEDERAL FUNDS.  CORRECT?

25     A    THERE ARE REQUIREMENTS AND THEN THERE IS

1  GUIDANCE.

2      **Q**    MY QUESTION TO YOU, MA'AM, AND -- MY

3  QUESTION TO YOU IS:  THE DEPARTMENT OF EDUCATION SAYS

4  TO A UNIVERSITY "IF YOU'RE GOING TO RECEIVE FEDERAL

5  FUNDS FROM US, THEN YOU MUST CONFORM YOURSELF TO OUR

6  TITLE IX GUIDELINES."  CORRECT?

7      **A**    CORRECT.

8      **Q**    AND THERE IS THE OFFICE OF CIVIL RIGHTS THAT

9  OVERSEES AND ENFORCES TITLE IX WITH THE UNIVERSITIES.

10 CORRECT?

11     **A**    CORRECT.

12     **Q**    AND WHAT ENFORCEMENT POWER DOES THE OFFICE

13 OF CIVIL RIGHTS HAS TO ENFORCE THE TITLE IX

14 OBLIGATIONS THAT THE UNIVERSITY ACCEPTS?

15     **A**    TO REMOVE FEDERAL FUNDING.

16     **Q**    CAN THEY DO AN INVESTIGATION?

17     **A**    THEY CAN DO AN INVESTIGATION.

18     **Q**    CAN THEY TURN THE UNIVERSITY -- CAN THEY --

19 IF A UNIVERSITY IS NOT IN COMPLIANCE WITH TITLE IX

20 REGULATIONS, CAN THEY REFER IT TO THE DEPARTMENT OF

21 JUSTICE?

22     **A**    MY UNDERSTANDING, YES.

23     **Q**    OKAY.  NOW, WHEN YOU STARTED -- I'M SORRY.

24 YOU STARTED IN TWO THOUSAND -- YOU -- I APOLOGIZE.

25 IT'S BEEN A LONG DAY.

1          WHEN YOU STARTED IN 2009, DID LSU HAVE A

2   TITLE IX OFFICE IN PLACE?

3      **A**    A TITLE IX OFFICE, NO.

4      **Q**    OKAY.  WAS THERE -- WHEN YOU STARTED IN

5   2009, WAS THERE PUBLISHED ACROSS THE UNIVERSITY

6   NOTIFICATIONS ABOUT "IF YOU HAVE A TITLE IX

7   VIOLATION, HERE IS WHO YOU ARE TO REPORT TO"?

8      **A**    NOT THAT I RECALL.

9      **Q**    I'M GOING TO COME BACK TO WHEN YOU TOOK OVER

10  THE TITLE IX OFFICE, AND I WANT TO TALK WITH YOU

11  ABOUT THE "DEAR COLLEAGUE" LETTER.

12          ARE YOU FAMILIAR WITH THE "DEAR COLLEAGUE"

13  LETTER?

14      **A**    I AM.

15      **THE COURT:**  MS. STEWART, WILL YOU PULL THAT

16  A LITTLE CLOSER TO YOU?

17      **THE WITNESS:**  I SURE WILL.

18      **THE COURT:**  THANK YOU.

19      **THE WITNESS:**  YES, MA'AM.

20      **MR. ENGLISH:**  WILL YOU PULL UP P-19.

21          AND I BELIEVE P-19 WAS NOT OBJECTED TO,

22  YOUR HONOR, AND IT HAS ALREADY BEEN ADMITTED INTO THE

23  RECORD.

24      **THE COURT:**  IT'S NOT ADMITTED.  BUT THERE IS

25  NO OBJECTION, AND SO IT'S ADMITTED.

1          **MR. ENGLISH:**  THANK YOU, YOUR HONOR.

2    **BY MR. ENGLISH:**

3     **Q**    CAN YOU SEE THE "DEAR COLLEAGUE" LETTER ON

4    YOUR SCREEN?

5     **A**    I CAN.

6     **Q**    AND IT'S DATED APRIL 4, 2011.  CORRECT?

7     **A**    CORRECT.

8     **Q**    CAN YOU TELL THE JURY WHAT YOU KNOW ABOUT

9    THE "DEAR COLLEAGUE" LETTER?

10    **A**    IT WAS A REMINDER OF AN INSTITUTION'S

11    OBLIGATIONS TO HAVE POLICIES AND PROCEDURES

12    CONSISTENT WITH PROHIBITING SEXUAL DISCRIMINATION AND

13    THEN ALSO POLICIES AND PROCEDURES IN RESPONSE TO

14    THEM.

15     **Q**    AND THIS WAS ISSUED IN 2011 UNDER THE OBAMA

16    ADMINISTRATION?

17     **A**    I RECALL, YES.

18     **Q**    OKAY.  I THINK HE WAS PRESIDENT THEN.

19          AND WAS THE "DEAR COLLEAGUE" LETTER

20    ULTIMATELY, FOR LACK OF A BETTER TERM, REVOKED AT

21    SOME POINT?

22     **A**    YES.

23     **Q**    AND WHO WAS IT REVOKED BY?  IF I TOLD YOU IT

24    WAS REVOKED UNDER THE TRUMP ADMINISTRATION, WOULD YOU

25    --

**1**   **A**   I WOULD AGREE WITH THAT, YES.

**2**   **Q**   AND I BELIEVE -- YOU KNOW I'M GOING TO MESS

**3**   THIS UP BECAUSE I'M A LAWYER AND I'M NOT GOOD WITH

**4**   NUMBERS.  AND I BELIEVE MR. TRUMP WAS ELECTED IN

**5**   2016, I BELIEVE?  2018?  '16.  SO THIS DOCUMENT WAS

**6**   IN EFFECT FROM 2011 TO 2016, AND IT WAS A GUIDANCE.

**7**          SO I WANT TO -- DO YOU KNOW -- CERTAINLY.

**8**   YOU'RE THE FORMER TITLE IX DIRECTOR.  WHY DID THE

**9**   OBAMA ADMINISTRATION FEEL THE NEED TO ISSUE THIS

**10**   DIRECTIVE LETTER TO ALL OF THE UNIVERSITIES AND

**11**   INSTITUTIONS THAT WERE RECEIVING FEDERAL FUNDING?  DO

**12**   YOU KNOW WHY THEY FELT THE NEED TO DO THAT?

**13**   **A**   I CAN'T SPEAK ON THEIR BEHALF.

**14**   **Q**   OKAY.  SO I WANT TO LOOK AT THE FIRST PAGE

**15**   THAT'S IN FRONT OF YOU, AND I WANT -- AND I'M GOING

**16**   TO CITE THE BATES STAMP SO THAT WE CAN -- FOR THE

**17**   RECORD, IF YOU'LL GIVE ME JUST ONE SECOND.  AND WE'RE

**18**   GOING TO ANSWER SOME QUESTIONS.

**19**          **THE COURT:**  SCROLL UP.  WANT TO SHOW THE

**20**   BATES NUMBER?

**21**          **MR. ENGLISH:**  YES, I'M GOING TO GIVE YOU THE

**22**   BATES NUMBER, YOUR HONOR.  GIVE ME ONE SECOND.

**23**   **BY MR. ENGLISH:**

**24**   **Q**   SO THE BATES -- THE FIRST PAGE IS PLAINTIFF

**25**   170 THAT'S IN FRONT OF YOU.  YOU HAVE THE DOCUMENT IN

1   FRONT OF YOU.  AND I ASKED YOU A QUESTION AS TO

2   WHETHER OR NOT -- YOU KNOW, WHAT WAS THE ORIGINS OF

3   TITLE IX LEGISLATION, AND YOU SAID IT WAS CONGRESS.

4   CORRECT?  NO, I THINK YOU SAID IT WAS THE DEPARTMENT

5   OF EDUCATION.

6          IF YOU LOOK AT THE SECOND PARAGRAPH, IT

7   SAYS:  "TITLE IX OF THE EDUCATION AMENDMENTS OF 1972

8   (TITLE IX) 20 U.S.C. § 1681, AND IT'S IMPLEMENTING

9   REGULATIONS 34 C.F.R. PART 106, PROHIBIT

10  DISCRIMINATION ON THE BASIS OF SEX IN EDUCATION

11  PROGRAMS OR ACTIVITIES OPERATED BY RECIPIENTS OF

12  FEDERAL FINANCIAL ASSISTANCE."

13         IS THAT YOUR UNDERSTANDING OF TITLE IX?

14     A   YES.

15     Q   AND YOU ARE A LAWYER, AS YOU HAVE STATED.

16  AND IT SAYS THE TITLE IX EDUCATION AMENDMENT OF 1972,

17  20 U.S.C. § 1681.  THIS WOULD INDICATE THAT THIS

18  STATUTE WAS PASSED BY CONGRESS IN 1972.  CORRECT?

19     A   THAT'S CORRECT, YES.

20     Q   AND ONE OF THE REASONS WHY TITLE IX WAS PUT

21  IN PLACE -- IT HAD TWO PURPOSES.  THE FIRST PURPOSE

22  WAS, WAS THAT CONGRESS WANTED TO MAKE SURE THAT WOMEN

23  HAD ACCESS TO ALL OF THE SAME ASPECTS OF EDUCATION

24  THAT MEN HAD.  CORRECT?

25     A   YES.

1      **Q**    OR -- YES?  OKAY.

2      **A**    YES.

3      **Q**    BECAUSE I DON'T WANT YOU TO TELL ME "NO"

4    HERE AND I'M WRONG HERE.

5           AND ANOTHER ASPECT OF TITLE IX WAS THAT

6    CONGRESS AND THE DEPARTMENT OF -- LET ME TAKE A STEP

7    BACK.

8           SO CONGRESS PASSES THE STATUTE.  IT LEAVES

9    IT UP TO THE DEPARTMENT OF EDUCATION TO IMPLEMENT

10   THAT STATUTE.  CORRECT?

11     **A**    THAT'S CORRECT.

12     **Q**    AND THE WAY THE PROCESS WORKS IS -- AND THE

13   SUPREME COURT HAS RULED THAT IT IS A CONTRACT -- IS

14   THAT THE -- FOR INSTANCE, LSU AND THE DEPARTMENT OF

15   EDUCATION -- LSU SAYS "WE WANT TO RECEIVE FEDERAL

16   FUNDING FROM YOU" AND THE DEPARTMENT OF EDUCATION

17   SAYS "IN RETURN FOR YOU RECEIVING FEDERAL FUNDING

18   FROM US, YOU MUST ADOPT AND FOLLOW OUR GUIDELINES

19   UNDER TITLE IX."  CORRECT?

20     **A**    CORRECT.

21     **Q**    AND A PART OF THOSE GUIDELINES AND WHAT YOU

22   ACCEPT TO DO IS YOU ACCEPT TO CREATE A PROCESS WHERE

23   STUDENTS CAN REPORT VIOLATION -- CAN REPORT WHETHER

24   OR NOT THEY HAVE BEEN SEXUALLY HARASSED, VIOLENCE.

25   CORRECT?

**1**     **A**    THAT'S CORRECT.

**2**     **Q**    AND TITLE IX REQUIRES YOU TO PUT IN PLACE A

**3** GRIEVANCE PROCEDURE.  CORRECT?

**4**     **A**    THAT IS CORRECT.

**5**     **Q**    CAN YOU TELL US WHAT -- CAN YOU TELL ME

**6** ABOUT THE GRIEVANCE PROCEDURE THAT THE DEPARTMENT OF

**7** EDUCATION REQUIRES SCHOOLS TO PUT IN PLACE?

**8**     **A**    THE GRIEVANCE PROCEDURE REQUIRED DESIGNATING

**9** A PERSON AS THE TITLE IX COORDINATOR AND THAT THE

**10** RECEIPT OF GRIEVANCES COULD BE FORMAL OR INFORMAL.

**11** IT DID REQUIRE ALSO THAT THERE WAS AN OPPORTUNITY FOR

**12** PEOPLE TO NOT GO FORWARD IN AN INVESTIGATION BUT TO

**13** STILL RECEIVE ASSISTANCE, WHICH THEY CALLED

**14** SUPPORTIVE MEASURES OR INTERIM MEASURES.

**15**     SO PEOPLE WHO CAME FORWARD HAD A GREAT DEAL

**16** OF DEFERENCE GIVEN TO THEM ABOUT WHICH, IF ANY,

**17** SELECTION THEY MIGHT WANT TO RECEIVE.

**18**     **Q**    OKAY.  THANK YOU.  AND WHY DON'T I TAKE YOU

**19** THROUGH THE "DEAR COLLEAGUE" LETTER, BECAUSE ONE

**20** OF -- AGAIN, IT'S MY UNDERSTANDING -- YOU CAN TELL ME

**21** IF I'M WRONG -- THE OBAMA ADMINISTRATION ISSUED THIS

**22** DIRECTIVE BECAUSE UNIVERSITIES WERE NOT PROPERLY

**23** APPLYING TITLE IX AND ENFORCING ITS REGULATIONS.  DO

**24** YOU AGREE OR DISAGREE WITH THAT?

**25**     **A**    I AGREE THAT IT WASN'T BROADLY CONSIDERED AS

1  A SEXUAL MISCONDUCT, SO THIS WAS A REMINDER THAT

2  ISSUES -- INSTANCES OF SEXUAL MISCONDUCT FALL UNDER

3  SEXUAL DISCRIMINATION.

4      Q    OKAY.  I WANT TO SHOW YOU -- TALK ABOUT SOME

5  SPECIFIC PARTS OF THIS "DEAR COLLEAGUE" LETTER.

6           COULD YOU, DEE, GO TO P -- PLAINTIFF 175 IN

7  THE "DEAR COLLEAGUE" LETTER.  COULD YOU MOVE THE

8  SCREEN THERE.

9      **THE COURT:**  ANY OBJECTION?  OH, WE'RE STILL

10  ON THE SAME EXHIBIT.  I THOUGHT WE WERE GOING TO A

11  NEW ONE.

12          **MR. ENGLISH:**  NO, THE SAME EXHIBIT, YOUR

13  HONOR.

14          **THE COURT:**  PARDON ME.

15  BY MR. ENGLISH:

16      Q    DO YOU SEE IT SAYS "PROCEDURAL REQUIREMENTS

17  PERTAINING" -- LET ME STOP YOU.  HAVE YOU -- DID YOU

18  READ THE "DEAR COLLEAGUE" LETTER?

19      A    YES, I DID.

20      Q    AND AS THE TITLE IX COORDINATOR WHEN YOU

21  CAME IN, IT WAS -- STRIKE THAT QUESTION.

22          SO YOU ARE FAMILIAR WITH THE "DEAR

23  COLLEAGUE" LETTER?

24      A    I AM.

25      Q    AND YOU UNDERSTAND ALL OF THE ASPECTS AND

1  THE REQUIREMENTS OF THE "DEAR COLLEAGUE" LETTER?

2      A    YES.

3      Q    NOW, I JUST TOOK YOU -- WE ARE NOW ON P --

4          **MR. ENGLISH:**  IT'S THE SAME DOCUMENT, YOUR

5  HONOR, 175.  I'M JUST STATING THE BATES NUMBERS SO

6  THAT THE RECORD IS CLEAR.

7  **BY MR. ENGLISH:**

8      Q    THE FIRST -- I'M LOOKING AT PROCEDURES

9  REQUIRING "PERTAINING TO SEXUAL HARASSMENT AND SEXUAL

10  VIOLENCE."  CAN YOU READ THAT FIRST SENTENCE, PLEASE,

11  AND EXPLAIN TO THE JURY WHAT THAT MEANS.

12      A    SURE.  THE SENTENCE READS:  "RECIPIENTS OF

13  FEDERAL FINANCIAL ASSISTANCE MUST COMPLY WITH THE

14  PROCEDURAL REQUIREMENTS OUTLINED IN THE TITLE IX

15  IMPLEMENTING REGULATIONS.  SPECIFICALLY, A RECIPIENT

16  MUST:

17          "DISSEMINATE" -- "(A) DISSEMINATE A NOTICE

18  OF NONDISCRIMINATION" --

19      Q    STOP.  CAN YOU TELL THE JURY WHAT DO THEY

20  MEAN BY BEING REQUIRED TO DISSEMINATE A NOTICE OF

21  NONDISCRIMINATION?

22      A    SURE.  THAT MEANS WITHIN THE COMMUNITIES

23  THAT SERVED WITHIN THE INSTITUTION -- TO THE FACULTY,

24  TO THE STUDENTS, TO THE STAFF -- THAT FOLKS HAVE TO

25  BE AWARE THAT THERE IS A POLICY, WHEN ONE MIGHT

1   ENCOUNTER DISCRIMINATION, WHERE ONE COULD GO TO MAKE

2   THAT COMPLAINT.  BUT THERE IS A PROCESS, A PERSON.

3   SO INDICATING THAT LSU DOES NOT DISCRIMINATE WOULD BE

4   THE PIECE OF NOTICE.

5       **Q**   READ (B) FOR THE JURY AND EXPLAIN TO US

6   AFTER YOU READ B WHAT THE GUIDANCE IS SAYING.

7       **A**   IN (B) IT INDICATES "DESIGNATE AT LEAST ONE"

8   PERSON -- "ONE EMPLOYEE TO COORDINATE ITS EFFORTS TO

9   COMPLY WITH AND CARRY OUT ITS RESPONSIBILITIES UNDER

10  TITLE IX."

11          SO (B) INDICATES THAT THERE MUST BE A

12  DESIGNATED TITLE IX COORDINATOR.

13      **Q**   AND IN 2009 WAS THERE A DESIGNATED TITLE IX

14  COORDINATOR AT LSU?  A TITLE -- TITLE IX COORDINATOR

15  AT LSU.

16      **A**   NOT THAT I CAN RECALL.

17      **Q**   IN 2012 WAS THERE A DESIGNATED INDIVIDUAL

18  TITLE IX COORDINATOR IN 2012?

19      **A**   I DON'T RECALL.

20      **Q**   IN 2013 WAS THERE A DESIGNATED INDIVIDUAL AS

21  THE TITLE IX COORDINATOR AT LSU?

22      **A**   I DON'T RECALL.

23      **Q**   IN 2014 WAS THERE A DESIGNATED COORDINATOR

24  FOR TITLE -- AS TITLE IX COORDINATOR AT LSU?

25      **A**   YES.

1    Q    WHO WAS THAT PERSON?

2    A    THAT WAS JIM MARCHAND.

3    Q    AND ALL OF THE TITLE IX COMPLAINTS ACROSS

4  THE UNIVERSITY WERE REQUIRED TO BE DIRECTED TO THAT

5  PERSON.  CORRECT?

6    A    THAT'S CORRECT.

7    Q    AND DID THIS -- WAS THERE AN ESTABLISHED

8  OFFICE ON CAMPUS AT LSU THAT ALL OF THE STUDENTS AND

9  EMPLOYEES KNEW THAT THIS WAS THE TITLE IX COORDINATOR

10  AND THIS IS WHERE YOU WERE TO REPORT ANY COMPLAINTS

11  THAT YOU HAD?

12    A    THE NAME OF THE TITLE IX COORDINATOR AND THE

13  CONTACT INFORMATION WAS PROVIDED AND AVAILABLE, YES.

14    Q    OKAY.  WAS IT IN EVERY DORM?

15    A    I COULDN'T SPEAK TO THAT.

16    Q    BASED ON WHAT YOU KNEW -- YOU WERE WORKING

17  THERE IN TWO THOUSAND NINE -- FROM 2011 TILL YOU

18  BECAME THE ACTUAL TITLE IX COORDINATOR, WAS THE

19  INFORMATION READILY AVAILABLE TO EVERY STUDENT AND

20  EMPLOYEE WERE TO FILE A COMPLAINT WITH WITH THE TITLE

21  IX COORDINATOR?

22    A    YOU'RE ASKING FROM WHAT TIME?

23    Q    FROM 2011 TILL 2016, BEFORE YOU BECAME THE

24  TITLE IX COORDINATOR.

25    A    FROM THE TIME OF MR. MARCHAND'S DESIGNATION,

1    THE ANSWER WOULD BE YES.

2       **Q**    READ (C) AND EXPLAIN TO THE JURY WHAT (C)

3    IS.

4       **A**    SURE.  "C" INDICATES "ADOPT AND PUBLISH

5    GRIEVANCE PROCEDURES PROVIDING FOR PROMPT AND

6    EQUITABLE RESOLUTION OF STUDENT AND EMPLOYEE SEX

7    DISCRIMINATION COMPLAINTS."

8       **Q**    OKAY.  BEFORE YOU BECAME TITLE IX

9    COORDINATOR -- LET'S TALK ABOUT BEFORE YOU BECAME

10   TITLE -- WE'RE TALKING ABOUT SPECIFICALLY BETWEEN

11   WHEN THIS GUIDANCE WAS PUBLISHED AND YOU BECAME TITLE

12   IX COORDINATOR.  WAS THERE A PUBLIC -- WAS THERE A

13   PUBLISHED GRIEVANCE PROCEDURE AT THE UNIVERSITY?

14      **A**    THERE WERE PUBLISHED GRIEVANCE PROCEDURES.

15   PM-73 PRECEDED MY TIME IN THE ROLE.

16      **Q**    THIS SAYS, "ADOPT AND PUBLISH GRIEVANCE

17   PROCEDURE PROVIDING PROMPT AND EQUITABLE RESOLUTION

18   OF STUDENTS AND EMPLOYEE SEX DISCRIMINATION

19   COMPLAINTS."

20          NOW, I BELIEVE MY DISTINGUISHED COUNSEL

21   STATED IN HIS OPENING STATEMENT THAT TITLE IX ONLY

22   APPLIES TO STUDENTS.  IS THAT CORRECT?

23      **A**    TITLE IX ALSO APPLIES TO OTHERS IN THE

24   COMMUNITY.  BUT IN THIS JURISDICTION VII USURPS IX AS

25   FAR AS EMPLOYEES.

1    Q    CAN YOU EXPLAIN?  YOU JUST USED SOME

2  LEGALESE ON ME AND YOU LOST ME, AND I KNOW YOU LOST

3  THE JURY.

4         CAN YOU EXPLAIN WHAT YOU JUST SAID.

5    A    SO IT DOES APPLY TO EVERYBODY EXCEPT THAT --

6  AND WHEN IT'S EMPLOYEE/EMPLOYEE THERE IS ANOTHER LAW,

7  TITLE VII, THAT USURPS TITLE IX.  SO IF IT IS THE

8  CASE OF EMPLOYEE/EMPLOYEE, THEN THAT WOULD FIRST BE

9  LOOKED AT FOR APPLICATION OF TITLE VII BEFORE LOOKING

10  AT TITLE IX.

11    Q    SO, FOR INSTANCE, IF A COACH IN THE ATHLETIC

12  DEPARTMENT SEXUALLY HARASSED AN EMPLOYEE IN THE

13  ATHLETIC DEPARTMENT, THAT WOULD BE COVERED BY TITLE

14  VII, IS WHAT YOU'RE SAYING?

15    A    THE FACTS AND CIRCUMSTANCES ARE GOING TO

16  DICTATE.  BUT THERE WOULD BE -- IT WOULD BE LOOKED AT

17  WHETHER VII OR IX WOULD BE THE DEFAULT WAY TO

18  PROCEED.

19    Q    CAN YOU GIVE ME AN EXAMPLE WHERE AN EMPLOYEE

20  ON EMPLOYEE SEXUAL HARASSMENT WOULD QUALIFY UNDER

21  TITLE IX?

22    A    I THINK THE FACTS WOULD BE PRETTY EXTENSIVE.

23    Q    OKAY.

24    A    YEAH.  I THINK --

25    Q    I UNDERSTAND.

1     **A**    IT WOULD BE PRETTY LONG.  WE'D BE HERE --

2     **Q**    I UNDERSTAND, AND WE CAN PARE THAT DOWN.

3          BUT CLEARLY IF A STUDENT REPORTS THAT A

4    COACH IS SEXUALLY HARASSING THEM, DOES THAT COME

5    UNDER THE TITLE IX REGULATIONS?

6     **A**    AGAIN, IT'S ALL GOING TO APPLY ON THE FACTS

7    AND CIRCUMSTANCES.  BUT IN THAT CASE, IT WOULD BE

8    APPROPRIATE FOR TITLE IX TO LOOK AT THE FACTS FIRST.

9     **Q**    IF A COACH SEXUALLY HARASSES A STUDENT IN

10   THE ATHLETIC DEPARTMENT, THESE REGULATIONS REQUIRE

11   THAT IT BE REPORTED TO TITLE IX -- TO THE TITLE IX

12   COORDINATOR FOR ITS INITIAL EVALUATION.  IS THAT

13   CORRECT?

14    **A**    IT WOULD -- TITLE IX WOULD BE THE

15   APPROPRIATE PLACE TO FIRST LOOK AND DETERMINE IF IT

16   APPLIES, YES.

17    **Q**    AND IF IT DOESN'T APPLY, THERE MAY BE OTHER

18   POLICIES IN PLACE AT THE UNIVERSITY THAT WOULD COVER

19   THE SPECIFIC COMPLAINT IF IT DID NOT FALL UNDER TITLE

20   IX?

21    **A**    LIKELY.  IT WOULDN'T BE THAT THE TITLE IX

22   OFFICE LOOKS AND JUST SAYS "NO" AND IT ENDS THERE.

23   IT WOULD LOOK AND SEE IF THERE IS SOMETHING ELSE TO

24   ATTACH.  EITHER IT COULD BE PERHAPS UNDER

25   DISCRIMINATION OR IT COULD BE UNDER EMPLOYEE OR

1   STUDENT POLICY.  SO THERE WOULD BE SOMEBODY TO TAKE

2   ANOTHER LOOK IF IT WAS DECIDED THAT TITLE IX WASN'T

3   THE FIRST PLACE TO START.

4        Q    OKAY.  LET'S GO DOWN -- CAN YOU SCROLL DOWN.

5   WE'RE STILL ON THE SAME DOCUMENT.  CAN YOU SCROLL

6   DOWN TO PLAINTIFF 176; BATE NUMBER PLAINTIFF 176.

7             DO YOU SEE IT UP ON THE SCREEN THERE?

8        A    I DO.

9        Q    AND IT SAYS "TITLE IX COORDINATOR."  SO

10  LET'S TALK ABOUT THE TITLE IX COORDINATOR.  IT SAYS:

11  "TITLE IX REGULATIONS REQUIRE A RECIPIENT TO NOTIFY

12  ALL STUDENTS AND EMPLOYEES OF THE NAME OR TITLE AND

13  CONTACT INFORMATION OF THE PERSON DESIGNATED TO

14  COORDINATE THE RECIPIENT'S COMPLIANCE WITH TITLE IX."

15            CAN YOU EXPLAIN WHAT THAT MEANS.

16       A    THAT MEANS PEOPLE HAVE TO KNOW WHO THE

17  PERSON IS AND HOW TO GET TO THEM.  SO IF SOMEBODY

18  EXPERIENCES SOMETHING THAT COULD QUALIFY AS SEX-BASED

19  DISCRIMINATION UNDER TITLE IX, THEY HAVE TO KNOW HOW

20  TO GET TO THAT PERSON; SO PROVIDING THE NAME OF THAT

21  PERSON, MAYBE AN EMAIL ADDRESS, WHERE THEY'RE

22  PHYSICALLY LOCATED, A PHONE NUMBER, SO PEOPLE KNOW

23  WHO IT IS AND HOW TO GET TO THEM.

24       Q    I'M GOING TO DROP DOWN IN THAT FIRST

25  PARAGRAPH AND JUST READ IT, AND YOU CAN EXPLAIN THAT

1   TO THE JURY OR HELP US UNDERSTAND WHAT THAT MEANS.

2   "THE RECIPIENT SHOULD DESIGNATE ONE COORDINATOR AS

3   HAVING ULTIMATE OVERSIGHT AND RESPONSIBILITY, AND THE

4   OTHER COORDINATORS SHOULD HAVE TITLES CLEARLY SHOWING

5   THEY ARE IN A DEPUTY SUPPORTING ROLE TO THE SENIOR

6   COORDINATOR."

7          CAN YOU EXPLAIN WHAT THEY'RE SAYING THERE?

8      A   YES.  YOU CAN'T HAVE TWO, THREE, FOUR -- YOU

9   CAN'T HAVE MULTIPLE TITLE IX COORDINATORS.  IF

10  SOMEBODY ELSE IS DOING THIS TYPE OF WORK AS WE DID --

11  WE HAD DEPUTY COORDINATORS, INDICATING THAT THOSE

12  PEOPLE MAY BE DOING THE WORK ALONG WITH THE TITLE IX

13  COORDINATOR.  BUT THE TITLE IX COORDINATOR IS THE

14  NAMED LEAD ON THESE ISSUES.

15     Q   DOES THE TITLE IX COORDINATOR HAVE

16  INDEPENDENCE FROM THE ADMINISTRATIVE HIERARCHY OF THE

17  UNIVERSITY?  FOR INSTANCE, THE TITLE IX COORDINATOR

18  IS HIRED BY THE UNIVERSITY.  WHEN YOU WERE HIRED AS

19  TITLE IX COORDINATOR, YOU WERE HIRED, I'M ASSUMING,

20  BY THE PRESIDENT OF THE UNIVERSITY.  CORRECT?

21     A   CORRECT.

22     Q   IS IT LAWFUL FOR THE PRESIDENT OF THE

23  UNIVERSITY TO INTERFERE IN THE TITLE IX COORDINATOR'S

24  RESPONSIBILITY THAT THE FEDERAL GOVERNMENT HAS PLACED

25  ON THEM?

1    A    THE WORK OF THE TITLE IX COORDINATOR HAS TO

2   BE INDEPENDENT, AUTONOMOUS AND NEUTRAL AS WELL, SO

3   THERE IS NO CONCEIVED NOTIONS, THERE IS NO UNDUE

4   INFLUENCE.  BUT THE PERSON HAS THE RIGHT AND

5   AUTHORITY TO MAKE DECISIONS ABOUT TITLE IX RELATED

6   MATTERS.

7    Q    IT SAYS -- SAME FIRST PARAGRAPH -- "THE

8   TITLE IX COORDINATORS SHOULD NOT HAVE OTHER JOB

9   RESPONSIBILITIES THAT MAY CREATE A CONFLICT OF

10   INTEREST."

11        CAN YOU EXPLAIN THAT FOR THE JURY?

12    A    SURE.  IN THAT CASE, IF SOMEONE WAS IN A

13   ROLE AS A TITLE IX COORDINATOR, THAT THEY SHOULDN'T

14   HAVE SOMETHING WHERE THEY WOULD HAVE TO MAKE

15   DECISIONS THAT WOULD BE CONTRARY; THAT THEY SHOULD BE

16   ABLE TO MAKE THE DECISIONS THROUGH ONE LENS.  SO THEY

17   SHOULDN'T HOLD ANOTHER ROLE OR BE IN ANOTHER ROLE

18   THAT COULD CAUSE DIFFICULTY IN THEM MAKING THE

19   DECISIONS REGARDING TITLE IX.

20    Q    FOR INSTANCE, IF AN EMPLOYEE INSIDE THE

21   ATHLETIC DEPARTMENT WHO WAS THE ASSISTANT ATHLETIC

22   DIRECTOR INSIDE THE ATHLETIC DEPARTMENT, THEY COULD

23   NOT HOLD THE ROLE AS TITLE IX COORDINATOR?

24    A    THERE ARE PLACES WHERE FOLKS HOLD DUAL

25   ROLES, MAYBE BECAUSE THEY'RE SMALL INSTITUTIONS,

1  BECAUSE THEY'RE UNDER-RESOURCED, BECAUSE THEY ARE IN

2  TRANSITION.  BUT GENERALLY A PERSON SHOULD HOLD JUST

3  THE SINGULAR ROLE.

4      Q    AGAIN, THE PURPOSE IS, IS THAT THE

5  DEPARTMENT OF EDUCATION WANTED TO BEHOLD THE

6  INTEGRITY OF THE POSITION BECAUSE THIS IS THE

7  INDIVIDUAL THAT CONDUCTS INVESTIGATIONS.  CORRECT?

8      A    THE INDIVIDUAL DOESN'T CONDUCT THE

9  INVESTIGATION BUT MAY OVERSEE THE INVESTIGATION.

10     Q    THEY OVERSEE THE INVESTIGATION, EXACTLY.

11          SO A COACH WHO IS ACCUSED OF SEXUALLY

12  HARASSING A STUDENT HAS DUE PROCESS RIGHTS.  CORRECT?

13     A    EVERYONE IN OUR PROCESS WOULD HAVE DUE

14  PROCESS.

15     Q    THE STUDENT WHO ALLEGED THE COMPLAINT HAS

16  DUE PROCESS RIGHTS.  CORRECT?

17     A    THEY WOULD, AS WOULD EVERYONE ELSE IN THE

18  PROCESS, YES.

19     Q    THE COACH HAS DUE PROCESS RIGHTS?

20     A    THAT'S CORRECT.

21     Q    AND THE PARADIGM OF THE DEPARTMENT OF

22  EDUCATION IS:  BECAUSE SIMPLY BECAUSE A STUDENT

23  ACCUSES A COACH OF SEXUAL MISCONDUCT DOESN'T MEAN

24  THAT THAT COACH IS GUILTY.  WOULD YOU AGREE WITH

25  THAT?

**1**    **A**   I WOULD AGREE THAT THERE IS NEUTRALITY COME

**2** INTO EVERY CASE; THAT THERE IS NOT A PRESUMPTION OF

**3** GUILT.  AND THAT'S ALSO A REQUIREMENT OF TITLE IX.

**4**    **Q**   AND THE DEPARTMENT OF EDUCATION, AGAIN,

**5** WANTED TO PROTECT THIS PROCESS SO THAT THE DUE

**6** PROCESS OF EVERY INDIVIDUAL INVOLVED WOULD BE

**7** PROTECTED.  CORRECT?

**8**    **A**   CORRECT.

**9**    **Q**   OKAY.  I'M GOING TO ASK YOU ABOUT -- EXPLAIN

**10** TO US ABOUT THE HEARING -- ABOUT THE HEARING PROCESS.

**11** BUT LET'S MOVE DOWN A LITTLE BIT MORE AND I THINK WE

**12** WILL GET THERE.

**13**        LET'S GO DOWN TO PLAINTIFF 177, "GRIEVANCE

**14** PROCEDURES."  DO YOU SEE THAT?

**15**    **A**   I DO.

**16**    **Q**   I'M GOING TO READ THE FIRST LINE.  "THE

**17** TITLE IX REGULATIONS REQUIRE ALL RECIPIENTS TO ADOPT

**18** AND PUBLISH GRIEVANCE PROCEDURES PROVIDING PROMPT AND

**19** EQUITABLE RESOLUTION OF SEX DISCRIMINATION

**20** COMPLAINTS."

**21**        CAN YOU -- I MEAN, IT'S SELF-EXPLANATORY,

**22** BUT CAN YOU EXPLAIN TO THE JURY WHAT THAT -- WHAT

**23** THEY'RE SAYING THERE?

**24**    **A**   SURE.  IT MEANS THAT YOU HAVE TO HAVE A

**25** POLICY OR A PROCESS THAT FOLKS KNOW ABOUT, THAT THEY

1  CAN LOOK AT, AND THAT IT APPLIES TO EVERYONE.  IT'S

2  NOT THAT PERSON ONE WOULD COME UP AND A PROCESS WOULD

3  BE DIFFERENT FOR PERSON TWO, BUT EVERYBODY HAS THE

4  SAME SHOT IN THE SAME PROCESS REGARDING SEX-BASED

5  DISCRIMINATION CLAIMS.

6      Q    AND AS SUCCINCTLY AS WE CAN, I'D LIKE --

7  WE'D LIKE TO -- I'D LIKE TO KIND OF TAKE THE JURY

8  THROUGH THE PROCESS.  STUDENT A REPORTS THAT "A COACH

9  GRABBED MY BUTTOCKS IN THE ATHLETIC DEPARTMENT."  WHO

10 IS THE STUDENT -- UNDER THIS POLICY, WHO IS THE

11 STUDENT REQUIRED TO REPORT THIS TITLE IX -- THIS

12 COMPLAINT TO?

13     A    THE STUDENT'S REQUIRED TO REPORT TO NO ONE.

14 A VICTIM'S NEVER COMPELLED TO REPORT.

15     Q    OKAY.  THANK YOU.

16          IF THE STUDENT WANTED TO REPORT THIS

17 INCIDENT, WHO WOULD THE STUDENT REPORT THIS INCIDENT

18 TO?

19     A    SO THE STUDENT CAN GO AND REPORT TO ANYONE

20 OR NO ONE.  THAT'S THEIR CHOICE.  THEIR OPTIONS COULD

21 BE SOMEBODY WHO'S CONFIDENTIAL, LIKE A THERAPIST OR A

22 PHYSICIAN IN THE STUDENT HEALTH CENTER.  THOSE PEOPLE

23 ARE PROTECTED BECAUSE OF THAT PRIVILEGE THAT EXISTS.

24 SO THAT'S WHERE IT WOULD END IF THEY WENT TO A

25 THERAPIST, A COUNSELOR, SOMEONE WHO'S INTENDED TO

1  ENGAGE IN THAT WORK.  THAT PERSON IS NOT A

2  RESPONSIBLE EMPLOYEE, MEANING THEY DON'T HAVE TO TELL

3  THE TITLE IX COORDINATOR.

4       IF THE STUDENT CHOOSES TO REPORT TO MOST

5  OTHER EMPLOYEES, MOST OTHER EMPLOYEES ARE GOING TO BE

6  WHAT ARE CALLED RESPONSIBLE EMPLOYEES.  THAT MEANS

7  THAT THEY HAVE TO REPORT THINGS THAT MAY BE SEXUAL

8  MISCONDUCT TO THE TITLE IX COORDINATOR.  ALTERNATELY,

9  THE STUDENT COULD THEMSELVES CHOOSE TO COME TO THE

10 TITLE IX COORDINATOR, SO IT DEPENDS ON WHAT ROUTE

11 SOMEONE MAY CHOOSE IF THEY DO CHOOSE TO REPORT.

12    Q    IF THE STUDENT GOES TO COACH A AND SAYS

13 "COACH B SEXUALLY HARASSED ME," IS COACH B A

14 RESPONSIBLE EMPLOYEE?

15    A    UNLESS IT'S AN EMPLOYEE WHO IS COVERED BY A

16 PROFESSIONAL PRIVILEGE, THEN THOSE INDIVIDUALS ARE

17 RESPONSIBLE EMPLOYEES.

18    Q    EXPLAIN TO THE JURY -- WE'RE PROBABLY GOING

19 TO TALK ABOUT IT, BUT LET'S GO AHEAD AND TALK ABOUT

20 IT NOW.  EXPLAIN TO THE JURY WHO A RESPONSIBLE

21 EMPLOYEE IS.

22    A    A RESPONSIBLE EMPLOYEE IS NEARLY ANYONE

23 EMPLOYED BY THE INSTITUTION WHO'S NOT A MENTAL HEALTH

24 THERAPIST, A PHYSICIAN -- AT OTHER INSTITUTIONS IT

25 COULD BE CLERGY, BUT WE DON'T HAVE THAT -- WHO HAS A

1   RELATIONSHIP THAT'S PROTECTED BY A CONFIDENTIAL

2   PRIVILEGE, MEANING THEY DON'T HAVE TO TELL ANYONE.

3   MOST OTHER EMPLOYEES, UNLESS THEY'RE EXCEPTED BY

4   STATE LAW, STATE LAW ALSO PROVIDES CONFIDENTIAL

5   ADVISORS CAN BE DESIGNATED.  SO IF SOMEONE IS AN

6   ACADEMIC ADVISOR BUT THEY'RE DESIGNATED AS A

7   CONFIDENTIAL ADVISOR, IT MEANS THEY HAVE THE

8   PRIVILEGE EVEN THOUGH THEIR ROLE WOULDN'T NECESSARILY

9   ATTACH THAT.

10          IF SOMEBODY REPORTS TO ANY ONE OF THE

11  RESPONSIBLE EMPLOYEES EXCEPT THAT SMALL GROUP

12  EXCEPTED BY THEIR CONFIDENTIAL PRIVILEGE, THEN THOSE

13  EMPLOYEES ARE REQUIRED TO REPORT TO THE TITLE IX

14  COORDINATOR THE INFORMATION THAT WAS SHARED WITH

15  THEM.  THEY'RE NOT INVESTIGATING.  THEY'RE JUST

16  SHARING WHAT INFORMATION THEY RECEIVED FROM ANOTHER

17  PERSON.

18     Q   SO IF COACH B RECEIVES INFORMATION THAT THE

19  DEFENSIVE COORDINATOR -- IF A STUDENT COMPLAINS TO

20  COACH B THAT "THE DEFENSIVE COORDINATOR SEXUALLY

21  HARASSED ME," THERE IS NOTHING -- THAT COACH IS A

22  RESPONSIBLE EMPLOYEE.  CORRECT?

23     A   UNLESS THEY'RE OTHERWISE COVERED BY A

24  CONFIDENTIAL ADVISOR.

25     Q   SO YOU'RE THE FORMER TITLE IX COORDINATOR.

1 DO YOU KNOW A SCENARIO WHICH BY THE DEFENSIVE LINE

2 COACH, FOR INSTANCE, WOULD BE DESIGNATED AS A

3 CONFIDENTIAL PERSON WHO DID NOT HAVE TO REPORT?

4    **A**    I DID NOT HAVE A PERSON DESIGNATED IN THAT

5 ROLE.

6    **Q**    EXCELLENT.  OKAY.

7        THEY MAKE THE COMPLAINT, THE COMPLAINT COMES

8 TO THE TITLE IX COORDINATOR, AND THEN WHAT HAPPENS?

9    **A**    AT THAT POINT THE TITLE IX COORDINATOR STAFF

10 WOULD REACH OUT TO THE PERSON WHO EXPERIENCED THE

11 HARM, THE PERSON WHO HAS MADE THE REPORT TO THE

12 RESPONSIBLE EMPLOYEE.  THAT PERSON WOULD BE OFFERED

13 THE INVITATION TO COME TO THE OFFICE AND MEET WITH

14 THE STAFF.  WE CAN'T REQUIRE ANYBODY TO DO THAT.

15 OKAY?  SO PEOPLE HAVE THE OPPORTUNITY TO MAKE A

16 REPORT TO A RESPONSIBLE EMPLOYEE AND THEN NEVER

17 PARTICIPATE IN THE PROCESS.

18        GENERALLY THEY WOULD COME IN, THOUGH, AND

19 THEY WOULD MEET WITH THE STAFF, BE AVAILED OF ANY

20 SUPPORTIVE MEASURES THAT EXIST, OPPORTUNITIES TO

21 REPORT AND WHAT A FORMAL OR INFORMAL RESPONSE MIGHT

22 LOOK LIKE AND THEN, IF APPROPRIATE, THE OPPORTUNITY

23 TO REPORT TO LAW ENFORCEMENT IF THEY SO DESIRE.  SO

24 ESSENTIALLY THEY'RE GIVEN A MENU OF OPTIONS TO CHOOSE

25 FROM.

1    **Q**    LET'S TALK ABOUT TWO SCENARIOS.  THE FIRST

2    SCENARIO IS:  COACH -- THE COACH REPORTS TO THE TITLE

3    IX COORDINATOR THAT THE DEFENSIVE LINE COACH -- THE

4    STUDENT SAYS THE DEFENSIVE LINE COACH GRABBED HIS

5    BUTTOCKS AND HE'S REPORTING.  IF THAT STUDENT

6    ULTIMATELY DECIDES, I DON'T REALLY WANT TO BE IN THIS

7    PROCESS; THIS IS TOO PERSONAL; I DON'T WANT TO HAVE

8    ANYTHING TO DO WITH IT, IS THAT THE END OF THE

9    PROCESS?

10    **A**    IT COULD BE.  IT COULD BE, FOR SURE.  IT

11    COULD BE FOR THAT PERSON THERE IS NO COMPELLING -- A

12    REPORTER OR WHAT WE CALL A COMPLAINANT -- THAT'S A

13    PERSON WHO IS IDENTIFIED AS BEING HARMED -- WE CAN'T

14    COMPEL THEM TO PARTICIPATE.

15        BUT THERE ARE FEW INSTANCES IN WHICH THE

16    TITLE IX COORDINATOR CAN GO FORWARD ON A COMPLAINT

17    ABSENT THE PERSON WHO'S BEING HARMED PARTICIPATING.

18    SO THAT WOULD BE A WAY THAT IT COULD GO FORWARD IF

19    THE COMPLAINANT DIDN'T PARTICIPATE.  BUT THAT'S ALSO

20    ON THE PREMISE THAT THERE IS ANOTHER -- ENOUGH

21    INFORMATION TO PROCEED ON.

22    **Q**    LET'S ASSUME UNDER THIS SCENARIO THE TITLE

23    IX INVESTIGATOR CALLS IN THE STUDENT AND THE STUDENT

24    BRINGS HIS BEST FRIEND WITH HIM AND HIS BEST FRIEND

25    SAYS, "I WITNESSED THE DEFENSIVE LINE COACH GRAB HIS

1   BUTTOCKS."  OKAY?  BUT THE STUDENT SAYS, "I KNOW I

2   MADE THIS REPORT, BUT I WANT TO WITHDRAW IT.  THIS IS

3   GOING TO BE TOO PERSONAL.  I DON'T WANT MY FAMILY TO

4   KNOW ABOUT THIS.  I WANT TO WITHDRAW."

5          NOW, THE TITLE IX COORDINATOR HAS

6   CORROBORATING EVIDENCE FROM THIS STUDENT THAT

7   CORROBORATES THE STUDENT'S ALLEGATIONS AGAINST THIS

8   DEFENSIVE LINE COACH.  CAN THE UNIVERSITY JUST SIMPLY

9   DROP THE COMPLAINT BECAUSE THE STUDENT DOESN'T WANT

10  TO PARTICIPATE?

11     A   YOU HAVE TO LOOK AT THE FACTS AND

12  CIRCUMSTANCES.  AND THESE ARE EXTRAORDINARILY

13  DIFFICULT CONSIDERATIONS TO MAKE.  SO THE INSTITUTION

14  COULD MAKE DECISIONS AND MUST MAKE DECISIONS BASED ON

15  ALL THE INFORMATION THAT'S RECEIVED.

16     Q   THE INSTITUTION BELIEVES THAT THE STUDENT IS

17  TELLING THE TRUTH.  UNDER THAT SCENARIO, THE

18  COORDINATOR AND THE INSTITUTION HAS ENOUGH

19  INFORMATION THAT THEY BELIEVE THAT THE STUDENT IS

20  TELLING THE TRUTH.

21          DOES THE COACH JUST SIMPLY WALK AWAY SIMPLY

22  BECAUSE THE STUDENT DOESN'T WANT TO MOVE FORWARD WITH

23  THE COMPLAINT?

24     A   IT WOULD STILL BE UP TO THE DISCRETION OF

25  THE TITLE IX COORDINATOR TO DETERMINE IF THERE ARE

1   FACTS AND CIRCUMSTANCES TO MOVE FORWARD ABSENT A

2   COMPLAINANT'S WISH.

3       Q    AND IF -- AND I'M GOING TO MOVE ON.  IN THE

4   SCENARIO THAT I'M LAYING OUT TO YOU, THE TITLE IX

5   COORDINATOR HAS MORE THAN ENOUGH EVIDENCE TO SUPPORT

6   THE STUDENT'S CLAIM.  EVEN IF THE STUDENT WITHDRAW,

7   THE TITLE IX COORDINATOR AND THE UNIVERSITY CAN MOVE

8   FORWARD.  CORRECT?

9       A    THE TITLE IX COORDINATOR COULD MOVE FORWARD

10  DESPITE A COMPLAINANT'S WISHES, IN EXTRAORDINARY

11  CIRCUMSTANCES, IF THE FACTS WOULD SUPPORT THAT THAT'S

12  THE DECISION TO BE MADE.

13      Q    ONE OF THE REASONS WHY THE DEPARTMENT OF

14  EDUCATION EMPOWERS THE UNIVERSITY TO MOVE ON --

15  BECAUSE ULTIMATELY THIS WHOLE SCHEME IS TO PROTECT

16  THE STUDENTS.  CORRECT?

17      A    IT'S TO PROTECT EVERYBODY FROM SEX-BASED

18  DISCRIMINATION.

19      Q    YES.  AND THE UNIVERSITY CAN'T TURN ITS HEAD

20  AWAY FROM KNOWING THAT THEY HAVE A SEXUAL ABUSER IN

21  THE ATHLETIC DEPARTMENT SIMPLY BECAUSE THE STUDENT

22  WHO COMPLAINED DOESN'T WANT TO MOVE FORWARD WITH THE

23  COMPLAINT.  CORRECT?

24      A    I'M SORRY.  COULD YOU REPHRASE THAT AGAIN

25  FOR ME?

**1**    **Q**    YOU KNOW WHAT?  I PROBABLY CONFUSED MYSELF

**2**  ON THAT QUESTION.

**3**        THE JURY -- ONCE THE -- IF THE UNIVERSITY

**4**  AND THE TITLE IX COORDINATOR BELIEVES THAT THIS COACH

**5**  THAT HAS BEEN ACCUSED OF THIS CONDUCT IS A SERIAL

**6**  SEXUAL HARASSER, THEY HAVE TO ADDRESS THIS COACH'S

**7**  CONDUCT EVEN IF THE STUDENT DOESN'T WANT TO MOVE

**8**  FORWARD.  CORRECT?

**9**    **A**    DEPENDING ON THE FACTS AND CIRCUMSTANCES.

**10**  WHAT COMPOUNDS A TITLE IX COORDINATOR TO BE ABLE TO

**11**  CONSIDER MOVING FORWARD WOULD BE THE PRESENCE OF

**12**  PATTERN, PREDATION, THREAT, WEAPONS OR VIOLENCE.

**13**  THOSE ARE ISSUES THAT, IF PRESENT, THEN THE

**14**  CONSIDERATION TO MOVE FORWARD DESPITE THAT PERSON'S

**15**  WISHES NOT TO.

**16**        BUT THE OTHER THING YOU HAVE TO BALANCE IS

**17**  THE ADDITIONAL HARM THAT CAN COME TO THAT PERSON BY

**18**  GOING FORWARD AND DISCLOSING SOMETHING THAT THEY'VE

**19**  NOT WANTED TO DISCLOSE.  THERE ARE EXTRAORDINARILY

**20**  DIFFICULT CIRCUMSTANCES TO GO FORWARD.

**21**        THE OTHER THING IS YOU ALSO HAVE TO MAKE

**22**  SURE THAT YOU WOULD HAVE ENOUGH INFORMATION TO

**23**  PROCEED AND SUPPORT NOT ONLY ALLEGATION BUT REBUTTAL.

**24**  SO THERE IS A GREAT DEAL OF INFORMATION THAT GOES

**25**  INTO MAKING THESE VERY DIFFICULT DECISIONS.

**Q**   BUT UNDER MY SCENARIO, I'M SAYING TO YOU THE
UNIVERSITY HAS A COACH WHO HAS A PATTERN OF -- TITLE
IX COORDINATOR DOES THEIR INVESTIGATION AND THREE
OTHER STUDENTS COME FORWARD SAYING "HE DID THE SAME
THING TO ME."  THREE OTHER MEN -- THREE OTHER YOUNG
MEN COME FORWARD AND SAY "HE KISSED ME.  HE PATTED ME
ON MY BUTT.  HE'S DRIVING BY MY DORM AT NIGHT,
HARASSING ME."  YOU HAVE MULTIPLE OTHER INDIVIDUALS
WHO ARE SAYING THAT THIS PARTICULAR INDIVIDUAL IS A
PROBLEM.

MY QUESTION I'M ASKING TO YOU UNDER THAT
SCENARIO -- I UNDERSTAND THIS IS COMPLICATED STUFF.
BUT UNDER THAT SCENARIO WHERE YOU SAY THERE IS A
CLEAR PATTERN OF CONDUCT BY A COACH, CAN THE
UNIVERSITY LOOK THE OTHER WAY?

**MS. MCDIARMID:**  OBJECTION.  EXTREMELY
LENGTHY, VAGUE AND AMBIGUOUS, CALLS FOR SPECULATION.
I THINK WE TRIED TO BE EXTRAORDINARILY GENEROUS.

**THE COURT:**  OVERRULED.

BY MR. ENGLISH:

**Q**   GO AHEAD.  CAN YOU ANSWER THE QUESTION UNDER
THAT SCENARIO?

**A**   UNDER THAT SCENARIO IT WOULD BE SOMETHING
THAT THE TITLE IX COORDINATOR WOULD CONSIDER WHETHER
TO GO FORWARD ON ABSENT THE INFORMATION.  BUT YES, IT

1   WOULD BE SOMETHING THAT WOULD BE CONSIDERED.

2       Q    AGAIN, THE WHOLE PURPOSE OF TITLE IX, THE

3   WHOLE PURPOSE OF THIS "DEAR COLLEAGUE" LETTER WAS TO

4   SAY TO UNIVERSITIES "YOU HAVE TO PROTECT THE STUDENT

5   BODY" -- MALE, FEMALE, WHOEVER -- "FROM SEXUAL

6   HARASSMENT AND POWER-BASED SEXUAL VIOLENCE AND POWER-

7   BASED VIOLENCE."  IS THAT CORRECT?

8       A    THAT'S CORRECT.

9       Q    AND ULTIMATELY THE UNIVERSITY WOULD HAVE TO

10  MAKE A DECISION AS TO WHETHER OR NOT THEY WANTED TO

11  ALLOW A SERIAL SEXUAL HARASSER TO REMAIN ON CAMPUS.

12  CORRECT?  IF THEY BELIEVED THEY HAD CREDIBLE

13  EVIDENCE, THEY WOULD HAVE TO MAKE THE DECISION.

14  CORRECT?

15      A    THEY WOULD HAVE TO MAKE A DECISION,

16  ABSOLUTELY, YES.

17      Q    LET ME ASK YOU:  AS THE TITLE IX

18  COORDINATOR, UNDER THE SCENARIO I JUST GAVE YOU, YOU

19  NOW HAVE IN FRONT OF YOU THIS YOUNG MAN SAYS -- HE

20  BROUGHT HIS THREE FRIENDS WITH HIM.  THEY SAY,

21  "LISTEN, WE ALL GOT THE SAME PROBLEM.  THE MAN IS

22  TEXTING ME.  HE'S PINCHING US ON OUR BUTTS.  HE'S

23  HARASSING US."  BUT THE STUDENT SAYS "BUT, MS.

24  STEWART, IF MY MOMMA FINDS OUT ABOUT THIS, I'M GOING

25  TO BE HEART BROKEN."

1    DO YOU -- ASSUMING THAT THE FACTS ARE THE

2  WAY I SAY THE FACTS ARE, WOULD YOU IN THAT PARTICULAR

3  INSTANCE SIMPLY SAY "WELL, YOU'VE WITHDRAWN YOUR

4  COMPLAINT AND I'M NOT GOING TO INVESTIGATE ANY

5  FURTHER AS TO WHETHER OR NOT THIS INDIVIDUAL MAY BE A

6  SERIAL HARASSER"?

7    A    NO.  AT THAT POINT I WOULD CONSIDER A

8  HEIGHTENED -- WHETHER THERE IS PATTERN, PREDATION,

9  THREATS, WEAPONS OR VIOLENCE THAT WOULD ALLOW ME TO

10 GO FORWARD AND, IF SO, BALANCING THE RISK OF GOING

11 FORWARD AS WELL.  SO I WOULD UNDERTAKE THE ANALYSIS.

12    Q    WHAT'S THE RISK?  JUST QUICKLY, IF YOU COULD

13 TELL ME QUICKLY WHAT'S THE RISK AND WE'LL MOVE ON.

14 WHAT WOULD BE THE RISK UNDER THAT SCENARIO OF MOVING

15 FORWARD?

16    A    SURE.  I'D WANT TO UNDERSTAND WHAT -- WHY

17 THE COMPLAINANTS MIGHT PERCEIVE THEIR OWN RISK.  IF

18 THEY'RE LIVING IN A RISKY SITUATION, WE CERTAINLY

19 DON'T WANT TO COMPOUND THAT.

20    Q    YES.  BUT EVEN -- LET'S ASSUME THAT THERE IS

21 A THREAT OF VIOLENCE.  THE COACH HAS SAID TO THE

22 STUDENT "LISTEN, IF YOU GO UP THERE AND COMPLAIN TO

23 THE TITLE IX COORDINATOR, I'M GOING TO HAVE YOU.  I'M

24 GOING TO BEAT YOU UP."  YOU WOULD STILL MAKE A

25 DECISION THAT BECAUSE THE STUDENT -- SIMPLY BECAUSE

1    THE STUDENT MIGHT BE AT RISK, WOULD YOU STILL ALLOW

2    THIS INDIVIDUAL FREE REIN ON THE CAMPUS?

3        A    IT'S NOT ONLY ABOUT DECIDING TO GO FORWARD.

4    IT'S ABOUT DECIDING WHEN TO GO FORWARD AS WELL.  SO

5    IT'S NOT JUST A "YES" OR "NO."

6        Q    ALL RIGHT.  SO LET'S -- WE GOT THAT.  WE

7    BEAT THAT HORSE.  THAT HORSE IS DEAD.

8            LET'S TALK ABOUT THE STUDENT WANTS TO MOVE

9    FORWARD.  WHAT'S THE PROCESS?

10       A    SO IF A PERSON INDICATES THAT THEY WANT TO

11   MOVE FORWARD WITH AN INVESTIGATION, THEN THAT

12   INFORMATION IS FIRST ASSIGNED TO AN INVESTIGATOR; A

13   PERSON WHO JUST DOES THIS TYPE OF WORK.  THEY SPEAK

14   AND GATHER INFORMATION ABOUT THE FACTS AND

15   CIRCUMSTANCES, THE NEEDS; THEY MIGHT GATHER

16   INFORMATION IF THERE ARE OTHER PEOPLE INVOLVED.  SO

17   THEY'RE COLLECTING A BODY OF INFORMATION, SUPPORTING

18   DOCUMENTATION IF THAT EXISTS, TO GATHER INFORMATION

19   AND ALSO MAKE SOME CREDIBILITY ASSESSMENTS, TOO.

20       Q    I WANT TO MOVE NOW TO -- I'M SORRY.

21           AND BASICALLY THERE IS A DUE PROCESS PUT IN

22   PLACE THAT PROTECTS THAT COACH AND PROTECTS THAT

23   STUDENT, AND THERE IS -- IS THERE A HEARING?

24       A    DEPENDS.  IT -- IT DEPENDS ON WHEN THIS

25   HAPPENS.  IF THIS HAPPENS NOW, BECAUSE IT -- IT CAN

1   CHANGE BASED ON THE GUIDELINES.  REQUIREMENTS NOW DO

2   REQUIRE A LIVE HEARING.  THAT WASN'T ALWAYS TRUE.  SO

3   IT DEPENDS WHEN SOMETHING HAPPENED.

4        Q    I WANT TO GO DOWN NOW TO P-181.  CAN YOU

5   MOVE IT DOWN, DEE, TO P-181.

6             I'M LOOKING AT THE SECOND PARAGRAPH.  AND

7   MIDWAY THROUGH -- AND I'M GOING TO READ IT TO YOU.

8   FIRST IT SAYS:  "THE TRAINING ALSO SHOULD INCLUDE

9   APPLICABLE CONFIDENTIALITY REQUIREMENTS."  AND YOU

10  TALKED ABOUT THAT.  "IN SEXUAL VIOLENCE CASES, THE

11  FACT-FINDER AND THE DECISION-MAKER ALSO SHOULD HAVE

12  ADEQUATE TRAINING OR KNOWLEDGE REGARDING SEXUAL

13  VIOLENCE."  IN OTHER WORDS, THE UNIVERSITY CAN'T JUST

14  PLUCK SOMEBODY -- THEY CAN'T PLUCK AN EMPLOYEE OUT OF

15  NOWHERE AND SAY -- YOU KNOW, THE PERSON THAT'S

16  RUNNING THE SWIMMING POOL -- AND SAY "YOU'RE THE

17  TITLE IX COORDINATOR."  CORRECT?

18       A    CORRECT.

19       Q    THAT PERSON HAS TO BE -- HAVE THE ADEQUATE

20  TRAINING TO DEAL WITH THESE COMPLEX ISSUES?

21       A    CORRECT.

22       Q    OKAY.  IT SAYS:  "ADDITIONALLY, A SCHOOL'S

23  INVESTIGATION AND HEARING PROCESS CANNOT BE EQUITABLE

24  UNLESS THEY ARE IMPARTIAL."  WHAT DO THEY MEAN THERE?

25       A    PEOPLE CAN'T HAVE PRECONCEIVED NOTIONS GOING

1    INTO DECISION-MAKING; THAT THEY THINK BECAUSE OF

2    SOMEONE'S IDENTITY OR SOME OF THE FACTS OF THE CASE

3    OR -- THAT THEY CAN'T GO IN THERE -- JUST AS YOU

4    JURORS ARE PROVIDED TO BE IMPARTIAL, SO ARE OUR

5    DECISION-MAKERS.

6        Q    "THEREFORE" -- READING -- "ANY REAL OR

7    PERCEIVED CONFLICT OF INTEREST BETWEEN THE FACT-

8    FINDER AND THE DECISION-MAKER AND THE PARTIES SHOULD

9    BE DISCLOSED."

10            ONE OF THE THINGS THAT THE DEPARTMENT OF

11   EDUCATION IS CONCERNED ABOUT IS THAT WHOEVER IS

12   OVERSEEING THAT TITLE IX INVESTIGATION DOES NOT HAVE

13   A CONFLICT.  CORRECT?

14       A    CORRECT.

15       Q    OKAY.  IN OTHER WORDS, IF THAT PERSON IS

16   OVERSEEING THIS INVESTIGATION, THAT PERSON'S FIDELITY

17   IS TO THE PROCESS AND NOT LSU.  CORRECT?

18       A    CORRECT.

19       Q    OKAY.  SO YOU CAN'T PICK THE VICE PRESIDENT

20   -- YOU CAN'T -- YOU CAN'T -- THE PRESIDENT -- THE --

21   AN ASSISTANT TO THE PRESIDENT OF THE UNIVERSITY WHO

22   WORKS FOR THE PRESIDENT CAN'T ALSO BE THE TITLE IX

23   COORDINATOR, BECAUSE THEY HAVE A CONFLICT OF

24   INTEREST.  CORRECT?  DUAL JOBS?

25       A    IDEALLY IT SHOULD BE A STAND-ALONE.  BUT AT

1  MANY CAMPUSES THERE ARE NOT ENOUGH FOLKS TO GO

2  AROUND, SO SOMETIMES FOLKS DO HAVE TO DO DUAL ROLES.

3       Q    LET'S TALK ABOUT LSU.  CERTAINLY A BIG,

4  POWERFUL STATE INSTITUTION LIKE LSU HAS -- HAD THE

5  RESOURCES AND HAS THE RESOURCES TO DESIGNATE A SINGLE

6  INDIVIDUAL AS TITLE IX COORDINATOR.  CORRECT?

7       A    SINCE JIM MARCHAND, SOMEONE HAS BEEN

8  DESIGNATED AS TITLE IX COORDINATOR.

9       Q    AND YOU -- WHEN YOU WERE DESIGNATED AS TITLE

10  IX COORDINATOR, YOU HAD NO OTHER POSITION ALSO.

11  CORRECT?

12      A    I HAD THE CLERY ROLE AND THEN LATER DID COME

13  INTO AN ADA COORDINATOR ROLE IN 2018.  BUT THOSE

14  DIDN'T PRESENT A CONFLICT.

15      Q    THAT'S NOT A CONFLICT BECAUSE, AGAIN, ALL

16  THOSE DUTIES ALIGN?

17      A    CORRECT.

18      Q    OKAY.  I NOW WANT TO GO TO -- I NOW WANT TO

19  GO TO P-184 IN THE SAME DOCUMENT.  "REMEDIES AND

20  ENFORCEMENTS," DO YOU SEE THAT?

21      A    I DO.

22      Q    I'M GOING TO READ IT FOR YOU AND I WANT YOU

23  TO EXPLAIN TO US WHAT THE DEPARTMENT OF EDUCATION

24  GOAL IS.  "AS DISCUSSED ABOVE, IF A SCHOOL DETERMINES

25  THAT SEXUAL HARASSMENT THAT CREATES A HOSTILE

1 ENVIRONMENT HAS OCCURRED, IT MUST TAKE IMMEDIATE

2 ACTION TO ELIMINATE THE HOSTILE ENVIRONMENT AND

3 PREVENT ITS RECURRENCE, AND ADDRESS ITS EFFECTS."

4          CAN YOU EXPLAIN TO THE JURY WHAT THE

5 DEPARTMENT OF EDUCATION IS DIRECTING LSU AND EVERY

6 OTHER UNIVERSITY IN THE COUNTRY TO DO WITH THIS

7 DIRECTION?

8     A    THAT MEANS THAT FOLKS SHOULDN'T HAVE TO

9 LEARN, ENGAGE AND SUCH IN THE SPACES WHERE THEY COME

10 TO DO THOSE THINGS IF THEY ARE EXPERIENCING BEING

11 DISCRIMINATED AGAINST BASED ON THEIR SEX.  THEY NEED

12 TO BE ABLE TO COME AND LEARN AND PARTICIPATE AND DO

13 ALL THOSE THINGS WITH NO -- NO RESPONSE TO THEM BASED

14 ON SEX BEING TREATED DIFFERENTLY.

15     Q    BUT THIS IS VERY SPECIFIC.  IT SAYS:  "IF

16 THE SCHOOL DETERMINES THAT SEXUAL HARASSMENT THAT

17 CREATES A HOSTILE ENVIRONMENT HAS OCCURRED, IT MUST

18 IMMEDIATELY ELIMINATE THAT HOSTILE ENVIRONMENT."

19          SO UNDER THE SCENARIO BY WHICH YOU AND I

20 HAVE BEEN DISCUSSING, ABOUT THE UNIVERSITY NOW KNOWS

21 THAT THE DEFENSIVE LINE COACH IS CREATING A HOSTILE

22 WORK ENVIRONMENT, ACCORDING TO THE DEPARTMENT OF

23 EDUCATION, UNDER THESE GUIDELINES THE UNIVERSITY MUST

24 ELIMINATE THAT -- THEY MUST STEP IN AND MAKE SURE

25 THAT THAT CONDUCT STOPS.  CORRECT?

1    **A**    WHEN WE KNOW OF CONDUCT THAT MIGHT RISE TO

2  THAT LEVEL, THEN WE HAVE TO STOP IT, MAKE SURE IT

3  DOESN'T HAPPEN AGAIN.  ALSO, IF THERE ARE ANY EFFECTS

4  THAT THE PERSON EXPERIENCED, WE HAVE TO MAKE SURE TO

5  ADDRESS THAT, TOO.

6    **Q**    OKAY.

7    **A**    THOSE ARE THE THREE.

8    **Q**    I WANT TO NOW GO DOWN TO P-185.  I'M GOING

9  TO THE SECOND PARAGRAPH.  AND I'M GOING TO READ IT

10 FOR YOU AND I WANT YOU TO EXPLAIN TO THE JURY WHAT

11 THE DEPARTMENT OF EDUCATION IS SEEKING TO DO HERE.

12         "SCHOOLS SHOULD BE AWARE THAT COMPLAINTS OF

13 SEXUAL HARASSMENT OR VIOLENCE MAY BE FOLLOWED BY

14 RETALIATION BY THE ALLEGED PERPETRATOR OR HIS

15 ASSOCIATES."

16         WHAT IS THE DEPARTMENT OF EDUCATION SAYING

17 TO LSU AND OTHER UNIVERSITIES HERE?

18   **A**    THAT THERE SHOULDN'T BE ANY KIND OF CHILLING

19 EFFECT FOR FOLKS CHOOSING TO COME FORWARD AND THAT

20 PEOPLE WHO COME FORWARD WITH A COMPLAINT CAN'T

21 EXPERIENCE ANYTHING ILL FOR CHOOSING TO DO THAT.

22   **Q**    IN OTHER WORDS, IF THE YOUNG MAN WHO

23 REPORTED THIS COACH, THE LAW SPECIFICALLY SAYS YOU

24 HAVE TO PROTECT THIS INDIVIDUAL FROM RETALIATION, IF

25 YOU CAN?

1      **A**    CORRECT.

2      **Q**    AND IF A FELLOW EMPLOYEE REPORTS THIS COACH,

3   SAYING "I'VE BEEN WATCHING THIS COACH DO ALL OF THIS

4   CONDUCT.  I'M WATCHING HIM GRAB THESE BOYS.  I'M

5   WATCHING HIM SEXUALLY HARASS THESE BOYS," THAT YOU

6   CANNOT -- THE SCHOOL -- NEITHER THE COACH, NOR THE

7   UNIVERSITY CAN RETALIATE AGAINST THAT EMPLOYEE WHO IS

8   A RESPONSIBLE EMPLOYEE FOR REPORTING IT.  CORRECT?

9      **A**    CORRECT.

10      **Q**    NOW, WE ASKED ABOUT ENFORCEMENT, BECAUSE

11   THIS IS SERIOUS STUFF.  I'M GOING TO TAKE YOU TO THE

12   SECOND PARAGRAPH.  IT SAYS:  "WHEN OCR FINDS THAT A

13   SCHOOL HAS NOT TAKEN PROMPT AND EFFECTIVE STEPS TO

14   RESPOND TO SEXUAL HARASSMENT OR VIOLENCE, OCR WILL

15   SEEK APPROPRIATE REMEDIES FOR BOTH THE COMPLAINANT

16   AND THE BROADER STUDENT POPULATION."  AND I'M GOING

17   TO SKIP TO THE SENTENCE THAT SAYS:  "OCR SEEKS TO

18   OBTAIN VOLUNTARY COMPLIANCE FROM THE RECIPIENTS."

19          IS LSU A RECIPIENT THAT THEY'RE TALKING

20   ABOUT HERE?

21      **A**    YES.

22      **Q**    AND IT SAYS:  "AND WHEN A RECIPIENT DOES NOT

23   COME INTO COMPLIANCE VOLUNTARILY, OCR MAY INITIATE

24   PROCEEDINGS TO WITHDRAW FEDERAL FUNDING FROM THE

25   DEPARTMENT OR REFER THE CASE TO THE U.S. DEPARTMENT

1   OF JUSTICE."

2        SO WHAT OCR IS SAYING HERE:  "WE TAKE THIS

3   SERIOUS, AND IF YOU DON'T COMPLY WITH THESE

4   GUIDELINES, THERE WILL BE CONSEQUENCES."  CORRECT?

5     **A**    CORRECT.

6     **Q**    AND IN THIS DOCUMENT IN 2011, THE OBAMA

7   ADMINISTRATION WASN'T JUST SAYING TO LSU -- WE'RE NOT

8   PICKING ON LSU, NOT NOW -- WEREN'T JUST SAYING TO LSU

9   BUT THEY WERE SAYING TO ALL OF THESE UNIVERSITIES:

10  "IF YOU DON'T PROPERLY APPLY THESE GUIDELINES, WE

11  WILL USE OUR ENFORCEMENT POWER TO MAKE YOU COME INTO

12  COMPLIANCE."  CORRECT?

13    **A**    THAT IS CORRECT.

14    **Q**    NOW I WANT YOU TO GO TO P-187.  SAME

15  DOCUMENT, P-187.  CAN YOU GO TO THE SAME DOCUMENT.

16        NOW, I WANT TO GO BACK BECAUSE MY

17  DISTINGUISHED COLLEAGUE MADE A STATEMENT IN HIS

18  OPENING STATEMENT -- AND IF I'M WRONG, HE'LL CLARIFY

19  IT -- THAT TITLE IX DEALS EXCLUSIVELY WITH STUDENTS.

20  BUT TITLE IX DOESN'T DEAL EXCLUSIVELY WITH STUDENTS.

21  TITLE IX PROTECTS EMPLOYEES WHO REPORT.  CORRECT?

22    **A**    IT CAN.  IT CAN.  BUT THE CHALLENGE IS THAT

23  IT'S USURP BY VII -- BY TITLE VII AT CERTAIN POINTS.

24    **Q**    DOES THE TITLE -- IF THE COACH WHO REPORTS

25  THE OTHER COACH'S CONDUCT UNDER TITLE IX -- I

1  UNDERSTAND TITLE VII.  UNDER TITLE IX IT IS ILLEGAL

2  TO RETALIATE AGAINST THAT OTHER COACH FOR REPORTING,

3  DOING HIS JOB OR HER JOB UNDER TITLE IX.  IS THAT

4  CORRECT?

5      **A**    TITLE IX DOES PROTECT AGAINST RETALIATION.

6  BUT IF IT'S UNDER TITLE VII, THEN IT WOULD APPLY

7  THERE.

8      **Q**    I UNDERSTAND.

9          NOW, IT SAYS:  "SCHOOL INVESTIGATION AND

10  REPORTS TO OCR."  OKAY?  WE'RE ON P-187.  OKAY?  AND

11  I'M GOING TO GO DOWN TO -- LET'S GO DOWN TO P-188.

12  AND I BELIEVE IT STARTS UP ON THE NEXT ONE.  YES,

13  OKAY.

14          AT THE BOTTOM OF P-187 -- I'M GOING TO READ

15  THIS WHOLE THING BECAUSE THIS IS VERY IMPORTANT.  IT

16  SAYS:  "CONDUCTING, IN CONJUNCTION WITH STUDENT

17  LEADERS, A SCHOOL CAMPUS 'CLIMATE CHECK' TO ASSESS

18  THE EFFECTIVENESS OF EFFORTS TO ENSURE THE SCHOOL IS

19  FREE FROM SEXUAL HARASSMENT AND VIOLENCE, USING

20  RESULTING INFORMATION TO INFORM FUTURE PROACTIVE

21  STEPS WILL BE TAKEN; AND" -- IF YOU GO TO THE NEXT

22  PAGE, IT SAYS -- NOW, THIS IS WHAT I WANT YOU TO

23  EXPLAIN TO US, WHAT IS THE DEPARTMENT OF EDUCATION

24  TRYING TO ACCOMPLISH.  "SUBMITTING TO OCR COPIES OF

25  ALL GRIEVANCES FILED BY STUDENTS ALLEGING SEXUAL

1  HARASSMENT OR VIOLENCE, AND PROVIDING OCR WITH

2  DOCUMENTS RELATED TO THE INVESTIGATIONS OF EACH

3  COMPLAINT, SUCH AS WITNESS INTERVIEWS, INVESTIGATOR

4  NOTES, EVIDENCE SUBMITTED BY THE PARTIES,

5  INVESTIGATIVE REPORTS AND SUMMARIES, AND ANY FINAL

6  DISPOSITION LETTERS, DISCIPLINARY RECORDS, AND

7  DOCUMENTATION REGARDING ANY APPEALS."

8        WHAT IS THE DEPARTMENT OF EDUCATION SAYING

9  HERE?

10    **A**   THAT IF AN INSTITUTION FAILS TO UPHOLD ITS

11  OBLIGATIONS, THAT THEY HAVE A RIGHT TO LOOK AT ANY

12  OTHER CASE OR CASE INFORMATION, ANY OTHER GRIEVANCES,

13  INFORMATION THAT'S FILED --

14    **Q**   AND --

15    **A**   -- BY STUDENTS.

16    **Q**   I'M SORRY.  I DIDN'T MEAN TO CUT YOU OFF.  I

17  APOLOGIZE.  GO AHEAD.  I DIDN'T MEAN TO CUT YOU OFF.

18    **A**   I SAID "FILED BY STUDENTS."

19    **Q**   OKAY.  SO IF A STUDENT FILES A GRIEVANCE AND

20  IT GOES THROUGH THE PROCESS, THE UNIVERSITY IS

21  REQUIRED TO REPORT THIS TO OCR, IF I'M READING THIS

22  RIGHT.  CORRECT?

23    **A**   STATISTICAL INFORMATION.

24    **Q**   STATISTICAL INFORMATION.

25    **A**   CORRECT, STATISTICAL INFORMATION.

**1**    Q    NOT SPECIFICALLY -- NOT SPECIFICALLY

**2**  GRIEVANCE.  BUT THEY HAVE TO SAY "WE HAD 200

**3**  GRIEVANCES THIS YEAR AND WE -- YOU HAVE TO REPORT

**4**  WHAT -- ALL THE GRIEVANCES THAT YOU'RE REPORTING."

**5**  CORRECT?

**6**    A    RIGHT.  YOU PROVIDE STATISTICAL INFORMATION,

**7**  NOT ANYTHING THAT'S PERSONALLY IDENTIFIABLE.

**8**    Q    NOW, I WANT TO DRAW YOUR ATTENTION -- THIS

**9**  POLICY WAS IN PLACE IN 2011.  CORRECT?

**10**    A    CORRECT.

**11**    Q    THIS POLICY WAS IN PLACE IN 2012 AND 2013.

**12**  CORRECT?

**13**    A    CORRECT.

**14**    Q    OKAY.  ARE YOU FAMILIAR WITH THE

**15**  INVESTIGATION OF ALLEGATIONS OF SEXUAL MISCONDUCT

**16**  AGAINST LES MILES?

**17**    A    NO, I'M NOT.

**18**    Q    YOU NEVER HEARD ABOUT LES MILES SEXUALLY

**19**  HARASSING STUDENTS IN 2011 AND 2012?  I'M SORRY.

**20**  2012 AND 2013?

**21**    A    I CAME INTO THE TITLE IX ROLE IN 2016.

**22**    Q    I UNDERSTAND -- YOU KNOW WHAT?  LET ME ASK

**23**  THE QUESTION ANOTHER WAY.

**24**    DID YOU READ THE HUSCH BLACKWELL REPORT?

**25**    A    YES.

1    Q    DID YOU READ IT IN ITS ENTIRETY?

2    A    I DID.

3    Q    DID THE HUSCH BLACKWELL REPORT SPECIFICALLY

4    ADDRESS LES MILES' SEXUAL MISCONDUCT?

5    A    YES.

6    Q    AND YOU READ THAT IN THE REPORT.  CORRECT?

7    A    I DID.

8    Q    OKAY.  AND YOU READ WHAT THE HUSCH

9    BLACKWELL -- THEY TALKED ABOUT THE INVESTIGATION.

10   CORRECT?

11   A    YES.

12   Q    EXPLAIN TO THE JURY WHO -- UNDER YOUR

13   UNDERSTANDING -- OF WHO HUSCH BLACKWELL IS AND THE

14   HUSCH BLACKWELL REPORT.

15   A    HUSCH BLACKWELL IS A LAW FIRM, AND THEY'RE

16   VERSED IN DOING TITLE IX WORK IN ADDITION TO OTHER

17   WORK.  AND THERE WERE TWO FOLKS WHO CAME FROM HUSCH

18   BLACKWELL TO CONDUCT ASSESSMENT OF LSU REGARDING

19   TITLE IX.

20   Q    AND THIS WAS A RESULT OF -- FOR LACK OF A

21   BETTER TERM, THIS WAS A RESULT OF THE UNIVERSITY'S

22   FAILURE IN PART -- NOT JUST ON LES MILES BUT IN

23   PART -- THIS WAS A RESULT OF THE UNIVERSITY FAILURE

24   TO PROPERLY APPLY THESE REGULATIONS THAT WE HAVE BEEN

25   TALKING ABOUT, NOT JUST UNIVERSITY WIDE, BUT

1  CERTAINLY THEY WERE FOCUSED ON THE ATHLETIC

2  DEPARTMENT.  CORRECT?

3         **MS. MCDIARMID:**  OBJECTION.  LEADING

4  QUESTIONS.

5         **MR. ENGLISH:**  I'LL RESTATE THE QUESTION.

6  I'LL WITHDRAW THE QUESTION.  WITHDRAW THE QUESTION.

7         **THE COURT:**  I BELIEVE THAT SHE'S BEEN --

8  THAT HE CAN ASK LEADING QUESTIONS.

9         **MS. MCDIARMID:**  I'M SORRY.  I DON'T THINK

10  THAT THAT WAS OUR UNDERSTANDING OF THIS WITNESS.

11         **THE COURT:**  WELL, I TOLD YOU I'D HAVE TO SEE

12  HOW IT WENT, AND I THINK IT'S WENT -- IT WENT.

13         **MS. MCDIARMID:**  UNDERSTOOD.  THANK YOU, YOUR

14  HONOR.

15  **BY MR. ENGLISH:**

16     **Q**   IN 2020 AND 2021, ARE YOU AWARE THAT USA

17  TODAY PUBLISHED A STORY ABOUT LSU'S HANDLING OF

18  SEXUAL HARASSMENT AND SEXUAL COMPLAINTS IN ITS

19  ATHLETIC DEPARTMENT?  ARE YOU AWARE OF THAT?

20     **A**   YES.

21     **Q**   YOU WERE THE TITLE IX COORDINATOR THEN.

22  CORRECT?

23     **A**   THROUGH APRIL 2021, YES.

24     **Q**   YES, OKAY.  AND PART OF WHAT DROVE THAT

25  REPORT WAS NOT JUST THE INCIDENTS WITH LES MILES BUT

1  THAT THERE WAS A CULTURE IN THE ATHLETIC DEPARTMENT

2  WHEREBY TITLE IX VIOLATIONS WERE NOT BEING TAKEN

3  SERIOUSLY.  IS THAT CORRECT?

4      **A**    I THINK THAT WAS THE POSITION OF SOME OF THE

5  PEOPLE WHO REPORTED.

6      **Q**    BUT LSU WENT OUT AND HIRED A LAW FIRM.

7  CORRECT?

8          COULD WE GO PULL UP -- AND I STATED IN MY

9  OPENING STATEMENT -- GALLIGAN'S HUSCH BLACKWELL

10  STATEMENT.  CAN YOU PULL IT UP AND PUT IT BACK UP ON

11  THE SCREEN.

12      **THE COURT:**  MR. ENGLISH, WHILE YOU'RE DOING

13  THAT, I WANT TO GO OFF THE RECORD FOR A MINUTE AND

14  LET MY CASE MANAGER VISIT WITH THE JURY WHILE WE'RE

15  STILL IN THE COURTROOM SO WE DON'T TAKE SO MUCH TIME.

16          IF YOU WOULD GO OVER AND VISIT OFF THE

17  RECORD WITH THEM ABOUT WHAT TIME WE'LL END TODAY AND

18  IF THEY ARE AGREEABLE -- IF THEY ONLY CAN STAY TILL

19  FIVE TODAY, ARE THEY OKAY RIGHT NOW WITH GOING TILL

20  FIVE OR DO THEY NEED A BREAK.

21              **(OFF THE RECORD)**

22      **THE COURT:**  ALL RIGHT.  WE'RE BACK ON THE

23  RECORD.

24          WE ARE GOING TO TAKE A TEN-MINUTE

25  COMFORT BREAK.  AND I REALLY MEAN IT; BE BACK HERE

1   READY TO -- WALK IN THAT DOOR IN TEN MINUTES, SO THAT

2   WOULD BE AT 4:10.

3           AND ANY OF THE LAWYERS, I WANT YOU OR

4   THE CLIENT REPRESENTATIVE, BE IN YOUR SPOT WHEN WE

5   START.  I DON'T LIKE DISTRACTIONS WITH PEOPLE WALKING

6   IN LATE.  SO YOU-ALL BE BACK IN YOUR CHAIRS WHEN WE

7   START AT 4:10.

8           **THE COURTROOM DEPUTY:**  ALL RISE.

9           **(WHEREUPON, THE JURY IS OUT OF THE**

10  **COURTROOM.)**

11          **THE COURT:**  LET'S BRING THE JURY BACK IN.

12          **(WHEREUPON, THE JURY IS IN THE COURTROOM.)**

13          **THE COURT:**  ALL RIGHT.  BE SEATED.

14          YOU MAY PROCEED.

15  **BY MR. ENGLISH:**

16    **Q**   NOW, MS. STEWART, YOU WERE WORKING AT LSU IN

17  2012.  CORRECT?

18    **A**   THAT'S CORRECT.

19    **Q**   I BELIEVE YOU HAVE TESTIFIED THAT PREVIOUS

20  TO YOU BECOMING A TITLE IX COORDINATOR, YOU WERE IN

21  THE -- FOR LACK OF A BETTER TERM, YOU WERE IN THE

22  MACHINERY OF TITLE IX INVESTIGATIONS?

23    **A**    NOT INVESTIGATION, NO.  I WORKED IN SUPPORT.

24  THAT COULD BE FOR A COMPLAINANT, IT COULD BE FOR A

25  RESPONDENT, BUT I HAD NO INVESTIGATIVE DUTIES.

1   **Q**   YOU HAD -- I MIS- -- YOU INDICATED THERE WAS

2   NO TITLE IX COORDINATOR IN 2012.  CORRECT?

3   **A**   I DON'T RECALL WHEN THE DESIGNATION

4   HAPPENED, SO I COULDN'T SAY YES OR NO.

5   **Q**   YOU READ THE HUSCH BLACKWELL REPORT.

6   CORRECT?

7   **A**   I DID.

8   **Q**   IN FACT, THE HUSCH BLACKWELL REPORT TALKED

9   ABOUT YOU -- NOT TALK ABOUT YOU.  I DIDN'T MEAN IT

10  THAT WAY.  THAT DIDN'T COME OUT RIGHT.

11       THE HUSCH BLACKWELL REPORT TALKED ABOUT YOUR

12  APPOINTMENT AS TITLE IX COORDINATOR.  CORRECT?

13  **A**   THAT'S CORRECT.

14  **Q**   AND THE HUSCH BLACKWELL TALKED -- I BELIEVE

15  THE HUSCH BLACKWELL SAID UP UNTIL THAT PARTICULAR

16  TIME THERE WAS NO TITLE IX OFFICE AT LSU UNTIL YOU

17  WERE APPOINTED AS TITLE IX COORDINATOR.  IS THAT

18  CORRECT?

19  **A**   I WOULD DISAGREE WITH THAT, BECAUSE JIM

20  MARCHAND WAS NAMED PRIOR TO MY TIME.

21  **Q**   ALL RIGHT.  SO I WAS ASKING YOU ABOUT THE

22  HANDLING OF THE LES MILES INVESTIGATION OF TWO

23  STUDENTS COMPLAINED AGAINST HIM IN 2012 AND 2011 -- I

24  MEAN 2012 AND 2013.  AND I THINK YOUR STATEMENT WAS

25  YOU DIDN'T REALLY KNOW ANYTHING ABOUT THAT.  CORRECT?

1    **A**    THAT'S CORRECT.

2    **Q**    YOU DIDN'T KNOW ANYTHING ABOUT IT AT THE

3  TIME.  CORRECT?

4    **A**    THAT'S CORRECT.

5    **Q**    NO INFORMATION ABOUT LES MILES COMING TO YOU

6  OR IN YOUR OFFICE COMING TO YOU; YOU HEARD NOTHING

7  ABOUT THAT?

8    **A**    THAT'S CORRECT.

9    **Q**    DO YOU -- ARE YOU AWARE OF AS TO WHETHER OR

10  NOT WHEN TWO STUDENTS ACCUSED LES MILES OF SEXUAL

11  MISCONDUCT IN 2012 AND 2013, IT WAS REPORTED TO --

12  WHO DID YOU SAY THE TITLE IX COORDINATOR WAS?  I

13  APOLOGIZE.

14    **A**    THE GENTLEMAN THAT PRECEDED ME WAS JIM

15  MARCHAND.

16    **Q**    WAS IT REPORTED TO JIM MARCHAND?

17    **A**    NOT THAT I'M AWARE OF.

18    **Q**    NOW, THE HUSCH BLACKWELL REPORT TALKED

19  PROMINENTLY -- NOT PROMINENTLY, BUT THEY SPOKE ABOUT

20  THE ATHLETIC DEPARTMENT AND WHAT WAS GOING ON IN THE

21  ATHLETIC DEPARTMENT.  CORRECT?

22    **A**    COULD YOU BE MORE SPECIFIC?

23    **Q**    YOU'RE RIGHT.  THAT'S A STUPID QUESTION.  I

24  APOLOGIZE.  I NEED TO BE MORE PRECISE.

25        THERE WAS SPECIFIC FINDINGS IN THE HUSCH

1   BLACKWELL REPORT AS TO HOW THE TITLE IX COMPLAINTS

2   WERE HANDLED IN THE ATHLETIC DEPARTMENT.  CORRECT?

3       A    I WOULDN'T SAY IT WAS HOW THEY WERE HANDLED.

4   THEY WERE ALWAYS TIMELY, THEY WERE EFFICIENT, THEY

5   WERE ACCURATE, BUT THEY WERE NOT COMING TO ME

6   DIRECTLY.  THAT WAS THE CONCERN.  BUT THE CONCERN WAS

7   NOT THAT THEY WERE NOT MADE TO ME IN A TIMELY FASHION

8   OR ACCURATELY.

9       Q    SO YOU'RE SAYING THAT THE HUSCH BLACKWELL

10  REPORT NEVER FOUND THAT TITLE IX COMPLAINTS IN THE

11  ATHLETIC DEPARTMENT WERE DIRECTED TO MIRIAM SEGAR AND

12  NOT THE TITLE IX OFFICE?  IS THAT WHAT YOUR TESTIMONY

13  IS?

14      A    MY TESTIMONY WAS THE CONCERN THAT THEY WERE

15  ROUTED THROUGH ANOTHER PERSON FIRST BEFORE COMING TO

16  ME.  BUT THE CONCERN WAS NOT ON THE TIMELINESS,

17  ACCURACY, OR INTEGRITY OF THAT HAPPENING.

18      Q    THE HUSCH BLACKWELL -- THE OTHER PERSON YOU

19  ARE TALKING ABOUT IS MIRIAM SEGAR?

20      A    THAT'S CORRECT.

21      Q    ALL TITLE IX COMPLAINTS WERE BEING -- IN THE

22  ATHLETIC DEPARTMENT -- WERE BEING DIRECTED TO MIRIAM

23  SEGAR.  CORRECT?

24      A    THAT'S HOW THEY FREQUENTLY CAME TO ME, YES.

25      Q    FROM MIRIAM SEGAR?

1    **A**    CORRECT.

2    **Q**    NOW, WE JUST SPENT THE LAST HOUR GOING

3    THROUGH THE "DEAR COLLEAGUE" LETTER TALKING ABOUT THE

4    PROPER PROCEDURE BY THIS PROCESS.  WOULD YOU AGREE

5    THAT TITLE IX COMPLAINTS GOING THROUGH MIRIAM SEGAR

6    WAS A VIOLATION OF DOE REGULATIONS?  WOULD YOU AGREE

7    WITH THAT?

8    **A**    I DON'T KNOW IF IT'S THAT SIMPLISTIC.  AND

9    HERE'S WHY I SAY THAT.  YES, REPORTS WERE TO COME TO

10   ME AND THAT WAS MY DESIRED METHOD.  SO IT WAS

11   SUPPOSED TO COME DIRECTLY FROM A PERSON WHO WAS A

12   RESPONSIBLE EMPLOYEE DIRECTLY TO ME.

13        DID I HAVE CONCERNS THAT WHAT MIRIAM WAS

14   SHARING WASN'T ACCURATE, TIMELY OR REFLECTIVE OF WHAT

15   WAS REPORTED?  NO.  BUT YES, I WOULD HAVE DESIRED

16   THAT THEY DID COME DIRECTLY.  AND THAT WAS REFLECTED

17   IN THE HUSCH BLACKWELL REPORT.

18   **Q**    I'M GOING TO ASK YOU THIS QUESTION VERY

19   SPECIFICALLY.  AND WE HAVE NOW -- WE SPENT -- WHAT I

20   WANTED TO DO WITH YOU AND WHAT YOU HAVE DONE A GREAT

21   JOB OF DOING, BY THE WAY, IS EDUCATING US ON THE

22   TITLE IX REGULATIONS.  OKAY?  AND WE WENT THROUGH THE

23   "DEAR COLLEAGUE" LETTER.  AND THE LETTER -- AND YOU

24   ARE A LAWYER BY TRAINING.  CORRECT?

25   **A**    YES.

1    Q    AND THE "DEAR COLLEAGUE" LETTER WAS CLEAR

2  AND UNAMBIGUOUS THAT ALL TITLE IX COMPLAINTS WERE TO

3  BE SENT TO THE TITLE IX DIRECTOR.  CORRECT?

4    A    THAT IS CORRECT.

5    Q    AND PART OF THE REASON WHY THEY DID NOT WANT

6  THEM TO GO TO MIRIAM SEGAR, BECAUSE MIRIAM SEGAR HAD

7  TWO POSITIONS.  SHE WAS THE ASSOCIATE ATHLETIC

8  DIRECTOR AND SHE WAS ACTING AS THE TITLE IX

9  COORDINATOR OR POINT PERSON, HOWEVER YOU WANT TO DO

10 IT, IN THE ATHLETIC DEPARTMENT.  CORRECT?

11   A    COUPLE OF QUESTIONS THERE.  COULD YOU BREAK

12 IT DOWN FOR ME, PLEASE?

13   Q    YOU KNOW WHAT?  AGAIN, THAT WAS AN

14 INARTFULLY ASKED QUESTION.

15   A    THANK YOU.

16   Q    AND I'M TALKING TO A LAWYER AND I SHOULD

17 HAVE BEEN MORE ARTFUL -- ARTFULLY THAN THAT.  OKAY?

18       YOU TESTIFIED IN YOUR DEPOSITION THAT F.

19 KING ALEXANDER SENT A DIRECTIVE OUT TO ALL THE

20 UNIVERSITIES -- WHAT YEAR WAS THIS?  2018?

21   A    AROUND ABOUT.

22   Q    HE SENT A DIRECTIVE OUT TO ALL OF THE

23 UNIVERSITY EMPLOYEES SAYING "MOVING FORWARD, ALL

24 TITLE IX COMPLAINTS ARE TO GO TO THE TITLE IX

25 COORDINATOR."  IS THAT CORRECT?

1    **A**    THAT IS CORRECT.

2    **Q**    AND YOU STATED IN YOUR DEPOSITION THAT JOE

3    ALLEVA ISSUED A EMAIL SAYING THAT ALL TITLE IX

4    COMPLAINTS IN THE ATHLETIC DEPARTMENT WERE TO BE

5    ROUTED THROUGH MIRIAM SEGAR.  DO YOU REMEMBER THAT

6    TESTIMONY?

7    **A**    I DO.

8    **Q**    OKAY.  SO THAT IS CORRECT.  CORRECT?

9    **A**    YES.

10    **Q**    IN YOUR DEPOSITION YOU INDICATED THAT YOU

11    HAD DEEP CONCERNS THAT THEY WERE CONTINUING TO DIRECT

12    THE TITLE IX COMPLAINTS IN THE ATHLETIC DEPARTMENT TO

13    MIRIAM SEGAR.  CORRECT?

14    **A**    I HAD CONCERNS THAT THEY WEREN'T COMING

15    DIRECTLY.  I DIDN'T HAVE CONCERNS ABOUT MIRIAM

16    SPECIFICALLY.  AND MY CONCERN WAS FOR TIMELINESS AND

17    THAT THE MORE PEOPLE THAT ARE IN LINE, A LITTLE BIT

18    CAN BE LOST.  AND THE OTHER PART IS THAT WE CAN'T

19    RESPOND TO THE COMPLAINANT AS QUICKLY.

20            SO DID I HAVE A CONCERN ABOUT THAT NOT --

21    THEM NOT COMING QUICKLY FOR EFFICIENCY AND TIMELINESS

22    AND RESPONSE, YES, BUT NOT ABOUT SPECIFICALLY MIRIAM

23    SEGAR AND ANY QUESTION OF INTEGRITY.

24    **Q**    BUT THE DEPARTMENT OF EDUCATION DIDN'T WANT

25    TO RELY UPON YOUR BELIEF OF MIRIAM SEGAR'S INTEGRITY,

1   YOUR BELIEF ON WHETHER OR NOT SHE WAS DOING THE

2   CORRECT PROCESS RIGHT.  THE TITLE IX, THE DEPARTMENT

3   OF EDUCATION, THE OFFICE OF CIVIL RIGHTS WAS CLEAR:

4   ALL TITLE IX COMPLAINTS MADE AT A UNIVERSITY WAS TO

5   GO TO THE TITLE IX COORDINATOR.  CORRECT?

6       **A**    THAT IS CORRECT.

7       **Q**    AND IT IS UNFAIR AND IMPROPER FOR A STUDENT

8   WHO MAY HAVE AN ISSUE FOR TO RELY -- AND I'M NOT

9   QUESTIONING YOUR INTEGRITY, BY THE WAY.  I WANT YOU

10  TO UNDERSTAND THAT I'M NOT QUESTIONING YOUR

11  INTEGRITY.  BUT I'M SAYING THAT THE DEPARTMENT OF

12  EDUCATION, AS WE JUST TALKED ABOUT, THEY WERE VERY,

13  VERY CLEAR; THEY WANTED THE TITLE IX COMPLAINTS TO GO

14  TO THE TITLE IX COORDINATOR.  CORRECT?

15          **MS. MCDIARMID:**  OBJECTION.  ASKED AND

16  ANSWERED, ARGUMENTATIVE.

17          **MR. ENGLISH:**  I WITHDRAW THE QUESTION.

18          **THE COURT:**  OVER -- WHAT?

19          **MR. ENGLISH:**  I WITHDRAW THE QUESTION, YOUR

20  HONOR, BECAUSE I DID ASK IT, YES.

21  **BY MR. ENGLISH:**

22      **Q**    MIRIAM SEGAR WAS HOLDING A DUAL ROLE.

23  CORRECT?

24      **A**    NO.  THERE WAS NO OFFICIAL DESIGNATION BY

25  OUR OFFICE OF HER.

1  **Q**   SO SHE SHOULDN'T HAVE BEEN HANDLING ANY

2  TITLE IX COMPLAINTS AT ALL THEN IF SHE WASN'T

3  OFFICIALLY DESIGNATED FROM YOUR OFFICE?

4       **MS. MCDIARMID:**  OBJECTION.  COUNSEL IS JUST

5  TESTIFYING AT THIS POINT.

6       **THE COURT:**  OVERRULED.  SHE'S ON CROSS.

7  **BY MR. ENGLISH:**

8  **Q**   I'M ASKING YOU A QUESTION.

9  **A**   I'M SORRY.  COULD I ASK YOU TO RESTATE IT,

10 PLEASE?

11 **Q**   NO, YOU CANNOT.  YOU KNOW, COUNSEL, YOU KNOW

12 HOW IT WORKS.  I ASK THE QUESTIONS.  OKAY?  I'M NOT

13 BEING MEAN, BUT WE'RE GOING TO GET THROUGH THIS.

14      MY POINT TO YOU IS, IS THAT YOU NEVER --

15 YOUR OFFICE NEVER DESIGNATED HER TO HANDLE TITLE IX

16 COMPLAINTS?

17 **A**   SHE WAS NOT DESIGNATED AS THE DEPUTY

18 COORDINATOR, NO.

19 **Q**   EXACTLY.  SHE HAD NO ROLE IN YOUR OFFICE.

20 SHE WORKED -- SHE WAS THE ASSOCIATE ATHLETIC DIRECTOR

21 AT LSU.  CORRECT?

22 **A**   THAT'S MY UNDERSTANDING, YES.

23 **Q**   SHE WORKED FOR JOE ALLEVA, DIRECTLY UNDER

24 JOE ALLEVA.  CORRECT?

25 **A**   TO MY KNOWLEDGE, YES.

**1**     Q    SHE -- AFTER JOE ALLEVA LEFT, SHE WORKED

**2**  DIRECTLY FOR SCOTT WOODWARD.  IS THAT CORRECT?

**3**     A    MY UNDERSTANDING, YES.

**4**     Q    SO ONE OF THE THINGS THAT THE DEPARTMENT OF

**5**  EDUCATION WAS TRYING TO -- AS WE JUST TALKED ABOUT, A

**6**  CONFLICT OF INTEREST.  NOW, YOU SAY -- YOU SAY, "I

**7**  BELIEVE MIRIAM SEGAR.  SHE DID EVERYTHING RIGHT."

**8**  OKAY?

**9**        BUT THE EVIDENCE SHOWS, THE HUSCH BLACKWELL

**10**  REPORT STATED -- AND YOU STATED IN YOUR

**11**  DEPOSITION THAT "ALL TITLE IX COMPLAINTS WERE TO COME

**12**  TO MY OFFICE AND NOT MIRIAM SEGAR."  CORRECT?

**13**     A    THAT IS CORRECT.

**14**        **MS. MCDIARMID:**  OBJECTION.  ASSUMES FACTS

**15**  NOT IN EVIDENCE, IMPROPER IMPEACHMENT.

**16**        **THE COURT:**  OVERRULED.

**17**  BY MR. ENGLISH:

**18**     Q    WINSTON DECUIR -- WHO IS WINSTON DECUIR?

**19**     A    HE IS THE GENERAL COUNSEL -- VICE PRESIDENT

**20**  AND GENERAL COUNSEL FOR LEGAL AFFAIRS AT LSU.

**21**     Q    DID YOU EVER HAVE ANY CONVERSATIONS WITH

**22**  WINSTON DECUIR ABOUT TITLE IX COMPLAINTS BEING

**23**  DIRECTED IN ATHLETICS?

**24**        **MS. MCDIARMID:**  OBJECTION.  TO THE EXTENT

**25**  THIS CALLS FOR PRIVILEGED INFORMATION, THE WITNESS

1   SHOULDN'T REVEAL IT.

2          **THE COURT:**  HE HASN'T ASKED THAT YET.  HE

3   SAID "DID YOU HAVE CONVERSATIONS?"  HE CAN ASK THAT.

4          **MS. MCDIARMID:**  AND JUST TO THE EXTENT HER

5   ANSWER DOES REQUIRE --

6          **THE COURT:**  OVERRULED.  IF HE ASKS WHAT

7   WAS IT SHE SAID, THEN YOU STAND UP AND OBJECT, BUT

8   YOU WAIT UNTIL THE QUESTION IS ASKED.

9          **MS. MCDIARMID:**  THANK YOU, YOUR HONOR.

10  **BY MR. ENGLISH:**

11     **Q**   DID YOU STATE IN YOUR DEPOSITION THAT YOU

12  HAD A CONVERSATION WITH WINSTON DECUIR ABOUT THE

13  DIRECTION OF TITLE IX COMPLAINTS IN THE ATHLETIC

14  DEPARTMENT?

15     **A**   YES.

16     **Q**   WAS -- ON THAT DEPOSITION WAS THE BOARD'S

17  COUNSEL ON THAT -- SITTING IN THAT DEPOSITION?  WHEN

18  YOU WERE DEPOSING, WAS -- I BELIEVE -- WAS ANY -- AT

19  THAT DEPOSITION THERE WERE LSU LAWYERS IN THAT

20  DEPOSITION.  CORRECT?

21     **A**   AS I RECALL.

22     **Q**   YES.  AND WHEN YOU HAVE TESTIFIED AS TO WHAT

23  WINSTON DECUIR TOLD YOU ABOUT DIRECTING COMPLAINTS TO

24  THE TITLE IX OFFICE, DID ANY OF LSU'S LAWYERS OBJECT

25  TO YOUR TESTIMONY ABOUT WHAT WINSTON DECUIR STATED TO

1  YOU?

2      **A**    I CAN'T RECALL.

3      **Q**    DID THEY SAY TO YOU "STOP.  DON'T DO THIS.

4  THIS IS ATTORNEY-CLIENT PRIVILEGE"?  DID THEY MAKE

5  THAT STATEMENT TO YOU?

6      **A**    I DON'T RECALL.

7      **Q**    ALL RIGHT.  NOW I CAN PULL YOUR DEPOSITION,

8  BUT I REALLY DON'T WANT TO WASTE THAT TIME.

9          IN YOUR DEPOSITION YOU STATED THAT -- NOW

10  YOU CAN MAKE YOUR OBJECTION.

11          IN YOUR DEPOSITION YOU STATED THAT WINSTON

12  DECUIR TOLD YOU THAT ALL TITLE IX COMPLAINTS WERE TO

13  STAY WITH MIRIAM SEGAR.  CORRECT?

14      **A**    I DISAGREE WITH THAT.

15      **Q**    TELL ME WHAT YOU SAID.  BECAUSE WE CAN --

16      **MS. MCDIARMID:**  OBJECTION TO THE EXTENT THAT

17  COUNSEL IS ASKING FOR THE WITNESS TO REVEAL

18  PRIVILEGED INFORMATION.

19      **THE COURT:**  I THINK HE'S MAKING THE POINT

20  THAT THAT PRIVILEGE WAS WAIVED BECAUSE SHE TESTIFIED

21  ABOUT IT AT HER DEPOSITION.

22      **MS. MCDIARMID:**  WE DON'T -- THE BOARD

23  DOESN'T AGREE THAT THAT IS THE CASE.  WE DO NOT

24  BELIEVE THAT THE PRIVILEGE HAS BEEN WAIVED.  WE CAN

25  GO TO THE HEADSETS IF YOU'D LIKE.

1          THE COURT:  I'M SORRY?

2          MS. MCDIARMID:  I THINK THAT THERE NEEDS TO

3   BE FURTHER DISCUSSION ON THIS.  I'M HAPPY TO OFFER

4   IT.

5          THE COURT:  ARE YOU GOING TO THE DEPOSITION?

6          MR. ENGLISH:  YES, YOUR HONOR.

7          THE COURT:  OKAY.  WELL, LET'S PUT ON OUR

8   HEADSETS FOR A MINUTE.

9          **(WHEREUPON, THE FOLLOWING BENCH DISCUSSION**

10  **VIA HEADSETS WAS HELD.)**

11         MR. ENGLISH:  YES, YOUR HONOR.

12         THE COURT:  OKAY.  LOOK, WE STILL HAVE VERY

13  BAD -- EVERYBODY DON'T TOUCH YOUR WIRES.  IF YOU

14  DON'T NEED TO BE ON, DON'T BE ON IS PROBABLY A

15  GOOD -- OKAY.

16         ALL RIGHT.  MS. MCDIARMID?

17         MS. MCDIARMID:  I'M NOT OBVIOUSLY SURE WHERE

18  COUNSEL IS GOING WITH THIS, BUT I ANTICIPATE THAT

19  HE'S ASKING MS. STEWART TO REVEAL PRIVILEGED

20  CONVERSATIONS THAT SHE HAD WITH US AT THE GENERAL

21  COUNSEL OFFICE.  OBVIOUSLY WHAT WAS SAID IN THE

22  DEPOSITION WAS SAID IN THE DEPOSITION.  BUT ANYTHING

23  FURTHER BEYOND THAT IS PRIVILEGED.  SHE DOES NOT HAVE

24  THE RIGHT TO WAIVE THE PRIVILEGE, AND THE DEPOSITION

25  TESTIMONY DOES NOT REVEAL SPECIFIC PRIVILEGED

1   INSTRUCTIONS OR ADVICE, SO WE WOULD NOT TAKE THE

2   POSITION THAT ANYTHING WAS WAIVED.

3        MR. ENGLISH:  YOUR HONOR, I'M NOT ASKING --

4   GOING TO ASK THIS WITNESS ABOUT ANYTHING OTHER THAN

5   WHAT SHE SAID WINSTON DECUIR TOLD HER IN HER

6   DEPOSITION.  I'M NOT INTERESTED IN ANY OTHER

7   CONVERSATIONS.  I CAN PULL THE DEPOSITION UP, YOUR

8   HONOR.  BUT THE DEFENDANTS KNOW THAT SHE ANSWERED --

9   SHE MADE THAT STATEMENT AND THEY DID NOT OBJECT WHEN

10  SHE MADE THE STATEMENT.

11       THE COURT:  BUT I THINK IF YOU WANT TO BE

12  PRECISE ABOUT WHAT WAS SAID AT THE DEPOSITION, YOU

13  NEED TO GET THE DEPOSITION OUT.

14       MR. ENGLISH:  I'M GOING TO PULL IT UP RIGHT

15  NOW, YOUR HONOR.

16       THE COURT:  THAT'S AS FAR AS HE'S GOING, SO

17  THE OBJECTION IS OVERRULED.

18       MR. ENGLISH:  THANK YOU, YOUR HONOR.

19       **(WHEREUPON, THE BENCH DISCUSSION VIA**

20  **HEADSETS WAS CONCLUDED.)**

21  BY MR. ENGLISH:

22    Q    MS. STEWART, I WANT TO TAKE A MINUTE AND I'M

23  GOING TO PULL UP YOUR DEPOSITION.  OKAY?

24    A    OKAY.

25    Q    AND I APOLOGIZE.  I PROBABLY SHOULD HAVE HAD

1  IT UP.

2        DO YOU HAVE MR. DECUIR'S DEPOSITION?  PULL

3  IT UP.  PUT IT ON THE SCREEN.  I MEAN MS. STEWART'S

4  DEPOSITION.

5        **THE COURT:**  DO YOU KNOW WHAT PAGE?

6        **MR. ENGLISH:**  YES, YOUR HONOR, I'M GOING TO

7  GET THERE RIGHT NOW.  I'LL BE RIGHT THERE.  OKAY?

8  AND I WILL DIRECT -- AND WE'LL PUT IT UP ON THE

9  SCREEN.  I WANT TO GO TO -- GO TO PAGE 52 OF MS.

10 STEWART'S DEPOSITION.  I NEED MS. STEWART TO SEE HER

11 DEPOSITION.

12       **THE COURT:**  SO WE CAN PUBLISH THAT PAGE.

13 THAT PAGE.

14 **BY MR. ENGLISH:**

15   **Q**   I'M LOOKING AT -- DO YOU SEE YOUR DEPOSITION

16 THERE?

17   **A**   I DO.

18   **Q**   I'M LOOKING AT LINE 8.  AND I'M GOING TO --

19 AND THIS IS YOU -- YOU BEING ASKED A QUESTION AND

20 THIS IS YOU SPEAKING IN YOUR DEPOSITION.  AND THIS IS

21 ON LINE 8.  "AND I SAID THEN I'VE HAD THIS DISCUSSION

22 THAT REPORTS WERE NOT TO GO TO MIRIAM.  REPORTS WERE

23 TO COME TO THE TITLE IX."  CORRECT?

24   **A**   THAT'S CORRECT.

25   **Q**   "I SAID I HAVE CONCERN ABOUT THAT, AND HE

1 SAID, 'OKAY.  WELL, LET ME GET WITH THEM.'  HE SAID,

2 'I AGREE WITH YOU' AND SAID 'OKAY, PERFECT.'  MIRIAM

3 AND I, STEPHANIE REMPE AND WINSTON DECUIR MET ABOUT

4 THIS ISSUE ON OCTOBER 2020.  AND AGAIN I SAID REPORTS

5 NEED TO COME DIRECTLY, AND RESPONSES AND -- DIRECTLY,

6 AND THE RESPONSES AND FEELINGS WAS, WAS THAT COACHES

7 AREN'T GOING TO DO THAT.  AND SO I RESPONDED THAT IF

8 WE CAN ASK NOBEL PRIZE WINNERS TO DO IT, WE IN THE

9 SAME TOKEN COULD ASK COACHES TO DO IT.  THAT SEEMED

10 REASONABLE."

11         DO YOU REMEMBER THAT TESTIMONY?

12     A    I DO.

13     Q    NOW I WANT YOU TO GO TO PAGE -- I BELIEVE IT

14 IS PAGE 54 OF THE DEPOSITION.  THE QUESTION WAS

15 ASKED -- DO YOU SEE PAGE 54?

16     A    I DO.

17     Q    THE QUESTION WAS:  "WHO WAS DISAGREEING WITH

18 YOU?"  AND WE WERE TALKING ABOUT -- THIS DISCUSSION

19 WAS ABOUT TITLE IX COMPLAINTS GOING TO THE ATHLETIC

20 DEPARTMENT.  AND YOU STATED "WINSTON DECUIR DISAGREED

21 WITH ME.  IT WAS HIS PROPOSAL TO LET ATHLETICS STAND

22 AS A SEPARATE EFFECTIVE INSTITUTION FOR THE CAMPUS

23 COORDINATOR AND THAT NO REPORTS -- IT WAS

24 UNREASONABLE TO EXPECT THAT EVERYBODY WAS GOING TO

25 REPORT DIRECTLY TO THOSE -- TO REPORT DIRECTLY AND

1　THAT THOSE SHOULD STILL GO TO MIRIAM SEGAR."

2　　　　　DO YOU REMEMBER MAKING THAT STATEMENT IN

3　YOUR DEPOSITION?

4　　　A　　I DO.

5　　　Q　　DO YOU SEE IN THIS DEPOSITION ANY OBJECTIONS

6　FROM THE BOARD OF SUPERVISORS?

7　　　A　　I DO NOT.

8　　　Q　　OKAY.  NOW WHAT I'M ASKING YOU ABOUT:  YOU

9　HAD A CONVERSATION WITH WINSTON DECUIR, AND WINSTON

10　DECUIR TOLD YOU THAT HIS POSITION -- WAIT A MINUTE.

11　TAKE A STEP BACK.

12　　　　　WHO IS WINSTON DECUIR?

13　　　A　　THE VICE PRESIDENT OF LEGAL AFFAIRS AND

14　GENERAL COUNSEL AT LSU.

15　　　Q　　HE IS THE CHIEF LAWYER FOR THE UNIVERSITY.

16　CORRECT?

17　　　A　　THAT'S CORRECT.

18　　　Q　　OKAY.  AND YOU, HIM -- WHO IS STEPHANIE

19　REMPE?

20　　　A　　STEPHANIE REMPE WAS THE PRIOR SECOND IN

21　CHARGE.  I CAN'T REMEMBER IF SHE WAS CHIEF OF STAFF

22　OR ASSOCIATE ATHLETIC DIRECTOR, BUT SHE REPORTED TO

23　SCOTT WOODWARD.

24　　　Q　　AND ACCORDING TO YOUR DEPOSITION, YOU WERE

25　PUSHING -- YOU WERE EMPHATIC:  "WE'VE GOT TO

1   FOLLOW" -- BECAUSE THE LAW REQUIRED THAT ALL TITLE IX

2   COMPLAINTS IN ATHLETICS WERE TO COME TO YOU AS THE

3   TITLE IX COORDINATOR.  CORRECT?

4       **A**   THAT'S CORRECT.

5       **Q**   AND THE CHIEF LEGAL OFFICER OF LSU WAS -- IT

6   SOUNDS LIKE TO ME HE WAS SAYING TO YOU "NO, THOSE

7   REPORTS NEED TO CONTINUE TO BE ROUTED THROUGH MIRIAM

8   SEGAR."  CORRECT?

9           **MS. MCDIARMID:**  I'D LIKE TO MAKE A

10  CONTINUING PRIVILEGE OBJECTION ON THIS TOPIC.

11          **MR. ENGLISH:**  YOU KNOW WHAT?  IT SPEAKS FOR

12  ITSELF.

13  **BY MR. ENGLISH:**

14      **Q**   WHY DID YOU DISAGREE WITH WINSTON DECUIR

15  THAT THE TITLE IX COMPLAINTS WERE TO COME TO YOUR

16  OFFICE AND NOT MIRIAM SEGAR?

17      **A**   THIS WAS FROM A SINGULAR CONVERSATION IN

18  ROUND TABLE, SO THIS HAPPENED -- MIRIAM, WINSTON, I

19  AND STEPHANIE WERE AT A ROUND TABLE.  HE THREW OUT AN

20  IDEA.  THERE WAS -- WHERE IT SAYS "PROPOSAL" HERE,

21  THIS IS NOT A FULLY THOUGHT OUT AND PRESENTED IDEA.

22  IT WAS AN OFF-THE-CUFF IDEA THAT HE THREW OUT.  I

23  DISAGREED WITH IT.  OUR TIME RAN OUT, BECAUSE IT WAS

24  A VERY LENGTHY MEETING.  SO WE DIDN'T HAVE RESOLUTION

25  AT THAT POINT.  BUT GOING FORWARD, MIRIAM WAS NOT

1  DESIGNATED AS CAMPUS COORDINATOR.

2      **Q**    MS. STEWART, YOU'RE A LAWYER.  CORRECT?

3  YOU'RE A LAWYER.  CORRECT?

4      **A**    YEAH.

5      **Q**    WOULD YOU AGREE THAT THE JOB OF THE CHIEF

6  LEGAL OFFICER FOR LSU IS TO ENSURE THAT THEY COMPLY

7  WITH FEDERAL AND STATE LAW?  WOULD YOU AGREE WITH

8  THAT?

9      **A**    I THINK SO.

10     **Q**    OKAY.  AND YOU AND I HAVE BEEN TALKING HERE

11 FOR THE LAST HOUR; THAT IT'S CLEAR AND UNAMBIGUOUS

12 THAT YOUR POSITION WAS THAT "THE COMPLAINTS NEED TO

13 COME TO US," AND THE DEPARTMENT OF EDUCATION'S

14 POSITION WAS THAT THE COMPLAINTS SHOULD GO DIRECTLY

15 TO YOU.  CORRECT?

16     **A**    YES, THAT'S MY -- YES.

17     **Q**    WHAT YOU'RE SAYING IS YOU'RE NO -- OBVIOUSLY

18 FROM YOUR DEPOSITION YOU CAN -- WE CAN TALK ABOUT --

19 YOU KNOW, IT'S OBVIOUS FROM YOUR DEPOSITION YOU

20 RAISED THIS ISSUE THAT THE CHIEF LEGAL OFFICER WAS

21 ESSENTIALLY TELLING YOU -- WHAT WAS THE TERM YOU

22 SAID?  HE THREW OUT AN IDEA?

23     **A**    YES.

24     **Q**    WHAT YOU WERE SAYING WAS THAT IN A MEETING

25 THE CHIEF LEGAL OFFICER OF LSU THREW OUT AN IDEA TO

1   VIOLATE DOE REGULATIONS.  CORRECT?

2       **A**   HE THREW OUT AN IDEA THAT I DIDN'T THINK WAS

3   A GOOD ONE AND COMPORTED WELL WITH TITLE IX.

4       **Q**   THANK YOU.  I'LL TAKE THAT ANSWER.

5           NOW, I ASKED YOU ABOUT THE LES MILES

6   INVESTIGATION.  I WANT TO SHOW YOU ONE DOCUMENT.

7           **THE COURT:**  TAKE THE EXHIBIT DOWN.

8           **MR. ENGLISH:**  CAN YOU PULL UP P-10 -- IT'S

9   UNREDACTED -- 119.  P-119.

10          **THE COURT:**  WE'RE TALKING EXHIBIT?

11          **MR. ENGLISH:**  I'M SORRY.  EXHIBIT P-119.

12          **THE COURT:**  IS THERE ANY OBJECTION?

13          **MS. MCDIARMID:**  JUST THE SAME OBJECTIONS

14  THAT WE'VE ALREADY LODGED.

15          **THE COURT:**  AND AS I'VE TOLD YOU, WE'RE

16  TALKING ABOUT ANY OBJECTIONS IN ADDITION TO ONES

17  YOU'VE ALREADY MADE, JUST TO SAVE YOU SOME WORDS.

18  YOU DON'T HAVE TO SAY THAT.

19          **MS. MCDIARMID:**  THANK YOU, YOUR HONOR.

20          **THE COURT:**  SO 119 IS ADMITTED.

21          **MR. ENGLISH:**  YEAH.  THANK YOU, YOUR HONOR.

22          I WANT TO GO -- CAN YOU PUT UP ON THE

23  SCREEN BOS-03 -- 023945.  THAT'S IT RIGHT THERE.

24  STUDENT COMPLAINT.  THAT'S THE ONE I WANT UP.  OKAY?

25  **BY MR. ENGLISH:**

**Q**   NOW, I WAS ASKING YOU ABOUT THE LES MILES INVESTIGATION.  OKAY?  AND YOU INDICATED THAT YOU DIDN'T REALLY KNOW A WHOLE LOT ABOUT IT.  OKAY?  AND YOU WEREN'T -- THEY NEVER -- YOU DIDN'T FIND OUT ABOUT IT; IT WAS NEVER PRESENTED TO YOUR OFFICE -- THE OFFICE YOU WERE WORKING IN, IT WAS NEVER PRESENTED TO YOU THAT ANYBODY HAD FILED A COMPLAINT AGAINST LES MILES.  CORRECT?

**A**   CORRECT.  I KNEW NOTHING ABOUT IT.

**Q**   OKAY.  ALL RIGHTY.  I THINK THAT'S CONSISTENT WITH THE EVIDENCE, BY THE WAY.

**A**   YEAH, I WASN'T EVEN IN THE ROLE WHEN THIS HAPPENED.

**Q**   OKAY.

**A**   SO I DON'T KNOW ABOUT IT.

**Q**   DO YOU KNOW WHO TAYLOR PORTER IS?

**A**   YES.

**Q**   WHO IS TAYLOR PORTER?

**A**   A LAW FIRM THAT DID BUSINESS IN BATON ROUGE WITH LSU.

**Q**   WHO IS VICKI CROCHET?

**A**   SHE WAS ONE OF THE PARTNERS WITH TAYLOR PORTER.

**Q**   DID VICKI CROCHET DO WORK WITH LSU?

**A**   YES.

1    **Q**   DID VICKI CROCHET DO WORK -- DID YOU EVER DO

2    ANY WORK WITH VICKI CROCHET ON TITLE IX ISSUES?

3         **MS. MCDIARMID:**  EXCUSE ME, YOUR HONOR.  I

4    DON'T HAVE A SPECIFIC OBJECTION TO THIS QUESTION, BUT

5    I SEE THIS EXHIBIT IS JUST BEING DISPLAYED AND I

6    DON'T BELIEVE THAT A PROPER FOUNDATION OR --

7         **MR. ENGLISH:**  I THINK THE COURT JUST SAID IT

8    WAS ADMITTED.

9         **THE COURT:**  YEAH, I THOUGHT WE TALKED THIS

10   MORNING ABOUT THAT THE ONES WHERE THERE IS NO

11   OBJECTION, THAT WE WERE GOING TO ADMIT THEM.

12        **MS. MCDIARMID:**  I THINK, DEPENDING ON THE

13   WITNESS, PERHAPS THAT COULD BE TRUE.  BUT I DON'T

14   THINK WE --

15        **THE COURT:**  NO, THAT'S NOT WHAT WE SAID THIS

16   MORNING.

17        **MS. MCDIARMID:**  I'M SORRY, YOUR HONOR.

18        **THE COURT:**  AND I'M GOING TO DO THE SAME

19   THING FOR YOU.  SO IT'S ADMITTED.

20        **MS. MCDIARMID:**  IT WASN'T OUR UNDERSTANDING

21   THAT A WITNESS LIKE MS. STEWART WOULD BE

22   AUTHENTICATING A DOCUMENT THAT -- I DON'T EVEN KNOW

23   IF SHE'S SEEN IT.

24        **MR. ENGLISH:**  I'M NOT ASKING HER TO

25   AUTHENTICATE -- I'M SORRY.  I DIDN'T MEAN TO

1 INTERRUPT YOU.  GO AHEAD.

2        MS. MCDIARMID:  NO, I WAS DONE.

3        MR. ENGLISH:  I'M NOT ASKING HER TO

4 AUTHENTICATE ANY DOCUMENT, YOUR HONOR.  I'M SIMPLY

5 ASKING HER -- I'M GOING TO ASK HER A POLICY QUESTION,

6 BUT THIS IS IN EVIDENCE.  WE'VE TALKED ABOUT -- WE

7 TALKED ABOUT POLICIES, AND THIS DOCUMENT IS RELEVANT.

8        THE COURT:  WHEN WE TALKED THIS MORNING, I

9 SAID "ARE WE GOING TO ADMIT THE DOCUMENTS?" AND I

10 BELIEVE WE ALL SAID "YES."  SO WE'RE GOING TO -- WE

11 CAN TALK ABOUT IT AGAIN AFTER COURT TODAY, BUT I'VE

12 ADMITTED THIS DOCUMENT.

13        MS. MCDIARMID:  THANK YOU, YOUR HONOR.

14 BY MR. ENGLISH:

15    Q   I WAS ASKING YOU:  HAD YOU EVER WORKED WITH

16 VICKI CROCHET ON TITLE IX ISSUES?

17    A   I DON'T BELIEVE SHE WAS INVOLVED IN ANY

18 TITLE IX ISSUES THAT I WORKED ON.

19    Q   ARE YOU AWARE OF THAT THE HUSCH BLACKWELL --

20 YOU SAY YOU READ THE HUSCH BLACKWELL REPORT?

21    A   I DID.

22    Q   ARE YOU AWARE WHETHER THE HUSCH BLACKWELL

23 REPORT STATED THAT VICKI CROCHET WAS BROUGHT IN TO

24 ASSIST THE ATHLETIC DEPARTMENT ON TITLE IX ISSUES?

25 ARE YOU AWARE OF THAT?

1    **A**    ONLY FROM THE HUSCH BLACKWELL REPORT.

2    **Q**    ARE YOU AWARE OF THAT THE HUSCH BLACKWELL

3    REPORT DOCUMENTED THAT VICKI CROCHET HELPED WROTE

4    PM-73 POLICIES?  ARE YOU AWARE OF THAT?

5    **A**    JUST FROM THE HUSCH BLACKWELL REPORT.

6    **Q**    SO YOU READ IN THE HUSCH BLACKWELL REPORT

7    THAT VICKI CROCHET HELPED THE UNIVERSITY DRAFT A

8    NUMBER OF THEIR PM -- I BELIEVE THE FIRST ONE WAS

9    PM-75, IF I'M -- I MAY HAVE GOT THE NUMBERS WRONG.

10   BUT VICKI CROCHET HELPED THE UNIVERSITY DRAFT THESE

11   POLICIES.  ARE YOU AWARE OF THAT?

12   **A**    ONLY TO THE EXTENT THAT IT'S LISTED IN THE

13   HUSCH BLACKWELL REPORT.

14   **Q**    NOW, YOU READ IN THE HUSCH BLACKWELL REPORT

15   THAT TWO STUDENTS ACCUSED LES MILES THAT -- LET ME

16   TAKE A STEP BACK.

17        YOU READ IN THE HUSCH BLACKWELL REPORT THAT

18   SHARON LEWIS REPORTED THAT IN 2012 THAT STUDENT 1

19   COMPLAINED TO HER AND TOLD HER THAT LES MILES WAS

20   SEXUALLY HARASSING HER.  DO YOU REMEMBER READING

21   THAT?

22   **A**    I REMEMBER THAT IN THE HUSCH BLACKWELL

23   REPORT.

24   **Q**    NOW, UNDER -- YOU AND I TALKED ABOUT

25   POLICIES AND WE TALKED ABOUT WHAT THE REQUIREMENTS OF

1  THE LAW WAS.  WHEN SHARON LEWIS --

2         **THE COURT:**  HOLD ON A SECOND.  LET'S TAKE

3  THE EXHIBIT DOWN.  HE'S NOT QUESTIONING THE WITNESS

4  ABOUT IT.

5         **MR. ENGLISH:**  I'M SORRY, YOUR HONOR.  I'LL

6  COME BACK TO IT.  I APOLOGIZE, YOUR HONOR.

7  **BY MR. ENGLISH:**

8     **Q**   THAT WE TALKED ABOUT WHAT THE PROCESS WAS

9  WHEN A COMPLAINT IS MADE.  CORRECT?

10    **A**   YES.

11    **Q**   WHEN STUDENT 1 -- WHEN SHARON LEWIS, WHO

12  IS -- WOULD SHARON LEWIS HAVE BEEN A RESPONSIBLE

13  EMPLOYEE IN THE ATHLETIC DEPARTMENT?

14    **A**   YES.

15    **Q**   AND AGAIN, THE RESPONSIBLE EMPLOYEE IS:  YOU

16  HAVE A MANDATORY OBLIGATION TO REPORT ANY COMPLAINTS

17  OF SEXUAL HARASSMENT THAT COMES TO YOU.  CORRECT?

18    **A**   SEXUAL MISCONDUCT PROBABLY INCLUDING SEXUAL

19  HARASSMENT.

20    **Q**   SEXUAL MISCONDUCT, SEXUAL HARASSMENT.

21         SO ONCE STUDENT 1 REPORTED TO SHARON LEWIS

22  IN 2012 THAT LES MILES WAS SEXUALLY HARASSING HER,

23  SHE HAD AN OBLIGATION TO REPORT?

24    **A**   I DON'T RECALL THE POLICY AT THAT TIME.  I

25  DON'T KNOW WHICH POLICY WOULD HAVE BEEN IN EFFECT.

1    Q    THE POLICY THAT WAS IN EFFECT WAS THE 2011

2  "DEAR COLLEAGUE" LETTER THAT YOU AND I HAVE SPENT THE

3  LAST HOUR TALKING ABOUT.  WOULD YOU AGREE?

4         **MS. MCDIARMID:**  OBJECTION.  THAT MISSTATES

5  HER TESTIMONY.

6         **THE COURT:**  OVERRULED.

7  **BY MR. ENGLISH:**

8    Q    DO YOU AGREE THAT THE POLICY THAT WAS IN

9  EFFECT WAS THE 2011 "DEAR COLLEAGUE" LETTER THAT YOU

10  SO MUCH EDUCATED US ON?  THAT WAS IN EFFECT.

11  CORRECT?

12   A    THE "DEAR COLLEAGUE" LETTER WOULD HAVE BEEN

13  IN EFFECT.  I DON'T KNOW WHAT THE INSTITUTIONAL

14  POLICY WAS AT THE TIME, SO THAT'S WHAT I MEANT I

15  COULDN'T SPEAK TO.

16   Q    GOT YOU.  BUT THE ULTIMATE POLICY WAS THE

17  DEPARTMENT OF EDUCATION'S POLICY.  WOULD YOU AGREE?

18   A    IT'S THE INSTITUTIONAL OBLIGATION, YES.

19   Q    YES.  SO NOW UNDER THE "DEAR COLLEAGUE"

20  LETTER -- SO THAT WE DON'T HAVE TO TALK ABOUT WHAT

21  POLICIES WAS IN PLACE, LET'S FOCUS ON THE "DEAR

22  COLLEAGUE" LETTER.

23         IN 2011 SHARON LEWIS -- IN 2012 WHEN STUDENT

24  1 CAME TO SHARON LEWIS, UNDER THE "DEAR COLLEAGUE"

25  LETTER SHARON LEWIS WAS A RESPONSIBLE EMPLOYEE.

1   CORRECT?

2       **A**    YES.

3       **Q**    SHE HAD AN OBLIGATION TO REPORT WHAT THAT

4   STUDENT TOLD HER ABOUT THAT COACH.  CORRECT?

5       **A**    SHE WOULD, YES.

6       **Q**    NOW, YOU AND I HAVE TESTIFIED, ONCE SHE MADE

7   THAT REPORT, THAT REPORT WAS SUPPOSED TO GO TO THE

8   TITLE IX COORDINATOR WHO -- YOU INDICATED WHO THAT

9   INDIVIDUAL WAS.  CORRECT?

10      **A**    CORRECT.

11      **Q**    ALL RIGHT.  IT WAS NOT TO GO TO MIRIAM

12  SEGAR -- CORRECT? -- UNDER THE LAW?

13      **A**    IT SHOULD HAVE GONE TO A TITLE IX

14  COORDINATOR, AND ONE SHOULD HAVE BEEN DESIGNATED,

15  YES.

16      **Q**    OKAY.  IF -- AND I UNDERSTAND YOU DON'T KNOW

17  WHAT HAPPENED.  BUT IF STUDENT 1'S COMPLAINT WAS NOT

18  SENT TO THE TITLE IX COORDINATOR, THAT WAS A

19  VIOLATION OF DEPARTMENT OF EDUCATION GUIDELINES.

20  CORRECT?

21      **A**    AS I SAID, I DON'T RECALL WHEN LSU

22  DESIGNATED A TITLE IX COORDINATOR.  SO IF IT PRECEDED

23  JIM MARCHAND BEING DESIGNATED, IT WOULD HAVE BEEN

24  TASKED TO WHOMEVER WAS CARRYING OUT THE WORK AT THAT

25  TIME.

1    Q    WHOEVER THE -- FIRST OF ALL, WHOEVER WAS

2  RESPONSIBLE AND HAD OVERSIGHT OVER TITLE IX, THAT

3  COMPLAINT SHOULD HAVE WENT TO THEM.  CORRECT?

4    A    YES.  WHOEVER HAD OVERSIGHT FOR THAT WORK,

5  YES.

6    Q    ALL RIGHT.  NOW, IN 2013 A SECOND STUDENT

7  CAME -- LET'S STAY ON STUDENT 1.

8         SHARON LEWIS -- UNDER THE 2011 GUIDELINES OF

9  WHICH YOU AND I TALKED ABOUT, SHARON LEWIS WAS

10  PROTECTED FROM RETALIATION FOR REPORTING.  SHE SHOULD

11  HAVE BEEN PROTECTED FROM RETALIATION FOR REPORTING.

12  CORRECT?

13    A    CORRECT.

14    Q    OKAY.  IF THE EVIDENCE SHOWS THAT SHARON

15  LEWIS REPORTED STUDENT 1 CONDUCT TO -- COMPLAINT ON

16  LES MILES AND SHE -- LET ME SCRATCH THAT QUESTION.

17  TAKE THAT QUESTION BACK.

18         IF SHE WAS RETALIATED AGAINST FOR MAKING

19  THAT REPORT, THAT WOULD HAVE BEEN A VIOLATION OF

20  DEPARTMENT OF EDUCATION GUIDELINES?

21    A    IF IT WAS A REPORT DONE IN GOOD FAITH AND

22  COVERED UNDER TITLE IX, YES.

23    Q    IN 2012-2013, YOU READ IN THE HUSCH

24  BLACKWELL REPORT THAT A SECOND STUDENT CAME TO SHARON

25  LEWIS AND ACCUSED LES MILES OF SEXUAL HARASSMENT.  DO

1    YOU REMEMBER READING THAT IN THE HUSCH BLACKWELL

2    REPORT?

3       **A**    I DO REMEMBER THAT IN THE HUSCH BLACKWELL

4    REPORT, YES.

5       **Q**    UNDER THE 2011 "DEAR COLLEAGUE" GUIDELINES,

6    SHARON LEWIS WAS A RESPONSIBLE EMPLOYEE WHEN STUDENT

7    2 CAME TO HER.  CORRECT?

8       **A**    YES.

9       **Q**    AND ONCE STUDENT 2 CAME TO HER AND SHARON

10   LEWIS MADE THE REPORT THAT THE STUDENT HAD -- A

11   SECOND STUDENT HAD COMPLAINED ABOUT LES MILES, THAT

12   COMPLAINT, TOO, SHOULD HAVE WENT TO WHOEVER WAS THE

13   DESIGNATED TITLE IX COORDINATOR.  CORRECT?

14      **A**    YES.

15      **Q**    AND IF THAT COMPLAINT DID NOT GO TO WHO WAS

16   THE DESIGNATED TITLE IX COORDINATOR IN 2013, THAT WAS

17   A VIOLATION OF DOE GUIDELINES.  CORRECT?

18      **A**    THAT'S CORRECT.

19      **Q**    OKAY.  NOW, I WANT YOU TO PULL UP -- LET ME

20   STAY.

21         THE HUSCH BLACKWELL REPORT STATED THAT

22   RATHER THAN THE REPORT GOING TO THE TITLE IX

23   COORDINATOR, LSU BROUGHT IN THIS OUTSIDE LAW FIRM,

24   TAYLOR PORTER, TO CONDUCT THE INVESTIGATION.

25   CORRECT?

1    **A**    THAT'S MY UNDERSTANDING FROM HUSCH

2  BLACKWELL.

3    **Q**    OKAY.  NOW, IN 2011 -- I UNDERSTAND THE

4  POLICY HAD CHANGED -- HAD SUBSEQUENTLY CHANGED.  BUT

5  IN 2011, WAS IT LEGAL FOR LSU TO BRING IN THEIR LAW

6  FIRM -- TO BRING IN THEIR LAW FIRM TO CONDUCT AN

7  INVESTIGATION -- A TITLE IX INVESTIGATION OF LES

8  MILES?

9    **A**    IT'S NOT UNUSUAL FOR INSTITUTIONS TO HIRE

10  EXTERNAL SOURCES TO CONDUCT INVESTIGATIONS.

11    **Q**    BUT WHAT YOU AND I HAVE TALKED ABOUT AND

12  WHAT WE'VE BEEN CLEAR ABOUT IS THE BIG ISSUE THAT THE

13  DEPARTMENT OF EDUCATION IS CONCERNED ABOUT IN THESE

14  INVESTIGATIONS IS THAT THEY BE IMPARTIAL AND THERE BE

15  NO CONFLICT OF INTEREST.  CORRECT?

16    **A**    CORRECT.

17    **Q**    NOW, YOU ARE A LAWYER AND WE ARE JUDGED BY

18  CONFLICTS OF INTEREST.  LSU'S LAW FIRM, TAYLOR

19  PORTER, REPRESENTS LSU.  CORRECT?

20    **A**    NO LONGER, IS MY UNDERSTANDING.

21    **Q**    WE'RE TALKING ABOUT IN 2013, COUNSELOR.

22         IN 2013 TAYLOR PORTER WAS REPRESENTING LSU.

23  CORRECT?

24    **A**    THAT'S MY UNDERSTANDING FROM HUSCH

25  BLACKWELL.  I WASN'T IN THE OFFICE AT THAT TIME.

1    Q    OKAY.

2    A    SO I WASN'T PRIVY TO THAT INFORMATION.

3    Q    SO CAN YOU EXPLAIN AS THE TITLE IX

4    COORDINATOR -- NOW YOU'RE A TITLE IX COORDINATOR.

5    YOU KNOW, I UNDERSTAND YOU WEREN'T THERE, AND YOU ARE

6    A LAWYER.  CAN YOU EXPLAIN -- DO YOU AGREE THAT IF

7    TAYLOR PORTER WAS ACTING AS LSU'S LAWYER AND

8    CONDUCTING A TITLE IX INVESTIGATION, THAT WAS A

9    CONFLICT UNDER EXISTING DOE GUIDELINES?

10    A    I'M NOT PRIVY TO ANY OF THE INFORMATION

11    ABOUT THE CONTRACTS THAT EXISTED, WHAT ROLE TAYLOR

12    PORTER PLAYED.  I WASN'T IN THE OFFICE OF GENERAL

13    COUNSEL.  I WAS IN THE OFFICE OF THE DEAN OF

14    STUDENTS.

15         SO I CAN'T SPECULATE ON WHAT WENT WHERE,

16    WHAT FOLKS WERE TASKED WITH.  I'VE NEVER SEEN THE

17    REPORT.

18    Q    THAT'S NOT THE QUESTION I'M ASKING YOU,

19    COUNSELOR, WITH ALL DUE RESPECT.

20    A    I UNDERSTAND.

21    Q    I'M ASKING YOU A SIMPLER QUESTION.  AND WHAT

22    YOU AND I TALKED ABOUT -- BECAUSE WE SPENT A LOT OF

23    TIME TALKING ABOUT THE POLICIES AND WHAT THE PROCESS

24    WAS.  THE DEPARTMENT OF EDUCATION WANTED TO MAKE SURE

25    THAT THESE INVESTIGATIONS WERE IMPARTIAL AND THERE

1  WAS NO CONFLICT OF INTEREST IN ORDER TO TAINT THOSE

2  INVESTIGATIONS.  CORRECT?

3      **A**    THAT'S CORRECT.

4      **Q**    AND IF LSU, RATHER THAN GOING TO --

5  DIRECTING THE COMPLAINTS TO THE TITLE IX COORDINATOR,

6  AS THE LAW REQUIRED THEM TO, BROUGHT THEIR OUTSIDE

7  LAW FIRM IN TO CONDUCT THE INVESTIGATION, THAT WAS A

8  VIOLATION OF TITLE IX.  DO YOU AGREE WITH THAT?

9      **A**    I DON'T AGREE WITH IT ON THE FACE, AGAIN,

10  BECAUSE EXTERNAL AGENCIES OFTEN CONDUCT TITLE IX

11  INVESTIGATIONS FOR VARIOUS REASONS.  EVEN WHEN THERE

12  IS A SITTING AND STANDING TITLE IX COORDINATOR AND

13  INVESTIGATIVE TEAMS, THEY CAN BE OUTSOURCED.

14      I CAN'T SPEAK TO THE DECISION OF THAT OR THE

15  CONFLICTS.  WOULD THERE BE A POTENTIAL ONE?  THERE

16  COULD BE.  DID IT EXIST?  I CAN'T ANSWER THAT FOR

17  YOU.

18      **Q**    I'M GOING TO MOVE ON.  I'M GOING TO ASK

19  AGAIN, BECAUSE I THINK IT'S -- I DON'T THINK IT'S

20  THAT COMPLICATED, TO BE QUITE CANDID WITH YOU,

21  COUNSELOR.  MAYBE I'M MISSING IT.

22      THE LAW REQUIRES LSU TO DIRECT THESE

23  COMPLAINTS TO THE TITLE IX COORDINATOR.  AND

24  ACCORDING TO HUSCH BLACKWELL, LSU DIDN'T DO IT.  AND

25  ACCORDING TO YOU, YOU NEVER SAW IT.  YOU DIDN'T KNOW

1   ABOUT THIS.  RIGHT?

2        A    THAT'S CORRECT.  YOU'RE CORRECT.

3        Q    THAT'S CORRECT.  RIGHT?

4        A    YES, ABSOLUTELY.

5        Q    SO LSU DOESN'T FOLLOW THE DEPARTMENT OF

6   EDUCATION RULES AND REGULATIONS.  THEY BRING IN --

7   AND THIS WAS JUST NOT AN OUTSIDE -- I AGREE WITH YOU.

8   I AGREE WITH YOU CERTAINLY.  IF LSU WOULD HAVE WENT

9   OFF AND HIRED A LAW FIRM FROM CALIFORNIA WHO HAD

10  ABSOLUTELY NO RELATIONSHIP WITH THEM AND SAID,

11  "LISTEN, THIS IS SO SERIOUS, WE WANT OUR HEAD

12  COACH -- THIS IS OUR HEAD COACH.  HE'S THE HIGHEST

13  PAID PERSON IN THE STATE.  WE DON'T WANT ANY -- WE

14  HIRING SOMEBODY FROM SAN FRANCISCO WHO HAS ABSOLUTELY

15  NO RELATIONSHIP WITH US TO COME IN AND INVESTIGATE."

16  I CAN SEE THEY HAD THE RIGHT TO DO THAT.  THAT'S NOT

17  -- I DON'T THINK -- I THINK YOU AGREE WITH THAT.

18  RIGHT?

19       A    I DO AGREE WITH THAT, ABSOLUTELY.  AND --

20       Q    BUT HERE'S MY QUESTION.  MY QUESTION TO YOU

21  IS:  BUT DID LSU HAVE THE RIGHT TO GO TO DOWNTOWN

22  BATON ROUGE, BRING THEIR LAW FIRM IN, AND HAVE THEM

23  CONDUCT AN INVESTIGATION ON -- A TITLE IX

24  INVESTIGATION ON THEIR BEHALF?

25            MS. MCDIARMID:  OBJECTION.  ASKED AND

1    ANSWERED.

2         **THE COURT:**  HE'S GOING TO ASK THIS THIS TIME

3    AND THEN HE'S MOVING ON.

4         **MR. ENGLISH:**  YES, I'M DONE.  I THINK I MADE

5    MY POINT, YOUR HONOR.

6              OKAY.  NOW LET'S PUT THE DOCUMENT UP.

7                   **(END OF EXCERPT)**

8              **C E R T I F I C A T E**

9         **I CERTIFY THAT THE FOREGOING IS A CORRECT**

10   **TRANSCRIPT FROM THE RECORD OF THE PROCEEDINGS IN THE**

11   **ABOVE-ENTITLED NUMBERED MATTER.**

12   S:/NATALIE W. BREAUX

13   NATALIE W. BREAUX, RPR, CRR

14   OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25