## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

**SHARON LEWIS,**
 **Plaintiff**

                **CIVIL ACTION**

**VERSUS**

                **NO. 21-198-SM-RLB**

**BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE,**
 **Defendant**

### ORDER AND REASONS

Before the Court is Plaintiff Sharon Lewis's Renewed Motion for Judgment as a Matter of Law, or, in the alternative, a New Trial (the "motion").[1] Pursuant to Federal Rule of Civil Procedure 50(b), Plaintiff urges this court to enter judgment as a matter of law in her favor notwithstanding the defense verdict at the conclusion of trial on December 20, 2023.[2] Alternatively, Plaintiff moves this Court to grant her a new trial under Federal Rule of Civil Procedure 59(b) "as the verdict is against the weight of the evidence" and the jury was tainted by certain communications by witnesses and statements in opening statement and closing argument by defense counsel.[3] Because the Court finds that neither a judgment as a matter of law under Rule 50(b) nor a new trial under Rule 59(b) is warranted, the motion is **DENIED.**

### BACKGROUND

The full and lengthy history of this case is set forth extensively in prior Orders &

---

[1] R. Doc. 555.
[2] R. Doc. 547.
[3] R. Doc. 555.

Reasons.[4]

Plaintiff initially sued Defendant, Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, along with dozens of other defendants on April 8, 2021,[5] and filed a First Amended Complaint on May 5, 2021.[6] Plaintiff, a former employee in the LSU athletics department, made a wide array of allegations concerning sex- and race-based discrimination and harassment at LSU, and she alleged her termination, along with a promotion she received without a corresponding increase in pay, were retaliation for her prior reporting of discrimination and misconduct.[7] After extensive motions practice, Plaintiff filed her Second Amended Complaint eight months later, on March 4, 2022.[8] Eighteen months of further dipositive motions and discovery disputes followed.

Eventually, only the Board remained as Defendant. On October 11, 2023, the Board filed a Motion for Summary Judgment,[9] which the Court granted in part and denied in part on December 1, 2023.[10] The five remaining claims against the Board proceeded to trial. They were:

- Title IX retaliation, for Plaintiff being given a promotion without a pay increase in August 2020;
- Title IX retaliation, for Plaintiff's 2022 termination;
- Title VII retaliation, for Plaintiff being given a promotion without a pay increase in August 2020;
- Title VII retaliation, for Plaintiff's 2022 termination; and
- Title VII hostile work environment.

---

[4] *See, e.g.,* R. Doc. 254.
[5] R. Doc. 1.
[6] R. Doc. 5.
[7] *See generally* R. Docs. 1, 8.
[8] R. Doc. 219.
[9] R. Doc. 424.
[10] R. Doc. 501.

The jury trial began on December 11, 2023,[11] and testimony lasted six days.[12] On December 20, the jury returned a verdict in favor of Defendant as to all five claims, awarding Plaintiff no damages.[13]

Plaintiff filed this motion on January 17, 2024.[14] Defendant filed its response in opposition on February 9, 2024,[15] and Plaintiff replied.[16]

## LEGAL STANDARD

Plaintiff moves for either judgment as a matter of law under Rule 50(b) or a new trial under Rule 59.

## I.    Rule 50(b) standard for judgment as a matter of law.

Rule 50(b) of the Federal Rules of Civil Procedure provides:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment--or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged--the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:
> (1) allow judgment on the verdict, if the jury returned a verdict;
> (2) order a new trial; or
> (3) direct the entry of judgment as a matter of law.[17]

"A party is entitled to judgment as a matter of law 'only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position.'"[18] The Court does not "weigh evidence, judge witness credibility, or

---

[11] R. Doc. 532.
[12] R. Docs. 532, 533, 534, 541, 543, 544.
[13] R. Doc. 547.
[14] R. Doc. 555.
[15] R. Doc. 574.
[16] R. Doc. 576.
[17] FED. R. CIV. P. 50(b).
[18] *Logan v. Burgers Ozark Country Cured Hams Inc.*, 263 F.3d 447, 455 (5th Cir. 2001) (citation omitted).

challenge the factual conclusions of the jury. Judgment as a matter of law is appropriate if there is no legally sufficient evidentiary basis for a claim under the controlling law."[19] When deciding a motion for judgment as a matter of law, a court should consider all the evidence "in the light and with all reasonable inferences most favorable to the party opposed to the motion."[20] Underscoring all of this, the Fifth Circuit "has expressed wariness in upsetting jury verdicts, stating that jury verdicts will be upheld 'unless the facts and inferences point so strongly and so overwhelmingly in favor of one party that reasonable [jurors] could not arrive at any verdict to the contrary.'"[21] Accordingly, in general, jury verdicts "should not be disturbed absent strong, overwhelming evidence that shows a reasonable jury could not reach the opposite conclusion."[22]

## II.    Rule 59 standard for new trial.

Rule 59 states, in relevant part, "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . . A motion for a new trial must be filed no later than 28 days after the entry of judgment." The Fifth Circuit has further defined "[a] new trial may be granted if the district Court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its court."[23]

Concerning the weight of the evidence, "[i]n a further effort to prevent the trial judge from simply substituting his judgment for that of the jury," the Fifth Circuit requires "that new trials should not be granted on evidentiary grounds 'unless, at a minimum, the

---

[19] *Id.* (citation and internal ellipsis omitted).
[20] *Mosley v. Excel Corp.*, 109 F.3d 1006, 1008-09 (5th Cir. 1997) (quotation omitted).
[21] *Johnson v. City of Thibodaux,* CV 14-2369, 2017 WL 3263275, at *1 (E.D. La. Jan. 9, 2017) (quoting *Mosely,* 109 F.3d at 1009 (quotation omitted)).
[22] *Gaddy v. Taylor Seidenbach, Inc.*, 446 F. Supp. 3d 140, 151 (E.D. La. 2020).
[23] *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985).

4

verdict is against the great—not merely the greater—weight of the evidence'"[24] True, "[a] verdict can be against the 'great weight of the evidence', and thus justify a new trial, even if there is substantial evidence to support it."[25] However, "[t]his does not mean that a judge may order a new trial simply because [s]he disagrees with the jury verdict. [She] must be convinced that the verdict is against the great weight of the evidence."[26] Nevertheless, when a jury's verdict is "clearly within the universe of possible awards which are supported by the evidence,"[27] a new trial is not warranted.

## LAW AND ANALYSIS

Plaintiff argues she is entitled to judgment as a matter of law or, alternatively, a new trial on each of the Title IX and Title VII claims on which the jury found for Defendant. Further, Plaintiff argues the Court should grant a new trial because of witness Scott Woodward's communication with jurors and certain statements by defense counsel in opening statement and closing argument. The Court addresses each argument in turn.

**I.     The Court will not grant Plaintiff judgment as a matter of law or a new trial on her Title IX retaliation claims.**

To prove a Title IX retaliation claim, a plaintiff must show (1) she engaged in activity protected by Title IX, (2) suffered an adverse employment action, and (3) a causal connection exists between the protected activity and the adverse employment action.[28] "[A] a Title IX retaliation claim only covers conduct protected by Title IX."[29]

It its opposition, Defendant does not address the first two elements, sidestepping, but not conceding, whether Plaintiff showed she engaged in protected activity and

---

[24] *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982) (citations omitted).
[25] *Id.*
[26] *Id.*
[27] *Gaddy*, 446 F. Supp. 3d at 149.
[28] *Normore v. Dallas Indep. Sch. Dist.*, 677 F.Supp.3d 494, 535 (N.D. Tex. 2023) (citing *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014)).
[29] *Taylor-Travis v. Jackson State Univ.*, 984 F.3d 1107, 1119 (5th Cir. 2021).

suffered an adverse employment action.[30] Defendant focuses on whether Plaintiff has established causation. Plaintiff agrees that "[t]he only issue before the Court is whether Plaintiff was terminated for engaging in protected activity."[31] For present purposes, the Court will assume Plaintiff proved the first two elements at trial: (1) she engaged in Title IX protected activity when she reported sexual misconduct by certain coaches and administrators at LSU, and (2) she suffered an adverse employment action when she was terminated and when she received a promotion without a corresponding increase in pay.

In her motion, Plaintiff argues that the "evidence is so strong and overwhelming in Plaintiff's favor" that "reasonable jurors could *only* have found Plaintiff"[32] was terminated and promoted without a pay increase because of her prior projected Title IX activity. Defendant argues that Plaintiff's motion fails as to the third element, causation—that is, that she was terminated or received a promotion without a pay increase *because* she engaged in protected activity. The Court agrees with Defendant.

### A.    The Court will not grant judgment as a matter of law that Plaintiff's termination was retaliation for her Title IX activity.

With respect to her termination, Plaintiff bases her theory of causation on the hiring of head football coach Brian Kelly and the related hiring of associate head coach Frank Wilson, against whom Plaintiff had previously filed Title IX complaints.[33] As she argues it, she "was terminated for reporting Frank Wilson in order to protect Wilson from a Title IX investigation."[34] That is, Kelly was hired to coach the football team, Kelly wished to hire Wilson as his top assistant, and Plaintiff was terminated to clear the way for

---

[30] R. Doc. 574 at p. 7. n. 11.
[31] R. Doc. 576 at p. 1.
[32] R. Doc. 555-1 at p. 16.
[33] *Id.* at pp. 11–16.
[34] *Id.* at p. 13. Plaintiff also argues that she was terminated "for reporting [Les] Miles, Wilson, and [Verge] Ausberry." *Id.* at p. 11. Regardless, as discussed herein, ample evidence supports the jury's verdict that Plaintiff's termination was not Title IX retaliation.

Wilson's hire.

In fact, as Defendant correctly identifies, there was substantial evidence presented to support the jury's verdict that Plaintiff's termination was not caused by retaliation for her Title IX reports against Wilson and others. Regarding Plaintiff's termination, Kelly testified that *he* "terminated the position."[35] Kelly testified he did not know of Plaintiff's prior allegations against Wilson when he made that decision: asked directly whether, "at the time [he] made the decision to eliminate . . . [Plaintiff's position, he] had heard anything about [Plaintiff] making any complaints about Frank Wilson," Kelly answered, "No."[36] Kelly further testified he "learned about [the complaints against Wilson] after" he eliminated Plaintiff's position.[37]

As to Kelly's reasons for eliminating Plaintiff's position, Kelly testified that upon arriving at LSU, "it was pretty quick that [he] was able to look at the current organizational chart and see that [he] was going to make quick and swift changes."[38] He gave a detailed description of the "sweeping changes across the board" he decided to make when he became head coach, in keeping with his "vision for" how he wanted to run the football program based on the "day-to-day" operations of his "prior successes" at other schools.[39] Asked whether he had authority from the athletic director to make such significant changes, Kelly responded, "I did."[40]

Miriam Segar and Verge Ausberry testified that roughly forty other football staff and administrators were terminated following Kelly's hire.[41] In fact, as described below,

---

[35] R. Doc. 555-2 at p. 28.
[36] R. Doc. 589 at pp. 18–19.
[37] *Id.*
[38] *Id.* at pp. 11–12.
[39] R. Doc. 555-2 at p. 10–11.
[40] R. Doc. 589 at p. 12.
[41] R. Doc. 585 at p. 310; R. Doc. 600 at p. 112.

*five* different witnesses testified that the widespread terminations following Kelly's arrival were not unexpected upon the arrival of a new head coach like Kelly.

Segar testified that "it's not uncommon, when [head coaching] staffs change, for them to bring in their own staff."[42] She recalled that "similar circumstance[s]" recently happened with the volleyball and soccer programs, and offered "it's not uncommon in sports for the head coach to have a say with who their staff is."[43] On this topic, Segar testified she "didn't know any difference" between Plaintiff's termination and the others who were terminated when Kelly was hired.[44]

Ya'el Lofton, Kelly's executive assistant, testified that she believed "when Coach Kelly was coming in, anybody that had a powerful position was going to be gone."[45] She understood that Kelly "was an established coach with a very high winning record" and "he had his own people."[46] In her view, she did not "feel like [the Board] had a part" in Plaintiff's termination because she believed the termination to be the result of "Coach Kelly bringing in his own people."[47]

Ausberry testified that "Brian Kelly said he wanted a whole new recruiting staff and whole new [sic] in that area . . . so it would have to be the football coach [who] makes those calls"[48] to terminate the staff members. Though much of the turnover was in the recruiting staff, Ausberry testified that the terminations also were widespread across coaching staff, strength and conditioning, and administrators.[49] Ausberry testified Kelly

---

[42] R. Doc. 585 at p. 305.
[43] *Id.* at pp. 305-06.
[44] *Id.*
[45] R. Doc. 584 at p. 360.
[46] *Id.* at p. 355.
[47] *Id.* at p. 361.
[48] R. Doc. 555-10 at p. 113.
[49] R. Doc. 600 at p. 112-13.

"had total control"[50] to make the decision to terminate "[b]etween 40 and 50"[51] people.

Scott Woodward, LSU's Athletic Director, testified that at LSU, "there's autonomy with [the] head coaches on what staff they want to bring in," but even more, "[f]ootball is unique and different," and "when you have a new head coach, especially one of Coach Kelly's stature, you have big turnover."[52] Woodward added, "I grant them autonomy to set up their staff."[53]

Stephanie Rempe testified that Kelly "knew that he wanted to make changes to the recruiting department, which led to terminating that entire staff and then hiring people that fit what he wanted to build."[54] Asked whether Kelly similarly made "sweeping changes in other departments," Rempe answered that he made changes to "the whole staff."[55]

In sum, numerous witnesses each testified that Plaintiff's termination was a result of Kelly's hiring as head coach and his decisions intended to shape his staff. On this point, Plaintiff offers only that "her termination was connected to the rehiring of Wilson."[56] But as the ample testimony recounted above shows, Plaintiff cannot show that the evidence points *only* to her termination being a result of her protected Title IX activity. Instead, it is possible that the jury found the evidence to point in another way—that Plaintiff's termination was a result of massive turnover in the football program upon the arrival of a new head football coach. The jury's verdict is supported by a "legally sufficient evidentiary basis for a claim under the controlling law."[57] This is a "reasonable inference[]

---

[50] R. Doc. 555-10 at p. 111.
[51] *Id.* at p. 112.
[52] R. Doc. 555-11 at p. 4.
[53] *Id.* at pp. 4–5.
[54] R. Doc. 589 at p. 68.
[55] *Id.*
[56] R. Doc. 555-1 at p. 15.
[57] *Burgers Ozark,* 263 F.3d at 455 (emphasis added) (cleaned up).

that may support the opposing party's position.'"[58] Accordingly, Plaintiff is not entitled to judgment as a matter of law on her Title IX claim that her termination was retaliatory.

### B.   The Court will not grant judgment as a matter of law that Plaintiff's motion without a pay increase was retaliation for her Title IX activity.

Similar to her argument regarding her termination, Plaintiff argues when she was not given a pay raise upon her August 2020 promotion, that lack of pay raise was retaliation for her prior protected Title IX activity.[59] As she did in regards to her termination, Plaintiff argues "[t]he evidence is so strongly in favor of Plaintiff [that] reasonable jurors could *only* have found Plaintiff did not receive a pay increase in retaliation for her engaging in protected activity."[60] But in fact, as with her termination, there was ample evidence introduced to support the jury's determination that Plaintiff's promotion without a raise was *not* caused by her Title IX protected activity.

Testimony from trial revealed that Plaintiff's promotion in August 2020, months into the COVID-19 pandemic, came at a time of operational and financial uncertainty for Defendant. Stephanie Rempe testified that when "COVID hit in March of 2020," the athletics department was "dealing with a lot of concerns."[61] She described the financial "hit" as "tens of millions of dollars," and she and other administrators "were evaluating how to manage the financial situation for the department."[62] She recalled that "eight or nine" employees were laid off as a result.[63] Ausberry similarly described laying off "friends of all races and sexes . . . [f]riends who ha[d] been there 20-something years."[64]

---

[58] *Id.*
[59] R. Doc. 555-1 at pp. 16–17.
[60] *Id.* at p. 17.
[61] R. Doc. 589 at p. 56.
[62] *Id.*
[63] *Id.*
[64] R. Doc. 600 at p. 101.

In her testimony, Plaintiff confirmed that employees who remained and earned more than $80,000 a year took a 5% pay reduction beginning January 1, 2021.[65] She testified she "remember[ed]" being one such affected employee.[66] Still, in April 2020, Plaintiff received a $13,800 increase to her annual pay.[67] It was during this time that Plaintiff sought a promotion with the understanding it would not come with a pay increase. Plaintiff confirmed she sent Ausberry a text message saying she "wanted the title without the pay because [she] thought it would mean something."[68] Ausberry's testimony corroborated that Plaintiff told him she wanted "the title" that came with the promotion "and not the raise."[69] Plaintiff told Ausberry it would "help[] her career."[70] Plaintiff was awarded the promotion,[71] and she confirmed in her testimony that, in emails with colleagues, she described herself as "super happy" with the promotion, later telling one colleague "[h]appiness is an understatement."[72] She testified that at the time, she thought "[t]he change of title . . . was exciting."[73] On the witness stand, she summed up, "Yes, I was happy."[74]

In her motion, Plaintiff points to the fact that the two other athletics department employees who were promoted alongside Plaintiff *did* receive raises.[75] However, in Plaintiff's testimony, when defense counsel noted that those employees still earned less than Plaintiff after their raises, Plaintiff did not disagree, but argued they were merely

---

[65] R. Doc. 555-5 at p. 62.
[66] *Id.*
[67] *See* R. Doc. 555-11 at p. 155; Def. Exh. 12 at p. 16.
[68] R. Doc. 555-5 at p. 56.
[69] R. Doc. 555-10 at pp. 101–02.
[70] R. Doc. 600 at p. 101.
[71] *Id.*; R. Doc. 555-5 at pp. 54–56.
[72] R. Doc. 555-5 at p. 58.
[73] *Id.* at p. 56.
[74] *Id.* at p. 58.
[75] R. Doc. 555-1 at p. 16.

paid "their market value,"[76] suggesting hers, as a member of the football program, was higher.[77] Confusingly, Plaintiff also argues that she "was the only employee promoted without a pay increase who had reported coaches for sexual misconduct,"[78] but this in fact works against her: if other employees who had *not* engaged in protected Title IX activity were promoted without a pay raise, that would suggest to a jury that the Title IX activity did not cause Plaintiff's failure to receive a raise. Lastly, Plaintiff takes issue with the evidence introduced concerning the comparison of Plaintiff's salary to similarly-situated employees at other schools in the Southeastern Conference, and she cites testimony from Ausberry that Plaintiff's salary was "compared to the people in [her] same position," but "not with a winning program" like that at LSU.[79] Ausberry confirmed her salary was "compared to those people at Alabama, Clemson, and Georgia," and it was "very similar."[80] But Plaintiff's claim is not that she was underpaid or her salary was otherwise unfair—rather, her claim is that she was offered a promotion, but Defendant retaliated against her for her Title IX activity by failing to offer her a raise at the same time. As described above, there was sufficient evidence presented at trial to permit reasonable jurors to make "reasonable inferences"[81] in favor of Defendant. Quite the opposite of the "strong, overwhelming evidence that shows a reasonable jury could not reach the opposite conclusion,"[82] the Court finds the evidence supports the jury's determination that Plaintiff's promotion without pay was not an act of retaliation. The Court will not grant judgment as a matter of law that Plaintiff's promotion without a pay raise was an act of

---

[76] R. Doc. 555-5 at p. 65.
[77] *Id.* at pp. 65–66.
[78] R. Doc. 555-1 at p. 16.
[79] R. Doc. 600 at pp. 149–50.
[80] *Id.* at p. 150.
[81] *Burgers Ozark,* 263 F.3d at 455 (cleaned up).
[82] *Gaddy*, 446 F. Supp. 3d at 149.

Title IX retaliation.

### C.    The Court will not grant Plaintiff a new trial on her Title IX retaliation claims.

Regarding her Title IX claims, Plaintiff repeatedly urges this Court to grant her a new trial because "the weight of the evidence is against the jury's verdict" and what evidence does favor Defendant, certain witness testimony, is "not credible."[83] Because both arguments fail, the Court will not grant Plaintiff a new trial on her Title IX retaliation claims.

First, as discussed at length above, Defendant elicited ample testimony to support the jury's determination that Plaintiff's termination and promotion without a raise were not Title IX retaliation. In her own motion, Plaintiff offers a conclusory summary of that evidence and further alleges that "Plaintiff testified Ausberry told her she would never be promoted because" she made a Title IX report.[84] Ausberry, however, testified there was "[n]o truth to that," and further testified Plaintiff "never even brought up Title IX" to him.[85] Plaintiff argues "[t]he weight of the evidence shows Plaintiff was the only employee who was promoted in athletics [at the time of her promotion] who did not receive a pay increase."[86] But this evidence does not show, and Plaintiff does not explain why, this is an act of Title IX retaliation. Plaintiff argues "Defendant produced no evidence as to who it compared Plaintiff's salary to before denying her a pay increase,"[87] but this is wrong twice over: Ausberry testified that Plaintiff's salary *was* compared to other comparable administrators in the Southeastern Conference,[88] and Plaintiff was not *denied* a pay

---

[83] R. Doc. 555-1 at pp. 30–31.
[84] R. Doc. 555-1 at p. 30; R. Doc. 555-5 at p. 64.
[85] R. Doc. 600 at pp. 108–09.
[86] R. Doc. 555-1 at p. 30.
[87] *Id.* at p. 31.
[88] R. Doc. 600 at p. 150.

increase, because the evidence shows she asked for a promotion without one.[89]

Plaintiff does not reckon with the evidence against her; instead, she cites only the evidence she believes favors her and insists it entitles her to a new trial. But "new trials should not be granted on evidentiary grounds 'unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence'"[90] Given the volume of evidence supporting Defendant's case and the jury's verdict, the Court does not find that the verdict was against the great weight of the evidence. Further, the jury's verdict is "clearly within the universe of possible awards which are supported by the evidence."[91] A new trial is not warranted on evidentiary grounds.

Second, Plaintiff attempts to discredit the evidence favoring the jury's verdict by asking this Court to disregard "any and all"[92] testimony by five different witnesses—Miriam Segar, Verge Ausberry, Scott Woodward, Brian Kelly, and Frank Wilson—whose testimony supports Defendant's case.[93] The Court refuses the invitation. "Whether to find the witnesses' testimony persuasive or to reject any part or all if it [is] a credibility call for the jury. The Court must defer to the trier of fact with respect to issues of conflicting testimony, weight of the evidence, and the credibility of the witnesses."[94] As Defendant correctly puts it: "[t]he jury's right to assess credibility is so well-established that it is frivolous for Plaintiff to have advanced this argument."[95]

The Court will not grant a new trial on Plaintiff's Title IX retaliation claims.

## II.    The Court will not grant Plaintiff judgment as a matter of law or a new trial on her Title VII retaliation and hostile work environment claims.

---

[89] R. Doc. 555-5 at p. 56; R. Doc. 555-10 at pp. 101–02.
[90] *Shows*, F.2d at 930 (citations omitted).
[91] *Gaddy*, 446 F. Supp. 3d at 149.
[92] R. Doc. 555-1 at pp. 31–34.
[93] *Id.*
[94] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).
[95] R. Doc. 574 at p. 21.

Title VII prohibits an employer from taking adverse employment action against an employee because she engages in a protected activity.[96]  As a result, to establish a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) she participated in an activity protected under the statute; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse action.[97] "Protected activity is defined as opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII."[98] The filing of an EEOC charge is a protected activity.[99]

To establish a claim of hostile work environment on the basis of race or sex, "a plaintiff must show that (1) she is a member of a protected class; (2) she suffered unwelcomed harassment; (3) the harassment was based on her membership in a protected class; (4) the harassment 'affected a term, condition, or privilege of employment'; and (5) 'the employer knew or should have known; about the harassment and 'failed to take prompt remedial action.'"[100]

As with Plaintiff's Title IX retaliation claims, Defendant's response in opposition to Plaintiff's Title VII retaliation claims focuses on whether she has established the causation element: whether Plaintiff was terminated or received a promotion without pay *because* she engaged in Title VII protected activity when she filed an EEOC complaint in

---

[96] *Joseph v. Phillips*, 2014 WL 5429455 at *3 (E.D. La. Oct. 24, 2014).
[97] *Feist v. La. Dep't of Justice*, 730 F.3d 450, 454 (5th Cir. 2013) (citing *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007)).
[98] *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003) (quoting *Green v. Administrators of Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (Apr. 26, 2002)).
[99] *Rainey v. Fannie Mae*, 46 F. App'x 732 (5th Cir. 2002) (citing *Green v. Administrators of Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (Apr. 26, 2002)).
[100] *West v. City of Houston*, 960 F.3d 736, 741–42 (5th Cir. 2020) (quoting *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)).

April 2021.[101] As with Plaintiff's Title IX retaliation claims, Plaintiff agrees "the only issue before [t]he Court" on her Title VII claims is "whether Plaintiff was terminated for engaging in protected activity."[102] As to Plaintiff's hostile work environment claim, the Board argues that the testimony of its witnesses provided ample basis for the jury to determine that Plaintiff was not subject to a hostile work environment. The Court addresses each argument in turn.

### A.    The Court will not grant Plaintiff judgment as a matter of law that her termination or promotion without pay increase were Title VII retaliation.

As Plaintiff's arguments concerning judgment as a matter of law on her Title VII claims are substantially identical to those she made concerning her Title IX claims, the Court rejects them for the same reasons.[103]Plaintiff again argues that the decision to terminate her was made because of her filing an EEOC complaint, protected activity under Title VII, and that her promotion without pay was similarly retaliation for that protected activity. As the Court discussed above, there was sufficient evidence presented at trial to permit reasonable jurors to make "reasonable inferences"[104] in favor of Defendant on Plaintiff's Title VII claims. Quite the opposite of the "strong, overwhelming evidence that shows a reasonable jury could not reach the opposite conclusion,"[105] the Court finds the evidence supports the jury's determination that Plaintiff's termination and promotion without pay increase were not acts of Title VII retaliation.

### B.    The Court will not grant Plaintiff judgment as a matter of law that she was subject to a Title VII hostile work environment.

---

[101] R. Doc. 574 at pp. 10–11.
[102] R. Doc. 576 at p. 5.
[103] *See* Parts I-A and I-B, *supra*.
[104] *Burgers Ozark,* 263 F.3d at 455 (cleaned up).
[105] *Gaddy*, 446 F. Supp. 3d at 151.

In support of her argument for judgment as a matter of law on her Title VII hostile work environment claim, Plaintiff alleges each of the required elements is met.[106] It is undisputed that Plaintiff, a black woman, is a member of two protected classes. She argues that Verge Ausberry's conduct toward her, based on her race and gender, was severe and pervasive, affected Plaintiff's employment, and that Defendant was aware of this hostile work environment.[107]

Yet as Defendant correctly argues, conflicting testimony was presented at trial, and the jury is not bound to believe Plaintiff's version of the facts and conclusions drawn therefrom. On the witness stand, when Ausberry was asked whether he ever called Plaintiff "an angry black woman," as she alleges, he said: "That never happened," further adding that phrase is "not in [his] vocabulary."[108]

Further, Ya'el Lfoton and Miriam Segar testified that race and gender did *not* seem to be a factor in Plaintiff's and Ausberry's interactions. Asked directly whether "the conflicts that [she] observed between [Plaintiff] and [Ausberry] were based on" the pair's "races" or "genders," Lofton flatly answered, "No."[109] Lofton explained that in her view, Plaintiff "is a very strong, proud woman and she knows her job . . . .and did it well," and Ausberry "was very prominent and boisterous and in charge of his domain too."[110] "Sometimes when you get two powerful people" like Plaintiff and Ausberry, Lofton testified, "you're going to tend to butt heads."[111] Segar, recalling a 2014 incident when Ausberry became "frustrated" and "angry" at Plaintiff for "not knowing" who she had

---

[106] R. Doc. 555-1 at pp. 19–21.
[107] *Id.*
[108] *Id.* at p. 99.
[109] R. Doc. 584 at pp. 348–49.
[110] *Id.* at p. 349.
[111] *Id.*

given an all-access campus pass to, was asked whether she viewed the event "based on [Plaintiff's] race" or "based on her gender." Segar, like Lofton, answered, "No."[112]

Plaintiff testified she "met with" Miriam Segar to report her allegations against Frank Wilson, and when asked by defense counsel whether she "reported Frank Wilson's conduct to Verge Ausberry," Plaintiff answered, "I did."[113] Accordingly, in her motion, Plaintiff argues Defendant knew about Wilson's harassment, and when Wilson was rehired to join Brian Kelly's staff, it was sufficiently "humiliating" to her to constitute a hostile work environment of which Defendant was aware.[114]

But at trial, Segar and Ausberry both testified that Plaintiff never told them of any misconduct by Wilson nor did they ever observe any such conduct. Asked directly, "Did [Plaintiff] ever report to you that Frank Wilson walked into her office and pulled his penis out and asked her to touch it," Segar replied, "Absolutely not."[115] Asked again, "[Plaintiff] never reported that to you?" Segar testified, "I would not forget that. No."[116] Asked more generally, "Did anybody else report to you about Frank Wilson's conduct," Segar again answered, "No."[117] Verge Ausberry, asked whether he "witness[ed] any sexual misconduct by [Frank] Wilson toward [Plaintiff]," testified, "No."[118] Asked if Plaintiff "ever [told Ausberry] anything to suggest that Frank Wilson had come in and unzipped his pants and exposed his penis to [Plaintiff]," Ausberry testified, "Not at all."[119]

The Court cannot grant Plaintiff judgment as a matter of law on this issue simply because the jury disbelieved her claims. When weighing directly conflicting testimony, as

---

[112] R. Doc. 585 at pp. 289–91.
[113] R. Doc. 599 at p. 23.
[114] R. Doc. 555-1 at pp. 21–22.
[115] R. Doc. 585 at p. 217.
[116] *Id.*
[117] *Id.* at p. 218.
[118] R. Doc. 600 at p. 71.
[119] *Id.* at p. 72.

the jury was required to do in this case, it is the jury's province to make credibility determinations and decide what deference to afford each witnesses' version of events.[120]

Lastly, in support of her hostile work environment claim, Plaintiff marshals excerpts from the Husch Blackwell Report. Relevant to her allegations against Ausberry, Plaintiff quotes a portion of the report stating that "several witnesses . . . have seen Ausberry yell and scream at [Plaintiff], call her profanities, and do other acts of harassment."[121] The testimony from Segar and Lofton recounted above did not directly refute whether this occurred, but that testimony did offer a different view of the incidents, as occurring between two "prominent" and "powerful" people who would "butt heads."[122] Plaintiff wrongly characterizes the Husch Blackwell Report as "uncontradicted" evidence.[123] Witnesses offered a different characterization of Plaintiff's working environment than the Husch Blackwell Report. Whether to find the Husch Blackwell Report "persuasive or to reject any part or all of it [is] a credibility call for the jury."[124] On this issue, it appears the jury, in light of other testimony, did not view the relevant behavior described in the Husch Blackwell Report to be credible or to rise to the level of a Title VII hostile work environment.

Plaintiff is not entitled to judgment as a matter of law absent "strong, overwhelming evidence that shows a reasonable jury could not reach the opposite conclusion."[125] As the testimony outlined above shows, instead, at trial, Defendant put forth a "legally sufficient evidentiary basis"[126] for the jury's determination that Plaintiff

---

[120] *See, e.g.*, *Woods v. Cain*, 2008 WL 2067002, at *7 (E.D. La. May 13, 2008) (citations omitted).
[121] R. Doc. 555-1 at p. 21 (citing R. Doc. 550-58 at p. 78).
[122] R. Doc. 584 at p. 349.
[123] R. Doc. 555-1 at p. 6.
[124] *Bickham v. Vannoy*, 2022 WL 19407173, at *14 (E.D. La. Sept. 16, 2022).
[125] *Gaddy*, 446 F. Supp. 3d at 151.
[126] *Id.* (citation and internal ellipsis omitted).

was not subject to a Title VII hostile work environment. On that evidentiary basis, the jury made "reasonable inferences" supporting Defendant's position."[127] The Court will not grant Plaintiff judgment as a matter of law that she suffered a Title VII hostile work environment.

### C.  The Court will not grant Plaintiff a new trial on her Title VII claims.

Plaintiff does not make a convincing argument in favor of a new trial on her Title VII claims. It is inchoate in places[128] and, in others, a restatement of her argument for a new trial on her Title IX claims.[129] As detailed above, ample testimony was introduced to provide the jury a sufficient evidentiary basis to determine that Defendant was not liable for Title VII retaliation or hostile work environment.[130] The jury weighed the credibility of each witness and rendered a verdict accordingly. Contrary to Plaintiff's conclusory assertions otherwise,[131] the verdict was "clearly within the universe of possible awards which are supported by the evidence,"[132] and thus not against the great weight of the evidence. The Court will deny Plaintiff's motion for a new trial on her Title VII claims.

### III.  The Court does not find that a new trial is warranted because of Woodward's communication with the jury or defense counsel's statements during opening statement and closing argument.

### A.  Woodward's communication with certain jurors does not warrant a new trial.

"It is well settled that a district court has broad discretion in deciding whether to grant a new trial for juror misconduct."[133] "Because the context in which alleged juror

---

[127] *Burgers Ozark,* 263 F.3d at 455 (citation omitted).
[128] *See, e.g.,* R. Doc. 555-1 at p. 35.
[129] *Id.* at pp. 34–35.
[130] *See* Part II, *supra*.
[131] R. Doc. 555-1 at pp. 34–35.
[132] *Gaddy*, 446 F. Supp. 3d at 149 (E.D. La.2020) (citing *Narcisse v. Illinois Cent. Gulf R. Co.*, 620 F.2d 544, 547 (5th Cir. 1980)).
[133] *Carson v. Polley*, 689 F.2d 562, 580 (5th Cir. 1982).

misconduct arises is different in every case, whether a new trial should be granted must be decided on an ad hoc basis."[134] "In this circuit, a defendant seeking a new trial based on juror misconduct must prove (1) misconduct by at least one juror that (2) prejudiced the defendant to the extent that it undermined the fairness of the trial."[135] "A presumption of prejudice arises when the jury is 'tainted by *outside* influence,' but not when "jurors themselves have violated an instruction of the court."[136]

Relevant to Plaintiff's arguments in the instant motion, though the Fifth Circuit has found it proper to grant a new trial where a juror engages in "long" and "deliberate conversations" with a third party connected to the case, the court has been careful to distinguish between "deliberate conversations" and "inadvertent exchanges or greetings."[137] While "deliberate conversations" between jurors and third parties may demand a new trial, mere "inadvertent exchanges or greetings" do not.[138]

On the first day of trial, the Court delivered its standard instructions to the empaneled jury. These instructions included the following:

> All of us were trained to extend to acquaintances, perhaps even to strangers, a "Good Morning," a "Hello," or other neighborly greeting. You should not engage in any such exchanges with the parties, their counsel, or any other persons connected with this trial. And you should not take offense . . . when such persons do not extend such a greeting to you. The reason that such exchanges are not indulged in is because, although they seem innocent, they could nonetheless give the impression of a lack of impartiality. And creating an impression of being partial is almost as bad as being biased, and that should be avoided.

> All of you should realize that if it is called to my attention that these instructions have been violated, I will have no alternative but to take appropriate action. I'm confident that in light of the instructions I've given you, this will not be required.[139]

---

[134] *Garcia v. Murphy Pac. Marine Salvaging Co.*, 476 F.2d 303, 306 (5th Cir. 1973).
[135] *United States v. Villalobos*, 601 F. App'x 274, 277 (5th Cir. 2015).
[136] *Gaddy*, 446 F. Supp. 3d at 159 (quoting *Villalobos*, 601 F. App'x at 277).
[137] *Leger v. Westinghouse Elec. Corp.*, 483 F.2d 428 (5th Cir. 1973).
[138] *Id.*
[139] R. Doc. 583 at pp. 117–18.

On the fourth day of trial, Plaintiff's counsel alerted the Court to possible non-verbal communication between some jurors and Scott Woodward, LSU Athletic Director.[140] In a sidebar, Plaintiff's counsel told the Court that "when [Woodward] walked in," a juror "gave him a thumbs-up," and Plaintiff's counsel "believe[d] [Woodward] acknowledged that thumbs-up."[141]

Once alerted, the Court heard sworn testimony, the transcript of which is under seal, from those who alleged they saw the thumbs-up: Plaintiff and Kennedy Ross and De'Naesha Mitchell, two assistants to Plaintiff's counsel.[142] The Court also heard sworn testimony from four jurors Plaintiff believed had non-verbal communications with Woodward.[143] One juror told the Court that during a sidebar while Woodward was testifying, as white noise played over the courtroom speakers, the juror noticed Woodward "looked confused" about the source of the noise.[144] The juror pointed to the ceiling and speakers and indicated "[t]hat's normal" to Woodward.[145]

Considering the result of the Court's investigation, the Court excluded the juror who admitted to gesturing to Woodward but allowed the others to remain on the jury.[146] The Court instructed both parties to direct their witnesses not to attempt to communicate in any way with the jury for the remainder of trial. Echoing the first-day instructions, the Court again reminded the remaining jurors "not to have any communication of any kind with any of the parties in the case: the witnesses, the attorneys, [or] anybody involved in

---

[140] R. Doc. 586 at p. 62.
[141] *Id.*
[142] R. Doc. 587 at p. 4 (sealed).
[143] *Id.* at pp. 23–34.
[144] *Id.* at pp. 24–25.
[145] *Id.* at pp. 24–25. It is not clear from the transcript whether the juror mouthed these words to Woodward or the juror was simply describing his gesture to the Court as representing the phrase "That's normal."
[146] *Id.* at pp. 38–39.

the case," emphasizing that though the jurors were "to look at the witness and to listen carefully to the testimony," jurors should not "interact in any way with any witness."[147] Nevertheless, in her motion, Plaintiff argues that these communications "pierced the 'virtual vacuum' that should surround the jury and undermined" Plaintiff's right to a fair trial.[148] Accordingly, Plaintiff asks the Court to grant a new trial.

The Fifth Circuit has rejected post-verdict claims of juror misconduct when "the trial judge—who had broad discretion to remedy the problem—took corrective action to ensure that there would be no" further improper juror communication.[149] In this case, the extent and meaning of the gesture was disputed, but neither counsel nor any witness described any "long" or "deliberate conversations."[150] Instead, the communications were broadly described as the kind of "exchanges or greetings"[151] that do not merit a new trial absent more severe allegations of juror misconduct or prejudice to the Plaintiff's right to a fair trial. Due to the nature of the communication, because the issue was quickly remedied during trial by the removal of the juror who directly communicated with Woodward, and in light of the Court's instruction to the remaining jurors,[152] Plaintiff's request for a new trial on these grounds is denied.

### B. The Court will not grant a new trial because of defense counsel's statements during opening statement and closing argument.

Lastly, Plaintiff seeks a new trial because of defense counsel's comments in opening and closing argument, which Plaintiff characterizes as describing her, her

---

[147] R. Doc. 586 at p. 108.
[148] R. Doc. 555-1 at p. 36 (citing *United States v. Harry Barfield Co.*, 359 F.2d 120, 124 (5th Cir. 1966)).
[149] *Hebert v. Rogers*, 2016 WL 8291110, at *27–28 (E.D. La. Nov. 14, 2016), *report and recommendation adopted sub nom. Herbert v. Rogers*, CV 15-4950, 2017 WL 679528 (E.D. La. Feb. 21, 2017), *aff'd sub nom. Hebert v. Rogers*, 890 F.3d 213 (5th Cir. 2018).
[150] *See* R. Doc. 587.
[151] *Leger*, 483 F.2d at 428.
[152] R. Doc. 587 at pp. 38–39.

attorneys, and her publicist as "hustlers."[153] For accuracy, the Court observes that defense counsel described Plaintiff's case and allegations as "a hustle," but did not describe anyone as a "hustler."[154] Plaintiff's motion makes serious allegations about the consequences of defense counsel's arguments, saying it was an "offensive and prejudicial . . . characterization" that was an "obvious and blatant appeal to racial and ethnic prejudice."[155] Plaintiff's counsel did not object to defense counsel's comments at the time they were delivered.

"A motion for new trial premised on improper arguments by counsel should only be granted when improper closing argument irreparably prejudices a jury verdict or a jury fails to follow instructions."[156] "To justify reversal based on improper comments of counsel, the conduct must be such as to gravely impair the calm and dispassionate consideration of the case by the jury."[157] Therefore, closing argument must go far beyond the bounds of accepted advocacy before a court should grant a new trial.[158] As the Fifth Circuit has instructed, "[a] trial judge is generally better able than an appellate court to evaluate the prejudice flowing from improper jury arguments."[159] "A new trial is warranted only if [the party opposing the jury arguments] shows that it was sufficiently prejudiced considering all the facts and circumstances of the case."[160] Furthermore, in deciding whether to grant a new trial, the Court should consider "the entire argument . . .

---

[153] R. Doc. 555-1 at pp. 36–37.

[154] R. Doc. 555-3 at pp. 5–6.

[155] R. Doc. 555-1 at p. 38 (quoting *Rojas v. Richardson*, 703 F.2d 186, 192 (5th Cir. 1983) *opinion set aside on reh'g*, 713 F.2d 116 (5th Cir. 1983)).

[156] *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 509 (5th Cir. 2012) (internal quotation marks omitted) (citing *Nissho-Iwai Co., Ltd. v. Occidental Crude Sales, Inc.*, 848 F.3d 613, 619 (5th Cir. 1988)).

[157] *Dulin v. Bd. of Comm'rs of Greenwood Leflore Hosp.*, 586 F. App'x 643, 649 (5th Cir. 2014) (internal quotation marks omitted) (quoting *Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 585 (5th Cir. 1985)).

[158] *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 284 (5th Cir. 1985). *See also Dulin*, 586 F. App'x at 649.

[159] *Baisden*, 693 F.3d at 509 (citing *Caldarera v. E. Airlines, Inc.*, 705 F.2d 778 (5th Cir. 1983)).

[160] *Facille v. Madere & Sons Towing, LLC*, No. 13-6470, 2015 WL 5017012, at *10 (E.D. La. Aug. 21, 2015) (citing *United States v. Jefferson*, 258 F.3d 405, 412 (5th Cir. 2001)).

within the context of the court's rulings on objections, the jury charge, and any corrective measures applied by the trial court."[161]

Further, the Fifth Circuit has held that "[i]mproper argument may be the basis for a new trial where no objection has been raised only where the interest of substantial justice is at stake. Absent a timely objection, reversal is generally not warranted based on counsel's improper statements alone."[162] Rather, the court should consider "the comments of counsel, the counsel's trial tactics as a whole, the evidence presented, and the ultimate verdict."[163]

The Court does not find that anything in defense counsel's "trial tactics as a whole, the evidence presented, and the ultimate verdict"[164] favors granting a new trial when considered alongside defense counsel's closing argument. Plaintiff brought a variety of claims alleging she was terminated and otherwise discriminated against because of her race, sex, and legally protected activity. Defendant put on its own case to disprove Plaintiff's allegations, which defense counsel characterized as "a good story"—a "hustle."[165] As discussed above concerning Plaintiff's Title IX and Title VII claims, Defendant presented ample evidence to counter Plaintiff's allegations. The Court does not find that defense counsel's comments during opening statement and closing argument worked to "gravely impair the calm and dispassionate consideration of the case by the

---

[161] *Westbrook v. Gen. Tire & Rubber Co.*, 754 F.2d 1233, 1238 (5th Cir. 1985).

[162] *Alaniz v. Zamora-Quezada*, 591 F.3d 761, 778 (5th Cir. 2009) (citations and internal quotation marks omitted). *See also Johnson v. Watkins*, 803 F. Supp. 2d 561, 582 (S.D. Miss. 2011); *Welch v. All Am. Check Cashing, Inc.*, No. 3:13CV271TSL-JCG, 2015 WL 4066495, at *11 (S.D. Miss. July 2, 2015) (citing *Nissho-Iwai Co.*, 848 F.2d at 619 (finding that the plaintiff's failure to object to impropriety of closing argument barred it "'from urging the improper arguments as grounds for a new trial after the jury had returned its verdict'"); *EON Corp. IP Holdings, LLC v. Landis+Gyr Inc.*, No. 6:11-CV-317-JDL, 2014 WL 6466663, at *3 (E.D. Tex. Nov. 14, 2014) (finding that defendant "waived its opportunity to object to the alleged impropriety of EON's closing arguments when it remained silent and let the case go to the jury")); *Pellegrin v. Larpenter*, No. Civ. A. 94-1410, 1995 WL 555595, at *1 (E.D. La. Sept. 15, 1995).

[163] *Mills v. Beech Aircraft*, 886 F.2d 758, 765 (5th Cir. 1989).

[164] *Id.*

[165] R. Doc. 555-1 at p. 36.

jury,"[166] which heard six days of testimony from both sides before deliberating on a verdict. Plaintiff has not established that the jurors' deliberations were tainted by defense counsel's comments.

The Court finds that a new trial is "not warranted," as Plaintiff's argument for new trial concerns "improper statements alone," not further and more pervasive conduct throughout trial. Considering "the comments of counsel, the counsel's trial tactics as a whole, the evidence presented, and the ultimate verdict,"[167] Plaintiff's request for a new trial is again denied.

## CONCLUSION

For the foregoing reasons;

**IT IS ORDERED** that Plaintiff's Renewed Motion for Judgment as a Matter of Law, or, in the alternative, a New Trial[168] is **DENIED**.

**New Orleans, Louisiana, this 7th day of May, 2024.**

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[166] *Dulin v. Bd. of Comm'rs of Greenwood Leflore Hosp.*, 586 F. App'x 643, 649 (5th Cir. 2014) (internal quotation marks omitted) (quoting *Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 585 (5th Cir. 1985)).
[167] *Mills v. Beech Aircraft*, 886 F.2d 758, 765 (5th Cir. 1989). *See also Alaniz*, 591 F.3d at 778.
[168] R. Doc. 555.